**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SOLID OAK SKETCHES, LLC, a Delaware limited liability company, | **CASE NO.** |
|  | **COMPLAINT FOR COPYRIGHT INFRINGEMENT** |
| Plaintiff, | |
| v. | **DEMAND FOR JURY TRIAL** |
| VISUAL CONCEPTS, LLC, a California limited liability company, and 2K GAMES, INC, a Delaware corporation, and TAKE-TWO INTERACTIVE SOFTWARE, INC, a Delaware corporation, | |
| Defendants. | |

**COMPLAINT**

Plaintiff, SOLID OAK SKETCHES, LLC ("S. OAK"), by and through undersigned counsel, hereby sues Defendants, VISUAL CONCEPTS, LLC ("VISUAL"), 2K GAMES, INC, ("2K"), and TAKE-TWO INTERACTIVE SOFTWARE, INC, ("TAKE-TWO"), and, in support thereof, state as follows:

**NATURE OF ACTION, JURISDICTION, AND VENUE**

1.      This is a civil action alleging copyright infringement.

2.      Plaintiff seeks preliminary and permanent injunctive relief in addition to appropriate damages from the Court.

3.      This action is proper under the Copyright Act of 1976, as amended, 17 U.S.C. §§ 101 *et seq.* (the "Copyright Act"). The Court has original subject matter jurisdiction pursuant to 17 U.S.C. §§ 101 *et seq.* and 28 U.S.C. §§ 1331 and 1338(a).

5.      The Court has personal jurisdiction as the principal place of business of TAKE-TWO is in the Southern District of New York. The other two defendants are properly joined under Fed. R. Civ. P 20(a)(2).

6.      Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b), as a substantial part of the events that gave rise to this Complaint, including the negotiations between the parties and the development and marketing of the infringing property, occurred in New York. In the alternative, venue is proper under 28 U.S.C. § 1391(c), as TAKE-TWO is subject to the personal jurisdiction of the Southern District of New York.

## PARTIES

7.      Plaintiff, S. OAK is a Delaware limited liability company with a principal address located at 1521 Concord Pike, Ste 301, Wilmington, DE 19803.

8.      Defendant, VISUAL is a California limited liability company with a principal address located at P.O. Box 3338, Ventura, CA 93006. The registered office address is located at 3159 Outrigger Ave, Ventura, CA 93001.

9.      Defendant, 2K is a Delaware corporation with a principal address located at 10 Hamilton Landing, Novato, CA 94949. The registered office address is located at 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833.

10.     Defendant, TAKE-TWO is a Delaware corporation with a principal address located at 622 Broadway, New York, NY 10012. The registered office address is located at 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833.

## SUBSTANTIVE ALLEGATIONS

## BACKGROUND ON 2K GAMES, INC.

11.     On September 29, 2015, 2K released its annual basketball video game titled NBA

2K16. The video game included the reproduction of several tattoo designs that are the

copyrighted intellectual property of the Plaintiff.

12.     On October 2, 2015, 2K announced that it had shipped more than four million

copies of NBA 2K16 within its first week of sales.[1] 2K also announced that the sales of digital

downloads had more than doubled from the prior year's iteration of the basketball video game.[2]

13.     The "monstrous" first week sales of NBA 2K16 were accredited to the crisp

details and real graphics, which combined with the authentic gameplay resulted in "the most

complete basketball game that 2K ever delivered.[3]

14.     NBA 2K16 was stated as having "the best launch month ever for any Sports game

on the 8th [generation of video game consoles]"[4]

15.     On social media, 2K has promoted the improved tattoo customization as a major

feature in the game.[5]

16.     Game reviewers praised NBA 2K16's improved visuals, which included smoother

looking character models and more individualized tattoos.[6]

---

[1] "NBA 2K16 Sales Figures Revealed," IGN.com, Oct. 2, 2015, available at
[2] htt"NBA 2K16 Breaks Records With 4 Million Copies Shipped in Under One Week," GameSpot.com, Oct. 2, 2015,
available at http://www.gamespot.com/articles/nba-2k16-breaks-records-with-4-million-copies-ship/1100-6431093/.
[3] "NBA 2K16 First-Week Record Sales Numbers Released," TechTimes.com, Oct. 2, 2015, available at
http://www.techtimes.com/articles/90935/20151002/nba-2k16-first-week-sales-numbers-released.htm.
[4] "September 2015 NPD Sales Analysis: NBA2K16 has the best launch for a sports game on 8th gen,"
GearNuke.com, Oct. 20, 2015, available at http://gearnuke.com/september-2015-npd-sales-analysis-nba2k16-best-
launch-sports-game-8th-gen/#.
[5] "NBA 2K16: Breaking Down Best New Features for This Year's Game," BleacherReport.com, Aug. 31, 2015,
available at http://bleacherreport.com/articles/2558410-nba-2k16-breaking-down-best-new-features-for-this-years-
game.
[6] Id. See also "NBA 2K16 Review: Stellar, but similar," Examiner.com, Sept. 25, 2015, available at
http://www.examiner.com/review/nba-2k16-review-stellar-but-similar.

## BACKGROUND ON TAKE-TWO INTERACTIVE SOFTWARE, INC.

17.    TAKE-TWO is a major developer, publisher, and marketer of interactive entertainment and video games around the globe.[7]

18.    TAKE-TWO develops and publishes products through 2K and Rockstar Games, two wholly owned labels.[8]

19.    For the second financial quarter in 2015, the quarter in which 2K released NBA 2K16, TAKE-TWO's revenue rose to $364.9 million, a 169 percent increase over the same quarter of the previous year.[9]

## BACKGROUND ON VISUAL CONCEPTS, LLC

20.    VISUAL is a subsidiary of 2K and is fully responsible for development and marketing of 2K products.[10]

## SOLID OAK SKETCHES' NEGOTIATIONS WITH DEFENDANTS

21.    On July 8, 2015, Plaintiff sent a letter to Daniel Emerson, Executive Vice President and General Counsel of TAKE-TWO, to discuss the infringing use of copyrighted tattoo designs in the NBA2K video games. *See Exhibit A.*

22.    On July 28, 2015, Plaintiff continued discussions regarding the infringing properties with Peter Welch, Senior Counsel 2K and Senior Vice-President and Associate General Counsel TAKE-TWO. *See Exhibit B.*

---

[7]  "Corporate Profile: About Take-Two Interactive Software," Take2Games.com, Jan. 12, 2016, available at http://ir.take2games.com/phoenix.zhtml?c=86428&p=irol-irhome.

[8]  *Id.*

[9]  "Take-Two revenues leap as NBA 2K16 soars," Gamasutra.com, Nov. 5, 2015, available at http://www.gamasutra.com/view/news/258619/TakeTwo_revenues_leap_as_NBA_2K16_soars.php.

[10]  Visual Concepts," IGN.com, Jan. 12, 2016, available at http://www.ign.com/companies/visual-concepts.

23. After various requests for documentation, the Defendants ultimately terminated negotiations and continued with the production of their intentionally infringing basketball video games.

## THE TATTOO DESIGNS ARE PROPER SUBJECTS FOR COPYRIGHT PROTECTION

24. Federal copyright protection, as defined by 17 U.S.C. §102(a), is available for "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."

25. This statutory requirement has been distilled into two required elements: (1) originality and (2) fixation.

26. The Supreme Court has set a low bar for originality. In *Feist Publications, Inc. v. Rural Tel. Serv. Co.* the Court stated that "[o]riginal, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." 499 U.S. 340, 345 (1991). The Court went on to state that the "vast majority of works make the grade quite easily, as they possess some creative spark." *Id.*

27. The copyrighted tattoo designs easily satisfy this standard for originality. The various designs were independently created by various authors (Shawn Rome, Justin Wright, and Tommy Ray Cornett) who have subsequently signed Copyright License Agreements with Solid Oak Sketches L.L.C. *See Exhibits C, G,* and *I; see also Paragraphs 33-38, infra.* The stylization and artistic nature of the designs is certainly sufficient to satisfy the "minimal degree of creativity" requirement. *Feist Publications, Inc.*, 499 U.S. at 345.

