Dale M. Cendali
Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
dale.cendali@kirkland.com
joshua.simmons@kirkland.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SOLID OAK SKETCHES, LLC, | CASE NO. 1:16-cv-724(LTS)(RLE) |
| Plaintiff-Counter-Defendant, | ECF Case |
| v. | |
| 2K GAMES, INC. AND TAKE-TWO INTERACTIVE SOFTWARE, INC., | |
| Defendants-Counterclaimants. | |

## DEFENDANTS' ANSWER AND COUNTERCLAIMS

Defendants and Counterclaimants 2K Games, Inc. ("2K") and Take-Two Interactive

Software, Inc. ("Take-Two") (collectively, "Defendants" or "Counterclaimants") created a series

of video games set in a virtual world that realistically depict NBA players playing simulated

basketball games.  Plaintiff and Counter-Defendant Solid Oak Sketches, LLC ("Solid Oak")

claims to be the exclusive licensee of six tattoos that appear on three players depicted in

Defendants' games—LeBron James, Eric Bledsoe, and Kenyon Martin—and asserts that, by

accurately depicting the players with their tattoos as a negligible component of Defendants' much larger work, Defendants somehow infringed the tattoos' copyrights.

Copyright law does not stretch so far. Indeed, if Solid Oak were correct, it would mean that anyone appearing in public, on a television program, or in an advertisement would need to license the display of their tattoos. This is not the law and, if it were, it would be an encroachment on basic human rights. As stated below, in this case, Defendants' actions are justified by various defenses. In particular, Defendants' creation of the *NBA 2K* video game series constitutes *de minimis* use and fair use under the Copyright Act. Moreover, counsel for Solid Oak and the tattooists made material misrepresentations concerning the tattoos to the Copyright Office, which constitutes fraud on the Copyright Office. Indeed, for at least one of the tattoos, the deposit copy presented to the Copyright Office did not depict the work that was registered, but rather a different tattoo created years later.

For these reasons, Defendants, by and through their attorneys, Kirkland & Ellis LLP, hereby answer the First Amended Complaint of Plaintiff Solid Oak Sketches, LLC ("Solid Oak"), dated April 6, 2016, ("Amended Complaint") as follows:

## NATURE OF ACTION, JURISDICTION, AND VENUE

1.      State that the allegations set forth in Paragraph 1 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, state that the Amended Complaint purports to assert a claim for copyright infringement.

2.      State that the allegations set forth in Paragraph 2 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, state that the Amended Complaint seeks injunctive relief and damages.

3.      State that the allegations set forth in Paragraph 3 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, admits that Plaintiff's Complaint purports to assert claims against Defendants based on the Copyright Act.

4.      State that the Amended Complaint does not contain a Paragraph 4.

5.      State that the allegations set forth in Paragraph 5 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, admit that Take-Two's principal place of business is in the Southern District of New York.  Defendants further state that there are only two defendants that have been served in this action—Take-Two and 2K—and thus deny the allegation that there are two "other" defendants in addition to Take-Two.

6.      State that the allegations set forth in Paragraph 6 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, deny the allegations set forth in Paragraph 6 of the Amended Complaint.

7.      Deny knowledge or information sufficient to form a belief as to the allegations set forth in Paragraph 7 of the Amended Complaint.

8.      Deny knowledge or information sufficient to form a belief as to the allegations set forth in Paragraph 8 of the Amended Complaint because they are not aware of an entity named "Visual Concepts, Inc."  Defendants also note that no entity named Visual Concepts, Inc. is related to their businesses and that no entity related to their businesses other than Take-Two and 2K has been served in this action.

9.      Admit the allegations set forth in Paragraph 9 of the Amended Complaint.

10.      Admit the allegations set forth in Paragraph 10 of the Amended Complaint.

11.     State that the allegations set forth in Paragraph 11 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, deny the allegations set forth in Paragraph 11, except admit that *NBA 2K16* was released on September 29, 2015 and that it is the newest version of the *NBA 2K* video game series.

12.     Admit the allegations set forth in Paragraph 12 of the Amended Complaint.

13.     Deny the allegations set forth in Paragraph 13 of the Amended Complaint, except state that, to the extent that the Complaint quotes from the article cited in Footnote 3, the article speaks for itself.

14.     State that, to the extent that Paragraph 14 of the Amended Complaint quotes from the article cited in Footnote 4, the article speaks for itself.

15.     Deny the allegations set forth in Paragraph 15 of the Amended Complaint, except admit that 2K has promoted *NBA 2K16's* MyCAREER mode, one component of which allows players to create MyPLAYER characters with certain tattoos, but note that the tattoos available in MyCAREER mode do not include the tattoos at issue in this litigation.

16.     Deny the allegations set forth in Paragraph 16 of the Amended Complaint, except state that, to the extent the Amended Complaint quotes from the article cited in Footnote 6, the article speaks for itself.

17.     Admit the allegations set forth in Paragraph 17 of the Amended Complaint.

18.     Admit the allegations set forth in Paragraph 18 of the Amended Complaint.

19.     Admit the allegations set forth in Paragraph 19 of the Amended Complaint, but state that the revenue increase was due primarily to an increase in revenue from video games other than *NBA 2K16*.

20.     Deny the allegations set forth in Paragraph 20 of the Amended Complaint.

21.     Deny the allegations set forth in Paragraph 21 of the Amended Complaint, except admit that Solid Oak sent a letter to Daniel Emerson, dated July 7, 2015, which claimed that Take-Two's *NBA 2K* video games infringed copyrighted tattoo designs.

22.     Deny the allegations set forth in Paragraph 22 of the Amended Complaint, except admit that the letter attached to the Complaint as Exhibit B dated July 28, 2015 is addressed and was sent to Peter Welch.

