Dale M. Cendali
Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
dale.cendali@kirkland.com
joshua.simmons@kirland.com

*Attorneys for Defendants-Counterclaimants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SOLID OAK SKETCHES, LLC,<br><br>               Plaintiff-<br>               Counterdefendant,<br><br>    v.<br><br>2K GAMES, INC. and TAKE-TWO<br>INTERACTIVE SOFTWARE, INC.,<br><br>               Defendants-<br>               Counterclaimants. | CASE NO. 1:16-cv-724-LTS-RLE |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS-COUNTERCLAIMANTS**</u>
<u>**2K GAMES, INC. AND TAKE-TWO INTERACTIVE SOFTWARE, INC.'S MOTION**</u>
<u>**FOR JUDGMENT ON THE PLEADINGS**</u>

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND .................................................................................. 3

    I.      TAKE-TWO'S *NBA 2K* VIDEO GAME SERIES ................................. 3

          A.    *NBA 2K's* Graphical and Auditory Components ....................... 3

          B.    *NBA 2K's* Story Modes .................................................... 5

          C.    *NBA 2K's* Gameplay Camera Angles .................................. 6

    II.     THE TATTOOS AND TAKE-TWO'S USE OF THEM IN *NBA 2K* ................... 7

    III.    SOLID OAK ................................................................................ 8

ARGUMENT ................................................................................................ 9

    I.      TAKE-TWO'S USE OF THE TATTOOS IS *DE MINIMIS* ............................. 10

    II.     TAKE-TWO'S USE OF THE TATTOOS IS FAIR USE ................................. 13

          A.    Factor One: Take-Two's Use Is Transformative and Its Profits Are Not Attributable to the Tattoos ................................. 15

          B.    Factor Two: Take-Two Used the Tattoos in the Interest of Accuracy and the Tattoos Were Published ................................. 20

          C.    Factor Three: Take-Two's Copying Was Reasonable In Light of Its Purpose ................................................................ 21

          D.    Factor Four: Take-Two Has Not Harmed the Tattoos' Markets ............. 22

          E.    Considerations of the Public Interest Favor Take-Two ..................... 24

CONCLUSION ............................................................................................ 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adjmi v. DLT Entm't Ltd.*,
   97 F. Supp. 3d 512 (S.D.N.Y. 2015)........................................................................10

*Allen v. Scholastic, Inc.*,
   739 F. Supp. 2d 642 (S.D.N.Y. 2011)........................................................................9

*Arica Inst., Inc. v. Palmer*,
   970 F.2d 1067 (2d Cir. 1992)........................................................................13

*Arrow Prods, Ltd. v. Weinstein Co.*,
   44 F. Supp. 3d 359 (S.D.N.Y. 2014)........................................................................10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................9

*Authors Guild, Inc. v. HathiTrust*,
   755 F.3d 87 (2d Cir. 2014)........................................................14, 15, 21, 22

*Authors Guild v. Google, Inc.*,
   804 F.3d 202 (2d Cir. 2015)........................................................14, 15, 20, 22

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................9

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
   448 F.3d 605 (2d Cir. 2006)........................................................................ *passim*

*Blanch v. Koons*,
   467 F.3d 244 (2d Cir. 2006)........................................................16, 23, 24

*Bouchat v. Baltimore Ravens Ltd.*,
   737 F.3d 932 (4th Cir. 2013) ........................................................................ *passim*

*Bouchat v. Baltimore Ravens Ltd. P'ship*,
   No. 08 Civ. 397, 2011 WL 5445947 (D. Md. Nov. 9, 2011)........................................24

*Brownmark Films, LLC v. Comedy Partners*,
   682 F.3d 687 (7th Cir. 2012) ........................................................................10

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994)........................................................................ *passim*

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013)..............................................................................15, 20

*Consumers Union of U.S. v. Gen. Signal Corp.*,
  724 F.2d 1044 (2d Cir. 1983)...........................................................................20

*Estate of Smith v. Cash Money Records, Inc.*,
  No. 14 Civ. 2703, 2017 WL 2333770 (S.D.N.Y. May 30, 2017).........................23

*Feist Pubs., Inc. v. Rural Telephone Serv. Co.*,
  499 U.S. 340 (1991)..........................................................................................13

*Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*,
  440 F.3d 571 (2d Cir. 2006)...............................................................................9

*Gordon v. Nextel Commn'cns*,
  345 F.3d 922 (6th Cir. 2003) .......................................................................11, 13

*Gottlieb Dev. LLC v. Paramount Pictures Corp.*,
  590 F. Supp. 2d 625 (S.D.N.Y. 2008)...............................................10, 11, 12, 13

*Hofheinz v. Discovery Commn'cns, Inc.*,
  No. 00 Civ. 3802, 2001 WL 1111970 (S.D.N.Y. Sept. 20, 2001) ....................17, 20

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811 (9th Cir. 2003) ......................................................17, 18, 21, 22

*L-7 Designs, Inc. v. Old Navy, LLC*,
  647 F.3d 419 (2d Cir. 2011).................................................................................9

*Monster Comm'ns, Inc. v. Turner Broad. Sys., Inc.*,
  935 F. Supp. 490 (S.D.N.Y. 1996)......................................................................17

*Newton v. Diamond*,
  388 F.3d 1189 (9th Cir. 2004) ............................................................................10

*Newton v. Penguin/Berkley Pub. USA*,
  No. 13 Civ. 1283, 2014 WL 505191 (S.D.N.Y. Jan. 28, 2014)............................11

*Nunez v. Caribbean Int'l News Corp.*,
  235 F.3d 18 (1st Cir. 2000)................................................................................22

*Poindexter v. EMI Record Grp. Inc.*,
  No. 11 Civ. 559, 2012 WL 1027639 (S.D.N.Y. Mar. 27, 2012) ....................10, 11

*Psihoyos v. Nat'l Geographic Soc'y*,
  409 F. Supp. 2d 268 (S.D.N.Y. 2005)................................................................13

*Sandoval v. New Line Cinema Corp.*,
    147 F.3d 215 (2d Cir. 1998)....................................................................10, 11, 12, 13

*Sarl Louis Feraud Int'l v. Viewfinder Inc.*,
    627 F. Supp. 2d 123 (S.D.N.Y. 2008)....................................................18, 19, 23

*Seltzer v. Green Day, Inc.*,
    725 F.3d 1170 (9th Cir. 2013) ....................................................................21, 22

*SOFA Entm't, Inc. v. Dodger Prods, Inc.*,
    709 F.3d 1273 (9th Cir. 2013) ....................................................................14, 16

*Swatch Grp. Mgmt. Serv. Ltd. v. Bloomberg L.P.*,
    756 F.3d 73 (2d Cir. 2014)....................................................................14, 23, 24

*VMG Salsoul, LLC v. Ciccone*,
    824 F.3d 871 (9th Cir. 2016) ....................................................................10

*West Publ'g Co. v. Edward Thompson Co.*,
    169 F. 833 (E.D.N.Y. 1909)....................................................................10

