Darren A. Heitner
HEITNER LEGAL, P.L.L.C.
215 Hendricks Isle
Fort Lauderdale, FL 33301
Telephone: (954) 558-6999
Facsimile: (954) 927-3333
Darren@HeitnerLegal.com
Alan@HeitnerLegal.com

Paul S. Haberman
Law Offices of Paul S. Haberman LLC
PO Box 167
Norwood, NJ 07648
Telephone: (201) 564-0590
Facsimile: (201) 767-2087
psh@paulhabermanlaw.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SOLID OAK SKETCHES, LLC, | CASE NO. 1:16-cv-724(LTS)(RLE) |
| Plaintiff/Counter-Defendant, | ECF Case |
| v. | |
| VISUAL CONCEPTS, INC.; 2K GAMES, INC.; TAKE-TWO INTERACTIVE SOFTWARE, INC., | |
| Defendants/Counter-Plaintiffs. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RESPONSE TO**
**DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

Page(s)

I.   **PRELIMINARY STATEMENT**…………………………………………............1

II.  **FACTUAL BACKGROUND**……………….………………….…………........3

III. **STANDARD OF REVIEW**……………………………….…………………...4

IV.  **ARGUMENT**……………………………………………………………......5

    A. DEFENDANTS CANNOT ESTABLISH FAIR USE
       AS THE CIRCUMSTANCES SURROUNDING THEIR
       USE OF THE SUBJECT TATTOOS SATISFY NONE OF
       THE FAIR USE DOCTRINE……………………………………...……………5

           1.   The Purpose and Character Factor Favors Plaintiff……......……...7

           2.   The Nature of the Work Factor Favors Plaintiff……....……….....11

           3.   The Amount and Substantiality Factor Favors Plaintiff…………..12

           4.   The Effect of the Use Upon the Potential Market
               Factor Favors Plaintiff…....…………….……….……...……….13

    B. DEFENDANTS FAIL TO ALLEGE THAT THEIR USE
       OF TATTOOS IS *DE MINUMUS* IN NATURE, AS THEIR
       USE OF THE SUBJECT TATTOOS IS FAR MORE THAN
       TRIVIAL AND IS AN IMPORTANT COMPONENT
       OF ITS VIDEOS GAME……....……….……....…….……….......……..……...……15

           1.   Defendants Have Failed to Establish that their Offending
               Use of the Subject Tattoos is *De Minimus* in Nature as
               A Matter of Law…....……….……....……….……...……..……....17

           2.   Defendants Failed to Establish that the Offending Depictions
               of the Subject Tattoos are Not Substantially Similar to the
               Protected Works…....……….…….……....……...……..……....18

           3.   The Issue of Whether the Subject Tattoo's Usage in the
               NBA 2K Games is *De Minimus* is Not Rope at this Stage…....…..18

V.   **CONCLUSION**…………………………………………….…………...…19

<h1 style="text-align:center"><u>TABLE OF AUTHORITIES</u></h1>

**<u>Cases</u>**                                                                                      **<u>Page(s)</u>**

*American Geophysical Union v. Texaco Inc.*,
   60 F.3d 913, (2d Cir 1994)……………………………………………………....13

*Ashcroft v. Iqbal*,
   556 U.S. 662, (2009). ………………………………...……………………....5

*Authors Guild v. Google, Inc.*,
   804 F.3d 202, (2d. Cir. 2015). ………………………………...……………….....8, 10

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, (2007)……………….……………….................………………….........4

*Bill Graham Archives v. Dorling Kindersley, Ltd.*,
   448 F. 3d 605, (2d Cir. 2006) ………………….……………..………….....6, 8, 9, 10, 12, 13

*Blanch v. Koons*,
   467 F.3d 244, (2d Cir. 2006). …………….………...………………………….....7, 11

*Browne v. McCain*,
   612 F. Supp.2d 1125, (C.D. Cal. 2009)…………………....……………….…….........6

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569, (1994). ………………….………...………….....7, 8, 9, 11, 12, 13

*Cariou v. Prince*,
   714 F.3d 694, (2d Cir. 2013)……………………………...……………....7, 8, 9, 11

*Castle Rock Entm't Inc. v. Carol Pub Grp., Inc.*,
   150 F.3d 132, (2d. Cir. 1998) …………………………...……………………....8, 13

*Crane v. Poetic Prods.*,
   549 F. Supp. 2d 566, (S.D.N.Y.2008) …………….………..…………………...15, 18

*DiFolco v. MSNBC Cable L.L.C.*,
   622 F.3d 104, 111 (2d. Cir. 2010)………………………………………….............5

*Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*,
   307 F.3d 197, 208 (3d Cir. 2002)……………………………..…………….............15

*eScholar, LLC v. Otis Educational Systems, Inc.*,
   No. 04 Civ. 4051 2005 WL 2977569, (S.D.N.Y. Nov. 3, 2005)….…………….….............16

*Gottlieb Development LLC v. Paramount Pictures Corp.*,
590 F. Supp.2d 625, (S.D.N.Y. 2008) …………….…………....…………………….........15

*Graham v. Prince*,
15-cv-10160, 2017 WL 3037535 (S.D.NY July 18, 2017)……....…………………….............6

