Dale M. Cendali
Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
dale.cendali@kirkland.com
joshua.simmons@kirkland.com

*Attorneys for Defendants-Counterclaimants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SOLID OAK SKETCHES, LLC, | CASE NO. 1:16-cv-724-LTS-RLE |
| Plaintiff-Counterdefendant, | |
| v. | |
| 2K GAMES, INC. and TAKE-TWO INTERACTIVE SOFTWARE, INC., | |
| Defendants-Counterclaimants. | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS-COUNTERCLAIMANTS
2K GAMES, INC. AND TAKE-TWO INTERACTIVE SOFTWARE, INC.'S MOTION
FOR SUMMARY JUDGMENT**</u>

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

FACTUAL BACKGROUND ...................................................................... 4

    I.     THE TATTOOS ........................................................................... 4

    II.    TAKE-TWO'S *NBA 2K* VIDEO GAME SERIES ................................ 5

    III.   TAKE-TWO'S USE OF THE TATTOOS IN *NBA 2K* ......................... 7

    IV.   SOLID OAK ............................................................................... 8

ARGUMENT .......................................................................................... 8

    I.     TAKE-TWO'S USE OF THE TATTOOS IS *DE MINIMIS* ................. 9

    II.    TAKE-TWO'S USE OF THE TATTOOS IS FAIR USE .................... 11

         A.    Factor One: Take-Two's Use Is Transformative and Its Profits Are Not Attributable to the Tattoos ................................ 12

             1.    Take-Two's Use of the Tattoos Is Transformative ...................... 12

             2.    The Commercial Use Subfactor Is Of Little Weight Here .......... 16

         B.    Factor Two: The Tattoos Are Not Creative and Were Published ............ 16

         C.    Factor Three: Take-Two's Copying Was Reasonable In Light of Its Purpose ................................................ 18

         D.    Factor Four: Take-Two Has Not Harmed the Tattoos' Markets ............... 19

         E.    Considerations of the Public Interest Favor Take-Two ............................ 22

    III.   TAKE-TWO'S USE OF THE TATTOOS WAS AUTHORIZED ....................... 23

    IV.   SOLID OAK CANNOT ESTABLISH THE TATTOOS' ORIGINALITY ......... 25

CONCLUSION .................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arica Inst., Inc. v. Palmer,*
970 F.2d 1067 (2d Cir. 1992) .................................................................................17

*Authors Guild, Inc. v. HathiTrust,*
755 F.3d 87 (2d Cir. 2014) ........................................................................11, 18, 19

*Authors Guild v. Google, Inc.,*
804 F.3d 202 (2d Cir. 2015) ......................................................................11, 16, 19

*Bill Diodato Photography, LLC v. Kate Spade, LLC,*
388 F. Supp. 2d 382 (S.D.N.Y. 2005) ....................................................................17

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
448 F.3d 605 (2d Cir. 2006) ......................................................................... *passim*

*Blanch v. Koons,*
467 F.3d 244 (2d Cir. 2006) ............................................................................21, 22

*Bouchat v. Baltimore Ravens Ltd.,*
737 F.3d 932 (4th Cir. 2013) ........................................................................ *passim*

*Bouchat v. Baltimore Ravens Ltd. P'ship,*
No. 08 Civ. 397, 2011 WL 5445947 (D. Md. Nov. 9, 2011) .................................21

*Campbell v. Acuff-Rose Music, Inc.,*
510 U.S. 569 (1994) ......................................................................12, 16, 18, 19

*Carano v. Vina Concha y Toro,*
288 F. Supp. 2d 397 (S.D.N.Y. 2003) ..............................................................23, 24

*Cariou v. Prince,*
714 F.3d 694 (2d Cir. 2013) ...................................................................................16

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ..................................................................................................9

*Consumers Union of U.S. v. Gen. Signal Corp.,*
724 F.2d 1044 (2d Cir. 1983) .................................................................................17

*Durham Indus., Inc. v. Tomy Corp.,*
630 F.2d 905 (2d Cir. 1980) ...................................................................................16

*Estate of Smith v. Cash Money Records, Inc.,*
253 F. Supp. 3d 737 (S.D.N.Y. 2017) ....................................................................21

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991)..................................................................................................25

*Fulks v. Knowles-Carter*,
207 F. Supp. 3d 274 (S.D.N.Y. 2016)......................................................................17

*Gottlieb Dev. LLC v. Paramount Pictures Corp.*,
590 F. Supp. 2d 625 (S.D.N.Y. 2008)...................................................................9, 10

*Great Minds v. FedEx Office & Print Servs., Inc.*,
886 F.3d 91 (2d Cir. 2018)........................................................................................23

*Hofheinz v. Discovery Commn'cns, Inc.*,
No. 00 Civ. 3802, 2001 WL 1111970 (S.D.N.Y. Sept. 20, 2001)......................13, 16

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811 (9th Cir. 2003) .........................................................................13, 14, 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)....................................................................................................9

*MiTek Holdings, Inc. v. Arce Eng'g Co.*,
89 F.3d 1548 (11th Cir. 1996) ...................................................................................11

*Monster Comm'ns, Inc. v. Turner Broad. Sys., Inc.*,
935 F. Supp. 490 (S.D.N.Y. 1996)............................................................................13

*Newton v. Diamond*,
388 F.3d 1189 (9th Cir. 2004) .....................................................................................9

*Nunez v. Caribbean Int'l News Corp.*,
235 F.3d 18 (1st Cir. 2000)........................................................................................18

*Poindexter v. EMI Record Grp. Inc.*,
No. 11 Civ. 559, 2012 WL 1027639 (S.D.N.Y. Mar. 27, 2012) ..................................9

*Porto v. Guirgis*,
659 F. Supp. 2d 597 (S.D.N.Y. 2009)........................................................................25

*Psihoyos v. Nat'l Geographic Soc'y*,
409 F. Supp. 2d 268 (S.D.N.Y. 2005)........................................................................17

*Rawkus Entm't, LLC v. JHH Pictures, Inc.*,
No. 01 Civ. 8804, 2003 WL 169781 (S.D.N.Y. Jan. 24, 2003).........................23, 24

*Sandoval v. New Line Cinema Corp.*,
147 F.3d 215 (2d Cir. 1998).......................................................................................10

*Sarl Louis Feraud Int'l v. Viewfinder Inc.*,
627 F. Supp. 2d 123 (S.D.N.Y. 2008)..................................................................14, 21

*Seltzer v. Green Day, Inc.*,
  725 F.3d 1170 (9th Cir. 2013) ..................................................................18

*SOFA Entm't, Inc. v. Dodger Prods., Inc.*,
  709 F.3d 1273 (9th Cir. 2013) ..................................................................13

*Swatch Grp. Mgmt. Servs Ltd. v. Bloomberg L.P.*,
  756 F.3d 73 (2d Cir. 2014)..............................................16, 19, 20, 22

**Statutes**

17 U.S.C. § 106 ..........................................................................................23

17 U.S.C. § 107 ..........................................................................................11

17 U.S.C. § 501 ..........................................................................................23

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................................9

2K Games, Inc. and Take-Two Interactive Software, Inc. (collectively, "Take-Two") submit this memorandum of law in support of their motion for summary judgment.