28. The copyrighted tattoo designs also satisfy the fixation requirement. The definitions section of the Copyright Act provides that "A work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." 17 U.S.C. §101. The copyrighted tattoo designs are imprinted permanently upon the skin of humans, clearly stable and able to be perceived for much more than a transitory duration.

29. Additionally, to be copyrightable, a subject must qualify as a "work" under the Copyright Act. 17 U.S.C. §102(a) lists eight works-of-authorship categories. Of those eight categories, tattoos are protected as copyrightable under the fifth, which covers "pictorial, graphic, and sculptural works." 17 U.S.C. §102(a)(5).

30. The definitions section of the Copyright Act provides that "pictorial, graphic, and sculptural work" includes "two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans. Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." 17 U.S.C. §101.

31. The copyrighted tattoo designs fit squarely within this statutory definition of "pictorial, graphic, and sculptural works." 17 U.S.C. §102(a)(5). Many legal authorities on copyright have offered support for this position. *See, e.g.* Yolanda M. King, *The Challenges*

*"Facing" Copyright Protection for Tattoos*, 92 Or. L. Rev. 129 (2013); *see also* Warner Bros.' Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction, Declaration of David Nimmer, ¶ 18, *Whitmill*, No. 4:11-CV-752.

32. The issue of tattoo copyrightability has yet to be decided upon in court due to numerous settlements preventing a final judicial opinion. *See, e.g., Whitmill v. Warner Bros.. and Escobedo v. THQ, Inc.* However, when presiding over the preliminary injunction phase of the *S. Victor Whitmill v. Warner Bros.* case, Judge Catherine D. Perry provided the greatest clarity thus far on the issue when she stated, "Of course tattoos can be copyrighted. I don't think there is any reasonable dispute about that . . . . [T]he tattoo itself and the design itself can be copyrighted, and I think it's entirely consistent with the copyright law." Noam Cohen, *Citing Public Interest, Judge Rules for 'Hangover II'*, THE NEW YORK TIMES (May 24 2011, 4:05pm), http://mediadecoder.blogs.nytimes.com/2011/05/24/citing-public-interest-judge-rules-for-hangover-ii/.

## THE TATTOOS ARE THE PROTECTED AND COPYRIGHTED INTELLECTUAL PROPERTY OF SOLID OAK SKETCHES, LLC

33. S. OAK entered into a Copyright License Agreement with Shawn Rome, the Licensor of the agreement, in regards to several of Rome's works. *See Exhibit C.* The Work titled "330 and Flames Tattoo Artwork" was issued a Certificate of Registration by the United States Register of Copyrights on June 08, 2015. *See Exhibit D.* The Registration Number is VA 1-969-863, with Rights and Permissions being granted to Chosen1, LLC (the former name of the Plaintiff S. OAK). *See Exhibit D.*

34. A Certificate of Registration by the United States Register of Copyrights was issued on June 08, 2015 for another of Rome's works included under this Copyright License Agreement. *See Exhibit E.* This Work was titled "Lion's Head Tattoo Artwork" *See Exhibit E.*

The Registration Number is VA 1-971-674, with Rights and Permissions being granted to Chosen1, LLC. *See Exhibit E.*

35. A third work of Rome included under the Copyright License Agreement was issued a Certificate of Registration by the United States Register of Copyrights on July 24, 2015. *See Exhibit F.* This Work was titled "Script with a scroll, clouds, and doves." *See Exhibit F.* The Registration Number is VA 1-971-878, with Rights and Permissions being granted to Chosen1, LLC. *See Exhibit F.*

36. S. OAK entered into a Copyright License Agreement with Justin Wright, the Licensor of the agreement, in regards to several of Wright's works. *See Exhibit G.* The Work titled "Child Portrait Tattoo Artwork" was issued a Certificate of Registration by the United States Register of Copyrights on June 08, 2015. *See Exhibit H.* The Registration Number is VA 1-971-672, with Rights and Permissions being granted to Chosen1, LLC. *See Exhibit H.*

37. S. OAK entered into a Copyright License Agreement with Tommy Ray Cornett, the Licensor of the agreements, in regards to several of Cornett's works. *See Exhibit I.* The Work titled "Basketball with Stars and Script" was issued a Certificate of Registration by the United States Register of Copyrights on July 24, 2015. *See Exhibit J.* The Registration Number is VA 1-971-877, with Rights and Permissions being granted to Chosen1, LLC. *See Exhibit J.*

38. United States Register of Copyrights issued a Certificate of Registration on July 24, 2015 for another of Tommy Ray Cornett's works included under this Copyright License Agreement. *See Exhibit K.* This Work was titled "Wizard." *See Exhibit K.* The Registration Number is VA 1-971-876, with Rights and Permissions being granted to Chosen1, LLC. *See Exhibit K.*

## COUNT I: COPYRIGHT INFRINGEMENT, 17 U.S.C. §§ 106(5) AND 501)

39. Plaintiff hereby re-alleges the allegations contained in the above paragraphs as if fully set forth herein and state as follows:

40. This is a count of Copyright Infringement against Defendants VISUAL, 2K, and TAKE-TWO.

41. Through their conduct averred in the previous paragraphs, Defendants have infringed Plaintiff's copyrights in their works by publicly displaying the Plaintiff's copyrighted works without authorization and in violation of 17 U.S.C. §§106(5) and 501.

42. Each infringement by Defendants of Plaintiff's protected copyrighted works creates an independent act of infringement.

43. Defendants' acts of infringement were made after a good faith attempt to negotiate licensing by the Plaintiff, and as such Defendants acted with willful disregard for the Plaintiff's rights. *See Exhibits A-B.*

44. Since the copyright infringement by the Defendants caused direct and proximate harm to the Plaintiff, the Plaintiff is entitled to damages in an amount to be determined at trial.

45. In the alternative, the Plaintiff is entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c)(2) in the amount of $150,000 per infringement.

46. Pursuant to 17 U.S.C. § 505, the Plaintiff is entitled to recover its full costs and reasonable attorney's fees.

47. As a direct and proximate result of the Defendants' actions, the Plaintiff has sustained and will continue to sustain immediate, substantial, and irreparable injury, for which there is no adequate remedy at law. Based upon their history of refusal to respect the rights of the Plaintiff, unless this Court enjoins their actions, the Defendants will continue to infringe upon the

Plaintiff's valid intellectual property rights in the copyrighted tattoo designs. As such, the Plaintiff is entitled to preliminary and permanent injunctive relief.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully requests that this Court:

(a) Grant preliminary and permanent injunctive relief against Defendants' production of the video game NBA 2K16 and against any other public displays or activities that infringe upon the Plaintiff's copyrighted works.

(b) Grant judgment against Defendants and require the Defendants to pay forthwith to Plaintiff appropriate statutory and/or monetary damages, together with interest, reasonable attorneys' fees, and costs incurred in this action.

(c) Grant any and all such further relief, in law or equity, to which this Court deems the Plaintiff is entitled.

## JURY TRIAL DEMAND

The Plaintiff demands a trial by jury on all issues.

February 1, 2016

Respectfully submitted.