23.     State that the allegations set forth in Paragraph 23 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, deny the allegations set forth in Paragraph 23, except admit that Defendants requested documentation of claims made by Solid Oak, Defendants did not agree to Solid Oak's settlement terms, and Defendants released *NBA 2K16*.

24.     State that the allegations set forth in Paragraph 24 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, state that 17 U.S.C. § 102 speaks for itself.

25.     State that the allegations set forth in Paragraph 25 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary.

26.     State that the allegations set forth in Paragraph 26 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, state that the *Feist Publications, Inc. v. Rural Telephone Service Co.* opinion speaks for itself.

27.     State that the allegations set forth in Paragraph 27 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any

response is required, deny knowledge or information sufficient to form a belief as to the allegations set forth in Paragraph 27 of the Amended Complaint, except admit that each document attached to the Complaint as Exhibits C, G, and I is titled "Tattoo Art Exclusive License Agreement (Artwork)."

28.     State that the allegations set forth in Paragraph 28 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, deny knowledge or information sufficient to form a belief as to the allegations set forth in Paragraph 28 of the Amended Complaint, and state that 17 U.S.C. § 101 speaks for itself.

29.     State that the allegations set forth in Paragraph 29 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, state that 17 U.S.C. § 102 speaks for itself.

30.     State that the allegations set forth in Paragraph 30 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, state that 17 U.S.C. § 101 speaks for itself.

31.     State that the allegations set forth in Paragraph 31 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, deny knowledge or information sufficient to form a belief as to the allegations set forth in Paragraph 31 of the Amended Complaint, and state that 17 U.S.C. § 102 and the materials cited in the Amended Complaint speak for themselves.  Defendants also note that Professor David Nimmer concluded in the declaration from the *Whitmill* case cited by Solid Oak that "human flesh cannot serve as the 'medium of expression' that Congress intended to embody legally protectable authorship" and, thus, a "claim of copyright over a tattoo . . . must be

summarily rejected."  Declaration of David Nimmer ¶ 25, *Whitmill v. Warner Bros. Entm't, Inc.*, No. 4:11 Civ. 752 (E.D. Mo.).

32.     State that the allegations set forth in Paragraph 32 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, state that the news article from which Solid Oak quotes speaks for itself. Defendants also note that a written opinion was not issued in the *Whitmill* case on the subject of tattoo copyrightability.

33.     Deny knowledge or information sufficient to form a belief as to the allegations set forth in Paragraph 33 of the Amended Complaint, except admit that the document attached to the Complaint as Exhibit C is titled "Tattoo Art Exclusive License Agreement (Artwork)" and the document attached to the Complaint as Exhibit D is dated June 8, 2015 and titled "Certificate of Registration," and state that the documents speak for themselves.

34.     Deny knowledge or information sufficient to form a belief as to the allegations set forth in Paragraph 34 of the Amended Complaint, except admit that the document attached to the Complaint as Exhibit E is dated June 8, 2015 and titled "Certificate of Registration," and state that the document speaks for itself.

35.     Deny knowledge or information sufficient to form a belief as to the allegations set forth in Paragraph 35 of the Amended Complaint, except admit that the document attached to the Complaint as Exhibit F is dated July 24, 2015 and titled "Certificate of Registration," and state that the document speaks for itself.

36.     Deny knowledge or information sufficient to form a belief as to the allegations set forth in Paragraph 36 of the Amended Complaint, except admit that the document attached to the Complaint as Exhibit G is titled "Tattoo Art Exclusive License Agreement (Artwork)" and the

document attached to the Complaint as Exhibit H is dated June 8, 2015 and titled "Certificate of Registration," and state that the documents speak for themselves.

37.     Deny knowledge or information sufficient to form a belief as to the allegations set forth in Paragraph 37 of the Amended Complaint, except admit that the document attached to the Complaint as Exhibit I is titled "Tattoo Art Exclusive License Agreement (Artwork)" and the document attached to the Complaint as Exhibit J is dated July 24, 2015 and titled "Certificate of Registration," and state that the documents speak for themselves.

38.     Deny knowledge or information sufficient to form a belief as to the allegations set forth in Paragraph 38 of the Amended Complaint, except admit that the document attached to the Complaint as Exhibit K is dated July 24, 2015 and titled "Certificate of Registration," and state that the document speaks for itself.

39.     Repeat and reallege each and every response to Paragraphs 1 through 38 of the Amended Complaint as if fully set forth herein.

40.     State that the allegations set forth in Paragraph 40 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, state that Solid Oak's Amended Complaint purports to assert a claim for copyright infringement against Defendants.

41.     State that the allegations set forth in Paragraph 41 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, deny the same.

42.     State that the allegations set forth in Paragraph 42 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, deny the same.

43.     State that the allegations set forth in Paragraph 43 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, deny the same.

44.     State that the allegations set forth in Paragraph 44 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, deny the same.

45.     State that the allegations set forth in Paragraph 45 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, deny the same pursuant to the Court's August 2, 2016 order granting Defendants' motion to dismiss Solid Oak's claim for statutory damages.

46.     State that the allegations set forth in Paragraph 46 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, deny the same pursuant to the Court's August 2, 2016 order granting Defendants' motion to dismiss Solid Oak's claim for attorney's fees.

47.     State that the allegations set forth in Paragraph 47 of the Amended Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, deny the same.

## <u>DEFENDANTS' AFFIRMATIVE DEFENSES</u>

<u>FIRST DEFENSE</u>
<u>(FAILURE TO STATE A CLAIM)</u>

48.     Solid Oak's claims fail, in whole or in part, because the Amended Complaint, and each and every claim stated therein, fails to state a claim upon which relief can be granted.