**Statutes**

17 U.S.C. § 106(5) ....................................................................25

17 U.S.C. § 107 ....................................................................14

**Rules**

Fed. R. Civ. P. 12(b)(6)....................................................................9, 10, 12

Fed. R. Civ. P. 12(c) ....................................................................1, 10

**Regulations**

37 C.F.R. § 202.1(a)....................................................................13

Defendants-Counterclaimants 2K Games, Inc. and Take-Two Interactive Software, Inc. (collectively, "Take-Two") submit this memorandum of law in support of their motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

## PRELIMINARY STATEMENT

Through this litigation, Plaintiff-Counterdefendant Solid Oak Sketches, LLC ("Solid Oak") and its founder and sole employee, Matthew Siegler, seek to hinder the ability to depict people as they appear in real life.  Solid Oak is not an aggrieved artist—it is an opportunist: Solid Oak bought the copyrights to a handful of tattoos that were inked on NBA players Eric Bledsoe, LeBron James, and Kenyon Martin (the "Tattoos").  Solid Oak acquired these copyrights to assert them against Take-Two because Take-Two's basketball simulation video game series, *NBA 2K*, depicts those players (among many others) as they appear in real life—including depicting their tattoos how they actually look.

In essence, Solid Oak argues that these public figures must seek its permission every time they appear in public, film, or photographs and that those that create new works depicting the players as they actually appear (with their Tattoos) should be enjoined and pay damages to Solid Oak.  Yet, no case has interpreted copyright law as providing such a right, and doing so here would inhibit copyright's purpose of encouraging the creation of new works.  This is particularly troubling at a time when tattoos are becoming increasingly popular.  Solid Oak's profit-making litigation should be halted in its tracks by dismissing Solid Oak's copyright claim as a matter of law under the *de minimis* use and fair use doctrines.

***First***, Take-Two's use of the Tattoos is *de minimis*.  The Tattoos rarely appear in *NBA 2K* as they only are displayed when the players on whom they are inked are selected from the over 400 other NBA players that are available.  Even when the Tattoos appear, they are not prominent as the game camera generally uses a full court shot with the players' avatars appearing as small

- 1 -

images, and the Tattoos thus appearing even smaller than they would in real life.  This makes the Tattoos difficult (if not impossible) to see even when the players appear in the game.  The lack of observability is compounded by the fact that they are often blocked from view altogether by other game elements and the fluid movements of the players.  The Tattoos are not spot lit in any way, but rather are deemphasized by the appearance of other game elements and even other tattoos on Messrs. Bledsoe, James, and Martin.

**Second**, Solid Oak's copyright claim fails for the independent reason that Take-Two has engaged in fair use.  Take-Two is not a rival tattooist that has replicated a creative design and inked it on a new person.  Rather, its use is completely different in a massive, highly creative video game featuring a virtual world that only uses player tattoos to realistically capture how the players actually look.  Each of the factors that courts consider supports a finding of fair use:

- As to the first factor ("purpose and character of the use"), Take-Two uses the Tattoos for a different purpose than that for which they were originally created.  While the Tattoos originally were created as the NBA players' self-expression, Take-Two uses them merely to replicate how the players appear in real life.  Moreover, the Tattoos' size is significantly reduced in *NBA 2K* compared to the Tattoos' actual size; the Tattoos appear beside numerous other game elements, diminishing their expressive value; and the Tattoos are a quantitatively small part of *NBA 2K* as a whole.

- As to the second factor ("nature of the copyrighted work"), any creativity the Tattoos may have must be weighed against the fact that they were published prior to Take-Two's use and that Take-Two uses them to depict the world accurately.

- As to the third factor ("amount and substantiality of the portion used"), Take-Two's use was reasonable given that its purpose was to depict real life accurately, and using any less of the Tattoos would defeat that purpose.  Further, because *NBA 2K* is a video game, the Tattoos' sizes on a television screen are smaller than their actual size, severely limiting the Tattoos' visual impact.

- As to the fourth factor ("effect of the use upon the potential market"), Solid Oak has admitted that it is contractually prohibited from inking the Tattoos on other people, meaning that Take-Two's use cannot harm that market.  Further, there is no market for depicting real people's tattoos in video games.  Indeed, Solid Oak has admitted that it has never created, contributed to, or licensed the Tattoos for such uses.

As each fair use factor supports Take-Two, its use of the Tattoos is not copyright infringement.

It simply is not reasonable to expect that, every time an NBA player commercializes his likeness or appears on television or other media, he needs to seek permission from Solid Oak.

Given Solid Oak's many admissions in its Complaint and its Answer to Take-Two's Counterclaims, these issues can be decided on the pleadings without discovery.  For the reasons set forth below, Take-Two respectfully requests that this Court dismiss Solid Oak's copyright infringement claim and enter judgment for Take-Two on Counterclaims I and II.

## FACTUAL BACKGROUND

### I.     TAKE-TWO'S *NBA 2K* VIDEO GAME SERIES

Take-Two is "responsible for the development, creation and marketing of the *NBA 2K* basketball simulation video game series."  Mem. Op., dated Aug. 2, 2016, (Dkt. No. 44) ("Aug. 2016 Op."), at 2.  "An updated version of the *NBA 2K* game is released annually" and "feature[s] animated versions of National Basketball Association (NBA) players as they appear in real life, replicating their physical features."  *Id.*

Solid Oak has admitted that *NBA 2K16* includes "many components, including graphics, characters, a fictitious plot, gameplay, music, and graphics."  Pl.'s Answ. to Defs.' Countercls., dated June 1, 2017, (Dkt. No. 65) ("Answer") ¶ 198.  These components are as realistic as possible to create a "virtual world."  *Id.* ¶ 201.  Within that world, users can observe the game's visual and auditory components, explore the game's narrative, and play virtual basketball against a variety of opponents.  Declaration of Dale M. Cendali, Esq., dated August 9, 2017, ("Cendali Decl.") ¶ 2 (attaching video game discs and summarizing them for the Court's convenience).  As a result of these many game elements, *NBA 2K* has a massive file size of over 40 gigabytes, with additional megabytes stored on a user's game console.  *Id.* ¶ 44.

### A.     *NBA 2K's* Graphical and Auditory Components

Take-Two's video games strive to depict the game of basketball as it appears in "real

life." Aug. 2016 Op. 2.  Take-Two has done so by depicting "NBA players realistically in *NBA 2K*." Answ. ¶ 141.  *NBA 2K16*, for instance, includes depictions of over 400 current and retired NBA players.  Cendali Decl. ¶ 13.  These depictions have realistic facial and physical features. *Id.* ¶ 42.  The players move around the court as they would in real life, running, dribbling, walking, shooting, and passing.  *Id.* ¶ 38.  They wear jerseys and sportswear with the numbers, colors and logos of their teams.  *Id.*  The game even depicts NBA-branded socks.  *Id.*

Moreover, users can approximate real-world rosters of the 30 current NBA teams.  *Id.* ¶ 13.  The game also highlights "classic" teams, including the Portland Trailblazers (1999–2000), the Los Angeles Lakers (2000–2001), the Dallas Mavericks (2002-2003), the Minnesota Timberwolves (2003–2004), and the Detroit Pistons (2003–2004).  *Id.*  *NBA 2K* even has realistic arenas that look how they appear in the real world.  *Id.* ¶ 43.