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
471 U.S. 539, (1985). …………….…………….……………....…………………….........13

*Hirsch v CBS Broadcasting Inc.*
17-Civ. 1860, 2017 WL 3393845, (S.D.NY Aug. 4, 2017) …………….....………….....6, 8, 12

*Infinity Broad Corp. v. Kirkwood*,
150 F.3d 104, (2d. Cir. 1998)…………….…………….……....………………..............7

*Lennon v. Premise Media Corp.*,
556 F. Supp.2d 310, (S.D.N.Y 2008). …………….…………....……………….…..............11

*Marketing Technology Solutions, Inc. v. Medizine LLC*,,
09-Civ. 8122, 2010 WL 2034404, (S.D.N.Y. May 18, 2010) …………………….............16

*Miller v. Wolpoff & Abramson, L.L.P.*,
321 F.3d 292, (2d Cir 2003)…………….…………….……....……....……………........4

*North Jersey Media Group Inc. v. Pirro*,
74 F. Supp.3d 605,(S.D.N.Y. 2015) …………….…………………………….....12, 13, 14

*On Davis v. The Gap, Inc.*,
804 F.3d 202, (2d. Cir. 2015). …………….…………….……....………………..............11

*Patel v. Contemporary Classics of Beverly Hills*,
259 F.3d 123, (2d. Cir. 2001)…………….…………….……....………………..............4

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
602 F.3d 57, (2d Cir. 2010) …………….…………….……....……………….....16, 19

*Ringgold v. BET, Inc.*
126 F.3d 70, (2d Cir. 1997)…………….…………….……....……….....15, 16, 17, 18

*Ritani, LLC v. Aghjayan*,
880 F. Supp.2d 425 (S.D.N.Y. 2012) …………….…………….……………….............5

*Sandoval v. New Line Cinema Corp.*,
973 F. Supp.401, (S.D.N.Y 1997). …………….…………….……………….......12

*SGC Communication Resources, LLC v. The Seminar Center, Inc.*,
   No. 98 Civ. 2724, 2001 WL 274053, (S.D.N.Y. March 20, 2001) …………………..........16

*Sheppard v. Beerman*,
   18. F.3d 147, (2d Cir. 1994). …………………………………..………………….......4, 5

*Stewart v. Abend*,
   495 U.S. 207, (1990) …………………………………………..…………………......5

*TCA Television Corp. v. McCollum*,
   839 F. 3d 168, 178 (2d. Cir. 2016)…………………….………...…….…...…....6, 7, 8, 9, 12

*Turkem v. Hasty*,
   789 F.3d 218, (2d. Cir. 2015)  ………...……………..…….....………………........4

*Wright v. Warner Books Inc.,*
   953 F. 2d 731,  (2d. Cir. 1991)). ……………………….……………….................6

## Statutes

17 U.S.C. § 107…………………….……………………………………….…...........6, 7, 13

## Rules

Fed R. Civ. P.12(b)(6)……………………….……………………………….................4, 5,  6

Fed R. Civ. P.12(c)……………………….…………………………………................4,  5, 6

Plaintiff/Counter-Defendant, Solid Oak Sketches, LLC ("Solid Oak" or "Plaintiff"), submits this Memorandum of Law in support of its response in opposition to the motion for judgment on the pleadings filed by Defendants/Counter-Claimants 2K Games, Inc. and Take-Two Interactive Software, Inc. (collectively "Defendants") pursuant to Federal Rule of Civil Procedure 12(c).

## I.   PRELIMINARY STATEMENT

Plaintiff's sole motive for instituting this action is to be made whole for the infringement of the copyrights that it paid money for in exchange for the exclusive licenses that it possesses. Plaintiff provided consideration to various tattoo artists in exchange for the exclusive licenses to the copyrights containing the tattoo art at issue that was created by the tattoo artists and inked on NBA players Eric Bledsoe, LeBron James and Kenyon Martin (the "Tattoos"). Plaintiff paid for the binding and enforceable exclusive licenses for the purpose of exploiting those Tattoos for commercial gain and to preclude third parties from infringing on Plaintiff's exclusive right to do same.

Defendants ask the Court to construe the creation and enforcement of the licensing agreements as Plaintiff simply being an opportunist. If Plaintiff's decision to enter into exclusive licensing agreements with the Tattoos' artists in attempt to create commercial opportunities is considered opportunism, then Plaintiff is guilty as charged. However, there is nothing improper or illegal surrounding a company, whose principal may have no experience as a tattoo artist, entering into valid, binding contractual agreements with tattoo artists for exclusive licenses over their intellectual property. Plaintiff received the exclusive licenses and then discovered that the Defendants were illegally exploiting them in a manner that constitutes infringement. Plaintiff reached out to the Defendants prior to initiation of the instant action, in good faith, to explore the

possibility of a resolution without judicial intervention. Ultimately, Plaintiff was left with no choice but to file the instant lawsuit in order to be made whole for Defendants' violations of intellectual property law.

Plaintiff is not arguing that NBA players must seek Plaintiff's permission every time that they appear in public. Rather, Plaintiff is arguing that corporate entities that purposefully seek to commercially benefit from the use of the Tattoos be held accountable for their actions and pay a royalty to the rightful owner of the intellectual property. Here, Defendants have sought to create as close of a replication to the Tattoos within their highly successful video games, promote the realism of the players to the consuming public and avoid making any payment to Plaintiff for the use of the copyright registrations it possesses.