## PRELIMINARY STATEMENT

This is a case about protecting personal liberty and freedom of expression. Solid Oak Sketches, LLC ("Solid Oak") obtained copyright licenses to five tattoos inked on professional basketball players Eric Bledsoe, LeBron James, and Kenyon Martin (the "Tattoos") for use in a clothing line that never came to pass. Now, through this action, Solid Oak seeks to create the unprecedented obligation on those NBA players and the companies working with them to receive permission from and pay money to Solid Oak when the players are realistically depicted with their tattoos in video games or, by extension, any other type of creative work.

Tattoos, however, represent the vital expression of the tattooed individual's identity and likeness. Neither the players, nor the tattooists, nor fundamental copyright law principles support Solid Oak's novel claim to control the depiction of tattooed individuals. As the declarations of the tattooists themselves, the players they inked, and unrebutted expert witnesses show: Take-Two's *NBA 2K* video game series is a *de minimis* and fair use of the Tattoos and, in any case, Take-Two was authorized to use of the Tattoos as part of the player's likenesses. In fact, as Thomas Ray Cornett, who inked two of the Tattoos, declared, "The position Solid Oak has taken is completely inconsistent with how I feel my work should be used, and quite candidly, *I feel that Solid Oak's claims are ridiculous*." Cornett Decl. ¶ 1 (emphasis added).[1]

Solid Oak's position is undermined in four critical ways. **First**, the Tattoos are a *de minimis* part of *NBA 2K*. As video game expert Dr. Ian Bogost observed, "the Tattoos are a fractional, fleeting part of *NBA 2K*." Take-Two's Statement of Undisputed Facts ("Defs.' SUF")

---

[1]   Each tattooist's, player's, and expert's declaration is designated with his or her surname in this brief.

¶ 76.  Each Tattoo is 0.000286–0.000431% of *NBA 2K's* game data.  *Id.* ¶ 75.  And "in ordinary

play mode . . . the ordinary player will perceive the Tattoos as a kind of visual noise,"  "creating

realism" but being no more noticeable than a "simulated player's nose shape or hairstyle."  *Id.*

¶¶ 82, 94, 95.  When users play *NBA 2K*, they choose from 400+ real-world players, such that the

Tattoos often will not appear at all.  When one of the three players bearing the Tattoos does

appear, he and his tattoos are depicted substantially smaller than in real-life given that, in the

game, users generally see multiple little figures playing basketball on a relatively small-sized

screen.  Moreover, the Tattoos "are hard to observe due to their obstruction by other game

elements, because they often appear out-of-focus, and because players on whom the Tattoos

appear move quickly in the game."  Defs.' SUF ¶¶ 97–99.

   ***Second***, Take-Two's use of the Tattoos constitutes fair use as all of the fair use factors

favor Take-Two.  As to **factor one** ("purpose and character of the use"), the Tattoos' original

purpose is the players' self-expression, but in *NBA 2K*, they "are depicted only as an incidental

part of Take-Two's focus on creating realistic video games."  *Id.* ¶ 83.  As Solid Oak admits,

*NBA 2K* "is not a substitute for the TATTOOS."  *Id.* ¶ 67.  The Tattoos also "are minimal by

comparison to the total size of the game," and "are used in a fleeting way, in small size, out-of-

focus, with a relative visual indistinctiveness."  *Id.* ¶¶ 77, 94.  As to **factor two** ("nature of the

work"), the Tattoos are based on pre-existing works, were included for accuracy, and previously

were published.  *See infra* 16.  As to **factor three** ("amount and substantiality"), "the Tattoos

generally are depicted about 4.4–10.96% of the size that they appear in real life," Defs.' SUF

¶ 92, as it was not necessary to depict them full size.  As to **factor four** ("effect on the potential

market"), there is no market for depicting the Tattoos in a video game as part of replicating a

person's real-life likeness.[2]  Neither Dr. Bogost, nor tattoo industry expert Dr. Nina Jablonski, nor Solid Oak itself could identify a prior license to reproduce a person's tattoos in a video game where the person himself already had provided consent to reproduce his likeness.  *Id.* ¶¶ 110–12.

***Third***, Take-Two's use of the Tattoos was authorized.  As Dr. Jablonski's unrebutted testimony shows, "clients and tattooists expect that a client's tattoo will be part of that person's body, image, likeness, and identity," *id.* ¶ 46, and "the client is free to authorize the use and dissemination of his or her likeness in whatever way he or she sees fit without the necessity of seeking permission from the tattooist." *Id.* ¶ 48.  Likewise, here, both the tattooists and players understood when the Tattoos were inked on the players that the players had the "right to display and recreate [the] tattoos as part of [the players'] likeness," *id.* ¶¶ 52, 65, and "to let third parties depict [the players] in various media, like video games." *Id.* ¶¶ 56, 66.  We know this because ***each of the tattooists*** who inked the Tattoos submitted declarations to that effect.  Cornett Decl. ¶¶ 16, 22; Wright Decl. ¶ 11; Rome Decl. ¶ 10.  NBA players Lebron James and Kenyon Martin submitted similar declarations.  James Decl. ¶ 10; Martin Decl. ¶ 10.  The players gave the NBA the right to license their likeness to third parties, Defs.' SUF ¶ 103, and the NBA granted Take-Two permission to depict the players realistically in *NBA 2K*, including their tattoos. *Id.* ¶ 104.

***Fourth***, Solid Oak cannot meet its burden to establish that the Tattoos are original as it has no knowledge of their creation. *Id.* ¶¶ 35–44.  And the Tattoos are based on pre-existing works, such as a photograph of Mr. James' child, making them unoriginal. *See infra* 16.

As discussed below, there are no material facts in dispute due to Solid Oak's many admissions through discovery responses, deposition testimony, and documentary evidence.  Solid Oak does not even rebut any of Take-Two's experts' testimony.  Accordingly, Take-Two

---

[2]  This case does not concern whether inking tattoos on another person or otherwise removing them from the person on whom they were inked would be infringement.

respectfully requests that this Court grant its summary judgment motion, dismiss Solid Oak's copyright infringement claim, and declare *NBA 2K* a *de minimis* and fair use of the Tattoos.

**FACTUAL BACKGROUND**

## I.    THE TATTOOS

Each Tattoo is a "custom tattoo intended only for the player on [whom] it was inked," Answ. ¶ 48, reflecting "the personal expression of the three NBA players."  Defs.' SUF ¶ 3.

 "Child Portrait Tattoo Artwork" was inked on Mr. James by Mr. Wright. Mr. James brought a picture of his child and "told the tattooist to copy" it as he wanted the "tattoo to look as realistic and close to [his] child's photograph as possible."  *Id.* ¶¶ 6, 7, 10.  Mr. Wright "followed [Mr. James'] instructions," *id.* ¶ 7, copying "as closely as possible."  *Id.* ¶ 8.

 "330 and Flames Tattoo Artwork" was inked on Mr. James by Shawn Rome.  "The digits '330' were selected because it is the area code of Akron, Ohio, Mr. James's hometown."  *Id.* ¶ 16.  Mr. Rome did not create the tattoo as Mr. James already had the "outline of [330] inked on his arm."  *Id.* ¶ 17.  Mr. Rome "inked over the existing tattoo."  *Id.* ¶ 18.