By: /s/ Matthew M. Spritz
Matthew M. Spritz, Esq. (MS 9212)
32 SE 2nd Ave., #629
Delray Beach, FL 33444
mspritz@gmail.com

**HEITNER LEGAL, P.L.L.C**
*Attorney for Plaintiff*
1736 NE 7th Street
Fort Lauderdale, FL 33304
Phone: 954-558-6999
Fax: 954-927-3333

By:

DARREN A. HEITNER
Florida Bar No.: 85956
Darren@heitnerlegal.com
*Pro Hac Vice* pending

# EXHIBIT A

**C A P E S ● S O K O L ● G O O D M A N ● S A R A C H A N ● P C**

ATTORNEYS AT LAW

● **Pierre Laclede Center**
**7701 Forsyth Boulevard**
**Twelfth Floor**
**St. Louis, Missouri 63105-1818**
**Phone 314-721-7701**
**Fax 314-721-0554**
www.capessokol.com

Michael A. Kahn
314-505-5406
Fax: 314-721-0554
email: kahn@capessokol.com

July 8, 2015

*Via FedEx*

Daniel Emerson
Executive Vice President and General Counsel
Take Two Interactive Software, Inc.
622 Broadway
New York, NY 10012-2600

      Re:    NBA2K--Copyright Infringement—Tattoos on Certain NBA Players

Dear Mr. Emerson:

This law firm represents a group of tattoo artists in protecting their intellectual property rights, including the copyrights in their creations.

These artists have created a total of eight tattoos that are displayed on the following NBA athletes featured in your company's *NBA2K* videogames: LeBron James, Kobe Bryant, Eric Bledsoe, DeAndre Jordan, and Kenyon Martin. Each artist owns the copyright in his creations. Specifically, the following tattoos are reproduced and displayed in your videogame:

- LeBron James: (1) Child Portrait on his inner left forearm; (2) "Hold My Own" on his left bicep; (3) 330 Area Code on his right forearm; and (4) script with a scroll, clouds, and doves on his right forearm.
- Kobe Bryant: Crown with Butterflies on his right bicep
- Kenyon Martin: Wizard on his left shoulder
- DeAndre Jordan: Script with a Scroll on his right shoulder
- Eric Bledsoe: Basketball with Stars and Script on his right shoulder

Some of these tattoos, in particular the ones on LeBron James and Kobe Bryant, have been prominently featured on the cover photos and advertising for those games (such as, for example, NBA2K14).

Daniel Emerson
July 7, 2015
Page 2

As you probably know, tattoos are original works of art entitled to full protection of the copyright laws.[1] Thus the exclusive rights granted to these artists under Section 106 of the Copyright Act, 17 U.S.C. § 106, include the right to make copies of the tattoos; the right to distribute copies of those tattoos to the public by sale, rental, lease, or other transfer of ownership; the right to display the tattoos publicly; and the right to include copies of the tattoos in a public performance, including a videogame.

Your company has been exercising my clients' exclusive rights in their copyrights without their permission, and thus your company has been engaging in ongoing acts of copyright infringement. It would appear that your plans for the next edition of *NBA2K16* would include additional infringement of the copyrights in some or all of these tattoos.

I can assure you that my clients would prefer to resolve this matter quietly and amicably. Assuming the parties can reach an agreement as to fair compensation for the prior unlicensed uses of the tattoos and, if your company so desires, a license for future uses, my clients would be willing to include in the settlement documents an appropriate nondisclosure provision designed to maintain the confidentiality of the settlement, including its very existence.

Thus please advise if your company has an interest in exploring an amicable resolution of these matters. If so, I will be happy to provide you with any additional documentation you reasonably believe you will need.

If we are to explore an amicable resolution, however, we need to start that process promptly. Accordingly, I request a response to this letter by the close of business on Friday, July 24, 2015. If I have not heard from you by then, I will assume that your company does not wish to negotiate a business deal and we will proceed accordingly.

In the interim, please be advised that this letter is not meant to be a full statement of my clients' rights and claims, all of which are reserved.

Very truly yours,

*Michael A. Kahn*

Michael A. Kahn

---

[1] Indeed, in a prior copyright case I handled on behalf of a tattoo artist over the unauthorized use in the movie *Hangover II* of the face tattoo he created for Mike Tyson, District Judge Catherine Perry labeled as "silly" the challenge by Warner Bros. to the copyrightability of a tattoo. *Whitmill vs. Warner Bros. Entertainment Inc.*, 11-cv-00752 (E.D. Mo.).

# **<u>EXHIBIT B</u>**

# CAPES • SOKOL • GOODMAN • SARACHAN • PC

### ATTORNEYS AT LAW

• Pierre Laclede Center
7701 Forsyth Boulevard
Twelfth Floor
St. Louis, Missouri 63105-1818
Phone 314-721-7701
Fax 314-721-0554
www.capessokol.com

Michael A. Kahn
314-505-5406
Fax: 314-721-0554
email: kahn@capessokol.com

July 28, 2015

### CONFIDENTIAL SETTLEMENT COMMUNICATION

***Via email (Peter.Welch@take2games.com)***

Peter Welch
Senior Counsel, 2K
Senior Vice-President and Associate General Counsel
Take-Two Interactive Software, Inc
622 Broadway
New York, NY 10012-2600

> Re:    NBA2K--Copyright Infringement—Tattoos on Certain NBA Players

Dear Peter:

This responds to the requests for information in your email of July 21, 2015 and our telephone conversation. Please be advised as follows.

As I explained in my prior letter of July 7th, the following tattoos are reproduced and displayed in your videogames:

- LeBron James: (1) Child Portrait on his inner left forearm; (2) "Hold My Own" on his left bicep; (3) 330 Area Code on his right forearm; and (4) script with a scroll, clouds, and doves on his right forearm.
- Kobe Bryant: Crown with Butterflies on his right bicep
- Kenyon Martin: Wizard on his left shoulder
- DeAndre Jordan: Script with a Scroll on his right shoulder
- Eric Bledsoe: Basketball with Stars and Script on his right shoulder

You requested the names of the tattoo artists. They are as follows (paired with the NBA players on whom they created one or more of the above tattoos):

- Justin Wright (LeBron James)
- Shawn Rome(LeBron James)
- Tommy Ray Cornett (Eric Bledsoe and Kenyon Martin)

   

Peter Welch                                    CONFIDENTIAL SETTLEMENT COMMUNICATION
July 28, 2015
Page 2

- Robert Benedetti (Kobe Bryant)
- Leslie Hennelly (DeAndre Jordan)

You also requested information regarding which of those tattoos appeared in which video games. All of the tattoos identified above are visible in your NBA 2K14, NBA 2K15, and, we assume, in NBA 2K16, set to launch in September of this year. Additionally, relevant to the issue of damages/compensation, LeBron James was on the cover of your company's NBA 2K14, which sold over 7million units. Specifically visible on the cover were the child portrait tattoo and the script tattoo with the scroll, clouds, and doves.

You also requested information regarding the copyright applications/registrations for these tattoos. All of the tattoos are the subject of pending copyright registration applications. Those application numbers and the associated tattoos and players are set forth below:

- Child Portrait: 1-2434997252 (LeBron James)
- Lion's Head: 1-2434997137 (LeBron James)
- 330 with flames: 1-2434997101 (LeBron James)
- Script with a scroll, clouds, and doves: 1-2580753941 (LeBron James)
- Script with a Scroll: 1-2581296651 (DeAndre Jordan)
- Basketball with Stars and Script: 1-2580754257 (Eric Bledsoe)
- Wizard: 1-2580754012 (Kenyon Martin)
- Crown with Butterflies: 1-2580753967 (Kobe Bryant)

Finally, during our telephone conversation you requested our demand and an explanation of how it was calculated. Absent sales and revenue numbers from your company, we provisionally turn to the only public damage award we are aware of, which, as you may know, was the bankruptcy court's award of $22,500 to Christopher Escobedo, the tattoo artist who created the lion tattoo over the rib cage of UFC champion Carlos Condit, which was copied and displayed by THQ, Inc. in its video game, UFC UNDISPUTED, which sold 4.1 million units. Mr. Escobedo appealed that award as inadequate but settled his claim out of court for an undisclosed amount. Thus while the ultimate payment no doubt exceeded $22,500, for purposes of this initial discussion we will use that number.