## SECOND DEFENSE
### (*DE MINIMIS* USE)

49.     Solid Oak's claims are barred, in whole or in part, by the doctrine of *de minimis* use.

## THIRD DEFENSE
### (FAIR USE)

50.     Solid Oak's claims are barred, in whole or in part, by the doctrine of fair use.  *See* 17 U.S.C. § 107.

## FOURTH DEFENSE
### (LICENSE)

51.     Solid Oak's claims are barred, in whole or in part, by license.

## FIFTH DEFENSE
### (CONSENT, WAIVER, ESTOPPEL)

52.     Solid Oak's claims are barred, in whole or in part, by consent, waiver, and/or estoppel.

## SIXTH DEFENSE
### (NON-INFRINGEMENT)

53.     Solid Oak's claims are barred, in whole or in part, because Defendants do not and have not infringed the copyrights at issue, including without limitation pursuant to the doctrines of *scènes à faire*, merger and/or other limits on the scope of copyright protection.

## SEVENTH DEFENSE
### (FRAUD ON THE COPYRIGHT OFFICE)

54.     Solid Oak's claims are barred, in whole or in part, by the doctrine of fraud on the U.S. Copyright Office.

## **COUNTERCLAIMS**

Counterclaimants for their counterclaims hereby allege against Solid Oak as follows:

## NATURE OF THE ACTION AND RELIEF SOUGHT

1.      Solid Oak alleges that Counterclaimants have infringed copyrights that subsist in six tattoos (the "Tattoos," and each a "Tattoo").  Counterclaimants' actions, however, constitute a *de minimis* use as the Tattoos are displayed for short periods of time, only fleetingly, and often out of focus in a manner that is hard to see.  Counterclaimants' actions also constitute fair use of the tattoos, which is not a copyright infringement.  *See* 17 U.S.C. § 107.  Moreover, material misrepresentations were made to the U.S. Copyright Office in obtaining the certificate of registration for at least one of the tattoos that Solid Oak has asserted, which constitutes fraud on the Copyright Office.  Accordingly, an actual controversy has arisen and now exists between Counterclaimants and Solid Oak, which may be resolved by this court.

## PARTIES

2.      Counterclaimant Take-Two Interactive Software, Inc. is a Delaware corporation having its principal place of business in the State of New York and is qualified to do business and is doing business in the State of New York and in this judicial district.

3.      Counterclaimant 2K Games, Inc. is a Delaware corporation having its principal place of business in the State of California, and is qualified to do business and is doing business in the State of New York and in this judicial district.

4.      Counterclaim-Defendant Solid Oak Sketches, LLC is a Delaware limited liability company that brought suit in this District.

## JURISDICTION AND VENUE

5.      This counterclaim arises under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.  This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1338.

6.      This Court has personal jurisdiction over Solid Oak because Solid Oak has chosen to avail itself of the laws and protections of this Court, and Counterclaimants' claims arise from the same series of operative facts that Solid Oak alleges.

7.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400.

FACTUAL BACKGROUND

**THE *NBA 2K* VIDEOGAME**

8.      Counterclaimants develop, publish, and distribute video games, including the sports series *NBA 2K* and *WWE 2K*.

9.      The *NBA 2K* series is released annually.

10.     Each release of *NBA 2K* depicts the sport of basketball with realistic renderings of different NBA teams and their current rosters of individual players.

11.     *NBA 2K16* is the most recent release of the game.  *NBA 2K16* is available on PC, Xbox One, Xbox 360, Playstation3, and PS4.

12.     *NBA 2K16* is a creative work that reflects creative choices in, among other things, the selection of characters, settings, plot, graphics, music, and other game elements.

13.     *NBA 2K16* also realistically depicts real-life NBA players as part of the overall video game.

14.     Counterclaimants have permission to include the players' names and likenesses in *NBA 2K16*, including without limitation Messrs. James, Martin, and Bledsoe.

**Single and Multiplayer Gameplay**

15.     *NBA 2K16* has several modes from which a user selects after the game launches on the user's gaming system.

16.     In single player standard game mode, one user selects an NBA team with its current team members, or selects individual players from different teams to create a custom

team, and then plays that team against computer-controlled opposing teams in a simulation of a complete game of basketball.

17.     In the multiplayer standard game mode, two users can select NBA teams, or select players for their respective teams, and then play each other in a simulated basketball game.

18.     When composing and selecting teams, users are presented with a bright, black-and red-toned roster through which users can scroll.  The roster includes photographs of each NBA player with his basketball statistics (*e.g.*, position, points per game, offensive rebounds per game, rebounds per game, assists per game, steals per game, blocks per game, turnovers per game).

19.     In addition to their ability to select real NBA players, game users may design their own custom NBA players.

20.     During simulated basketball gameplay, users control each NBA player, one at a time.  Users select which of the five NBA players to control, and can have the NBA player walk, run, block, steal, pass, or shoot the ball.  Just like in professional basketball games, users seek to score the most points by making baskets.

21.     During the game, commentators narrate what the players are doing, like commentators narrate real NBA games.

22.     In addition to the commentators, during these game-playing modes, the audio includes cheering crowds, buzzers, and an intermittent musical soundtrack.

23.     The game also generates replays of some players' shots and moves.

24.     *NBA 2K* is a comprehensive depiction of professional basketball.

25.     *NBA 2K* includes up-to-date depictions of NBA players.

26.     *NBA 2K* realistically depicts NBA players.

27.     *NBA 2K* also depicts arenas, audiences, basketballs, and hoops realistically.

28.     As shown in the screenshots below, the perspective of gameplay in *NBA 2K* is such that the user can see a large portion of the court, or the entire court, with multiple NBA players visible so that the game user may manipulate them.  Much of the game is seen from this perspective, from various angles which shift automatically or manually:



 

**Story Mode Gameplay**

***NBA 2K16*'s Story Modes**

29.     In addition to the single player and multiplayer modes, which replicate NBA basketball gameplay, *NBA 2K16* includes story modes.