Other people related to basketball and the NBA also are realistically depicted in *NBA 2K,* including cheerleaders and real-world coaches.  *Id.* ¶ 42.  Take-Two even has enlisted real-life sports professionals for in-game commentary, including: (a) CBS sportscaster Kevin Harlan for play-by-play commentary, (b) CBS Sports analysts Clark Kellogg and Greg Anthony as well as (c) Golden State Warriors head coach Steve Kerr for color commentary, (d) ESPN reporter Doris Burke for sideline reporting, (e) CBS Sports sportscaster Ernie Johnson for "studio" hosting, and (f) former players Shaquille O'Neal and Kenny Smith for studio analysis.  *Id.* ¶ 35.

In addition to these visual elements, *NBA 2K* includes auditory elements that are crucial to its realism.  These include commentary by the above-referenced professional sportscasters, cheering crowds, buzzers, and a fifty-song soundtrack curated by chart-topping producers DJ Khaled, DJ Mustard and DJ Premier.  *Id.* ¶ 33.  The game also uses realistic announcers for the court's PA system, promotion, and outdoor announcements.  *Id.*

B.       *NBA 2K's* **Story Modes**

The foregoing visual and auditory elements are combined in *NBA 2K* with original storylines created by award-winning writers.  Within these narratives, users create and customize their own fictional player, who competes against real-world players.  *Id.* ¶ 14; Answ. ¶¶ 29–30.

To take *NBA 2K16* as an example, its keystone story mode is called MyCAREER, which features a narrative called "Livin' Da Dream" written by famous Hollywood director Spike Lee. Cendali Decl. ¶ 16.  In MyCAREER mode, a user creates a fictional player and follows that character's rise from high school to college to professional basketball stardom.  *Id.* ¶ 16.  The mode progresses like a film, with gameplay interspersed with non-interactive cut scenes involving the professional and personal dramas of the fictional protagonist.  *Id.* ¶ 18.  Users play numerous short games throughout the story—three in high school, four in college, and eight in the character's rookie season in the NBA.  *Id.* ¶ 17.  While a handful of characteristics of the user's fictional character are fixed, such as the character's nickname ("Freq") and backstory, the user can customize many other aspects of the character.   *Id.* ¶¶ 20–22.  A user can even scan his or her own face into the game, so that the fictional player resembles the user.  *Id.* ¶ 23.

*NBA 2K16's* other gameplay modes have varying degrees of user customization.  In MyGM, the user simulates the decisions faced by the general manager of a professional basketball team, including monitoring the physical wear-and-tear of players, handling conversations about trading or playing time, and negotiating contracts.  *Id.* ¶¶ 25–27.  In MyLEAGUE, users control the NBA organization as a whole.  *Id.* ¶ 28.  MyTEAM focuses on the trading aspect of professional basketball by allowing users to build their ultimate team of professional NBA players through virtual trading cards of varying rarity and power.  *Id.* ¶ 29. Finally, MyPARK allows online play of the customized MyPLAYER character through online communities.  *Id.* ¶ 30.  This mode also can be customized, but its teams exclusively draw from

custom MyPlayers; users cannot select NBA players to be on their Pro-Am team.  *Id.* ¶ 32.

If a user only wants to play virtual basketball (without a narrative story), *NBA 2K16* has a mode called PLAY NOW, which allows users to play alone against the computer, or with another human—against other users either in the room or online.  *Id.* ¶¶ 10–11.  To play in this mode, users must select their team, drawing from actual NBA teams with current rosters, or from a custom selection of individual players from different teams and eras.  *Id.* ¶¶ 12–13.

C.     *NBA 2K's* Gameplay Camera Angles

Regardless of the gameplay mode, *NBA 2K's* basketball games are generally shown at camera angles optimized for visualizing the entire or large section of the court, so as to better observe the multiple players available to a user at any given time.  *Id.* ¶¶ 36–37.  The camera shifts automatically over the course of the game to follow the active gameplay, but users can select from a variety of default options or position the cameras manually according to the users' preference.  *Id.* ¶ 37.  As shown below, a user can choose to set the camera as if viewing the game on television, from the press section, or from a skybox in the stands.  *Id.*  The game also enables particular camera angles in each stage of its narrative mode: for example, high school games can be viewed with the "High School" angle.  *Id.*




**Camera Angle: Broadcast (Generic)**          **Camera Angle: Skybox**

 

**Camera Angle: Press**          **Camera Angle: High School**

Cendali Decl. ¶ 37.

As with a real-life basketball game, not every element is visible at any given time.  For instance, due to the varying camera angles, players may be obstructed by other parts of the court or other players.  *Id.* ¶ 37.  Similarly, during gameplay, elements may be shown in the background and/or out of focus.  *Id.*  Finally, the camera generally shows the players on the court, rather than those on the bench or in other areas of the arena.  *Id.* ¶ 39.  Thus, as players rotate on and off the court, they may not be visible at all.  *Id.* ¶¶ 37–39.

## II.   THE TATTOOS AND TAKE-TWO'S USE OF THEM IN *NBA 2K*

Solid Oak's operative complaint alleges infringement based on the five Tattoos shown below.  *See generally* Pl.'s 2d Am. Compl., dated Oct. 24, 2016, (Dkt. No. 55) ("Compl.").[1]  Each Tattoo was created as a "custom tattoo intended only for the player on which it was inked."  Answ. ¶ 48.  Thus, they are imbued with special meaning for the players.  For instance, Solid Oak admits that "Child Portrait Tattoo Artwork" depicts LeBron James's son.  *Id.* ¶¶ 57, 61.  Similarly, "330 and Flames Tattoo Artwork" depicts the number 330, *id.* ¶ 50, which is the area code for Mr. James's hometown.  Cendali Decl. ¶ 59.

---

[1]   Solid Oak originally also brought suit on "Lion's Head Tattoo Artwork."  Pl.'s Org. Compl., dated Feb. 1, 2016, (Dkt. No. 1) ("Org. Compl.") ¶ 34.  When Take-Two filed its Counterclaims, it showed that Solid Oak had deposited with the Copyright Office an image of a later version of the work, not the one created by the tattooist with which Solid Oak has an agreement.  Defs.' Countercls., dated Aug. 16, 2016, (Dkt No. 47) ("Countercls.") ¶¶ 69–80.  As a result, Solid Oak "dropp[ed] [its] infringement claim as to 'Lion's Head Tattoo Artwork."  Mem. Ord., dated May 16, 2017, (Dkt. No. 64) ("May 2017 Op."), at 2.