Defendants' use of the Tattoos is neither *de minimis* nor protected by the fair use doctrine. The Tattoos are a main design on the NBA players on which they are attached, and those players' Tattoos at issue are prominently featured, with LeBron James being the highest rated player in Defendants' video game.[1] Separately, the purpose and character of the use is clearly commercial in nature and not a matter of newsworthy or educational speech worthy of receiving an exception to laws concerning copyright infringement. Furthermore, the Tattoos are used in their entirety and Plaintiffs ability to license the Tattoos to third parties, including other video game manufacturers, is impeded by Defendants' refusal to pay for the intellectual property of Plaintiff that it is using.

For the reasons set forth below, Plaintiff respectfully requests that this Court deny Defendants' motion for judgment on the pleadings in whole.

---

[1] See Nick Schwartz, *The 26 highest-rated players in NBA 2K17*, FOX Sports, Oct. 20, 2016, *at* http://www.foxsports.com/nba/gallery/nba-2k17-player-ratings-highest-lebron-james-stephen-curry-kevin-durant-091816.

## II. FACTUAL BACKGROUND

Plaintiff is a Delaware limited liability company that entered into Copyright License Agreements with various authors of the Tattoos, and secured registrations of the copyrights surrounding same. Plaintiff's Second Amended Complaint ("Amended Compl.") ¶¶ 6, 26, 32-36, ECF No. 55. The Tattoos received Certificates of Registration by the United States Register of Copyrights on various dates in the months of June and July 2015. *Id.* at ¶¶ 32-36. Despite the valid Copyrights for the tattoos, the Defendants used the copyrighted materials in its games without any credit or licensing arrangement with the Plaintiff. Amended Comp. ¶¶ 20-22, 39.

Specifically, the Tattoos at issue have been reproduced by the Defendants in their video games, including, but without limitation to, *NBA 2K14*, *NBA 2K15* and *NBA 2K16*. Amended Compl. ¶¶ 9-11.)"An updated version of the *NBA 2K* game is released annually" and "feature[s] animated versions of National Basketball Association (NBA) players as they appear in real life, replicating their physical features." Memo. Op., dated Aug. 2, 2016 (ECF No. 44). "Users can manipulate dozens of parameters for every aspect of gameplay." Declaration of Dale M. Cendali, Esq, dated August 9, 2017 ("Cendali Decl.") (ECF No. 78). Thus, users influence many aspects of the game and control what they ultimately see when playing any of the aforementioned games. When playing the videogames, like NBA2K16, on either the Xbox 360, PlaysStation3, PS4, Xbox One, or PC, users can be playing the realistic games on large screens including, but not limited to projectors. Declaration of Paul S. Haberman, Esq. dated September 12, 2017, ("Haberman Decl.") ¶ 8. Because of the Defendants' use of the tattoos, the Plaintiff has substantiated will continue to sustain immediate, substantial, and irreparable injury, for which there is no adequate remedy at law. Amended Complaint ¶ 44. Therefore, the Plaintiff commenced this action on or about February 1, 2016. Plaintiff's Complaint, dated February 1, 2016 (ECF No.1).

At the heart of the instant dispute is Defendants' use of the tattoos, specifically whether Defendants use of the Tattoos is considered (a) *de minimis*; or (b) fair use. (Defendants' Memorandum of Law in Support of Motion for Judgment on the Pleadings ("Defendants' Memo.") ECF No. 77.) In brief, Defendants contend that their use constitutes fair use on the following grounds: (1) the tattoos are significantly reduced in size;(2) users cannot see their expressive value; (3) the tattoos appear only "fleetingly and in small size"; and (4) Defendants' use serve as a "historical or biographical anchor". Defendants' Memo at 15-20. Similarly, on the *de minimus* claim the Defendants proclaim that the tattoos are not prominent and appear "even smaller than they would appear in the real life." *Id*. at 2. To date, Defendants has sent Plaintiff many discovery requests, yet Plaintiff has not been afforded the opportunity to conduct depositions or send similar discovery requests. Haberman Decl. ¶¶ 7-8. Plaintiff intends to conduct reasonable discovery throughout the duration of this litigation. *Id.*

## III.      STANDARD OF REVIEW

The Court of Appeals for the Second Circuit has explained that "in deciding a Rule 12(c) motion, we apply the same standard as that applicable to a motion under Rule 12(b)(6). *Sheppard v. Beerman*, 18. F.3d 147, 150 (2d Cir. 1994). In both postures, courts must accept all allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003)(*quoting Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d. Cir. 2001). To survive a motion to dismiss under Rule 12(b)(6), a complaint must only contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *see also Turkem v. Hasty*, 789 F.3d 218, 240 (2d. Cir. 2015) (noting that plaintiffs "need not prove their

allegations; they must plausibly plead them").