 "Script with a Scroll, Clouds, and Doves" was inked on Mr. James by Mr. Rome, using a pre-existing design.  *Id.* ¶ 22.

 "Wizard" is a tattoo of the Grim Reaper that was inked on Kenyon Martin by Thomas Ray Cornett.[3]  Mr. Cornett "did not design the tattoo"; instead, he copied it from a pre-existing design in his tattoo parlor, *id.* ¶ 27, 28, changing one element to a basketball at Mr. Martin's direction.  *Id.* ¶ 29.

---

[3]    Mr. Cornett does not know why Solid Oak registered the tattoo with the Copyright Office with the title "Wizard."  Cornett Decl. ¶ 12.

 "Basketball with Stars and Script" was inked on Eric Bledsoe by Mr. Cornett. "Mr. Bledsoe specifically requested the design of a basketball with stars and script, and [Mr. Cornett] inked the custom design with his direction and input." Cornett Decl. ¶ 20.

Once the Tattoos were inked, the tattooists intended for the players to decide when and how the Tattoos would be depicted, "including allowing others to depict [them], such as in advertisements and video games." Defs.' SUF ¶¶ 13, 52, 56. For example, Mr. Cornett "knew and intended" that his tattoos would be displayed when the players "appeared in public," "in media," or in renderings "such as in art or video games." *Id.* ¶ 55. Likewise, Mr. Wright "knew and intended that when [Mr. James] appeared in public, on television, in commercials, or in other forms of media, he would display the Child Portrait Tattoo" and that "if anyone were to create a rendition of Mr. James' likeness, such as in art or video games, that tattoo should be depicted as part of his likeness." *Id.* ¶¶ 11, 58; Rome Decl. ¶ 10 ("I also intended that these tattoos become a part of Mr. James's likeness and part of his image."). This was the players' understanding too. Defs.' SUF ¶¶ 59–66. Mr. James understands that he "ha[s] the right to have [his] tattoos visible when people or companies depict what [he] look[s] like," and "[n]o tattooist has ever told [him] he needed their permission to be shown with [his] tattoos, even when it was clear [he] was a public basketball player." James Decl. ¶¶ 10–11.; Martin Decl. ¶ 10.

## II. TAKE-TWO'S *NBA 2K* VIDEO GAME SERIES

Take-Two is "responsible for the development, creation and marketing of the *NBA 2K* basketball simulation video game series." Mem. Op. (Dkt. No. 44) ("Aug. 2016 Op."), at 2. "An updated version . . . is released annually" and has "animated versions of [NBA] players as they appear in real life, replicating their physical features." *Id.* These realistic depictions are created using full-body scans of the players, photographing them from every angle. Defs.' SUF ¶ 80.

"The game has many components, including graphics, characters, a fictitious plot, gameplay, music, and graphics."  Mem. Op. (Dkt. No. 117) ("Mar. 2018 Op."), at 2 (internal quotation marks omitted).  These realistic components create a "virtual world."  Defs.' SUF ¶ 73.

As can be seen from recordings of *NBA 2K* gameplay, Declaration of Jeffrey Thomas ("Thomas Decl") Exs. A–D, an "ordinary player" would "play action-oriented bouts of simulated basketball, either alone against the computer or with other people," and "can interact with over 400 current and retired NBA players."  Bogost Decl. ¶ 44.  Other realistic parts of *NBA 2K* include "the performance of cheer squads and mascots on and off the court; the movement and behavior of the crowd, the coaches, the referees, [and] team members on the bench."  *Id.* ¶ 50.  In addition to these visual elements, *NBA 2K* includes auditory elements that are crucial to its realism, including "announcers and sportscasters," *id.* ¶ 50, as well as "sounds associated with the on-court action," ranging from "generally the voices, noises, and soundtrack one would normally associate with a televised, professional basketball game[]," all the way to such small details as "the sound of player shoes against the court's surface."  *Id.* ¶ 51.

*NBA 2K* combines the foregoing visual and auditory elements in various game modes, and "[e]ach of these modes provides a different experience of play, corresponding with a different aspect of basketball as sport and as media."  Bogost Decl. ¶ 55.  The "central story mode in *NBA 2K16* . . . allows players to experience a fictitious narrative, called 'Livin' Da' Dream,' authored by Hollywood director Spike Lee with original characters."  *Id.* ¶ 58.

In *NBA 2K*, "the player's typical experience will involve looking at the basketball court in a manner similar to that of a television viewer or a fan watching the game from the stands."  Bogost Decl. ¶ 46.  To show the players during the game, "this view generally is of a full basketball court," and this may include "team branding and other emblems on the court surface."

*Id.* ¶ 46.  During gameplay, "the camera view adjusts accordingly" to show "shots, throw-ins, free-throws, substitutions, fouls, and other ordinary actions of the sport."  *Id.* ¶ 48.  Generally speaking, the camera "scan[s] across the court to follow the action of play."  *Id.*

## III.  TAKE-TWO'S USE OF THE TATTOOS IN *NBA 2K*

By depicting the NBA players "as they appear in real life," Take-Two realistically "replicat[ed] their physical features, including their tattoos."  August 2016 Op. 2; Answ. ¶ 142. "Take-Two included the Tattoos in its video game . . . to accurately depict the physical likenesses of the real-world basketball players as realistically as possible."  Defs.' SUF ¶ 79.

Each Tattoo represents "0.000286–0.000431% of *NBA 2K*," because the texture files that are used to depict the players are an infinitesimal part of *NBA 2K's* 55 GB data package.  *Id.* ¶¶ 75, 78.  The Tattoos also are a tiny part of *NBA 2K's* audio-visual display because they "only appear on the players on which they are inked in real life."  *Id.* ¶ 84.  "As a result, the Tattoos only appear when those players appear in a given game" due to the user's selection to play them, or the computer's selection of them as the user's opponent.  Bogost Decl. ¶ 68.  Because there are over 400 NBA players available in the game, Defs.' SUF ¶ 86, "in the average game of *NBA 2K*, the players on which the Tattoos are inked (and by extension the Tattoos) will not appear." *Id.* ¶ 88.  Further, given the average screen size on which *NBA 2K* is played, the Tattoos "are depicted about 4.4–10.96% of the size that they appear in real life."  *Id.* ¶ 92.

The Tattoos "are difficult to observe" in *NBA 2K*.  Bogost Decl. ¶ 66.  They are obstructed "by other game elements, such as the players' own bodies, the bodies of other players, and other in-game avatars," Defs.' SUF ¶ 97, and "sometimes appear out of focus during *NBA 2K* gameplay."  *Id.* ¶ 98.  And because "in *NBA 2K*, the NBA PLAYERS are often moving," *id.* ¶ 99, it makes "it difficult to see the Tattoos."  Bogost Decl. ¶ 88.  Dr. Deborah Jay surveyed *NBA 2K* purchasers and concluded that, while they "buy *NBA 2K* video games for numerous

- 7 -

reasons," they "do not buy *NBA 2K* video games for the" Tattoos.  Defs.' SUF ¶ 90.