Using the $22,500 and the publicly available information on your company's sales, here is what the calculations yield:

Peter Welch                                    CONFIDENTIAL SETTLEMENT COMMUNICATION
July 28, 2015
Page 3

     1.     $22,500, divided by the 4.1 million units sold, is 0.55 cents per unit. This is what Escobedo was awarded per unit. We will use that price per unit even though Mr. Condit is in a niche sport and far less familiar to the public than the NBA players here, and especially LeBron James, who is arguably the most famous U.S. athlete today.

     2.     0.55 cents, multiplied by 8—which is the total number of tattoos here— equals 4.4 cents.

     3.     We understand that NBA 2K14 and NBA 2K15 sold approximately 13 million units. At 4.4 cents per unit, the total for the eight tattoos equals $572,000.

     4.     Then there are the two LeBron James tattoos that your company featured prominently on the cover of NBA 2K14. Given that those two tattoos are "the face" of the 2014 game, their marketing and promotion value is, conservatively, at least four times the value of the rest of the tattoos. Using the 0.55 cents/unit valuation, tripling it for the added value, and multiplying that tripled amount (1.65 cents) by the 7.5 million units sold would add $123,750 for each of the two tattoos, for an additional $247,500.

     5.     Thus the total for the prior unauthorized reproductions, displays, and public disseminations of those eight tattoos equals $819,500

     6.     Additionally, my clients are willing to offer Take-Two Interactive a perpetual license for these eight tattoos for use in NBA 2K16 and every year thereafter for an additional one-time license fee of $1,144,000 (twice the amount of the two-year prior infringements of $572,000). Most of these athletes' careers, including LeBron James, will far surpass the four additional years reflected by that license fee calculation.

As noted above, these calculations are based on your company's publicly-available sales information and the only court-ordered valuation of a tattoo reproduced in a video game. If you have additional information you believe would result in a different calculation, such as, for example, other relevant license agreements, I will be happy to review and discuss them with you.

In the interim, we both understand that our correspondence is not meant to be a full statement of our respective clients' rights and claims, all of which are reserved.

     Very truly yours,

     *Michael Kahn*

     Michael A. Kahn

**EXHIBIT C**

## TATTOO ART EXCLUSIVE LICENSE AGREEMENT (ARTWORK)

This Copyright License Agreement (the "Agreement") is entered into as of April 20, 2012 (the "Effective Date") by and between Solid Oak Sketches L.L.C., a Delaware limited liability corporation which maintains an address at 1521 Concord Pike, 301, Wilmington, DE 19803 (the "Licensee"), and Shawn Rome, an individual who maintains an address at 14730 Perham Rd. Mereno Valley, CA 92553 (the "Licensor," and together with Licensee, each a "Party" and collectively the "Parties").

## RECITALS

WHEREAS, Licensor has created and performed the artwork more particularly described as LeBron James' tattoos, including "Witness" on his lower leg, "330" on his forearm, "loyalty" on his torso, a script with a scroll, clouds, and doves, on his inner-right forearm, and cloud filling on his left bicep;
(the "Artwork") [,a copy of which is attached as Exhibit A hereto and made a part hereof by reference]; and

WHEREAS, neither the Licensor nor Licensee (i) has registered or (ii) has applied for the registration of the Artwork before the U.S. Copyright Office;

WHEREAS, the Licensor has the exclusive right to license others to produce, copy, make, or sell the artwork

WHEREAS, the Licensee wants to obtain, and the Licensor has agreed to grant, an exclusive license authorizing the use of the Artwork by the Licensor subject to the terms and conditions of this Agreement; and

WHEREAS, each Party is duly authorized and capable of entering into this Agreement.

NOW THEREFORE, in consideration of the above recitals and the mutual promises and benefits contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## 1. GRANT OF LICENSE.

As of the Effective Date, the Licensor hereby grants to Licensee, and Licensee hereby accepts, an exclusive, worldwide, perpetual, irrevocable, and fully sublicensable right in and to the Artwork, in any and all media (including but not limited to electronic, broadcast, mobile, apparel, trading card(s), temporary tattoo, print, clothing, apparel,

sticker, video, and any other technology now known or that may be developed in the future, but excluding the right to tattoo a permanent tattoo rendering onto a person's skin), to store, use, reproduce, distribute, modify, adapt, publicly display, create derivative works, license and sublicense the Artwork for Licensee's benefit as an individual work or as part of a compilation.

Licensor further appoints Licensee as Licensor's exclusive agent for purposes of registering the Artwork before the United States Copyright Office ("USCO"), and agrees to provide any required information, execute any documents, including electronic communications, and perform any other acts reasonably requested by Licensee to register the Artwork before the USCO. If Licensor fails or refuses to execute and deliver to Licensee any such documents, Licensor hereby appoints Licensee as its irrevocable attorney-in-fact, with the right, but not the obligation, to do any and all acts and things necessary to execute, acknowledge and deliver such documents, in the name of and on behalf of Licensor, which appointment shall be deemed to be a power coupled with an interest and shall be irrevocable. The license shall be sublicensable, transferable, and exclusive to the Licensee.

If during the term of the Agreement Licensor creates subsequent artwork that is displayed as a tattoo upon an athlete playing in a professional league in the United States, that artwork shall be subsequently licensed by Licensee upon written notice to Licensor of intent to license as a New Artwork upon the same terms and conditions of this Agreement. Upon such notice, Licensor shall have fourteen (14) days to reject the terms of the license of the New Artwork.

## 2. FEES.

Royalties. The Licensee shall pay to the Licensor, an annual royalty of 8% (eight percent) of the Net Earnings of Licensee for any use of the Artwork sold by the Licensee or any of its subsidiaries, divisions, or affiliates. In the event the Artwork is used in a collective work that includes artwork contributions from multiple licensors who have also entered into licensing agreements with Licensee, Licensor shall receive a pro-rated royalty of 8%, shared amongst all licensors, and apportioned based on the pro rata revenue generated from such artwork(s) per licensor incorporated into the collective work. As used in this Agreement, "Net Earnings" shall mean Licensee's net earnings from sales of work utilizing the Artwork based on an item's billing price to customers or distributors, buyers including the royalty amount less:

    i.    Expenses, including agency and union fees if applicable;
    ii.    Trade discounts and marketing allowances actually given;

      iii.     Returns and Spoilage/Damages; and

      iv.     Transportation charges on returns.

Royalties shall be reported and paid annually. The royalty report deadline is thirty (30) days following the end of each calendar year.

## 3. OWNERSHIP AND USE OF ARTWORK.

<u>Ownership of Artwork</u>. The Licensee hereby acknowledges that the Licensor is the owner of the Artwork and of any associated federal copyright registrations and pending or future registrations, and that nothing in this Agreement shall give the Licensee any right, title, or interest in the Artwork other than the right to use the same in accordance with this Agreement. Notwithstanding the foregoing, the Licensor acknowledges that any and all rights that might be acquired by the Licensee because of its use of the Artwork, including copyright in derivative works, shall inure to the benefit of the Licensee.

## 4. REPRESENTATIONS AND WARRANTIES.

(a)    The Parties each represent and warrant as follows:

    A. Each Party has full power, authority, and right to perform its obligations under the Agreement; and

    B. Entering into this Agreement will not violate the charter or bylaws of either Party or any Artwork contract to which that Party is also a party.

(b)    The Licensor hereby represents and warrants as follows:

    A. It is the sole owner of all right, title, and interest in and to the Artwork;

    B. It has the sole and exclusive right to grant permission for use of the Artwork as specified in this Agreement;

    C. the Artwork is original or Licensor has obtained the necessary valid and binding permissions from all required parties and that Licensor will keep the original release and will provide a copy to Licensee if requested;

    D. It has not assigned, transferred, exclusively licensed, pledged, or otherwise encumbered the Artwork or agreed to do so;

E.  It is not aware of any violation, infringement, or misappropriation of any third party's rights or any claims of rights (including existing intellectual property rights, rights of privacy, publicity, or any other rights) by the Artwork; and

F.  It is not aware of any third-party consents, assignments, releases, or licenses that are necessary to perform under this Agreement that have not already been obtained.