30.     These story modes allow users to create their own fictional basketball player.

- 14 -

31.     While the player may be customized with various attributes, such as height, weight, and hair color, as well as tattoos, the Tattoos asserted by Solid Oak cannot be added to a customized character.

32.     Thus, when the articles cited by Solid Oak in the Amended Complaint mention the ability to select tattoos to add to characters within *NBA 2K16*, they are not referencing the Tattoos at issue in this case.

33.     The *NBA 2K16* story modes allow customized players to interact with real-life NBA players.

34.     The story modes reflect myriad creative choices, including what to include and how to depict it in the game, specific game elements, music, and plot.

35.     The "MyCareer" mode of the game, for example, is a fictional story, complete with its own characters, plot, settings, and themes.

36.     The MyCareer mode allows a game user to create a "MyPlayer" character (by scanning in his or her own likeness, or selecting features) and follow that character's development from high school basketball to the NBA.

37.     The story for this mode was written and directed by famous Hollywood filmmaker Spike Lee and is called "Livin' Da Dream."

38.     The MyCareer mode plays like a film, in which the player's MyPlayer character is nicknamed Freq, has a twin sister named Cece and a best friend named Vic, and lives in Harlem. The progression of the story is punctuated by shortened basketball games in which the user participates, as the user would participate in the single player mode.  The MyPlayer character begins in high school and plays three games there, selects a college and plays four games there, and then is drafted to the NBA after one year of college.  The user plays eight games in the

MyPlayer character's rookie season.  There is personal and professional drama interwoven between games.



39.     After this rookie season, the MyPlayer character is then a free agent, and negotiates with several NBA teams on salary, noted in "Virtual Currency."  Thereafter, the MyPlayer character plays games, earns more Virtual Currency through playing well, and users have the ability to buy clothes, personal gym upgrades, and better attributes with the earned Virtual Currency.  Users make more connections with other in-game personalities and become more successful over time.

40.     The "MyGM" mode is similarly fictional.  In this mode, the user is the general manager for a team.  The user checks the wear-and-tear of the team's players, handles conversations with players about trades or desires for more playing time, builds trust with the team's coaches and staff, and evaluates potential assistant coaches.

41.     In the MyGM mode, the user strategizes how to attract successful NBA players, and may make decisions like moving the team to a different city with the requisite approvals.  If the user decides to move the team, the user will design a stadium, uniforms, and a new logo.

**Marketing for NBA 2K**

42.     *NBA 2K* is marketed by emphasizing its gameplay.

43.    *NBA 2K* is marketed by highlighting its story modes.

**CREATION OF THE TATTOOS**

44.    In the Amended Complaint, Solid Oak asserts copyrights in six tattoos against Counterclaimants.

45.    Upon information and belief, each Tattoo was created by a tattooist with contributions and guidance from Mr. Bledsoe, Mr. James, or Mr. Martin.

46.    Each Tattoo was created to reflect the personal expression of Mr. Bledsoe, Mr. James, and Mr. Martin.

47.    The Tattoos are imbued with special meaning attributable to the individuals on which they were inked.

48.    Upon information and belief, each of the Tattoos is a custom tattoo intended only for the player on which it was inked.

### 330 and Flames Tattoo Artwork

49.    Solid Oak asserts that one of the Tattoos that it registered with the Copyright Office is titled "330 and Flames Tattoo Artwork."

50.    As shown from the three images of Mr. James' forearm that were submitted to the Copyright Office as deposit copies by counsel for Solid Oak and the tattooist, the tattoo is the numbers 3, 3, and 0:

  

51.     According to the certificate of registration, "330 and Flames Tattoo Artwork" was completed in 2002 and published on July 15, 2002.

52.     The effective date of the certificate of registration for "330 and Flames Tattoo Artwork" is June 8, 2015, which is approximately thirteen years after it was created.

53.     Upon information and belief, because the tattoo was registered so many years after its completion, images of Mr. James' forearm were copied by Solid Oak from the Internet to serve as the deposit copies for the Copyright Office.

54.     Upon information and belief, the numbers "330" were selected for the tattoo because 330 is the area code of Mr. James's hometown Akron, Ohio.

55.     Upon information and belief, Mr. James informed the tattooist of what to ink on his arm, and the tattooist did so.

**Child Portrait**

56.     Solid Oak asserts that one of the Tattoos that it registered with the Copyright Office is titled "Child Portrait Tattoo Artwork."

57.     As shown from the image of Mr. James' inner left forearm that was submitted to the Copyright Office as a deposit copy by counsel for Solid Oak and the tattooist, the tattoo is a portrait of a young child:



58.     According to the certificate of registration, "Child Portrait Tattoo Artwork" was completed in 2006 and published on May 1, 2006.

59.     The effective date of the certificate of registration for "Child Portrait Tattoo Artwork" is June 8, 2015, which is approximately nine years after it was created.

60.     Upon information and belief, because the tattoo was registered so many years after its completion, images of Mr. James' forearm were copied from the Internet by Solid Oak to serve as the deposit copies for the Copyright Office.

61.     Upon information and belief, the child depicted in "Child Portrait Tattoo Artwork" is Mr. James's son, LeBron Jr.  Mr. James got the tattoo to celebrate LeBron Jr.'s first birthday.[1]

62.     Upon information and belief, Mr. James provided a photo of Lebron Jr. and informed the tattooist of what to ink on his arm, and the tattooist did so.

63.     Upon information and belief, the Child Portrait tattoo was created through an iterative process over the course of years.

---

[1]     *See* http://nikelebron.net/lebron_james/tattoos/.

64.     Upon information and belief, "Child Portrait Tattoo Artwork" was changed over the years by different tattooists.

65.     Upon information and belief, the portrait of Mr. James's son on his left forearm initially was a simple drawing of a child's face, and was registered as such.