    

**"Child Portrait Tattoo Artwork"**   **"330 and Flames Tattoo Artwork"**   **"Cloud and Doves Tattoo Artwork"**   **"Wizard"**   **"Basketball with Stars and Script"**

Cendali Decl. ¶¶ 54–58

By depicting the NBA players "as they appear in real life," Take-Two "replicat[ed] their physical features, including their tattoos."  August 2016 Op. 2.  These depictions are realistic.  Answ. ¶ 142.  And, in *NBA 2K*, the Tattoos only appear on the players on which they were inked in real life, not other real-world players or fictional characters.  *Id.* ¶ 153; Cendali Decl. ¶ 60.

The Tattoos are just one of the myriad of elements that makeup *NBA 2K*.  *See* Answ. ¶¶ 198–99.  As discussed above, the visual, auditory, and narrative elements that compose *NBA 2K* are legion.  *See supra* 3–7.  The Tattoos are minor in comparison.  Even focusing on Take-Two's depiction of Messrs. Bledsoe, James, and Martin, the Tattoos are only a subset of their overall tattoos.  Answ. ¶¶ 146–48.  Thus, when the Tattoos are depicted as they are in real life, they appear in proportion to the player, alongside the player's other tattoos.[2]  Cendali Decl. ¶ 62.

Moreover, the Tattoos are not observable in every playing of *NBA 2K*.  They only appear on three players, and only during gameplay in which those players appear.  Cendali Decl. ¶ 60.  When Messrs. Bledsoe, James, or Martin do not appear in the game, neither do the Tattoos.  *Id.* ¶ 63.  Even when the Tattoos do appear, they frequently are obstructed from view by the players' limbs, other players on the court, or other in-game elements.  *Id.* ¶ 66.  Further, as the Tattoos are not highlighted visually or verbally, they may appear out of focus or in the background.  *Id.* ¶ 65.

## III.   SOLID OAK

Solid Oak is "owned by Matthew Siegler," and has "no [other] employees."  Answ. ¶¶

---

[2]    The Tattoos are much smaller in *NBA 2K* when viewed on a typical television than in real life.  *Id.* ¶ 62.

174–75.  Mr. Siegler is "not a tattooist," "did not create the tattoos," and "was not present when the Tattoos were created."  *Id.* ¶¶ 177–79.  Solid Oak "has never created, or contributed to the creation of, a video game depicting the Tattoos," and never "licensed a video game depicting [them]."  *Id.* ¶¶ 192–93.  It "has never licensed to any other party the ability to ink the Tattoos on other people."  *Id.* ¶ 183.  And it "has never sold merchandise depicting the Tattoos."  *Id.* ¶ 186.

## ARGUMENT

To decide a motion for judgment on the pleadings, courts "employ the same standard applicable to dismissals pursuant to Rule 12(b)(6)."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011) (alterations omitted).  Thus, the Complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Solid Oak must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  A court need not "accord legal conclusions, deductions or opinions couched as factual allegations a presumption of truthfulness."  *Allen v. Scholastic, Inc.*, 739 F. Supp. 2d 642, 653 (S.D.N.Y. 2011) (internal quotation marks, omissions, and alterations omitted).  Further, any admissions made by Solid Oak in its Answer "are judicial admissions that bind [Solid Oak] throughout this litigation."  *See Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir. 2006).

This Court may consider "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case."  *L-7 Designs*, 647 F.3d at 422.  It also may consider "any written instrument attached to [them] as an exhibit, materials incorporated in [to them] by reference, and documents that, although not incorporated by reference, are 'integral' to the [pleadings]."  *Id.*

Based on Solid Oak's many admissions in its Complaint and its Answer to Take-Two's

Counterclaims, as well as the documents attached to and incorporated by reference into the pleadings, Take-Two's *de minimis* and fair use of the Tattoos is clear.  It is within this Court's power to decide those issues at the pleadings stage.  *See Poindexter v. EMI Record Grp. Inc.*, No. 11 Civ. 559, 2012 WL 1027639, at \*4 (S.D.N.Y. Mar. 27, 2012) (Swain, J.) (dismissing copyright infringement claim on a 12(b)(6) motion based on *de minimis* use defense); *see Adjmi v. DLT Entm't Ltd.*, 97 F. Supp. 3d 512, 515 (S.D.N.Y. 2015) (granting 12(c) motion for declaratory judgment of fair use); *Arrow Prods, Ltd. v. Weinstein Co.*, 44 F. Supp. 3d 359, 363 (S.D.N.Y. 2014) (granting 12(c) motion based on fair use defense); *Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625 (S.D.N.Y. 2008) (granting 12(b)(6) motion based on *de minimis* use defense); *see also Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 689 (7th Cir. 2012) (affirming grant of 12(b)(6) motion based on fair use finding).

## I.   TAKE-TWO'S USE OF THE TATTOOS IS *DE MINIMIS*

"The principle that trivial copying does not constitute actionable infringement has long been a part of copyright law."  *Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004) (citing *West Publ'g Co. v. Edward Thompson Co.*, 169 F. 833, 861 (E.D.N.Y. 1909), in which Judge Learned Hand observed that "Some copying is permitted.").  An alleged copyright infringement is "*de minimis*, and therefore not actionable" where "the copying of the protected material is so trivial as to fall below the quantitative threshold of substantial similarity."  *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir. 1998) (internal quotation marks omitted).  To make that determination, courts consider the observability of the protectable elements in the allegedly infringing work from the perspective of the "average lay observer."  *Id.* at 217–18; *see also VMG Salsoul, LLC v. Ciccone*, 824 F.3d 871, 878 (9th Cir. 2016) (requiring observability to the "average audience").  They also filter out portions of the copyrighted work that are not protected by the plaintiff's copyright.  *Diamond*, 388 F.3d at 1193–94 (filtering out licensed elements);

*Poindexter*, 2012 WL 1027639, at *4 (filtering out "elements unique to the sound recording").

With regard to observability, courts consider two factors: "[1] the length of time the copyrighted work appears in the allegedly infringing work, and [2] its prominence in that work as revealed by the lighting and positioning of the copyrighted work." *Sandoval*, 147 F.3d at 217; *Newton v. Penguin/Berkley Pub. USA*, No. 13 Civ. 1283, 2014 WL 505191, at *1 (S.D.N.Y. Jan. 28, 2014) (dismissing lawsuit as copying of 95 words was *de minimis*). For example, in *Sandoval*, ten of the plaintiff's "black and white self-portrait studies" were reproduced in the motion picture *Seven*. 147 F.3d at 216. While it is possible, as can be seen in the image below, to pause the film and observe the photographs, the Second Circuit focused on how the film would be observed by the "average lay observer." *Id.* at 218. The court noted that the photographs appear in a scene lasting a "minute and half" from "eleven different camera shots." *Id.* at 216. Nevertheless, it held such copying to be *de minimis* because the photographs are displayed "at great distance," "out of focus," and "only briefly," such that they have no "cumulative effect because the images contained in the photographs are not distinguishable." *Id.* at 218; *see also Gordon v. Nextel Commn'cns*, 345 F.3d 922, 924 (6th Cir. 2003) (use of two illustrations in commercial was *de minimis* due to limited display time that was in background and not in focus).