A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Neither *Twombly* nor *Iqbal* requires a plaintiff in a copyright infringement action to plead specific evidence or extra facts beyond what is needed to make the claim plausible." *Ritani, LLC v. Aghjayan*, 880 F. Supp.2d 425. 440 (S.D.N.Y. 2012) (internal quotation marks omitted). The court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d. Cir. 2010). Accordingly, courts must deny a motion for judgment on the pleadings unless it appears that it is blatantly apparent that no sets of facts can be proved that would entitle the plaintiff to relief. *Beerman,* 18. F.3d at 150.

Based on the complaints, answers and accompanying documents, there is no doubt that Plaintiff has plausibly plead the allegations needed to show that it is entitled to relief; to rule otherwise would go against long-standing precedent and the traditional notions of justice and equity.

## IV.     ARGUMENT

### A.     DEFENDANTS CANNOT ESTABLISH FAIR USE AS THE CIRCUMSTANCES SURROUNDING THEIR USE OF THE SUBJECT TATTOOS SATISFY NONE OF THE ELEMENTS OF THE FAIR USE DOCTRINE

The fair use doctrine is an "equitable rule of reason which permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity that law is designed to foster." *Stewart v. Abend*, 495 U.S. 207, 236 (1990) (internal citations omitted). The applicability of the fair use doctrine is a mixed question of law and fact, and a court cannot engage in the fair use inquiry until it has been presented with facts relevant to evaluating the fair

use factors. *Bill Graham Archives v. Dorling Kindersley, Ltd.*, 448 F. 3d 605, 608 (2d Cir. 2006); *Graham v. Prince*, 15-cv-10160, 2017 WL 3037535 (S.D.NY July 18, 2017); *Hirsch v CBS Broadcasting Inc.*, 17-Civ. 1860, 2017 WL 3393845, *7 (S.D.NY Aug. 4, 2017) (denying a 12(b)(6) motion on the grounds that further discovery would enable a more careful assessment on a fair use claim). Due to the fact-sensitive nature of the inquiry, courts generally do not address the fair use defense until the summary judgment phase. *TCA Television Corp. v. McCollum*, 839 F. 3d 168, 178 (2d. Cir. 2016); *Wright v. Warner Books Inc.,* 953 F. 2d 731, 735 (2d. Cir. 1991) ("the fact-driven nature of the fair use determination suggests that a district court should be cautious in granting *Rule 56 motions* in this area) (emphasis added). Since it is conceivable— though highly unlikely—that the fair use doctrine can be addressed on a motion to dismiss, let alone a motion for judgment on the pleadings, the Court must review Defendants' infringing use of the tattoos by evaluating the four fair use factors. *TCA Television Corp.,* 839 F. 3d at 178; *see also Browne v. McCain,* 612 F. Supp.2d 1125, 1130 (C.D. Cal. 2009) ("[I]n light of a court's narrow inquiry [for a motion to dismiss] and limited access to all potentially relevant and material facts needed to undertake the [fair use] analysis, courts rarely analyze fair use on a 12(b)(6) motion").

The doctrine, which was incorporated into the Copyright Act, provides four non-exclusive factors in which courts must consider in analyzing the fair use doctrine: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. No single factor is determinative, and all of the four factors "are to be explored, and the results weighed together, in

light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 578 (1994).

Taking the fact that the remedy that Defendants request is extraordinary, further discovery is needed and the reasons set forth below, the Court should find in favor of Plaintiff on Defendants' fair use defense.

### 1. The Purpose and Character Factor Favors Plaintiff

The first statutory factor, the purpose and character of the use, is "[t]he heart of the fair use inquiry." *Blanch v. Koons,* 467 F.3d 244, 251 (2d Cir. 2006). It examines the purpose and character of the secondary use, including whether such use is of a commercial nature or is for nonprofit educational purposes. 17 U.S.C. § 107. The essence of this factor is whether the copier's use is transformative; that is, whether the new work "merely 'supersedes the objects' of the original creation or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message[.]" *Cariou v. Prince,* 714 F.3d 694, 705 (2d Cir. 2013) (*quoting Campbell,* 510 U.S. at 579); *see also Infinity Broad Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d. Cir. 1998).

In *Cariou*, the defendant, an "appropriation artist," had taken plaintiff's copyrighted photographs and altered them to create "crude and jarring collages." 714 F.3d at 706. Both works had underlying artistic purposes, but the Second Circuit held the work was transformative because the defendant's use was so "heavily obscured and altered" that the original photographs were "barely recognizable" within the new work. *Id.* at 710. But where lesser changes retained certain of the original work's aesthetics, the court should not say "for sure" that their incorporation into defendant's works had "transformed [the original] work enough to render it transformative." *TCA Television Corp*, 839 F.3d at 181(*quoting Cariou*, 714 F.3d at 711). Moreover, copying is transformative only if it "uses the copyrighted material itself for a purpose, or imbues it with a

character, different from that for which it was created." *Id.* at 180; *see also Castle Rock Entm't Inc. v. Carol Pub Grp., Inc.*, 150 F.3d 132, 143 (2d. Cir. 1998) (holding that a work that merely transforms an original work, yielding a modified or derivative work, is not transformative for the purposes of analyzing fair use). "In other words, the would-be fair user of another's work must have justification for the taking." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 215 (2d. Cir. 2015).