## IV.   SOLID OAK

Solid Oak is "owned by Matthew Siegler," and has "no [other] employees."  Answ. ¶¶ 174–75.  Mr. Siegler is "not a tattooist," "did not create the Tattoos," and "was not present when the Tattoos were created."  *Id.* ¶¶ 176–78.  Instead, he pitched the tattooists the idea of using the Tattoos on t-shirts without the players' images.  Wright Decl. ¶ 13; Cornett Decl. ¶¶ 24–25; Rome Decl. ¶ 12; Declaration of Dale M. Cendali, Esq. ("Cendali Decl.") Ex. A (Siegler Dep.) at 168:25–169:18.  This business was unsuccessful, generating no revenue, Cendali Decl. Ex. E (Pl.'s Am. Resp. to 2d RFAs) at Nos. 370–71, and the tattooists "have not received any royalties or other payments from Solid Oak."  Rome Decl. ¶ 15; Cornett Decl. ¶ 26; Wright Decl. ¶ 14.

Solid Oak "has never created, or contributed to the creation of, a video game depicting the Tattoos," and never "licensed a video game depicting [them]."  Defs.' SUF ¶¶ 105–06.  It "has never licensed to any other party the ability to ink the Tattoos on other people."  *Id.* ¶ 107.  And it "has never sold merchandise depicting the Tattoos."  *Id.* ¶ 108.

Dr. Jablonski, a noted tattoo expert, and the tattooists who inked the Tattoos are concerned that if Solid Oak is successful in this lawsuit, it will harm the tattoo industry and personal expression by deterring people from getting tattoos.  Dr. Jablonski explained that the "impingement on personal freedom that such a requirement would entail is untenable, and would lead to the decline of the tattoo industry."  *Id.* ¶ 51.  Mr. Cornett wrote, "it would hurt the tattoo industry and deter people from using tattoos as a way of expressing themselves if anyone thought that if he or she ever became successful or wanted to be displayed in any sort of media or advertising, they would be prevented from doing so without the tattooist's permission."  *Id.*

## **ARGUMENT**

Courts grant summary judgment if there is "no genuine dispute as to any material fact"

- 8 -

and the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant informs "the district court of the basis for its motion" and the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Then, the non-moving party must present competent evidence establishing disputed issues as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Conclusory allegations or unsupported speculation is insufficient. *See id.*

## I. TAKE-TWO'S USE OF THE TATTOOS IS *DE MINIMIS*

Solid Oak's copyright infringement claim cannot succeed if Take-Two's use of the Tattoos was *de minimis*. Mar. 2018 Op. 5. To make that determination, courts consider the "observability of the copied work—the length of time the copied work is observable in the allegedly infringing work and such factors as focus, lighting, camera angles, and prominence." *Id.*[4] This Court previously found that the pleadings were insufficient to provide an "objective perspective as to how the Defendants' video game is generally played." Mar. 2018 Op. 8. With the benefit of discovery, it is now clear what an average player would see and hear in *NBA 2K*.

**First**, as Dr. Bogost explained, "in the average game of *NBA 2K*, the players on which the Tattoos are inked (and by extension the Tattoos) will not appear" because of the over 400+ NBA players available, only "two teams of 5 on-court players each" will be selected. Defs.' SUF ¶¶ 86–88; *see supra* 7. And, as Solid Oak repeatedly admitted in discovery, the Tattoos "only appear on the players on which they are inked in real life." Defs.' SUF ¶ 84. Thus, Take-Two's use is even less than cases where *de minimis* use was found despite a work always appearing when a movie was watched, because the Tattoos may not appear at all.

---

[4] Courts consider only elements of the copyrighted work that are protected by the plaintiff's copyright. *Newton v. Diamond*, 388 F.3d 1189, 1193–94 (9th Cir. 2004); *Poindexter v. EMI Record Grp. Inc.*, No. 11 Civ. 559, 2012 WL 1027639, at *4 (S.D.N.Y. Mar. 27, 2012); *Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 633 (S.D.N.Y. 2008). Solid Oak cannot show that any such elements exist here. *See infra* 25.

**Second**, even in the limited instances when the three NBA players are selected, unlike an NBA game, each quarter in *NBA 2K* lasts only a few minutes. *Id.* ¶ 71. As this Court previously observed, such "stopwatch-in-hand observations" often are decisive in *de minimis* use decisions. Mar. 2018 Op. 8 (citing *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 216 (2d Cir. 1998) (1.5 minutes supported *de minimis* use), and *Gottlieb*, 590 F. Supp. 2d at 632 (3.5 minutes supported *de minimis* use)).

**Third**, the other observability factors weigh in favor of a *de minimis* use finding. Dr. Bogost's unrebutted calculation is that the "the Tattoos generally are depicted about 4.4–10.96% of the size that they appear in real life due to the great distance from the camera that the players usually are depicted," Defs.' SUF ¶ 92, as well as the small screens on which *NBA 2K* usually is played. *Id.* ¶ 91. As Dr. Bogost observed, "in ordinary play mode . . . the ordinary player will perceive the Tattoos as a kind of visual noise," "creating realism" but being no more noticeable than a "simulated player's nose shape or hairstyle." *Id.* ¶¶ 82, 94, 95. Take-Two has not offered expert testimony to rebut Dr. Bogost's conclusion.

Moreover, when the Tattoos are depicted, they appear near other visual and auditory elements—such as "the basketball; the hoop . . . ; the court . . . ; the players . . . ; coaches; referees; cheerleaders; spectators; the stadium; and the game clock and scoring system"[5]— making them nearly impossible to pick out. *Id.* ¶ 93. In addition to diminishing the Tattoos' visual impact, Solid Oak admits that these other elements often obstruct the Tattoos, making them impossible to see. *Id.* ¶ 97. The observability of the Tattoos is further lessoned by the facts, conceded by Solid Oak, that the Tattoos "appear out of focus," *id.* ¶ 98, and that the

---

[5]    *NBA 2K* also contains various auditory elements, such as "shoes against the court's surface; the noise of the crowd; the horns and other audible warnings signaling elapsing shot clocks, ending timeouts, and so forth; television announcers performing play-by-play; and a musical soundtrack." *Id.* ¶ 74.

players are "often moving," *id.* ¶ 99, usually very quickly across the basketball court. *Id.* ¶ 97. It simply is difficult to pick out the five, small Tattoos while controlling five players and competing against five others as they dash around the basketball court. Further, the Tattoos play no role in *NBA 2K's* plot. *Id.* ¶ 89. Such use is *de minimis*.

In addition to being a tiny part of *NBA 2K's* audio-visual display, the Tattoos are a fractional piece of the *NBA 2K* program. Dr. Bogost calculated that each Tattoo represents only "0.000286–0.000431% of *NBA 2K*" as the texture files that are used to depict the players are an infinitesimal part of *NBA 2K's* 55 GB data package. *Id.* ¶¶ 75, 78. This too militates in favor of a finding of *de minimis* use. *MiTek Holdings, Inc. v. Arce Eng'g Co.*, 89 F.3d 1548, 1560 (11th Cir. 1996) (holding that "elements that were considered original and appropriated were not of such significance to the overall program to warrant an ultimate finding of substantial similarity").

## II. TAKE-TWO'S USE OF THE TATTOOS IS FAIR USE

Solid Oak's copyright claim also fails as Take-Two's inclusion of the Tattoos in *NBA 2K* is fair use. As discussed below, each of the four fair use factors weighs in favor of Take Two. Such use "is not an infringement of copyright." Mar. 2018 Op. 8–9 (quoting 17 U.S.C. § 107).