## 5.  INDEMNIFICATION.

The Licensor will indemnify the Licensee against and hold it harmless from any claim, litigation, arbitration, judgments, awards, attorneys' fees, liabilities, settlements, damages, losses, and expenses relating to or arising from:

(a)  an allegation that the Artwork or its use or reproduction infringes or misappropriates any copyright or other intellectual property;

(b)  an allegation that this Agreement conflicts with, violates, or breaches any contract, assignment, license, sublicense, security interest, encumbrance, or other obligation to which the Licensor is a party; or

(c)  any past, present, or future use, licensing, sublicensing, distribution, marketing, disclosure, or commercialization of the Artwork by the Licensor.

## 6.  TERMINATION.

(a)  <u>Termination Procedures</u> The Agreement will terminate under the following conditions:

(1)  Licensee may terminate this Agreement at any time by providing Licensor with at least thirty (30) days' prior written notice;

(2)  Licensor may terminate this Agreement upon written notice if Licensee has not sold any uses of the Artwork or entered into any licensing agreement with a third party for use of the Artwork within five (5) years of the Effective Date;

(3)  Either Party may terminate the Agreement upon notice to the other Party if the other Party is in material breach of the Agreement, where the non-breaching Party provides the breaching Party notice of the breach within fourteen (14) days of knowledge of the breach, and such breach has not been cured within sixty (60) days after notice of such breach is delivered;

Either Party may terminate this Agreement at any time upon notice to the other Party if any of the following events occurs (each such event, an "Insolvency Event"): (i) the filing by the other Party of any petition in bankruptcy or for reorganization, debt consolidation, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation under bankruptcy laws or under any comparable law with respect to such Party and such petition or proceeding is not dismissed within sixty (60) days after its commencement, (ii) the appointment of a custodian (as defined under bankruptcy laws) over all or substantially all of the property of the other Party, (iii) the adjudication that the other Party is insolvent or bankrupt, (iv) the other Party's making of an assignment of its assets for the benefit of creditors, or the application of the other Party for the appointment of a receiver or a trustee of its assets or (v) the failure of the other Party to pay its debts in the ordinary course as they become due

## 7. SUCCESSORS AND ASSIGNS.

This Agreement shall be binding upon and inure to the benefit of the parties and their successors and assigns.

## 8. NO IMPLIED WAIVER.

The failure or delay of either party to exercise any right, power or privilege under this Agreement or the failure to strictly enforce any breach or default, shall not constitute a waiver with respect to it. No waiver shall be deemed to have been made unless expressed in writing and signed by the party against whom the waiver is to be charged.

## 9. NO AGENCY RELATIONSHIP.

This Agreement creates a licensor-licensee relationship between the Parties. Nothing in this Agreement shall be construed to establish a joint venture, agency, or partnership relationship between the Parties.

## 10. GOVERNING LAW.

This Agreement shall be governed by the laws of the state of Illinois. The parties agree that any civil action or proceeding to enforce any term(s) of this Agreement may be filed either in the federal or state courts in Chicago, Illinois and the parties consent to the jurisdictions of those courts.

## 11. COUNTERPARTS/ELECTRONIC SIGNATURES.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. In

making proof of this Agreement it shall not be necessary to produce or account for more than one counterpart.

## 12. SEVERABILITY.

In the event that any portion, word, clause, phrase, sentence or paragraph of this Agreement is declared void or unenforceable, such portion shall be considered independent and severable from the remainder hereof, the validity of which shall remain unaffected.

## 13. ENTIRE AGREEMENT.

This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes any and all prior and contemporaneous agreements or understandings relating to the subject matter of this Agreement.  This Agreement may not be amended or modified except by an agreement in writing signed by both Parties.

## 14. HEADINGS.

Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Effective Date.

**LICENSOR**

By: _____

Name: Shawn Rome


**LICENSEE**          Solid Oak Sketches, LLC

By: _____

Name: Matthew Siegler

Title: Founder

# **EXHIBIT D**

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**

## VA 1-969-863

**Effective Date of Registration:**
June 08, 2015

## Title

**Title of Work:**   330 and Flames Tattoo Artwork

## Completion/Publication

**Year of Completion:**   2002
**Date of 1st Publication:**   July 15, 2002
**Nation of 1st Publication:**   United States

## Author

- **Author:**   Shawn Rome
  **Author Created:**   2-D artwork
  **Work made for hire:**   No
  **Citizen of:**   United States

## Copyright Claimant

**Copyright Claimant:**   Shawn Rome
14730 Perham Rd., Mereno Valley, CA 92553

## Limitation of copyright claim

**Material excluded from this claim:**   Prior 2-D artwork

**New material included in claim:**   2-D artwork

## Rights and Permissions

**Organization Name:**   Chosen1, LLC
**Email:**   siegler.matt@gmail.com
**Telephone:**   (404)824-4343
**Address:**   1735 W. Diversey Pkwy.
#218
Chicago, IL 60614 United States

## Certification

**Name:**   Benjamin Gilford

**Date:**   June 08, 2015
**Applicant's Tracking Number:**   155913.010100-F____

**Correspondence:**   Yes

# **EXHIBIT E**

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code,*
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**

## VA 1-971-674

**Effective Date of Registration:**
June 08, 2015

---

## Title
_____

**Title of Work:**   Lion's Head Tattoo Artwork

## Completion/Publication
_____

**Year of Completion:**   2000
**Date of 1st Publication:**   March 15, 2000
**Nation of 1st Publication:**   United States

## Author
_____

- **Author:**   Shawn Rome
  **Author Created:**   2-D artwork
  **Citizen of:**   United States

## Copyright Claimant
_____

**Copyright Claimant:**   Shawn Rome
14730 Perham Rd., Mereno Valley, CA 92553

## Rights and Permissions
_____

**Organization Name:**   Chosen1, LLC
**Email:**   siegler.matt@gmail.com
**Telephone:**   (404)824-4343
**Address:**   1735 W. Diversey Pkwy.
#218
Chicago, IL 60614 United States

## Certification
_____

**Name:**   Benjamin Gilford
**Date:**   June 08, 2015
**Applicant's Tracking Number:**   155913.010100-F___

**Registration #:** VA0001971674
**Service Request #:** 1-2434997137



Greenberg Traurig, LLP
Benjamin Gilford
77 West Wacker Drive
Suite 3100
Chicago, IL 60601 United States

# **EXHIBIT F**

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code,*
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**

## VA 1-971-878

**Effective Date of Registration:**
July 24, 2015

---

## Title

**Title of Work:** Script with a scroll, clouds, and doves

## Completion/Publication

**Year of Completion:** 2001
**Date of 1st Publication:** December 15, 2001
**Nation of 1ˢᵗ Publication:** United States

## Author

• **Author:** Shawn Rome
**Author Created:** 2-D artwork
**Work made for hire:** No
**Citizen of:** United States

## Copyright Claimant

**Copyright Claimant:** Shawn Rome
14730 Perham Rd., Mereno Valley, CA 92553

## Rights and Permissions

**Organization Name:** Chosen1, LLC
**Email:** siegler.matt@gmail.com
**Telephone:** (404)824-4343
**Address:** 1735 W. Diversey Pkwy.
#218
Chicago, IL 60614 United States

## Certification

**Name:** Benjamin Gilford
**Date:** July 24, 2015
**Applicant's Tracking Number:** 155913.010100-F___

Page 1 of 2

**Registration #:**   VA0001971878
**Service Request #:**   1-2580753941



Greenberg Traurig, LLP
Benjamin Gilford
77 West Wacker Drive
Suite 3100
Chicago, IL 60601 United States

# **EXHIBIT G**

## TATTOO ART EXCLUSIVE LICENSE AGREEMENT (ARTWORK)

This Copyright License Agreement (the "Agreement") is entered into as of April 20, 2012 (the "Effective Date") by and between Solid Oak Sketches L.L.C., a Delaware limited liability corporation which maintains an address at 1521 Concord Pike, 301, Wilmington, DE 19803 (the "Licensee"), and Justin Wright, an individual who maintains an address at 24525 Sprague Rd. Columbia Station, OH 44028 (the "Licensor," and together with Licensee, each a "Party" and collectively the "Parties").