66.     Upon information and belief, years later the tattoo was changed to add more detail.

67.     It is the tattoo with further detail that is visible in *NBA 2K16*, as shown below:



68.     Upon information and belief, Justin Wright, the tattooist who initially inked the child's face on Mr. James's arm, was not the tattooist who added further detail to the tattoo years later.

**Lion's Head**

69.     Solid Oak asserts that one of the Tattoos that it registered with the Copyright Office is titled "Lion's Head Tattoo Artwork."

70.     As shown from the two images of Mr. James' right bicep that were submitted to the Copyright Office as deposit copies by counsel for Solid Oak and the tattooist, the tattoo is a drawing of the head of a lion:

 

71.     According to the certificate of registration, "Lion's Head Tattoo Artwork" was completed in 2000 and published on March 15, 2000.

72.     The effective date of the certificate of registration for "Lion's Head Tattoo Artwork" is June 8, 2015, which is approximately 15 years after it was created.

73.     Upon information and belief, because the tattoo was registered so many years after its completion, images of Mr. James' forearm were copied from the Internet by Solid Oak to serve as the deposit copies for the Copyright Office.

74.     Upon information and belief, Mr. James informed the tattooist of what to ink on his arm, and the tattooist did so.

75.     Upon information and belief, the lion head on Mr. James's right bicep was created initially in 2000, when Mr. James was 16 years old.  At that time, the tattoo was a simple drawing of a lion's head wearing a crown, as pictured below in a high school photo of Mr. James.



76.     Upon information and belief, years later the tattoo was changed such that, among other things, the crown is no longer visible.

77.     Upon information and belief, Shawn Rome, the tattooist who initially inked the lion's head on Mr. James's arm when he was a teenager, was not the tattooist who added further detail to the tattoo years later.

78.     It is the tattoo with further detail that was submitted to the Copyright Office for registration.

79.     Upon information and belief, the tattoo that was submitted to the Copyright Office for registration was the work of not just Mr. Rome but at least one other tattooist.

80.     It is the changed tattoo that is visible in *NBA 2K16*.

**Wizard**

81.     Solid Oak asserts that one of the Tattoos that it registered with the Copyright Office is titled "Wizard."

82.     As shown from the two images of Mr. Martin's left shoulder that were submitted to the Copyright Office as deposit copies by counsel for Solid Oak and the tattooist, the tattoo is a drawing of a grim reaper holding a basketball:

   

83.     According to the certificate of registration, "Wizard" was completed in 1998 and published on September 1, 1998.

84.     The effective date of the certificate of registration for "Wizard" is July 24, 2015, which is approximately 17 years after it was created.

85.     Upon information and belief, because the tattoo was registered so many years after its completion, images of Mr. Martin's shoulder were copied from the Internet by Solid Oak to serve as the deposit copies for the Copyright Office.

86.     Upon information and belief, this tattoo depicts a grim reaper holding a basketball because, according to Mr. Martin, the tattoo signifies that he fears no one in the game and that he is "the place layups go to die."[2]

87.     Upon information and belief, Mr. Martin informed the tattooist of what to ink on his arm, and the tattooist did so.

**Basketball with Stars and Script**

88.     Solid Oak asserts that one of the Tattoos that it registered with the Copyright Office is titled "Basketball with Stars and Script."

89.     As shown from the four images of Mr. Bledsoe's right shoulder that were submitted to the Copyright Office as deposit copies by counsel for Solid Oak and the tattooist, the tattoo is a drawing of script on a scroll of paper, with two hands holding a basketball on top of the scroll, with stars surrounding the basketball:



90.     According to the certificate of registration, "Basketball with Stars and Script" was completed in 2005 and published on April 1, 2005.

---

[2]     *See* http://enquirer.com/editions/2000/01/20/spt_martins_d_where.html.

91.     The effective date of the certificate of registration for "Basketball with Stars and Script" is July 24, 2015, which is approximately 10 years after it was created.

92.     Upon information and belief, because the tattoo was registered so many years after its completion, images of Mr. Bledsoe's shoulder were copied from the Internet by Solid Oak to serve as the deposit copies for the Copyright Office.

93.     Upon information and belief, Mr. Bledsoe informed the tattooist of what to ink on his arm, and the tattooist did so.

**Clouds and Doves**

94.     Solid Oak asserts that one of the Tattoos that it registered with the Copyright Office is titled "Script with a scroll, clouds, and doves."

95.     As shown from the three images of Mr. James's right forearm that were submitted to the Copyright Office as deposit copies, the tattoo is a drawing of clouds and doves:

  

96.     According to the certificate of registration, "Script with a scroll, clouds, and doves" was completed in 2001 and published on December 15, 2001.

97.     The effective date of the certificate of registration for "Script with a scroll, clouds, and doves" is July 24, 2015, which is approximately 14 years after it was created.

98.     Upon information and belief, because the tattoo was registered so many years after its completion, images of Mr. James' forearm were copied from the Internet by Solid Oak to serve as the deposit copies for the Copyright Office.

99.     Upon information and belief, Mr. James informed the tattooist of what to ink on his arm, and the tattooist did so.

## NBA PLAYERS ARE FREQUENTLY PHOTOGRAPHED

100.    Professional basketball players are photographed for different reasons, and those photographs appear in myriad copyrighted works.