Similarly, in *Gottlieb*, the plaintiff's pinball machine appeared in a three-and-a-half minute scene in the motion picture *What Women Want*. 590 F. Supp. 2d at 629, 633. Judge Chin determined that the film's use was *de minimis* because the machine was "always in the background," "never appear[ed] by itself or in a close-up," was "never mentioned and plays no role in the plot," and was "almost always partially obscured (by Gibson and pieces of furniture)." *Id.* at 632–33. Thus, because "an average observer would not recognize the Designs as anything

other than generic designs in a pinball machine," the copyright claim was dismissed on a Rule

12(b)(6) motion. *Id.*





**Still from *Seven***                **Still from *What Women Want***

Here, both factors show that Take-Two's use of the Tattoos was *de minimis*.  **First**, the

Tattoos rarely appear in *NBA 2K,* and when they do, it is only fleetingly.  In fact, in any given

playing, the Tattoos may not appear at all.  Cendali Decl. ¶ 63.  As Solid Oak admits, "the

Tattoos are depicted on the players on which they are inked in real life."  Answ. ¶ 153.  The

Tattoos will not appear if any of those three NBA players are not selected as playable or non-

playable characters in the game, which is likely to occur the majority of the time as there are

over 400 NBA players available for selection in the game.  Cendali Decl. ¶ 63.  And even if the

three NBA players are selected, unlike an NBA game, each basketball game in *NBA 2K* is played

over a few minutes.  *Id.* ¶ 41.  Apart from the very limited instances when Messrs. Bledsoe,

James, or Martin are on the screen, the Tattoos do not appear in *NBA 2K*.  *See Sandoval*, 147

F.3d at 218 (appearance in scene lasting 1.5 minutes supported finding of *de minimis* use);

*Gottlieb*, 590 F. Supp. 2d at 632 (appearance in 3.5 minute scene supported finding of *de minimis*

use).

**Second**, even when Messrs. Bledsoe, James, or Martin are selected for gameplay, the

Tattoos are not prominent.  During normal gameplay, the camera is angled to provide users with

a full view of the basketball court, causing the Tattoos to appear small if they can be seen at all.

- 12 -

*See supra 6.*  Moreover, as the players twist and move on the basketball court (often quite fast),

the Tattoos are hard to observe.  *Id.* ¶ 66.  They also often appear out of focus and frequently are

obscured by other players and the basketball.[3]  Cendali Decl. ¶¶ 66–67.  Furthermore, the Tattoos

never appear by themselves (rather, they appear on the players on whom they are inked in real

life), are not part of the plot of the video game, and are never highlighted verbally or visually.

*Id.* ¶ 65.  As a result, it is even more difficult to perceive the Tattoos than was the case in

*Sandoval* or *Gottlieb*, where the scenes took place in small rooms where stills of the films fully

displayed the works.  *See Sandoval*, 147 F.3d at 218 (finding *de minimis* use where photographs

were "not displayed with sufficient detail"); *Gottlieb*, 590 F. Supp. 2d at 632 (finding *de minimis*

use where pinball machine was obscured by actors and furniture); *see also Gordon*, 345 F.3d at

924 (finding *de minimis use* where illustrations were out of focus and in the background).

 As the Tattoos appear fleetingly and are not easily visible in *NBA 2K*, Solid Oak's

copyright claim should be dismissed and a judgment of *de minimis* use entered for Take-Two.[4]

## II. TAKE-TWO'S USE OF THE TATTOOS IS FAIR USE

 Fair use is an "important limit[] to an author's rights to control original and derivative

---

[3] While it is possible to manipulate the video game to try to get a better view of the Tattoos, this is not how an average lay observer would play the game and, thus, is irrelevant.  *See Sandoval*, 147 F.3d at 217–18 (ignoring ability to pause film to focus on copyrighted works).

[4] The *de minimis* nature of the use is even clearer when you consider that several of the Tattoos are based on pre-existing works and, thus, are entitled to, at best, thin copyright protection.  In *Gottlieb*, then-District Court Judge Chin observed that only "unique expressive element[s]" are to be considered in determining *de minimis* use.  590 F. Supp. 2d at 633.  This makes sense, as neither ideas nor facts are protectable by copyright.  *See Feist Pubs., Inc. v. Rural Telephone Serv. Co.*, 499 U.S. 340, 344 (1991).  Thus, for example, while Solid Oak may own certain rights with regard to "Child Portrait Tattoo Artwork," it has admitted that "the child depicted in 'Child Portrait Tattoo Artwork' is Mr. James's son."  Answ. ¶ 61; *see also* Cendali Decl. Ex. F (deposit copy of tattoo).  Any copyrights held by Solid Oak do not extend to the child's actual features.  *See Psihoyos v. Nat'l Geographic Soc'y*, 409 F. Supp. 2d 268, 275 (S.D.N.Y. 2005) ("To the extent a photograph captures the characteristics of an object as it occurs in nature, these characteristics are not protectible.").  Similarly, the most prominent feature of "330 and Flames Tattoo Artwork" is the pre-existing Akron area code 330.  Answ. ¶ 50; *see also* Cendali Decl. Ex. G (deposit copy of tattoo).  Words and short phrases like this are not protected by copyright.  *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir. 1992) (holding that "single words or short phrases . . . do not exhibit the minimal creativity required for copyright protection"); 37 C.F.R. § 202.1(a).  Solid Oak cannot rely on these elements to support its copyright infringement claim.

works" as it "allows the public to draw upon copyrighted materials without the permission of the copyright holder," *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014), and prevents an "overzealous monopolist" from using "his copyright to stamp out the very creativity that the Act seeks to ignite." *SOFA Entm't, Inc. v. Dodger Prods, Inc.*, 709 F.3d 1273, 1278 (9th Cir. 2013). Section 107 creates this "breathing space," *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994), by defining fair use as "not an infringement." 17 U.S.C. § 107. In determining whether a use is a fair use, "the factors to be considered" include:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

*Id.* Defendants "need not establish that each of the factors set forth in § 107 weighs in their favor." *Swatch Grp. Mgmt. Serv. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014). Rather, all of the factors "are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578. Those purposes being "to stimulate activity and progress in the arts for the intellectual enrichment of the public." *HathiTrust*, 755 F.3d at 94–95.

As discussed below, each fair use factor favors Take-Two. Above all else, however, it cannot be overemphasized that, in assessing fair use, copyright law focuses on whether a defendant's work serves as a substitute for a plaintiff's work. *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) (fair use where use does not "serve as a substitute for the original or its plausible derivatives, shrinking the protected market opportunities of the copyrighted work");

*HathiTrust*, 755 F.3d at 95 ("A fair use must not excessively damage the market for the original by providing the public with a substitute for that original work.").  In this scenario, *NBA 2K*, a video game, simply does not serve as a substitute for the Tattoos, which were custom inked on specific individuals.  A large-scale game that realistically depicts NBA players and the sport of basketball cannot be used to ink tattoos.  Moreover, Take-Two does not use the Tattoos for merchandise (such as decals).  Answ. ¶ 158.