While the Supreme Court has not clearly defined the point at which point a secondary work has altered an original work to qualify as transformative, "courts have frequently afforded fair use protection to the use of copyrighted materials in biographies, recognizing such works as forms of historic scholarship, criticism, and comment that require incorporation of original source material for optimum treatment of their subjects." *Bill Graham Archives*, 448 F. 3d at 608 (internal citations omitted) (holding that a book using an original work to commemorate historic events as a "biographical anchor," which arranged the original work in a creative fashion, and displayed them in a reduced form, constituted fair use). Thus, commercial motivation weighs against a finding of fair use "especially . . . when a persuasive transformative purpose is lacking." *Authors Guild,* 804 F.3d at 219; *See also Campbell*, 510 U.S. at 579 (holding that commercialism may weigh against a finding of fair use). The key question is how the secondary work appears to a "reasonable observer" when compared side-by-side with the original. *Cariou*, 714 F.3d at 707-08. However, cases ultimately decided on a side-by-side analysis are fairly "uncommon." *Hirsch*, 2017 WL 3393845, at *6.

Defendants contend that the first factor favors fair use, but that is not the case—they have no justification for the taking. Far from altering the tattoos to the point where it is "barely recognizable" within the game, Defendants' use appears not to have altered the copyrighted work at all. *Cariou*, 714 F.3d at 710. To the Defendants, the video games may replicate how the players

appear in real life or allegedly serve as a "historical anchor," but it does not transform the original works so that it conveys that message. To the contrary, it appears that the Defendants' use of the tattoos is purely commercial and a ploy to enthrall consumers to the realism of the games. *Campbell*, 510 U.S. at 579. Specifically, the videos games have the tattoos, without alteration, so that the users will readily recognize them in their entirety.

Despite the aforementioned, Defendants nevertheless maintain that using the tattoo emphasizes the "biographical" nature of the video games. Defendant's Memo. at p. 16. However, this argument will not bear close scrutiny. The use of the tattoos does not reference an event or provide commentary on images. *Bill Graham Archives*, 448 F.3d at 608. Rather, the video games are released at or near the time of the upcoming professional basketball season. Compl. ¶¶ 9-11. Most athletes are depicted in the same way they appear at, or near, the same time the video games are released. Merely including players and teams from the past does not constitute the Defendants' use of the tattoos as a historical anchor. This is not proper justification for using the tattoos in their entirety. *TCA Television Corp*, 839 F.3d at 181(quoting *Cariou*, 714 F.3d at 711).

Defendants heavily rely on the *Bill Graham Archives* case, approximately three pages of its analysis, but its reliance is wholly misplaced. In *Bill Graham Archives*, the defendant published a "biographical work" documenting the 30-year history of the Grateful Dead and the book had, in miniature, posters advertising the band's performance. 448 F. 3d at 609. The court found that the defendant's use of the posters, which were combined with a prominent timeline, textual material to create a collage, was necessary to its transformative historical purpose and noted that the defendant used "minimal image size necessary to accomplish its transformative purpose*." Id.* at 610.

Whereas the *Bill Graham Archives* court held that the defendant's inclusion was fair use,

the opposite should occur here for three reasons. *Id.*  First, the Defendants' use did not commemorate certain events or individuals; it used the tattoos to entertain users and capitalize on professional basketball market.  As stated above, it is <u>not</u> a biographical anchor. Second, despite the many components of the video game, the tattoos are readily recognizable. They are not obscured and a marginal part of the game. Unlike a book in *Bill Graham Archives*, users manipulate the game to create a certain story line—including who is playing as well as how often they choose to use a player—and it is uncertain how many times a user will see the tattoos during the duration of a game.[2] *See Bill Graham Archives*, 448 F. 3d at 611.  Lastly, the original size is <u>not</u> significantly reduced.  Defendants' subjective belief that the tattoos are significantly reduced relative to the large size of the game does not take into account the fact that when users view the tattoos in the game, they are not truly significantly reduced.  In reality, and as discovery may show, the tattoos are viewed on televisions, computers and projectors that all accentuate the tattoo in its original forms. In some cases, the tattoos may be significantly larger than the originals tattooed on the player's bodies—they are relative to the size of the screen users are playing the respective games on. *See Generally* Haberman Decl. ¶ 8 Accordingly, the tattoos are not significantly reduced, but rather blown up to fit the proportion of the screens, and ensure that the quality, and realistic aspects, of the games are still prominent.

Additionally, it is important to emphasize that the use of the copyrighted work is purely commercial: Defendants' use reasonably furthers its commercial interests. *Authors Guild*, 804 F.3d at 219. That being said, there needs to be more of a reasonable justification for using the tattoos in their entirety. Nowhere in the pleadings, exhibits, and the Defendants' memorandum does it allude

---

[2] Here is one circumstance in which discovery will further show that the Defendants' use is not shielded by the fair use doctrine. The four corners of the Complaint, the exhibits and accompanying documents cannot show how often users see that tattoos and if they are always readily recognizable. Discovery is only mechanism that can show how often a reasonable user sees the tattoos.

to such reasonable justification. Overall, the Defendants' commercial use of the tattoos was not transformative. Rather, it conveyed a similar message, idea or purpose that is embedded in the original works. As such, the first fair use factors weighs against a finding of fair use.