In conducting this analysis, it cannot be overemphasized that Solid Oak admits that "*NBA 2K* is not a substitute for the TATTOOS." Defs.' SUF ¶ 67. This admission is critical as the Second Circuit has held that fair use exists where the parties' works are not substitutes for each other. *See Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) (fair use where use does not "serve as a substitute for the original or its plausible derivatives, shrinking the protected market opportunities of the copyrighted work"); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87,95 (2d Cir. 2014) ("A fair use must not excessively damage the market for the original by providing the public with a substitute for that original work."). Thus, while each fair use factor is discussed below, Solid Oak's admission essentially is dispositive of the issue, and summary

judgment is appropriate.

### A. Factor One: Take-Two's Use Is Transformative and Its Profits Are Not Attributable to the Tattoos

The first fair use factor requires consideration of two main subfactors: (1) transformative use, and (2) commercial use. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578–79 (1994).

### 1. Take-Two's Use of the Tattoos Is Transformative

A new work is transformative where, instead of "supersed[ing] the objects of the original creation," it "instead adds something new, with a further purpose or different character." *Id.* at 579 (internal quotation marks omitted). Solid Oak already has conceded that "*NBA 2K* is not a substitute for the TATTOOS," Defs.' SUF ¶ 67, which essentially concedes Take-Two's different, "transformative" use here. In addition, each of the four considerations used by courts to determine transformativeness, *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609–611 (2d Cir. 2006), supports Take-Two. We discuss each consideration in turn.

Different Purposes. The first consideration is whether the original purpose differs from the reproduction's purpose. Courts repeatedly have held that the use of a visual work to depict real world people or events is a different purpose than the expressive purpose the visual work originally performed, supporting a finding of transformativeness. For example, using Grateful Dead concert posters as "historical artifacts to document and represent the actual occurrence of Grateful Dead concert events" was a different purpose from the posters' original "artistic expression and promotion[al]" value. *Id.* at 610 (transformative where images served as "historical artifacts graphically representing the fact of significant Grateful Dead concert events selected by the [book's] author"). Similarly, showing a logo "as part of the historical record" was different from the logo's purpose "as the brand symbol for the team." *Bouchat v. Baltimore Ravens Ltd.*, 737 F.3d 932, 940 (4th Cir. 2013) (transformative to use, "not for its expressive

content, but rather for its factual content" and as a "historical guidepost"); *SOFA Entm't, Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1278 (9th Cir. 2013) (using *Ed Sullivan Show* clip "as a biographical anchor" within the fictional musical *Jersey Boys* constituted transformative use).

Here, it is undisputed that Take-Two "included the Tattoos in its video game . . . to accurately depict the physical likenesses of the real-world basketball players as realistically as possible." Defs.' SUF ¶ 79; May 2017 Op. 2 (Take-Two's "games depict individual NBA players realistically, including the players' tattoos"); Aug. 2016 Op. 2 (players appear in *NBA 2K* as they do in "real life, replicating their physical features"). This use as an "anchor" is completely different from the purpose of the Tattoos to serve as "a reflection of the personal expression of the three NBA players on which they were inked." Defs.' SUF ¶ 3; *see supra* 4. Moreover, because Take-Two depicted professional basketball players, its transformative use is even stronger. *See Monster Comm'ns, Inc. v. Turner Broad. Sys., Inc.*, 935 F. Supp. 490, 494 (S.D.N.Y. 1996) (use of film footage depicting Muhammed Ali was transformative, particularly due to Ali's status as a "figure of legitimate public concern").[6]

Size of the Reproductions. The next consideration is whether the Tattoos' size was "significantly reduced." *See Bill Graham*, 448 F.3d at 611. In *Bill Graham*, for instance, the concert posters were small enough to "permit readers to recognize the historical significance of the posters," but "inadequate to offer more than a glimpse of their expressive value." *Id.* As the defendant "used the minimal image size necessary to accomplish its" purpose, the use was transformative. *Id.* Similarly, in *Kelly v. Arriba Soft Corp.*, although the defendant "made exact replications of Kelly's images," the thumbnails that actually were displayed were "smaller, lower-resolution images," making it less likely that they would substitute for the original

---

[6] Take-Two's transformative use of the Tattoos is not lessened by *NBA 2K* being an entertainment property. *See Hofheinz v. Discovery Commn'cns, Inc.*, No. 00 Civ. 3802, 2001 WL 1111970, at *4 (S.D.N.Y. Sept. 20, 2001).

works.  336 F.3d 811, 818 (9th Cir. 2003).

Here, Dr. Bogost calculated that when the players' real life sizes are compared to their sizes on the average game screen, the Tattoos appear "4.4–10.96% of the size that they appear in real life due to the great distance from the camera that the players usually are depicted" and the screens' small size.  Defs.' SUF ¶¶ 91–92.  Dr. Bogost's calculations are unrebutted.  Moreover, this is consistent with Solid Oak's admission that, on an average screen, the players, and by extension the Tattoos, "would be much smaller than they appear in regular life."  *Id.* ¶ 91.  Indeed, as discussed above, the Tattoos are difficult to observe in *NBA 2K* at all.  *See supra* 10.

Minimizing Expressive Value.  Courts also consider the qualitative context in which the reproduction appears, including whether other textual, graphic, or creative content minimizes its expressive value.  When the "expressive value of the reproduced" material is "minimized" by combining it with other materials, a transformative use finding is more likely.  *Bill Graham*, 448 F.3d at 611.  For example, in *Bill Graham*, the book at issue included a "prominent timeline, textual material, and original graphical artwork, to create a collage of text and images on each page of the book."  *Id.*  Moreover, the images were "displayed at angles," such that the overall layout "ensures that the images at issue are employed only to enrich the presentation of the cultural history of the Grateful Dead, not to exploit copyrighted artwork for commercial gain."  *Id.*  Similarly, in *Bouchat*, the logo was "used only fleetingly and insignificantly . . . limiting its expressive value."  737 F.3d at 941.  And, in *Sarl Louis Feraud Int'l v. Viewfinder Inc.*, the court noted that the argument for "transformative use is stronger" where a "three-dimensional, life-sized" work was reduced to a smaller, 2D image imbued with the defendant's own creative expression.  627 F. Supp. 2d 123, 128 (S.D.N.Y. 2008).

Here, Take-Two created more than just a book or a short film; *NBA 2K* is "an entire

virtual world," Defs.' SUF ¶ 73, with "many components, including graphics, characters, a fictitious plot, gameplay, [and] music." *Id.* ¶ 72. These elements create a fun, lush experience for game users. *See supra* 5–7. Thus, "when the Tattoos are depicted, they appear among a plethora of other visual and auditory elements, including other tattoos." Defs.' SUF ¶ 93. Far from being prominent in *NBA 2K*, the Tattoos are just "visual noise creating realism" but not making a visual impact, akin to hairstyles or facial features, and "subordinated to the display of the court and the players in competition." *Id.* ¶¶ 82, 95, 96. Any expressive value of the Tattoos has been diminished significantly by *NBA 2K's* other elements, particularly as the Tattoos appear on fluid, moving 3D players while the user is trying to play a fast-moving, interactive game, which makes it even less likely that the user would even have a chance to focus on them.