## RECITALS

**WHEREAS,** Licensor has created and performed the artwork more particularly described as LeBron James' tattoos, including a child portrain on his inner-left forearm and lettering on this top of his hands;
(the "Artwork") [,a copy of which is attached as <u>Exhibit A</u> hereto and made a part hereof by reference]; and

**WHEREAS,** neither the Licensor nor Licensee (i) has registered or (ii) has applied for the registration of the Artwork before the U.S. Copyright Office;

**WHEREAS,** the Licensor has the exclusive right to license others to produce, copy, make, or sell the artwork

**WHEREAS,** the Licensee wants to obtain, and the Licensor has agreed to grant, an exclusive license authorizing the use of the Artwork by the Licensor subject to the terms and conditions of this Agreement; and

**WHEREAS,** each Party is duly authorized and capable of entering into this Agreement.

**NOW THEREFORE,** in consideration of the above recitals and the mutual promises and benefits contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## 1. GRANT OF LICENSE.

As of the Effective Date, the Licensor hereby grants to Licensee, and Licensee hereby accepts, an exclusive, worldwide, perpetual, irrevocable, and fully sublicensable right in and to the Artwork, in any and all media (including but not limited to electronic, broadcast, mobile, apparel, trading card(s), temporary tattoo, print, clothing, apparel, sticker, video, and any other technology now known or that may be developed in the future, but excluding the right to tattoo a permanent tattoo rendering onto a person's

skin), to store, use, reproduce, distribute, modify, adapt, publicly display, create derivative works, license and sublicense the Artwork for Licensee's benefit as an individual work or as part of a compilation.

Licensor further appoints Licensee as Licensor's exclusive agent for purposes of registering the Artwork before the United States Copyright Office ("USCO"), and agrees to provide any required information, execute any documents, including electronic communications, and perform any other acts reasonably requested by Licensee to register the Artwork before the USCO.  If Licensor fails or refuses to execute and deliver to Licensee any such documents, Licensor hereby appoints Licensee as its irrevocable attorney-in-fact, with the right, but not the obligation, to do any and all acts and things necessary to execute, acknowledge and deliver such documents, in the name of and on behalf of Licensor, which appointment shall be deemed to be a power coupled with an interest and shall be irrevocable.  The license shall be sublicensable, transferable, and exclusive to the Licensee.

If during the term of the Agreement Licensor creates subsequent artwork that is displayed as a tattoo upon an athlete playing in a professional league in the United States, that artwork shall be subsequently licensed by Licensee upon written notice to Licensor of intent to license as a New Artwork upon the same terms and conditions of this Agreement.  Upon such notice, Licensor shall have fourteen (14) days to reject the terms of the license of the New Artwork.

## 2.  FEES.

<u>Royalties</u>. The Licensee shall pay to the Licensor, an annual royalty of 8% (eight percent) of the Net Earnings of Licensee for any use of the Artwork sold by the Licensee or any of its subsidiaries, divisions, or affiliates.  In the event the Artwork is used in a collective work that includes artwork contributions from multiple licensors who have also entered into licensing agreements with Licensee, Licensor shall receive a pro-rated royalty of 8%, shared amongst all licensors, and apportioned based on the pro rata revenue generated from such artwork(s) per licensor incorporated into the collective work.  As used in this Agreement, "Net Earnings" shall mean Licensee's net earnings from sales of work utilizing the Artwork based on an item's billing price to customers or distributors, buyers including the royalty amount less:

    i.      Expenses, including agency and union fees if applicable;
   ii.      Trade discounts and marketing allowances actually given;
  iii.      Returns and Spoilage/Damages; and
  iv.      Transportation charges on returns.

Royalties shall be reported and paid annually. The royalty report deadline is thirty (30) days following the end of each calendar year.

### 3. OWNERSHIP AND USE OF ARTWORK.

<u>Ownership of Artwork</u>. The Licensee hereby acknowledges that the Licensor is the owner of the Artwork and of any associated federal copyright registrations and pending or future registrations, and that nothing in this Agreement shall give the Licensee any right, title, or interest in the Artwork other than the right to use the same in accordance with this Agreement. Notwithstanding the foregoing, the Licensor acknowledges that any and all rights that might be acquired by the Licensee because of its use of the Artwork, including copyright in derivative works, shall inure to the benefit of the Licensee.

### 4. REPRESENTATIONS AND WARRANTIES.

(a)   The Parties each represent and warrant as follows:

A. Each Party has full power, authority, and right to perform its obligations under the Agreement; and

B. Entering into this Agreement will not violate the charter or bylaws of either Party or any Artwork contract to which that Party is also a party.

(b)   The Licensor hereby represents and warrants as follows:

A. It is the sole owner of all right, title, and interest in and to the Artwork;

B. It has the sole and exclusive right to grant permission for use of the Artwork as specified in this Agreement;

C. the Artwork is original or Licensor has obtained the necessary valid and binding permissions from all required parties and that Licensor will keep the original release and will provide a copy to Licensee if requested;

D. It has not assigned, transferred, exclusively licensed, pledged, or otherwise encumbered the Artwork or agreed to do so;

E. It is not aware of any violation, infringement, or misappropriation of any third party's rights or any claims of rights (including existing intellectual property rights, rights of privacy, publicity, or any other rights) by the Artwork; and

F. It is not aware of any third-party consents, assignments, releases, or licenses that are necessary to perform under this Agreement that have not already been obtained.

## 5. INDEMNIFICATION.

The Licensor will indemnify the Licensee against and hold it harmless from any claim, litigation, arbitration, judgments, awards, attorneys' fees, liabilities, settlements, damages, losses, and expenses relating to or arising from:

(a) an allegation that the Artwork or its use or reproduction infringes or misappropriates any copyright or other intellectual property;

(b) an allegation that this Agreement conflicts with, violates, or breaches any contract, assignment, license, sublicense, security interest, encumbrance, or other obligation to which the Licensor is a party; or

(c) any past, present, or future use, licensing, sublicensing, distribution, marketing, disclosure, or commercialization of the Artwork by the Licensor.

## 6. TERMINATION.

(a) Termination Procedures The Agreement will terminate under the following conditions:

(1) Licensee may terminate this Agreement at any time by providing Licensor with at least thirty (30) days' prior written notice;

(2) Licensor may terminate this Agreement upon written notice if Licensee has not sold any uses of the Artwork or entered into any licensing agreement with a third party for use of the Artwork within five (5) years of the Effective Date;

(3) Either Party may terminate the Agreement upon notice to the other Party if the other Party is in material breach of the Agreement, where the non-breaching Party provides the breaching Party notice of the breach within fourteen (14) days of knowledge of the breach, and such breach has not been cured within sixty (60) days after notice of such breach is delivered;

Either Party may terminate this Agreement at any time upon notice to the other Party if any of the following events occurs (each such event, an "Insolvency Event"): (i) the filing by the other Party of any petition in bankruptcy or for reorganization, debt consolidation, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation under bankruptcy laws or under any comparable law with respect to such Party and such petition or proceeding is not dismissed within sixty (60) days after its commencement, (ii) the appointment of a custodian (as defined under bankruptcy laws) over all or substantially of the property of the other Party, (iii) the adjudication that the other Party is insolvent or bankrupt, (iv) the other Party's making of an assignment of its assets for the benefit of creditors, or the application of the other Party for the appointment of a receiver or a trustee of its assets or (v) the failure of the other Party to pay its debts in the ordinary course as they become due

## 7. SUCCESSORS AND ASSIGNS.

This Agreement shall be binding upon and inure to the benefit of the parties and their successors and assigns.