101.    NBA games are telecast.

102.    NBA players appear in the telecasts of NBA games.

103.    The Tattoos have been visible in some telecasts of NBA games.

104.    NBA players are photographed and recorded playing basketball.

105.    The Tattoos have been visible in some of the photographs and recordings of the NBA players playing basketball.

106.    Sports news outlets have shown images and video of Messrs. James, Bledsoe, and Martin playing basketball.

107.    The Tattoos have been visible in some of the images and videos shown by sports news outlets.

108.    Sports photographers have taken pictures of Messrs. James, Bledsoe, and Martin.

109.    The Tattoos have been visible in some of the photographs taken by sports photographers.

110.    Paparazzi take pictures of some NBA players.

111.    The Tattoos have been visible in some of the photographs taken by Paparazzi.

112.    Mr. James has been photographed by paparazzi, sometimes for inclusion in commercial publications.

113.    NBA players appear in advertisements for different products.

114.    LeBron James has appeared in various advertisements over the years.

115.    At times, when Mr. James has appeared in advertisements, his tattoos have been displayed.

116.    Mr. James has appeared in commercials.

117.    At times, when Mr. James has appeared in commercials, his tattoos have been visible.

118.    Mr. James and Mr. Martin have appeared on the covers of magazines.

119.    At times, when Mr. James has appeared on magazine covers, his tattoos have been visible.

120.    At times, when Mr. Martin has appeared on magazine covers, his tattoos have been visible.

121.    Messrs. James, Bledsoe, and Martin have appeared in public.

122.    Some of the times that the players have appeared in public, the Tattoos have been publicly displayed.

**THE TATTOOS KNEW THAT THE TATTOOS WOULD BECOME PART OF THE PLAYERS' LIKENESSES**

123.    When the Tattoos were inked, the tattooists knew that the individuals that they were inking would appear in public.

124.    The tattooists also knew that the Tattoos would be publicly displayed.

125.    Upon information and belief, Mr. Rome knew that Mr. James was a basketball player when he inked "330 and Flames Tattoo Artwork"; "Lion's Head Tattoo Artwork"; and "Script with a scroll, clouds, and doves."

126.    Upon information and belief, when he inked each of Mr. James' tattoos, Mr. Rome knew that Mr. James likely would attempt to commercialize his likeness.

127.    Upon information and belief, when Mr. Rome inked "330 and Flames Tattoo Artwork"; "Lion's Head Tattoo Artwork"; or "Script with a scroll, clouds, and doves" on Mr. James, Mr. Rome never informed Mr. James that the display of the tattoos would require additional compensation.

128.    Upon information and belief, prior to 2015, Mr. Rome never asserted that display of Mr. James' tattoos required a license or permission from Mr. Rome.

129.    Upon information and belief, Mr. Wright knew that Mr. James was a basketball player when he inked "Child Portrait Tattoo Artwork."

130.    Upon information and belief, at that time, Mr. Wright knew that Mr. James likely would attempt to commercialize his likeness.

131.    Upon information and belief, when Mr. Rome inked "Child Portrait Tattoo Artwork," he did not inform Mr. James that the display of the tattoo would require additional compensation.

132.    Upon information and belief, prior to 2015, Mr. Wright never asserted that display of Mr. James' tattoos required a license or permission from Mr. Wright.

133.    Upon information and belief, Mr. Cornett knew that Mr. Bledsoe was a basketball player when he inked "Basketball with Stars and Script."

134.     Upon information and belief, at that time, Mr. Cornett knew that Mr. Bledsoe likely would attempt to commercialize his likeness.

135.     Upon information and belief, when Mr. Cornett inked "Basketball with Stars and Script," he did not inform Mr. Bledsoe that the display of the tattoo would require additional compensation.

136.     Upon information and belief, prior to 2015, Mr. Cornett never asserted that display of Mr. Bledsoe's tattoos required a license or permission from Mr. Cornett.

137.     Upon information and belief, Mr. Cornett knew that Mr. Martin was a basketball player when he inked "Wizard."

138.     Upon information and belief, at that time, Mr. Cornett knew that Mr. Martin likely would attempt to commercialize his likeness.

139.     Upon information and belief, when Mr. Cornett inked "Wizard," he did not inform Mr. Martin that the display of the tattoo would require additional compensation.

140.     Upon information and belief, prior to 2015, Mr. Cornett never asserted that display of Mr. Martin's tattoos required a license or permission from Mr. Cornett.

**THE INCLUSION OF THE TATTOOS IN *NBA 2K***

141.     Counterclaimants depict NBA players realistically in *NBA 2K*, including Messrs. Bledsoe, James, and Martin.

142.   Counterclaimants also have realistically depicted the Tattoos.

143.   The following images depict how the Tattoos appear in *NBA 2K16* if a user chose to zoom in on a particular player:

   

**Eric Bledsoe**                    **LeBron James**



**Kenyon Martin**

144.   To play *NBA 2K16*, users generally play with the basketball court and other players visible.

145.   The Tattoos appear only fleetingly within *NBA 2K*.

146.   Mr. James has multiple tattoos, and the Tattoos inked on him are not emphasized in *NBA 2K16* any more than any of his other tattoos.

147.   Mr. Martin has multiple tattoos, and the Tattoo inked on him is not emphasized in *NBA 2K16* any more than any of his other tattoos.

148.    Mr. Bledsoe has multiple tattoos, and the Tattoo inked on him is not emphasized in *NBA 2K16* any more than any of his other tattoos.

149.    The Tattoos are not given any more prominence in *NBA 2K16* than the tattoos on any of the other players depicted in the video game.

150.    Upon information and belief, none of the tattooists of tattoos other than those at issue in this litigation has asserted a right to compensation for their tattoos being used in *NBA 2K16*.

151.    There is no time during gameplay that Counterclaimants cause *NBA 2K* to zoom in on the Tattoos.

152.    The Tattoos, at any given moment in which they are visible, constitute only a negligible part of the overall scene depicted in the *NBA 2K* games.

153.    In *NBA 2K16*, the Tattoos are depicted on the players on which they are inked in real life.

154.    In *NBA 2K16*, when the Tattoos appear in the context of a fictional basketball game, the players on which they are inked, an audience, an arena, a basketball, and other aspects of *NBA 2K16's* gameplay also appear.

155.    While Counterclaimants include the Tattoos as part of the players' likenesses, at no point does the *NBA 2K16* depict the Tattoos in a manner other than on the players on whom they are inked in real-life.