### A.   Factor One: Take-Two's Use Is Transformative and Its Profits Are Not Attributable to the Tattoos

The first fair use factor requires consideration of two subfactors: (1) transformative use, and (2) commercial use.  *Campbell*, 510 U.S. at 578–79.

### 1.   Take-Two's Use of the Tattoos Is Transformative

"Most important to the court's analysis of the first factor is the 'transformative' nature of the work."[5]  *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006).  The "central purpose" of the first factor inquiry "is to see . . . whether the new work merely supersedes the objects of the original creation . . . or instead adds something new, with a further purpose or different character."  *Campbell*, 510 U.S. at 579 (alterations and internal quotation marks omitted).  "A use is transformative if it does something more than repackage or republish the original copyrighted work."  *HathiTrust*, 755 F.3d at 96.

Courts conduct this analysis by performing a side-by-side review of the works at issue and determining whether a "reasonable observer" would consider the defendant's work transformative.  *Cariou v. Prince*, 714 F.3d 694, 707–08 (2d Cir. 2013).  In doing so, they analyze four considerations: (1) whether the original purpose differs from the reproduction's

---

[5]   While a "transformative use is not absolutely necessary for a finding of fair use . . . the goal of copyright . . . is generally furthered by the creation of transformative works."  *Google*, 804 F.3d at 214 (internal quotation marks omitted).  "[S]uch works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright."  *Id.*

purpose; (2) the size of the reproduction; (3) the context in which the reproduction appears, including whether other textual, graphic, or creative content minimizes its expressive value; and (4) the proportion of the copied material in relation to the new work as a whole. *Bill Graham*, 448 F.3d at 609–611. Here, each of these considerations favors Take-Two.

Different Purposes. In *Bill Graham*, the Second Circuit highlighted the difference between using Grateful Dead concert posters for their original "artistic expression and promotion[al]" value, and using them in a book as "historical artifacts to document and represent the actual occurrence of Grateful Dead concert events." 448 F.3d at 609; *see also Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006) (holding that differing objectives confirmed the transformative nature of the use). In other words, because the images served as "historical artifacts graphically representing the fact of significant Grateful Dead concert events selected by the [book's] author for inclusion," their use was transformative. *Bill Graham*, 448 F.3d at 610.

Similarly, in *Bouchat v. Baltimore Ravens Ltd.*, the court considered whether it was transformative to show in videos a logo that appeared without authorization on the Ravens' uniforms. 737 F.3d 932 (4th Cir. 2013). The court found that such use was transformative because, whereas the logo "initially served as the brand symbol for the team," in the videos it was being used "as part of the historical record"; "not for its expressive content, but rather for its factual content." *Id.* at 940. In the broader context of the defendant's creative videos, the small logo "act[ed] simply as a historical guidepost—to those who even detect it—within videos that construct new narratives about the history of the Ravens and the NFL." *Id.* at 940–41 (defendant "used the historical footage to tell new stories"); *see also SOFA Entm't*, 709 F.3d at 1278 (using clip from *The Ed Sullivan Show* "as a biographical anchor" within the fictional musical *Jersey Boys* constituted transformative use).

Take-Two's use of the Tattoos similarly differs from the Tattoos' original purpose.  Solid Oak admits that "each of the Tattoos is a custom tattoo intended only for the player on which it was inked."  Answ. ¶ 48.  As discussed above, each of the Tattoos includes special meaning for those players, such as the image of a player's child or his hometown area code.  *See supra* 7.

By contrast, Take-Two uses the Tattoos to depict the players realistically in its video games—what the courts above refer to as a historical or biographical "anchor."[6]  This Court already has found that Take-Two's "games depict individual NBA players realistically, including the players' tattoos."  May 2017 Op. 2.  As a result, the players appear in *NBA 2K* as they do in "real life, replicating their physical features."  Aug. 2016 Op. 2.  Solid Oak has admitted that these "realistic renderings" include Messrs. Bledsoe, James, and Martin, as well as their Tattoos. Answ. ¶¶ 10, 141–42.  It also has conceded the importance of "authentic gameplay" to *NBA 2K's* success.  *See* Compl. ¶ 13.  Further, it has admitted that the Tattoos do not appear on other players or characters, and Take-Two "does not sell decals of the Tattoos."  Answ. ¶¶ 153, 158.

As Take-Two's use is "separate and distinct from the original artistic and promotional purpose for which the [Tattoos] were created," it is transformative.  *Bill Graham*, 448 F.3d at 610; *see also Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818 (9th Cir. 2003) (use of images in search engine was transformative as it was "unrelated to any aesthetic purpose").  Take-Two's transformative use is underscored by the fact that its video games depict professional basketball players who are public figures.  *See Monster Comm'ns, Inc. v. Turner Broad. Sys., Inc.*, 935 F. Supp. 490, 494 (S.D.N.Y. 1996) (use of film footage depicting Muhammed Ali was transformative, particularly due to Ali's status as a "figure of legitimate public concern").

<u>Size of the Reproductions</u>.  Transformative use also is more likely where an original

---

[6]   The transformative nature of using the Tattoos as a historical anchor is not lessened by the fact that *NBA 2K* is an entertainment property.  *See Hofheinz v. Discovery Commn'cns, Inc.*, No. 00 Civ. 3802, 2001 WL 1111970, at *4 (S.D.N.Y. Sept. 20, 2001) (refusing to "engage in such subjective line-drawing").

work's size is "significantly reduced" in a second work.  *Bill Graham*, 448 F.3d at 611.  In *Bill Graham*, for instance, the concert posters were small enough to "permit readers to recognize the historical significant of the posters," but "inadequate to offer more than a glimpse of their expressive value."  *Id.*  Because the defendant "used the minimal image size necessary to accomplish its" purpose, the use was transformative.  *Id.*  Similarly, in *Kelly*, the court highlighted that, although the defendant "made exact replications of Kelly's images," the thumbnails that actually were displayed were "smaller, lower-resolution images," making it less likely that they would substitute for the original works.  336 F.3d at 818.

Here, the Tattoos appear only fleetingly and in small size.  *See supra* 8.  They certainly are not life-size recreations, nor do they serve as an adequate replacement for the Tattoos.  *See id.*  Further, though *NBA 2K's* gameplay is exceptionally realistic, the Tattoos in the game are necessarily smaller than the Tattoos in real life.  Cendali Decl. ¶ 62.