### 2. The Nature of the Work Factor Favors Plaintiff

The second factor in the fair use inquiry, "the nature of the copyrighted work," embodies the following idea: "works are closer to the core of intended copyright protection of others, with the consequence that fair use is more difficult to establish when the former works are copying. *Campbell*, 510 U.S. at 586. Thus, works that are "expressive or creative" are entitled to a greater protection than works that are "factual or informational." *Cariou*, 714 F.3d at 709-710. This factor, though, is "rarely found to be determinative." *On Davis v. The Gap, Inc.,* 246 F.3d 152, 175 (2d Cir. 2001).

Courts also consider whether the original work was published or unpublished, with the scope of fair use considerable narrower for unpublished works. *Blanch*, 467 F.3d 244, 256 (2d. Cir. 2006). Even where a creative work is published, publication status is afforded only "a bit" of weight. *Lennon v. Premise Media Corp.,* 556 F. Supp.2d 310, 325 (S.D.N.Y 2008). Fundamentally, where the original work is creative and published, the nature-of-the work factors weighs against a fair use determination. *Cariou*, 714 F.3d at 710.

The copyrighted tattoos are expressive and creative which therefore establishes that the second factor favors Plaintiff. The tattoos have valid copyright protection and the Defendants fail to fully explain how it is imperative to fully depict the tattoos when they claim it is a minute portion of the game. Here, like in many other cases, despite the fact that the tattoos were previously published, it does not fully withdraw the original works from protection. *Lennon*, 556 F. Supp.2d at 325. Additionally, the tattoos clearly embody the artistic efforts of its artist, which militates

against fair use. As discussed above, the Defendants' use of the tattoos is not transformative; therefore, the nature-of the work factor carries weight, and ultimately weighs in favor of Plaintiff.

### 3. The Amount-and-Substantiality Factor Favors Plaintiff

The third statutory factor asks whether the "amount and substantiality of the portion used in relation to the copyrighted work as a whole. . . are reasonable in relation to the purpose of the copying."[3] *TCA Television Corp.*, 839 F.3d at 185 (*quoting Campbell*, 510 U.S. at 586). In assessing this factor, a court considers not just the proportion of the original work used, but also "whether the quantity and value of the materials used are reasonable in relation to the purpose of copying." *Hirsch*, 2017 WL 3393845, at *6 (internal citations omitted); *see also North Jersey Media Group Inc. v. Pirro,* 74 F. Supp.3d 605, 621 (S.D.N.Y. 2015) (internal citations omitted) ("[t]he crux of the inquiry is whether no more was taken than necessary"). Courts routinely conclude that copying in the entirety weighs against fair use, but they also recognize that substantial taking, however can constitute fair use if justified. See, e.g., *North Jersey Media Group Inc.*, F. Supp. 3d at 621; *Sandoval v. New Line Cinema Corp.,* 973 F. Supp.401, 414 (S.D.N.Y 1997).

Defendants offer no persuasive justification for using the tattoos in their entirety; they have not demonstrated its use is material for the alleged purpose of the game. To reiterate, neither the use of the tattoos nor the video games itself serve as a historical purpose—Defendants' purpose is purely commercial. Thus, the Defendants' reasoning is flawed when they assert that it was necessary for them to display the tattoos in their entirety. Additionally, if the tattoos were so minute, and had limited expressive value, then the question is begged as to why has the Defendants not modified the tattoos to ultimately avoid improper use.

---

[3] This factor is reviewed with reference to the copyrighted work, not the infringing work. *See Bill Graham Archives,* 448 F. 3d at 613.

Most importantly, the third factor presents material questions of facts which cannot be resolved on a motion for judgment on the pleadings. The current docket cannot answer many of the material questions of facts that is needed to fully give the context of the Defendants' use. Furthermore, discovery is necessary to resolve those questions of fact. For the foregoing reasons, the third fair use factors weighs against fair use and thus against granting the instant motion.

### 4. The Effect of the Use Upon the Potential Market Factor Favors Plaintiff

Under the fourth and final factor, courts evaluate "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor "requires courts to consider not only the extent of the market harm by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (internal quotation marks and alterations omitted).

Although the Second Circuit places little weight on the loss of the licensing fee sought from defendants, fair use is usually disfavored when there is a showing of an impact on the potential licensing revenues for "traditional, reasonable, or likely to be developed markets." *Bill Graham Archives*, 448 F. 3d at 610 (*quoting American Geophysical Union v. Texaco Inc.,* 60 F.3d 913, 930 (2d Cir 1994); *see also North Jersey Media Group Inc.,* 74 F. Supp. 3d at n. 20. "To negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 568 (1985). Impact on the market can be proven even without exploiting the market for derivative works or showing that the alleged use diminished the work's profitability. *See Castle Rock Entm't Inc.,* 150 F.3d at 145-146 (noting that although the plaintiff had little interest in exploiting the market for derivative works based on the copyrighted material,

"the copyright law must respect that creative and economic choice"). When conducting the analysis on the fourth fair use factors, courts are "mindful that the more transformative the secondary use, the less likelihood that the secondary use substitutes for the original,' even though fair use, being transformative, might well harm, even destroy, the market for the original." *North Jersey Media Group Inc.,* 74 F. Supp. 3d at 622.