    <u>Proportion of Copied Material</u>. The final consideration is the quantitative proportion of the copied material in relation to the new work as a whole. *See Bill Graham*, 448 F.3d at 611. For instance, the book at issue in *Bill Graham* was 480-pages long, the images only appeared on seven pages, and they were "less than 1/20 the size of the original." *Id.* Thus, "[i]n total, the images account[ed] for less than one-fifth of one percent of the book." *Id.* Likewise, in *Bouchat*, in the "vast majority of its appearances," the logo was "present for fractions of a second, and [could] be perceived only by someone who [was] looking for it." 737 F.3d at 940.

    Here, the Tattoos are a tiny fraction of *NBA 2K*. In terms of data, they are only "0.000286–0.000431% of *NBA 2K*." Defs.' SUF ¶ 75. In terms of visuals, the Tattoos often do not appear at all. *Id.* ¶ 88. When they do, they are dwarfed by the "plethora of other visual and auditory elements, including other tattoos," in *NBA 2K*. *Id.* ¶ 93. The Tattoos certainly are far less of *NBA 2K* than the 0.2% that was found to support transformative use in *Bill Graham*.

    As each of these considerations favors Take-Two, its use of the Tattoos is transformative.

## 2. The Commercial Use Subfactor Is Of Little Weight Here

As to commercial use, "the more transformative the new work, the less will be the significance of other factors, like commercialism." *Campbell*, 510 U.S. at 579. Indeed, the Second Circuit has "repeatedly rejected the contention that commercial motivation should outweigh a convincing transformative purpose and absence of significant substitutive competition with the original." *Google*, 804 F.3d at 219. Here, renowned survey expert Dr. Jay conducted a survey and concluded that "consumers do not buy *NBA 2K* video games for the tattoos on LeBron James, Eric Bledsoe or Kenyon Martin." Defs.' SUF ¶ 90. This supports a finding of fair use. *See Swatch Grp. Mgmt. Servs Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 83 (2d Cir. 2014) (assigning commercial nature of defendant's use "little weight" where "the link between the defendant's commercial gain and its copying is attenuated" (alterations omitted)).

For the foregoing reasons, the first fair use factor weighs in favor of fair use.

## B. Factor Two: The Tattoos Are Not Creative and Were Published

The second fair use factor considers "(1) whether the work is expressive or creative, . . . with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished." *Cariou v. Prince*, 714 F.3d 694, 709–10 (2d Cir. 2013). "As a general rule, published works enjoy less fair use protection than unpublished works." *Hofheinz*, 2001 WL 1111970, at *5. While the "second factor has rarely played a significant role in the determination of a fair use dispute," it favors Take-Two here. *Google*, 804 F.3d at 220.

***First***, any creativity of the Tattoos is thin at best as Solid Oak cannot show the Tattoos are original. A work is not original if it is a "mere reproduction of a [prior] work of art in a different medium." *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 910 (2d Cir. 1980). Further, "under the doctrine of *scenes-a-faire*, 'elements of an image that flow naturally and

necessarily from the choice of a given concept cannot be claimed as original.'" *Fulks v. Knowles-Carter*, 207 F. Supp. 3d 274, 279 (S.D.N.Y. 2016) (quoting *Bill Diodato Photography, LLC v. Kate Spade, LLC*, 388 F. Supp. 2d 382, 392 (S.D.N.Y. 2005)). Here, each Tattoo was copied from pre-existing works or used common elements of tattoos that Solid Oak does not own:

- "Child Portrait Tattoo Artwork" was created by copying a photograph of LeBron James' child "as closely as possible." Defs.' SUF ¶ 8. This is not original. *See Psihoyos v. Nat'l Geographic Soc'y*, 409 F. Supp. 2d 268, 275 (S.D.N.Y. 2005) ("To the extent a photograph captures the characteristics of an object as it occurs in nature, these characteristics are not protectible.").

- Similarly, "330 and Flames Tattoo Artwork" was created by "ink[ing] over" a tattoo of the digits "330" that "Mr. James already had . . . inked on his arm," Defs.' SUF ¶¶ 17–18, which is not original. Moreover, words and short phrases like this are not protected by copyright. *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir. 1992) (holding that "single words or short phrases . . . do not exhibit the minimal creativity required for copyright protection"). The additional flame details do not make the tattoo copyrightable as flames are a "common" motif for tattoos, Defs.' SUF ¶ 20, and thus unprotectable *scènes à faire*.

- "Script with a Scroll, Clouds, and Doves" also is based on a pre-existing design, *id.* ¶ 22, in which Solid Oak does not hold rights. *Id.* ¶ 23. Further, the inclusion of birds is typical of tattoos as they have been a "popular subject of tattoos since ancient times." *Id.* ¶ 24.

- "Wizard" was copied from a pre-existing design in Mr. Cornett's tattoo parlor. *Id.* ¶¶ 27–28. One element was changed to a basketball, *id.* ¶ 29, but it is "common for basketball players to have tattoos that incorporate basketballs," *id.* ¶ 30, as is the choice of a "grim reaper." *Id.* ¶ 31.

- "Basketball with Stars and Script" again uses a basketball, which is standard for the tattoos of basketball players. *Id.* ¶ 30.

**Second**, any creativity that the Tattoos have must be weighed against the fact that Take-Two copied the Tattoos to depict real-world subject matter realistically. *See Consumers Union of U.S. v. Gen. Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983) (copying plaintiff's work "in the interest of accuracy" did not weigh against fair use); *see also Bouchat*, 737 F.3d at 943 (where use is related to work's role as "historical facts, then the creative nature of the work

matters much less than it otherwise would" (internal quotation marks omitted)).  Solid Oak has

concluded that *NBA 2K* is more realistic because it includes the Tattoos.  Defs.' SUF ¶ 81.

**Third**, the Tattoos were published prior to their inclusion in *NBA 2K*.  Defs.' SUF ¶ 4.

"Published works are more likely to qualify as fair use because the first appearance of the artist's

expression has already occurred."  *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1178 (9th Cir.

2013).  Where a work is widely disseminated, as is the case with the Tattoos, it favors fair use.

*Id.* (image appeared on Internet and L.A. streets); *Kelly*, 336 F.3d at 820 (photographs posted on

the Internet).  This factor supports Take-Two.

### C.    Factor Three: Take-Two's Copying Was Reasonable In Light of Its Purpose

"The third factor asks whether the secondary use employs more of the copyrighted work

than is necessary, and whether the copying was excessive in relation to any valid purposes

asserted under the first factor."  *HathiTrust*, 755 F.3d at 96.  "[T]he extent of permissible

copying varies with the purpose and character of the use."  *Campbell*, 510 U.S. at 586–87.

Indeed, "[f]or some purposes, it may be necessary to copy the entire copyrighted work, in which

case Factor Three does not weigh against a finding of fair use."  *HathiTrust*, 755 F.3d at 98.