## 8. NO IMPLIED WAIVER.

The failure or delay of either party to exercise any right, power or privilege under this Agreement or the failure to strictly enforce any breach or default, shall not constitute a waiver with respect to it. No waiver shall be deemed to have been made unless expressed in writing and signed by the party against whom the waiver is to be charged.

## 9. NO AGENCY RELATIONSHIP.

This Agreement creates a licensor-licensee relationship between the Parties. Nothing in this Agreement shall be construed to establish a joint venture, agency, or partnership relationship between the Parties.

## 10. GOVERNING LAW.

This Agreement shall be governed by the laws of the state of Illinois. The parties agree that any civil action or proceeding to enforce any term(s) of this Agreement may be filed either in the federal or state courts in Chicago, Illinois and the parties consent to the jurisdictions of those courts.

## 11. COUNTERPARTS/ELECTRONIC SIGNATURES.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. In

making proof of this Agreement it shall not be necessary to produce or account for more than one counterpart.

## 12. SEVERABILITY.

In the event that any portion, word, clause, phrase, sentence or paragraph of this Agreement is declared void or unenforceable, such portion shall be considered independent and severable from the remainder hereof, the validity of which shall remain unaffected.

## 13. ENTIRE AGREEMENT.

This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes any and all prior and contemporaneous agreements or understandings relating to the subject matter of this Agreement.  This Agreement may not be amended or modified except by an agreement in writing signed by both Parties.

## 14. HEADINGS.

Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Effective Date.

**LICENSOR**

By: _____

Name: Justin Wright

**LICENSEE**                Solid Oak Sketches, LLC

By: _____

Name: Matthew Siegler

Title: Founder

## EXHIBIT H

Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**

# VA 1-971-672

**Effective Date of Registration:**
June 08, 2015

## Title

**Title of Work:**  Child Portrait Tattoo Artwork

## Completion/Publication

**Year of Completion:**  2006
**Date of 1st Publication:**  May 01, 2006
**Nation of 1st Publication:**  United States

## Author

- **Author:**  Justin Wright
  **Author Created:**  2-D artwork
  **Citizen of:**  United States

## Copyright Claimant

**Copyright Claimant:**  Justin Wright
24525 Sprague Rd., Columbia Station, OH 44028

## Rights and Permissions

**Organization Name:**  Chosen1, LLC
**Email:**  siegler.matt@gmail.com
**Telephone:**  (404)824-4343
**Address:**  1735 W. Diversey Pkwy.
#218
Chicago, IL 60614 United States

## Certification

**Name:**  Benjamin Gilford
**Date:**  June 08, 2015
**Applicant's Tracking Number:**  155913.010100-F____

Page 1 of 2

**Registration #:**   VA0001971672
**Service Request #:**   1-2434997252



Greenberg Traurig, LLP
Benjamin Gilford
77 West Wacker Drive
Suite 3100
Chicago, IL 60601 United States

# EXHIBIT I

## TATTOO ART EXCLUSIVE LICENSE AGREEMENT (ARTWORK)

This Copyright License Agreement (the "Agreement") is entered into as of August 10, 2012 (the "Effective Date") by and between Solid Oak Sketches L.L.C., a Delaware limited liability corporation which (the "Licensee"), and Tommy Ray Cornett (the "Licensor," and together with Licensee, each a "Party" and collectively the "Parties").

### RECITALS

**WHEREAS,** Licensor has created and performed the artwork more particularly described as follows: Deandre Liggins, Demarcus Cousins, Eric Bledsoe, and Kenyon Martin tattoos (the "Artwork") [,a copy of which is attached as <u>Exhibit A</u> hereto and made a part hereof by reference]; and

**WHEREAS,** neither the Licensor nor Licensee (i) has registered or (ii) has applied for the registration of the Artwork before the U.S. Copyright Office;

**WHEREAS,** the Licensor has the exclusive right to license others to produce, copy, make, or sell the artwork

**WHEREAS,** the Licensee wants to obtain, and the Licensor has agreed to grant, an exclusive license authorizing the use of the Artwork by the Licensor subject to the terms and conditions of this Agreement; and

**WHEREAS,** each Party is duly authorized and capable of entering into this Agreement. and

**WHEREAS** this agreement is only valid so long as the professional athletes whose tattoos are represented authorize their right of publicity to be used by any party attempting to gain any form of monies from said tattoos,

**NOW THEREFORE,** in consideration of the above recitals and the mutual promises and benefits contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

### 1. GRANT OF LICENSE.

As of the Effective Date, the Licensor hereby grants to Licensee, and Licensee hereby accepts, an exclusive,  worldwide, perpetual, irrevocable, and fully sublicensable right in and to the Artwork, in any and all media (including but not limited to electronic, broadcast, mobile, apparel, trading card(s), temporary tattoo, print, clothing, apparel, sticker, video, and any other technology now known or that may be developed in the future, but excluding the right to tattoo a permanent tattoo rendering onto a person's skin), to store, use, reproduce, distribute, modify, adapt, publicly display, create

derivative works, license and sublicense the Artwork for Licensee's benefit as an individual work or as part of a compilation.

Licensor further appoints Licensee as Licensor's exclusive agent for purposes of registering the Artwork before the United States Copyright Office ("USCO"), and agrees to provide any required information, execute any documents, including electronic communications, and perform any other acts reasonably requested by Licensee to register the Artwork before the USCO.  If Licensor fails or refuses to execute and deliver to Licensee any such documents, Licensor hereby appoints Licensee as its irrevocable attorney-in-fact, with the right, but not the obligation, to do any and all acts and things necessary to execute, acknowledge and deliver such documents, in the name of and on behalf of Licensor, which appointment shall be deemed to be a power coupled with an interest and shall be irrevocable.  The license shall be sublicensable, transferable, and exclusive to the Licensee.

If during the term of the Agreement Licensor creates subsequent artwork that is displayed as a tattoo upon an athlete playing in a professional league in the United States, that artwork shall be subsequently licensed by Licensee upon written notice to Licensor of intent to license as a New Artwork upon the same terms and conditions of this Agreement.  Upon such notice, Licensor shall have fourteen (14) days to reject the terms of the license of the New Artwork.

2.  **FEES.**

_Royalties_. The Licensee shall pay to the Licensor, an annual royalty of 8% (eight percent) of the Net Earnings of Licensee for any use of the Artwork sold by the Licensee or any of its subsidiaries, divisions, or affiliates.  In the event the Artwork is used in a collective work that includes artwork contributions from multiple licensors who have also entered into licensing agreements with Licensee, Licensor shall receive a pro-rated royalty of 8%, shared amongst all licensors, and apportioned based on the pro rata revenue generated from such artwork(s) per licensor incorporated into the collective work.  As used in this Agreement, "Net Earnings" shall mean Licensee's net earnings from sales of work utilizing the Artwork based on an item's billing price to customers or distributors, buyers including the royalty amount less:

i.      Expenses, including agency and union fees if applicable;
ii.     Trade discounts and marketing allowances actually given;
iii.    Returns and Spoilage/Damages; and
iv.     Transportation charges on returns.

Royalties shall be reported and paid annually. The royalty report deadline is thirty (30) days following the end of each calendar year.

## 3. OWNERSHIP AND USE OF ARTWORK.

Ownership of Artwork. The Licensee hereby acknowledges that the Licensor is the owner of the Artwork and of any associated federal copyright registrations and pending or future registrations, and that nothing in this Agreement shall give the Licensee any right, title, or interest in the Artwork other than the right to use the same in accordance with this Agreement._Notwithstanding the foregoing, the Licensor acknowledges that any and all rights that might be acquired by the Licensee because of its use of the Artwork, including copyright in derivative works, shall inure to the benefit of the Licensee.