156.    Counterclaimants do not depict the Tattoos other than as part of the players' likenesses.

157.    Counterclaimants do not sell merchandise depicting the Tattoos without the player on which they are inked.

158.     Counterclaimants do not sell decals of the Tattoos.

159.     Counterclaimants do not depict the Tattoos on fictional characters.

160.     Counterclaimants have not highlighted the inclusion of the Tattoos in marketing for *NBA 2K16*.

161.     The covers of *NBA 2K16* do not depict the Tattoos.

162.     As shown below, the covers of *NBA 2K16* do not include any of the players on which the Tattoos were inked.  Rather, they depict James Harden, Stephen Curry, and Anthony Davis:



163.     As shown below, the ads displayed on websites and in various publications advertising *NBA 2K16* depict the same players:





164.    The ads for *NBA 2K16* do not include any of the players on which the Tattoos were inked.

165.    The ads for *NBA 2K16* do not depict the Tattoos.

166.    None of the ads for *NBA 2K16* discuss the Tattoos.

167.    None of the ads for *NBA 2K16* mention any real-world tattoos that appear on the players in the video game.

168.    Upon information and belief, no consumers of Counterclaimants' games have purchased *NBA 2K16* to acquire copies of the Tattoos.

169.    Counterclaimants' profits and revenues are not a direct consequence of including the Tattoos in *NBA 2K*.

**SOLID OAK**

170. Solid Oak claims to be an exclusive licensee to copyrights in the Tattoos.

171. Solid Oak did not create the Tattoos.

172. Solid Oak sought to register the Tattoos with the U.S. Copyright Office.

173. Originally, Solid Oak attempted to register each of the Tattoos with Chosen1 LLC (the prior name of its company) as the copyright claimant. After filing its application but before they issued, Solid Oak requested that its copyright application be amended to list the copyright claimants for the Tattoos as Shawn Rome, Justin Wright, and Tommy Ray Cornett.

**Solid Oak's Owner**

174. Upon information and belief, Solid Oak is owned by Matthew Siegler.

175. Upon information and belief, Solid Oak has no employees other than Mr. Siegler.

176. Mr. Siegler is not a tattooist.

177. Mr. Siegler did not create the Tattoos.

178. Mr. Siegler was not present when the Tattoos were created.

179. Instead, Mr. Siegler sees the Tattoos as a business opportunity.

180. Upon information and belief, Mr. Siegler has stated that he developed "big plans" for what he saw as an easy payout.[3]

181. Mr. Siegler bought certain rights to the Tattoos to make money.

**Solid Oak's Lack of Licensing of the Tattoos**

182. Upon information and belief, Solid Oak has not commercialized the Tattoos.

183. Upon information and belief, Solid Oak has never licensed to any other party the ability to ink the Tattoos on other people.

---

[3] *See* http://www.forbes.com/sites/darrenheitner/2013/10/02/exclusive-licensee-of-lebron-james-and-kobe-bryant-tattoo-artwork-preps-to-profit-off-of-images/.

184.    Upon information and belief, Solid Oak has never licensed to any other party the ability to include the Tattoos in another work.

185.    Upon information and belief, Solid Oak did not license the depiction of the Tattoos in campaigns or photographs discussed in Paragraphs 100 through 121 of these Counterclaims.

186.    Upon information and belief, Solid Oak has never sold merchandise depicting the Tattoos.

187.    Upon information and belief, Solid Oak has not entered into licenses with Mr. Bledsoe, Mr. James, or Mr. Martin related to the right to depict their Tattoos.

188.    Upon information and belief, Solid Oak has not entered into licenses with Mr. Bledsoe, Mr. James, or Mr. Martin related to the right to depict their likenesses.

189.    Upon information and belief, Solid Oak has not entered into licenses with Mr. Bledsoe, Mr. James, or Mr. Martin related to their trademark rights.

190.    Upon information and belief, Solid Oak has not entered into licenses with any NBA teams related to the right to depict any NBA trademarks.

191.    Upon information and belief, no party has ever sought a license from Solid Oak to use the Tattoos.

192.    Upon information and belief, Solid Oak has never created, or contributed to the creation of, a video game depicting the Tattoos.

193.    Upon information and belief, Solid Oak has never licensed a video game depicting the Tattoos.

**Solid Oak's Attempt to Extract Monies from Take-Two**

194.    Solid Oak has tried to make money off of the Tattoos by attempting to extract payment from Take-Two and ultimately by bringing this lawsuit.

195.   To that end, on July 8, 2015, Michael Kahn of Capes Sokol Goodman Sarachan P.C. sent Daniel Emerson, Executive Vice President and General Counsel of Take-Two, a letter, claiming that Mr. Kahn's firm represented "a group of tattoo artists" and that Counterclaimants were infringing the artists' copyrights in various NBA players' tattoos by including them in *NBA 2K* video games.

196.   In a follow-up letter on July 28, 2015, Mr. Kahn made clear that the tattooists were seeking $819,500 "for the prior unauthorized reproductions, displays, and public disseminations" of eight tattoos listed in his letter.

## FIRST COUNTERCLAIM

### Declaratory Judgment of *De Minimis* Use
### (28 U.S.C. § 2201 *et. seq.*)

197.   Counterclaimants repeat and reallege the allegations set forth in the foregoing paragraphs as if fully set forth herein.

198.   *NBA 2K16* is a video game that includes many components, including graphics, characters, a fictitious plot, gameplay, music, and graphics.

199.   The Tattoos are only one of many components of *NBA 2K16*.

200.   *NBA 2K16* includes other tattoos beyond the Tattoos at issue in this litigation.

201.   *NBA 2K16* includes an entire virtual world.