Minimizing Expressive Value.  When the "expressive value of the reproduced" material is "minimized" by combining it with other materials, a transformative use finding is more likely.  *Bill Graham*, 448 F.3d at 611.  For example, in *Bill Graham*, the book at issue included a "prominent timeline, textual material, and original graphical artwork, to create a collage of text and images on each page of the book."  *Id.*  Moreover, the images were "displayed at angles," such that the overall layout "ensures that the images at issue are employed only to enrich the presentation of the cultural history of the Grateful Dead, not to exploit copyrighted artwork for commercial gain."  *Id.*  Similarly, in *Bouchat*, the logo was "used only fleetingly and insignificantly . . . limiting its expressive value."  737 F.3d at 941.  And, in *Sarl Louis Feraud Int'l v. Viewfinder Inc.*, the court noted that the argument for "transformative use is stronger" where a "three-dimensional, life-sized" work was reduced to a smaller, 2D image imbued with

the defendant's own creative expression.  627 F. Supp. 2d 123, 128 (S.D.N.Y. 2008).

Here, Solid Oak has admitted that *NBA 2K* represents "an entire virtual world."  Answ. ¶ 201.  It has "many components, including graphics, characters, a fictitious plot, gameplay, music, and graphics."  *Id.* ¶ 198.  These elements create a fun, lush experience for game users.  *See supra* 3–7.  While the Tattoos appear in *NBA 2K*, Solid Oak has admitted that they are "only one of many components."  Answ. ¶ 199.  It also concedes, as it must, that the Tattoos are only a small number of the total tattoos in the game.  *Id.* ¶ 200.  In fact, they are only a small number of the tattoos that appear on Messrs. Bledsoe, James, and Martin.  *Id.* ¶¶ 146–48.  Thus, any expressive value of the Tattoos has been significantly diminished by *NBA 2K's* other elements.

<u>Proportion of Copied Material</u>.  Similar to the prior qualitative consideration of the expressive value of the Tattoos, courts also consider the quantitative amount of the material taken in relation to the allegedly infringing work.  *See Bill Graham*, 448 F.3d at 611.  For instance, the book at issue in *Bill Graham* was 480-pages long, the images only appeared on seven pages, and they were "less than 1/20 the size of the original."  *Id.*  As a result, "[i]n total, the images account[ed] for less than one-fifth of one percent of the book."  *Id.*  Likewise, in *Bouchat*, in the "vast majority of its appearances," the logo was "present for fractions of a second, and [could] be perceived only by someone who [was] looking for it."  737 F.3d at 940.

Here, the Tattoos are such a small component of the overall video game that it would be difficult to even calculate.  *See supra* 8.  They only appear on three of the players, and only then on small parts of their bodies, which aren't visible at all times.  *Id.*  When the Tattoos are present, they are a tiny fraction of the overall graphic display of the video games.  *Id.*  In light of the massive, over 40 gigabyte size of *NBA 2K*, as well as its myriad user options and enormous graphic and auditory elements, at best the Tattoos would only be a tiny fraction of a game in

which the players on which the Tattoos were inked were selected—certainly far less than the

0.2% that was found to support transformative use in *Bill Graham*.

　　As each of these considerations favors Take-Two, its use of the Tattoos is transformative.

　　　　　　2.　　The Commercial Use Subfactor Is Of Little Weight Here

　　While commercial use also must be considered, "the more transformative the new work,

the less will be the significance of other factors, like commercialism." *Campbell*, 510 U.S. at

579. Indeed, the Second Circuit has "repeatedly rejected the contention that commercial

motivation should outweigh a convincing transformative purpose and absence of significant

substitutive competition with the original." *Google*, 804 F.3d at 219.

　　　　　　　　　　　　　　* * *

　　For the foregoing reasons, the first fair use factor weighs in favor of fair use.

**B.　　Factor Two: Take-Two Used the Tattoos in the Interest of Accuracy and the Tattoos Were Published**

　　The second fair use factor involves consideration of "(1) whether the work is expressive

or creative, . . . with a greater leeway being allowed to a claim of fair use where the work is

factual or informational, and (2) whether the work is published or unpublished." *Cariou*, 714

F.3d at 710. "As a general rule, published works enjoy less fair use protection than unpublished

works." *Hofheinz*, 2001 WL 1111970, at *5. While the "second factor has rarely played a

significant role in the determination of a fair use dispute," it favors Take-Two here. *Google*, 804

F.3d at 220.

　　***First***, any creativity that the Tattoos have must be weighed against the fact that Take-

Two copied the Tattoos to depict real-world subject matter realistically. *See Consumers Union*

*of U.S. v. Gen. Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983) (finding that copying plaintiff's

work "in the interest of accuracy" did not weigh against fair use); *see also Bouchat*, 737 F.3d at

943 ("[I]f the disputed use of the copyrighted work is not related to its mode of expression but rather to its historical facts, then the creative nature of the work matters much less than it otherwise would." (internal quotation marks omitted)).[7]

**Second**, as evidenced by the Certificates of Registration Solid Oak attached to the Complaint, each of the Tattoos was published prior to its inclusion in *NBA 2K*. *See* Compl. Exs. D, F, H, J, K (indicating that Tattoos were published); Org. Compl. Ex. E (same); *see also* Answ. ¶¶ 51, 58, 71, 83, 90, 96 (admitting publication). "Published works are more likely to qualify as fair use because the first appearance of the artist's expression has already occurred." *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1178 (9th Cir. 2013). Where a work is widely disseminated, as is the case with the Tattoos, it favors fair use. *Id.* (image appeared on the Internet and streets of Los Angeles before the defendant's use); *Kelly*, 336 F.3d at 820 (factor mitigated by fact that photographs were posted on the Internet by copyright holder). This factor supports Take-Two.

### C.   Factor Three: Take-Two's Copying Was Reasonable In Light of Its Purpose

"The third factor asks whether the secondary use employs more of the copyrighted work than is necessary, and whether the copying was excessive in relation to any valid purposes asserted under the first factor." *HathiTrust*, 755 F.3d at 96. "[T]he extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586–87. Indeed, "for some purposes, it may be necessary to copy the entire work, in which case Factor Three does not weigh against a finding of fair use." *HathiTrust*, 755 F.3d at 98.

Here, where the Tattoos are two-dimensional images used to depict real life accurately, using less than the whole would defeat Take-Two's purpose. *See supra* 8. Thus, this factor does not weigh against fair use. *See Bouchat*, 737 F.3d at 949 (finding it was necessary to include the logo in displays showing the NFL's history and noting, "It is hard to see frankly how the use of

---

[7]   Moreover, as noted above, any copyright in these works is thin at best. *See supra* 7, 13 n.4.

one-third or two-third of the logo is even practical or makes any sense."); *Seltzer*, 725 F.3d at

1178 (finding that, unlike a television program or book, images are "not meaningfully

divisible"); *Kelly*, 336 F.3d at 821 ("If Arriba only copied part of the image, it would be more

difficult to identify it, thereby reducing the usefulness of the visual search engine."); *Nunez v.*

*Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000) (copying less than entire photograph

"would have made the picture useless to the story," mitigating the relevance of this factor).

Moreover, in assessing this factor, courts consider whether "the visual impact of

[reproductions'] artistic expression is significantly limited because of their reduced size." *Bill*

*Graham*, 448 F.3d at 613. Where, as here, the copyrighted work is displayed in its entirety but at

"the minimal image size and quality necessary to ensure" that it can be recognized as a

"historical artifact," this factor does not weigh against fair use. *Id.*; *see supra* 8. Accordingly,

the third fair use factor weighs in favor of fair use.