Based on the foregoing, the Defendants' use cannot be rendered as transformative; thus, they have usurped multiple markets for the tattoos. By using without consent or compensation the tattoos in their entirety, in a notably successful videogame, and not even crediting the Plaintiff for such use, Defendants diminished the commercial value of the tattoos in the marketplace for licensing its use in other works including, but without limitation to, video games, apparel, and memorabilia. Notably, the Defendants' use poses a "very real danger" that other such video game manufactures, and others similarly situated with the Defendants, will paying licensing fees for the tattoos and instead opt to use the tattoos without either consent or credit to Plaintiff. *Id.*

Defendants contend that the fourth factor factors a finding of fair use because it is has never sold merchandise and its use is "transient and fleeting," but the Court must respect Plaintiff's economic choice. Defendants Memo at 24. Furthermore, lack of involvement in one derivative market should not equate to no economic harm. The fourth factor only demands harm in potential markets. Accordingly, it is not necessary for Plaintiff to establish a market that have been determined in. Plaintiff has established in the Complaint that it has suffered harm from the Defendants' use and there is no need to declare more. Moreover, the fourth factors weighs against fair use and favors Plaintiff for the aforementioned reasons.

On balance, the four fair use factors favor Plaintiff, among them the most important that the use was not transformative. Plaintiff plead enough facts to state a claim to relief that is plausible

on its face, and the Court accordingly should deny the Defendants' wholly premature motion in its entirety.

### B.    DEFENDANTS FAIL TO ALLEGE THAT THEIR USE OF TATTOOS IS *DE MINIMUS* IN NATURE, AS THEIR USE OF THE SUBJECT TATTOOS IS FAR MORE THAN TRIVIAL AND IS AN IMPORTANT COMPONENT OF ITS VIDEO GAMES

It is recognized that copying of a copyrighted work is *de minimus* in nature when a defendant copies protected material "to such a trivial extent as to fall below the quantitative threshold of substantial similarity." *Ringgold v. BET, Inc.*, 126 F.3d 70, 74 (2d Cir. 1997). A *de minimus* defense is not available "where the qualitative value of the copying is material." *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 208 (3d Cir. 2002). In *Ringgold*, the Second Circuit held that the unauthorized use of a copyrighted poster on a television show was not *de minimus*, as all or part of the poster was shown nine times in a five minute period, for a total of 26.75 seconds, and was thematically related to the show's content. 126 F.3d at 72-73. In order to make such a determination, a court must consider, *inter alia,* "the length of time the copyright work is observable" and its prominence. *Gottlieb Development LLC v. Paramount Pictures Corp.*, 590 F. Supp.2d 625, 632 (S.D.N.Y. 2008) (explaining that in cases involving visual works, courts consider "the length of time the copyrighted work is observable as well as factors such as focus, lighting camera angles, and prominence").

To determine substantial similarity for the purposes of ruling on a *de minimus* defense, a court must decide "whether the average lay observer would recognize the challenged material as having been copied from the copyrighted work." *Crane v. Poetic Prods.,* 549 F. Supp. 2d 566, 569 (S.D.N.Y.2008) (internal quotation omitted). Moreover, in order to make a determination as to whether the quantitative threshold of substantial similarity is met in cases, such as the instant matter, involving visual works, courts consider the extent to which a protected work is copied

within an allegedly infringing work. The overall observability of a copyrighted work is pivotal, leading courts to consider such items as the length of time that the copyrighted work was observable, as well as additional factors such as focus, lighting, camera angles, and prominence on the screen. *Ringgold,* 126 F.3d at 75.

The issue of a *de minimus* use is widely regarded as not being ripe even at the summary judgment stage, never mind on a motion to dismiss or on the pleadings. *See, e.g., Marketing Technology Solutions, Inc. v. Medizine LLC*, 2010 WL 2034404, *3 (S.D.N.Y. May 18, 2010) (holding that "[t]he qualitative value in the equation, on the present record…remains an issue of fact"); *eScholar, LLC v. Otis Educational Systems, Inc.*, 2005 WL 2977569, *28 (S.D.N.Y. Nov. 3, 2005) (holding that "[w]e do not find that it is undisputed any copying was *de minimis*. Nor do we find that the similarity concerns only non-copyrightable elements of eScholar's work, or that no reasonable trier of fact could determine that the works are substantially similar. These are the only circumstances where courts have required summary judgment at the substantial similarity stage"). Further, since the question of whether an infringement is substantially similar to the original work often raises a question of fact, summary judgment has been discouraged in determining substantial similarity. See, e.g., *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,* 602 F.3d 57, 63 (2d Cir. 2010) (holding that because substantial similarity "typically presents an extremely close question of fact…questions of non-infringement have traditionally been reserved for the trier of fact"); *SGC Communication Resources, LLC v. The Seminar Center, Inc.*, No. 98 Civ. 2724, 2001 WL 274053, *5 (S.D.N.Y. March 20, 2001) (holding that "I cannot say, as a matter of law…that defendants' alleged copying of plaintiff's catalog is *de minimis* and that summary judgment should, therefore, be granted").