Here, where the Tattoos are two-dimensional images used to depict real life accurately,

using less than the whole would defeat Take-Two's purpose of realistically depicting an NBA

basketball game.  *See supra* 7.  Thus, this factor does not weigh against fair use.  *See Bouchat*,

737 F.3d at 949 (finding it was necessary to include the logo in displays showing the NFL's

history and noting, "It is hard to see frankly how the use of one-third or two-thirds of the logo is

even practical or makes any sense."); *Seltzer*, 725 F.3d at 1178 (finding that, unlike a television

program or book, images are "not meaningfully divisible"); *Kelly*, 336 F.3d at 821 ("If Arriba

only copied part of the image, it would be more difficult to identify it, thereby reducing the

usefulness of the visual search engine."); *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 24

(1st Cir. 2000) (copying less than entire photograph "would have made the picture useless to the story," mitigating the relevance of this factor).

Moreover, it is well-established that when images are reproduced in a "reduced size," the "visual impact of their artistic expression is significantly limited," which indicates that the use "is tailored to further [the defendant's] transformative purpose." *Bill Graham*, 448 F.3d at 613. Where, as here, the copyrighted work is displayed in its entirety but at "the minimal image size and quality necessary to ensure" that it can be recognized as a "historical artifact," this factor does not weigh against fair use. *Id.*; *see supra* 13. Thus, the third factor favors fair use.

### D.     Factor Four: Take-Two Has Not Harmed the Tattoos' Markets

The fourth fair use factor considers whether the use will "result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (internal quotation marks omitted). The focus is on "whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." *Google*, 804 F.3d at 223; *HathiTrust*, 755 F.3d at 96 ("copyright holder must point to market harm that results because the secondary use serves as a substitute for the original work"). But as discussed above, Solid Oak admits that *NBA 2K* is not a substitute for the Tattoos, *see supra* 11; Defs.' SUF ¶ 67, thus there can be no market harm. Moreover, "any economic 'harm' caused by transformative uses does not count because such uses, by definition, do not serve as substitutes for the original work." *HathiTrust*, 755 F.3d at 99.

Solid Oak also cannot claim a potential market for the use of the Tattoos made by Take-Two. The Second Circuit has cautioned that "it is a given in every fair use case that plaintiff suffers a loss of a *potential* market if that potential is defined as the theoretical market for licensing the very use at bar." *Swatch*, 756 F.3d at 91. To "guard against this vice of circular

reasoning," the factor four inquiry is limited "to a use's impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets." *Id.* (internal quotation marks omitted). "[W]ere a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the fourth fair use factor would *always* favor the copyright holder." *Bill Graham*, 448 F.3d at 614.[7]

Here, video game industry expert Dr. Bogost, tattoo industry expert Dr. Jablonski, and economist Mr. Malackowski offered ***unrebutted*** testimony that video games are not a reasonable, traditional, or likely to be developed market for tattoos. Defs.' SUF ¶¶ 109, 115–16. Indeed, they are not "aware of any instance in which a license for a tattoo has been sought or issued for use in a video game." *Id.* ¶ 110. This makes sense for two reasons. ***First***, Take-Two minimally uses the Tattoos to realistically depict the players on which the Tattoos are inked. *See supra* 7, 9. "The video game industry would not reasonably anticipate licensing the Tattoos" for this purpose. Defs.' SUF ¶ 116; *see also Bouchat*, 737 F.3d at 943 (market harm unlikely where use is "transient and fleeting" as well as for "its factual, and not its expressive, content"). ***Second***, a "tattooist would not want to encumber his or her clients by" requiring a license under these circumstances. Defs.' SUF ¶¶ 47, 50 ("[T]he norm of the tattoo industry is that tattooists do not seek to control their tattoos as they appear on their clients."); *see supra* 8.

Not only are these experts' testimony unrebutted, but their conclusions make sense based on the factual evidence that supports their points-of-view. Solid Oak conceded that (a) it is not industry custom to pay for the use of Tattoos in video games, Defs.' SUF ¶ 113; (b) Solid Oak

---

[7]    Solid Oak does not and cannot claim that *NBA 2K* affects the original market for the Tattoos (i.e., inking them on people) as Take-Two is not in the tattoo inking business. Defs.' SUF ¶ 66. Moreover, Solid Oak does not hold "the right to tattoo a permanent tattoo rendering onto a person's skin." *Id.* ¶ 99.

itself "has never created, or contributed to the creation of, a video game depicting the Tattoos" or "licensed a video game depicting the Tattoos," *id.* ¶¶ 105–06; and (c) Solid Oak could not identify such a license by anyone else. *Id.* ¶ 112. Likewise, the tattooists who created the Tattoos do not believe Take-Two requires a license from them or Solid Oak. *Id.* ¶¶ 52–58. These admissions are fatal to Solid Oak's case. *See Blanch v. Koons*, 467 F.3d 244, 258 (2d Cir. 2006) (admission that copyright owner had "never licensed any of her photographs for" the use made by defendant weighed in favor of fair use); *Estate of Smith v. Cash Money Records, Inc.*, 253 F. Supp. 3d 737, 752 (S.D.N.Y. 2017) (holding that fourth factor favored fair use finding where "Plaintiffs never attempted to establish a market for licensed derivative uses of the JSR composition copyright until Defendants used the recording on the Album"); *Viewfinder*, 627 F. Supp. 2d at 136 (market harm argument is "undermined by the fact that plaintiffs do not themselves sell or license photos of their designs to the media").

A market also is unlikely to be developed for the Tattoos because Solid Oak has admitted that it has not obtained the players' publicity or trademark rights, which it needs to commercialize the Tattoos. Defs.' SUF ¶ 102. Solid Oak's own documents reveal that it could not commercialize the Tattoos due to these overlapping intellectual property rights. *Id.* ("I not only need the permission from the artists for the copyrights, but I need permission from the players as well to not infringe on their right of publicity."; "I will need all athlete approval to move forward."; Solid Oak needed "to steer away from using LeBron James' likeness . . . ."); *cf. Bouchat v. Baltimore Ravens Ltd. P'ship*, No. 08 Civ. 397, 2011 WL 5445947, at *2 (D. Md. Nov. 9, 2011) (finding lack of harm due to copyright holder being "limited (perhaps totally) in his commercial use of the [copyrighted work] by virtue of Defendants' trademark rights").

As "Solid Oak is trying to create a market in this case that has never existed before and

would not be reasonable or likely to be developed based on the customs and practices of the tattoo industry," Defs.' SUF ¶ 109, this factor supports a finding of fair use.

### E. Considerations of the Public Interest Favor Take-Two

"The ultimate test of fair use . . . is whether the copyright law's goal of promoting the Progress of Science and useful Arts . . . would be better served by allowing the use than by preventing it." *Blanch*, 467 F.3d at 251 (internal quotation marks omitted); *see also Swatch*, 756 F.3d at 90 (balancing public benefit of use with copyright owner's personal gain). Of particular import for this case, fair use protects secondary users "from the inevitable chilling effects of allowing an artist too much control over the dissemination of his or her work for historical purposes." *Bouchat*, 737 F.3d at 944. Were courts to "require those wishing to produce [new works] to receive permission from copyright holders for fleeting factual uses of their works, [they] would allow those copyright holders to exert enormous influence over new depictions of historical subjects and events." *Id.* "This would align incentives in exactly the wrong manner, diminishing accuracy and increasing transaction costs, all the while discouraging the creation of new expressive works." *Id.* at 944–45.