## 4. REPRESENTATIONS AND WARRANTIES.

(a)   The Parties each represent and warrant as follows:

A.   Each Party has full power, authority, and right to perform its obligations under the Agreement; and

B.   Entering into this Agreement will not violate the charter or bylaws of either Party or any Artwork contract to which that Party is also a party.

(b)   The Licensor hereby represents and warrants as follows:

A.   It is the sole owner of all right, title, and interest in and to the Artwork;

B.   It has the sole and exclusive right to grant permission for use of the Artwork as specified in this Agreement;

C.   the Artwork is original or Licensor has obtained the necessary valid and binding permissions from all required parties and that Licensor will keep the original release and will provide a copy to Licensee if requested;

D.   It has not assigned, transferred, exclusively licensed, pledged, or otherwise encumbered the Artwork or agreed to do so;

E.   It is not aware of any violation, infringement, or misappropriation of any third party's rights or any claims of rights (including existing

intellectual property rights, rights of privacy, publicity, or any other rights) by the Artwork; and

F.  It is not aware of any third-party consents, assignments, releases, or licenses that are necessary to perform under this Agreement that have not already been obtained.

## 5.  INDEMNIFICATION.

The Licensor will indemnify the Licensee against and hold it harmless from any claim, litigation, arbitration, judgments, awards, attorneys' fees, liabilities, settlements, damages, losses, and expenses relating to or arising from:

(a)  an allegation that the Artwork or its use or reproduction infringes or misappropriates any copyright or other intellectual property;

(b)  an allegation that this Agreement conflicts with, violates, or breaches any contract, assignment, license, sublicense, security interest, encumbrance, or other obligation to which the Licensor is a party; or

(c)  any past, present, or future use, licensing, sublicensing, distribution, marketing, disclosure, or commercialization of the Artwork by the Licensor.

## 6.  TERMINATION.

(a)  Termination Procedures The Agreement will terminate under the following conditions:

(1)  Licensee may terminate this Agreement at any time by providing Licensor with at least thirty (30) days' prior written notice;

(2)  Licensor may terminate this Agreement upon written notice if Licensee has not sold any uses of the Artwork or entered into any licensing agreement with a third party for use of the Artwork within five (5) years of the Effective Date;

(3)  Either Party may terminate the Agreement upon notice to the other Party if the other Party is in material breach of the Agreement, where the non-breaching Party provides the breaching Party notice of the breach within fourteen (14) days of knowledge of the breach, and such breach has not been cured within sixty (60) days after notice of such breach is delivered;

Either Party may terminate this Agreement at any time upon notice to the other Party if any of the following events occurs (each such event, an "Insolvency Event"): (i) the filing by the other Party of any petition in bankruptcy or for reorganization, debt consolidation,

adjustment of debt, relief of debtors, dissolution, insolvency or liquidation under bankruptcy laws or under any comparable law with respect to such Party and such petition or proceeding is not dismissed within sixty (60) days after its commencement, (ii) the appointment of a custodian (as defined under bankruptcy laws) over all or substantially of the property of the other Party, (iii) the adjudication that the other Party is insolvent or bankrupt, (iv) the other Party's making of an assignment of its assets for the benefit of creditors, or the application of the other Party for the appointment of a receiver or a trustee of its assets or (v) the failure of the other Party to pay its debts in the ordinary course as they become due

## 7.  SUCCESSORS AND ASSIGNS.

This Agreement shall be binding upon and inure to the benefit of the parties and their successors and assigns.

## 8.  NO IMPLIED WAIVER.

The failure or delay of either party to exercise any right, power or privilege under this Agreement or the failure to strictly enforce any breach or default, shall not constitute a waiver with respect to it.  No waiver shall be deemed to have been made unless expressed in writing and signed by the party against whom the waiver is to be charged.

## 9.  NO AGENCY RELATIONSHIP.

This Agreement creates a licensor-licensee relationship between the Parties. Nothing in this Agreement shall be construed to establish a joint venture, agency, or partnership relationship between the Parties.

## 10. GOVERNING LAW.

This Agreement shall be governed by the laws of the state of Illinois.  The parties agree that any civil action or proceeding to enforce any term(s) of this Agreement may be filed either in the federal or state courts in Chicago, Illinois and the parties consent to the jurisdictions of those courts.

## 11. COUNTERPARTS/ELECTRONIC SIGNATURES.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. In making proof of this Agreement it shall not be necessary to produce or account for more than one counterpart.

## 12. SEVERABILITY.

In the event that any portion, word, clause, phrase, sentence or paragraph of this Agreement is declared void or unenforceable, such portion shall be considered independent and severable from the remainder hereof, the validity of which shall remain unaffected.

## 13. ENTIRE AGREEMENT.

This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes any and all prior and contemporaneous agreements or understandings relating to the subject matter of this Agreement.  This Agreement may not be amended or modified except by an agreement in writing signed by both Parties.

## 14. HEADINGS.

Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Effective Date. 10·16·16

LICENSOR                [LICENSOR NAME]

THOMAS RAM CURNETT

By:
Name:
Title:

LICENSEE                Solid Oak Sketches, LLC

By:
Name:   Matt  Siegler
Title:

7

*Copyright License Agreement*
*(Artwork)*
C1187139.2
666666-55555

# **EXHIBIT J**

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**

## VA 1-971-877

**Effective Date of Registration:**
July 24, 2015

---

## Title

**Title of Work:** Basketball with Stars and Script

## Completion/Publication

**Year of Completion:** 2005
**Date of 1st Publication:** April 01, 2005
**Nation of 1st Publication:** United States

## Author

- **Author:** Tommy Ray Cornett
  **Author Created:** 2-D artwork
  **Work made for hire:** No
  **Citizen of:** United States

## Copyright Claimant

**Copyright Claimant:** Tommy Ray Cornett
527 S Upper St, Lexington, KY 40508

## Limitation of copyright claim

**Material excluded from this claim:** Prior 2-D artwork and text

**New material included in claim:** 2-D artwork

## Rights and Permissions

**Organization Name:** Chosen1, LLC
**Email:** siegler.matt@gmail.com
**Telephone:** (404)824-4343
**Address:** 1735 W. Diversey Pkwy.
#218
Chicago, IL 60614 United States

## Certification

**Name:** Benjamin Gilford

**Registration #:**   VA0001971877
**Service Request #:**   1-2580754257



Greenberg Traurig, LLP
Benjamin Gilford
77 West Wacker Drive
Suite 3100
Chicago, IL 60601 United States

# **EXHIBIT K**

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**

## VA 1-971-876

**Effective Date of Registration:**
July 24, 2015

---

## Title

**Title of Work:** Wizard

---

## Completion/Publication

**Year of Completion:** 1998
**Date of 1st Publication:** September 01, 1998
**Nation of 1st Publication:** United States

---

## Author

- **Author:** Tommy Ray Cornett
  **Author Created:** 2-D artwork
  **Work made for hire:** No
  **Citizen of:** United States

---

## Copyright Claimant

**Copyright Claimant:** Tommy Ray Cornett
527 S Upper St, Lexington, KY 40508

---

## Rights and Permissions

**Organization Name:** Chosen1, LLC
**Email:** siegler.matt@gmail.com
**Telephone:** (404)824-4343
**Address:** 1735 W. Diversey Pkwy.
#218
Chicago, IL 60614 United States

---

## Certification

**Name:** Benjamin Gilford
**Date:** July 24, 2015
**Applicant's Tracking Number:** 155913.010100-F___

**Registration #:**  VA0001971876
**Service Request #:**  1-2580754012



Greenberg Traurig, LLP
Benjamin Gilford
77 West Wacker Drive
Suite 3100
Chicago, IL 60601 United States