202.   The Tattoos are observable only fleetingly in *NBA 2K16*.

203.   The Tattoos are displayed only briefly in *NBA 2K16*.

204.   When they are displayed, the Tattoos are a small part of the graphical display of *NBA 2K16*.

205.   The Tattoos are sometimes obscured by other graphics displayed in *NBA 2K16*.

206.   The Tattoos are not displayed prominently in *NBA 2K16*.

207.   The Tattoos are sometimes displayed out of focus.

208.   Counterclaimants' inclusion of the Tattoos constitutes *de minimis* use.

## SECOND COUNTERCLAIM

### Declaratory Judgment of Fair Use
### (28 U.S.C. § 2201 *et. seq.*)

209.   Counterclaimants repeat and reallege the allegations set forth in the foregoing paragraphs as if fully set forth herein.

210.   Counterclaimants are not creating, distributing, or marketing tattoos; they are creating, distributing, and marketing video games.

211.   *NBA 2K16* is an imaginative, creative work that allows users to play basketball in fictional worlds with real and fictional players.

212.   It includes all aspects of NBA basketball, including arenas, audiences, hoops, basketballs, commentators, cheers, and the likenesses of NBA players.

213.   It includes the creative output of various individuals, including Spike Lee.

214.   It reflects numerous creative choices made by those individuals.

215.   *NBA 2K16* realistically depicts the real world players that appear in the otherwise fictional video game.

216.   In depicting NBA players' likenesses, *NBA 2K16* also includes each players' actual tattoos, visible only fleetingly during gameplay.

217.   As part of the creativity of *NBA 2K16*, the video game uses real world players with permission to allow the game's users to play fantasy games using real and fictional NBA players as their characters.

218.   The depiction of NBA players as they appear in real life serves as a biographical anchor for *NBA 2K16*.

- 37 -

219.    Counterclaimants' inclusion of players' tattoos as merely minor features of their likenesses—used in order to depict the players accurately, and not as separable items for sale within or separately from the game—is a fair use under 17 U.S.C. § 107.

220.    Counterclaimants add new context to the Tattoos.

221.    *NBA 2K16* does not show the Tattoos divorced from the bodies on which they are inked.

222.    The Tattoos appear on the real world players that bear them as part of a larger work that includes other graphics (such as team jerseys basketball arenas, background characters) and sounds.

223.    When they appear, the Tattoos are shown in motion as one element of a fictional basketball game.

224.    The market for tattoos and the market for basketball video games do not intersect.

225.    *NBA 2K16* is not a substitute for the Tattoos.

226.    Counterclaimants' inclusion of the Tattoos does not interfere with any market Solid Oak may have to commercialize the Tattoos.

227.    Because a fair use is by definition a non-infringing use, Solid Oak's permission was not needed for Counterclaimants to include players' tattoos in the *NBA 2K* games, and Solid Oak may not block the marketing or sale of *NBA 2K*.

## THIRD COUNTERCLAIM

### Declaratory Judgment of Fraud on the Copyright Office
### (28 U.S.C. § 2201 *et. seq.*)

228.    Counterclaimants repeat and reallege the allegations set forth in the foregoing paragraphs as if fully set forth herein.

229.    The copyright registration for the tattoo titled "Lion's Head Tattoo Artwork" (Reg. No. VA1971674) was improperly obtained because a specimen was submitted of a work that Shawn Rome, the claimed author, did not create on the listed creation date of 2000.  This knowing failure to disclose the actual deposit to the Copyright Office constitutes fraud on the U.S. Copyright Office as the proper specimen was required to be submitted reflecting the actual work Mr. Rome allegedly authored on that creation date.

230.    Upon information and belief, had the Copyright Office known that the deposit did not reflect the work that was being registered, it would not have issued the certificate of registration for "Lion's Head Tattoo Artwork."

231.    As a result, Counterclaimants request that this Court declare that the Lion's Head Tattoo Artwork registration was obtained through fraud, and thus the Tattoo is not subject to copyright protection, and order Solid Oak to take steps to have the registration cancelled by the U.S. Copyright Office.

232.    By reason of the foregoing, there now exists between the parties an actual and justiciable controversy concerning Solid Oak's and Counterclaimants' respective rights and obligations to the use of the Lion's Head Tattoo Artwork, requiring declaratory relief.

233.    The aforesaid declaration is necessary and appropriate at this time to affirm Counterclaimants' right to continue to make use of the Lion's Head Tattoo Artwork.

234.    Counterclaimants have no adequate remedy at law.

235.    Accordingly, Counterclaimants seek, pursuant to 28 U.S.C. §§ 2201 and 2202, a judgment from this Court that the copyright registration is invalid and should be cancelled.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaimants Take-Two and 2K respectfully request judgment against Counter-Defendant Solid Oak as follows:

- 39 -

A.      Deny Solid Oak all relief requested in its Amended Complaint in this action and

dismiss Solid Oak's First Amended Complaint with prejudice;

B.      Declare that Counterclaimants' use of the Tattoos is a *de minimis* use;

C.      Declare that Counterclaimants' use of the Tattoos is a fair use;

D.      Declare that fraud on the Copyright Office was committed in registering the

Lion's Head Tattoo Artwork;

E.      Order Solid Oak to cancel the registration for the Lion's Head Tattoo Artwork;

F.      Grant an award of Counterclaimants' costs and disbursements in this action,

including reasonable attorney's fees pursuant to 17 U.S.C. § 505; and

G.      Grant such other, further and different relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Defendants demand a trial by jury on all issues so triable in this action.

Dated:  New York, New York
        August 16, 2016                        */s/ Dale M. Cendali*
        _____

                                                Dale M. Cendali
                                                Joshua L. Simmons
                                                KIRKLAND & ELLIS LLP
                                                601 Lexington Avenue
                                                New York, New York 10022
                                                Telephone: (212) 446-4800
                                                dale.cendali@kirkland.com
                                                joshua.simmons@kirkland.com

                                                Attorneys for Defendants