### D.      Factor Four: Take-Two Has Not Harmed the Tattoos' Markets

The fourth fair use factor considers whether the use will "result in a substantially adverse

impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (internal quotation

marks omitted). The focus is on "whether the copy brings to the marketplace a competing

substitute for the original, or its derivative, so as to deprive the rights holder of significant

revenues because of the likelihood that potential purchasers may opt to acquire the copy in

preference to the original." *Google*, 804 F.3d at 223; *HathiTrust*, 755 F.3d at 96 ("To defeat a

claim of fair use, the copyright holder must point to market harm that results because the

secondary use serves as a substitute for the original work."). "[A]ny economic 'harm' caused by

transformative uses does not count because such uses, by definition, do not serve as substitutes

for the original work." *HathiTrust*, 755 F.3d at 99.

As to the original market for the Tattoos, Solid Oak's license agreements with the

tattooists expressly disclaim "the right to tattoo a permanent tattoo rendering onto a person's skin."  Compl. Exs. C, G, I.  Moreover, Solid Oak has admitted that it has never licensed to any party "the ability to ink the Tattoos on other people."  Answ. ¶ 183.  Thus, it has no rights in or to the original market for the Tattoos (*i.e.*, inking them on people).

As to the market for derivative works, Solid Oak cannot claim a potential market for the use of the Tattoos made by Take-Two.  The Second Circuit has cautioned that "it is a given in every fair use case that plaintiff suffers a loss of a *potential* market if that potential is defined as the theoretical market for licensing the very use at bar."  *Swatch*, 756 F.3d at 91.  To "guard against this vice of circular reasoning," the factor four inquiry is limited "to a use's impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets."  *Id.* (internal quotation marks omitted).  "[W]ere a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the fourth fair use factor would *always* favor the copyright holder."  *Bill Graham*, 448 F.3d at 614.

Here, Solid Oak has admitted that it "has never created, or contributed to the creation of, a video game depicting the Tattoos" and that it "has never licensed a video game depicting the Tattoos."  Answ. ¶¶ 192–93.  These admissions are fatal to Solid Oak's case.  *See Blanch*, 467 F.3d at 258 (admission that copyright owner had "never licensed any of her photographs for" the use made by defendant weighed in favor of fair use); *Estate of Smith v. Cash Money Records, Inc.*, No. 14 Civ. 2703, 2017 WL 2333770, at *10 (S.D.N.Y. May 30, 2017) (holding that fourth factor favored fair use finding where "Plaintiffs never attempted to establish a market for licensed derivative uses of the JSR composition copyright until Defendants used the recording on the Album"); *Viewfinder*, 627 F. Supp. 2d at 136 (market harm argument is "undermined by the

fact that plaintiffs do not themselves sell of license photos of their designs to the media").

Moreover, Solid Oak has admitted that it "has never sold merchandise depicting the Tattoos." Answ. ¶ 158.  Nor could it do so as it has admitted that it has not obtained the publicity or trademark rights necessary to depict the Tattoos (part of the players on which they are inked's likenesses) on merchandise. *Id.* ¶¶ 187–190.  Solid Oak's lack of licenses in these overlapping intellectual property rights prevents Solid Oak from commercializing the Tattoos. *Cf. Bouchat v. Baltimore Ravens Ltd. P'ship*, No. 08 Civ. 397, 2011 WL 5445947, at *2 (D. Md. Nov. 9, 2011) (finding lack of harm due to copyright holder being "limited (perhaps totally) in his commercial use of the [copyrighted work] by virtue of Defendants' trademark rights").  In any case, Take-Two does "not sell decals of the Tattoos."   Answ. ¶ 186.

Finally, where a use is "transient and fleeting . . . as well as for its factual, and not expressive, content," it is unlikely to cause market harm.  *Bouchat*, 737 F.3d at 943.  As discussed above, Take-Two's use of the Tattoos in *NBA 2K* is *de minimis*, *see supra* 10, and the Tattoos are merely used to depict the real world accurately, not for their expressive value, *see supra* 17.  Thus, this factor supports a finding of fair use.

### E.     Considerations of the Public Interest Favor Take-Two

"The ultimate test of fair use . . . is whether the copyright law's goal of promoting the Progress of Science and useful Arts . . . would be better served by allowing the use than by preventing it." *Blanch*, 467 F.3d at 251 (internal quotation marks omitted); *see also Swatch*, 756 F.3d at 90 (balancing "the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied").  Of particular import for this case, fair use protects secondary users "from the inevitable chilling effects of allowing an artist too much control over the dissemination of his or her work for historical purposes." *Bouchat*, 737 F.3d at 944.  Were courts to "require those wishing to produce [new works] to receive

- 24 -

permission from copyright holders for fleeting factual uses of their works, [they] would allow those copyright holders to exert enormous influence over new depictions of historical subjects and events." *Id.* "This would align incentives in exactly the wrong manner, diminishing accuracy and increasing transaction costs, all the while discouraging the creation of new expressive works." *Id.* at 944–45.

Here, Solid Oak admits that "NBA players appear in the telecasts of NBA games," are "photographed and recorded playing basketball," and "appear in advertisements for different products." Answ. ¶¶ 102, 104, 113. Moreover, it admits that images and videos of Messrs. Bledsoe, James, and Martin have been shown by "[s]ports news outlets," as well as taken by "[s]ports photographers" and paparazzi (sometimes for inclusion in commercial publications). Answ. ¶¶ 106, 108, 110, 112. Mr. James, in particular, has appeared in "various advertisements," "commercials," and the "covers of magazines." *Id.* ¶¶ 114, 116, 118.

If Take-Two's motion is denied, Solid Oak will be able to use that decision to shakedown each of the publications and television programs in which those players have appeared, as well as any other video game publisher that depicts the Tattoos. It would be illogical to allow Solid Oak to seek rents each time that a player bearing one of its tattoos commercializes his likeness, or worse, appears in public, and therefore arguably "publicly displays" the Tattoos under copyright law. *See* 17 U.S.C. § 106(5). We know of no case reaching such a result. Doing so here would set a bad precedent affecting all bearers of tattoos and the companies that creatively depict them.

## <u>CONCLUSION</u>

As Take-Two's use of the Tattoos constitutes *de minimis* use and fair use, Solid Oak's copyright claim should be dismissed with prejudice and judgment granted to Take-Two on its Counterclaims I and II.

Dated: New York, New York
   August 9, 2017

         */s/ Dale M. Cendali*
         Dale M. Cendali
         Joshua L. Simmons
         KIRKLAND & ELLIS LLP
         601 Lexington Avenue
         New York, NY 10022
         Telephone: (212) 446-4800
         Facsimile: (212) 446-4900
         dale.cendali@kirkland.com
         joshua.simmons@kirland.com

         Attorneys for Defendants-Counterclaimants