**1. Defendants Have Failed to Establish That Their Offending Use of the Subject Tattoos is *de Minimus* in Nature as a Matter of Law**

The above-synthesized case law reveals that it is wholly premature for the Defendants to suggest that their offending use of the subject tattoos was *de minimus* in nature. To start, it is wildly disingenuous to suggest that the tattoos were only used to a "trivial extent" in the Defendants' video games. *Ringgold*, 126 F.3d at 74. Defendants, on the one hand, spent pages upon pages of both their memorandum of law and declaration touting how multi-dimensional, dynamic, and customizable that the NBA 2K line of games is, such that one can pick his or her players with ease, dictate camera angles, control how long a player is on the screen, etc., yet on the other hand blanketly and cavalierly dismiss the possibility that the same depth of features can result in the subject tattoos being readily seen on the screen game in and game out for potentially hours at a time depending on what players someone opts to use. A gamer could, hypothetically, pick exactly each player whose tattoos are at issue in this matter, use them repeatedly over a given gaming session lasting hours, use them repeatedly in a video game tournament, and thus be in a position to continuously observe the details of the subject tattoos with minimal difficulty given the NBA 2K games' options. Nonetheless, the Defendants would have the Court summarily believe that said tattoos "rarely," "only fleetingly" appear on the screen in "very limited instances" and "appear small if they can be seen at all" and are thus "not easily visible" despite their own boastings as to the games' features and thus that the tattoos' use are *de minimus* in nature as a matter of law. Such readily undermined, empty rhetoric as the "trivial extent" of the use of tattoos should be rejected in its entirety by the Court in its consideration of this motion and the motion should accordingly be denied in its entirety. Defendants' Memo at pp. 12-13; *Ringgold*, 126 F.3d at 74.

### 2. Defendants Failed to Establish that the Offending Depictions of the Subject Tattoos are Not Substantially Similar to the Protected Works

At this stage of the instant matter, the only purported "lay observers" who have chimed in on whether the subject material could be recognized as "having been copied from the copyrighted work" is Defendants' counsel and Defendants' counsel alone. *Crane*, 549 F. Supp.2d at 569. Naturally, Defendants' in-house lay observers described purported difficulty in recognizing the subject tattoos based on them purportedly being "out of focus," "frequently…obscured by other players and the basketball," and as being "difficult to perceive" since when they play, the subject tattoos are "never highlighted verbally or visually." Defendants' Memo at p. 13. Defendants attempt to minimize the possibility that other "lay observers" may try to manipulate the NBA 2K games to get a better view of the tattoos than they had by dismissing such action as "not how an average lay observer would play the game and, thus…irrelevant." *Id*. at p. 13, fn. 3. No support at all is given for how Defendants reached a decision as to what a lay observer typically would or would not do in the process. Such self-serving *ipse dixit* falls far short of establishing that the tattoos are not substantially similar as a matter of law. The fact is that the overall observability of the subject tattoos can be fairly significant if a gamer either simply selects all of the players with the subject tattoos in a given game or series of games, or otherwise employs the broad range of the video game's features to focus, angle the camera on, or make the subject tattoos more prominent on screen such that they would appear regularly on the screen and appear to be substantially similar to the real tattoos for which Plaintiff has copyright protection. *Ringgold*, 126 F.3d at 75. Defendants' motion for judgment on the pleadings should accordingly be denied in its entirety.

### 3. The Issue of Whether the Subject Tattoo's Usage in the NBA 2K Games is *de Minimus* is Not Ripe at This Stage

For all of the reasons discussed in subsections 1 and 2, above, it is respectfully requested

that the instant motion be denied for lack of ripeness at this time such that a determination of whether Defendants' use of the subject tattoos was *de minimus* in nature can be "reserved for the trier of fact." *Peter F. Gaito Architecture, LLC*, 602 F.3d at 63. As is readily detailed, there are simply too many potential permutations on the usage of the NBA 2K game and its players to state with any degree of legal certainty that the offending use was, or was not, *de minimus* in nature. Accordingly, the instant motion should be denied in its entirety.

## V.     CONCLUSION

For all of the foregoing reasons, the Defendants' motion to for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) should be dismissed in its entirety.

Dated: Norwood, New Jersey
        September 12, 2017

                                    Respectfully submitted,

                                    **HEITNER LEGAL, P.L.L.C**
                                    *Attorney for Plaintiff*
                                    215 Hendricks Isle
                                    Fort Lauderdale, FL 33301
                                    Phone: 954-558-6999
                                    Fax: 954-927-3333


                        By:
                                    DARREN A. HEITNER
                                    Florida Bar No.: 85956
                                    Darren@heitnerlegal.com

**LAW OFFICES OF PAUL S. HABERMAN LLC**
Attorney for Plaintiff
P.O. Box 167
Norwood, New Jersey 07648
Phone: 201-564-0590
Fax: 201-767-2087

/s/

By: _____
Paul S. Haberman (PH 2771)
psh@paulhabermanlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of September, 2017, I electronically filed the foregoing document using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of

Electronic Filing.                          By:

DARREN A. HEITNER
Florida Bar No.: 85956
Darren@heitnerlegal.com

Dale M. Cendali, Esq.
Joshua L. Simmons, Esq.

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

dale.cendali@kirkland.com
joshua.simmons@kirkland.com

TakeTwo-SolidOak@kirkland.com