Here, a finding of copyright infringement will not encourage the creation of new works. It would not result in more tattoos because, as Mr. Cornett explained, if clients continually must go back to the tattooist for permission, "it would hurt the tattoo industry and deter people from using tattoos as a way of expressing themselves." Defs.' SUF ¶ 51; Jablonski Decl. ¶ 37. It also would deter video game developers from creating realistic video games as they are not likely to engage in the "herculean task of identifying and negotiating with the tattooist for each tattoo," Defs.' SUF ¶ 117, and would be "completely stymied" from creating realistic games by an obstinate copyright holder. Thomas Decl. ¶ 19. Finding each tattooist may not even be possible if the tattooed individual does not remember who the tattooist was, or the tattooist retired,

moved, or passed away. *Id.* ¶ 19. And it would hamper the creation of numerous other works in which NBA players appear, including NBA telecasts, photographs, advertisements, and news programs. Defs.' SUF ¶ 68. Accordingly, Take-Two respectfully requests that this Court declare that *NBA 2K* makes a fair use of the Tattoos.

## III.    TAKE-TWO'S USE OF THE TATTOOS WAS AUTHORIZED

Solid Oak's copyright claim fails for the additional reason that Take-Two's use of the Tattoos was authorized. As the Copyright Act prohibits only unauthorized use of a copyrighted work, 17 U.S.C. §§ 106, 501, a "copyright owner waives the right to sue . . . for uses of copyrighted material that are authorized." *Great Minds v. FedEx Office & Print Servs., Inc.*, 886 F.3d 91, 94 (2d Cir. 2018). Here, Solid Oak admits that the NBA players "have given the NBA the right to license the NBA PLAYERS' likeness to third-parties," Defs.' SUF ¶ 103, and that "TAKE-TWO is licensed by the NBA to use the NBA PLAYERS' likeness." *Id.* ¶ 104.

The final link is the tattooists' authorization of the NBA players to permit the depiction of the Tattoos as part of the players' likenesses. Such authorization may "be granted orally, or may even be implied from conduct." *Rawkus Entm't, LLC v. JHH Pictures, Inc.*, No. 01 Civ. 8804, 2003 WL 169781, at *1 (S.D.N.Y. Jan. 24, 2003). It is implied "when [1] a person, the licensee, requests the creation of a work, [2] the creator, the licensor, makes that particular work and [3] delivers it to the licensee with the understanding that the licensee will copy and distribute the work." *Carano v. Vina Concha y Toro*, 288 F. Supp. 2d 397, 402–03 (S.D.N.Y. 2003).

As to the first and second prongs, each Tattoo was created at the request of the NBA player on whom it was inked, and inked on that player's body by the tattooist for the Tattoo. Defs.' SUF ¶¶ 7–9, 19, 28–29, 34. As to the third prong, Dr. Jablonski's unrebutted testimony is that, "[o]nce a tattoo has been inked on to the client's skin, the tattooist exercises no control over it because the tattoo itself is part of the client's body." *Id.* ¶ 46. Thus, "the client is free to

authorize the use or dissemination of his or her likeness in whatever way he or she sees fit without the necessity of seeking permission from the tattooist." *Id.* ¶ 48; *see supra* 5.  This shows that Take-Two's use was authorized.  *See Carano*, 288 F. Supp. 2d at 402 (relying on "common" "commercial practices" to grant summary judgment given implied authorization).

The tattooists and players confirm this understanding by expressly declaring that they intended the players to be able to authorize the depiction of each Tattoo as part of his likeness:

- Mr. Cornett explained, "any athlete I tattoo . . . was and is free to use his likeness as he desires," including "the ability to let third parties depict him in various media, like video games."  Defs.' SUF ¶¶ 56, 57  (Mr. Cornett told Solid Oak that he "didn't understand why [he] would sell Mr. Martin any rights to the tattoos, because [Mr. Martin] had already paid to use the tattoos in any way he wanted fair and square when [Mr. Cornett] tattooed him").

- Mr. Wright wrote, "Mr. James was and is free to use his likeness as he desires, including allowing others to depict it, such as in . . . video games." *Id.* ¶ 13.

- Mr. Rome "intended that these tattoos become a part of Mr. James' likeness and part of his image." *Id.* ¶ 53.

- According to Mr. James, "the tattoos are a part of my body and my likeness," and he can authorize their use in connection with his likeness in "creative works, like video games." *Id.* ¶¶ 61, 62.

- Mr. Martin's "tattoo became a part of [his] body, and [he] could use [his] body in any way without having to return to the tattooist for any kind of permission." *Id.* ¶ 64.

The athletes were not told that they needed to go back to the tattooists to get permission. *Id.* ¶¶ 60, 65–66.  These clear statements of intent from the creators of the Tattoos and the players on whom they were inked establish that the players had the right to authorize Take-Two to include the Tattoos in *NBA 2K*.  *See Carano*, 288 F. Supp. 2d at 401 (parties' testimony supporting finding of implied authorization on summary judgment); *Rawkus*, 2003 WL 169781, at *1 (implied licensed "flow[ed] from the parties' conduct").  And the players did grant "Take-Two permission to use [their] likeness in its video game series *NBA 2K*."  Defs.' SUF ¶¶ 63, 65,

103–04 (the players "granted the NBA permission to allow Take-Two to use [their] likeness[es] in its video game series *NBA 2K*," which included "the right to display and recreate [their] tattoos as part of [their] likeness[es]").

It makes no sense for the tattooists to require the players to stay in touch throughout the players' lives so that the tattooists could grant permission every time the players commercialized their likenesses, or else risk a copyright infringement lawsuit. As Dr. Jablonski's unrebutted report makes clear, this simply is not tattoo industry practice. *Id.* ¶¶ 45–51.

## IV.    THE TATTOOS ARE NOT ORIGINAL AS THEY ARE BASED ON PRE-EXISTING WORKS AND COMMON TATTOO MOTIFS

Finally, to establish infringement, Solid Oak must establish "ownership of a valid copyright," including that the Tattoos were "independently created by the author[s] (as opposed to copied from other works)" and possess "at least some minimal degree of creativity." *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345, 361 (1991). This requirement cannot be satisfied by the mere reproduction of a work in a different medium, and *scènes à faire* is not protectable. *See supra* 16. Solid Oak cannot meet its burden as it admits that it does not know how any of the Tattoos were created. Defs.' SUF ¶¶ 35–44; *Porto v. Guirgis*, 659 F. Supp. 2d 597, 603 (S.D.N.Y. 2009). Further, the evidence that does exist shows that the Tattoos were copied from pre-existing works or used common elements of tattoos. *See supra* 16.

## CONCLUSION

Consistent with established industry practice, even the individuals who created the Tattoos do not "believe that Solid Oak has the right to prevent Take-Two from including the tattoos [they] inked in their games as part of [the NBA players'] likenesses." Cornett Decl. ¶ 27; Wright Decl. ¶ 16; Rome Decl. ¶ 10. As discussed above, they are right. Accordingly, Take-Two respectfully requests that this Court grant its motion for summary judgment in its entirety.

Dated: New York, New York
August 24, 2018

/s/ Dale M. Cendali

Dale M. Cendali
Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
dale.cendali@kirkland.com
joshua.simmons@kirkland.com

*Attorneys for Defendants-Counterclaimants*