Dale M. Cendali
Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
dale.cendali@kirkland.com
joshua.simmons@kirkland.com

*Attorneys for Defendants-Counterclaimants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SOLID OAK SKETCHES, LLC, <br><br> Plaintiff-Counterdefendant, <br><br> v. <br><br> 2K GAMES, INC. and TAKE-TWO INTERACTIVE SOFTWARE, INC., <br><br> Defendants-Counterclaimants. | CASE NO. 1:16-cv-724-LTS-RLE |

**DEFENDANTS-COUNTERCLAIMANTS 2K GAMES, INC. AND TAKE-TWO INTERACTIVE SOFTWARE, INC.'S RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Defendants-Counterclaimants 2K Games Inc. and Take-Two Interactive Software, Inc. (collectively, "Take-Two"), by and through their counsel, respectfully submit the following statement of material and undisputed facts that support a grant of their motion for summary judgment.

## I.    <u>THE TATTOOS</u>

1.    "Tattoos have been a part of human expression for thousands of years." Declaration of Nina Jablonski ("Jablonski Decl.") ¶ 13; Declaration of Dale Cendali, Esq. ("Cendali Decl.") Ex. A (Siegler Dep.) at 277:7–10 ("[M]ummies were recently found, they're thousands of years old, with tattoos found on them.").

2.    "Modern tattoos reflect the personal expression of the person bearing the tattoo and are created for that purpose."  Jablonski Decl. ¶ 20.

3.    The tattoos at issue in this litigation (the "Tattoos") "are a reflection of the personal expression of the three NBA players on which they were inked."  Jablonski Decl. ¶ 42; Pl.'s Answ. to Defs.' Countercls. (Dkt. No. 65) ("Answ.") ¶ 48 ("[E]ach of the Tattoos is a custom tattoo intended only for the player on which it was inked.").

4.    Each of the Tattoos was published prior to its inclusion in *NBA 2K*.  Pl.'s 2d Am. Compl. (Dkt. No. 55) ("Compl.") Exs. D, F, H, J, K; Answ. ¶¶ 51, 58, 71, 83, 90, 96.

## A.    Child Portrait Tattoo Artwork

5.    The Tattoo titled "Child Portrait Tattoo Artwork" was inked on LeBron James by Justin Wright.  Declaration of Justin Wright ("Wright Decl.") ¶ 9; Cendali Decl. Exs. A (Siegler Dep.) at 91:12–92:20, D (Pl.'s 2d Am. Resps. to Take-Two's 1st Requests for Admission ("1st RFA Resp.")) at No. 109.

6.     For "Child Portrait Tattoo Artwork," Mr. James "brought a baby picture to the tattooist."  Declaration of LeBron James ("James Decl.") ¶ 5.

7.     To create "Child Portrait Tattoo Artwork," Mr. Wright copied "a photograph of Mr. James's [child]."  Wright Decl. ¶ 9; James Decl. ¶ 5 (Mr. James "told the tattooist to copy that image, and he followed [Mr. James's] instructions.").

8.     Mr. Wright inked "Child Portrait Tattoo Artwork" by "copying [the photograph] as closely as possible."  Wright Decl. ¶ 9.

9.     Mr. Wright inked "Child Portrait Tattoo Artwork" "with [Mr. James's] direction and input."  Wright Decl. ¶ 9.

10.    Mr. James "wanted the tattoo to look as realistic and close to [his] child's photograph as possible."  James Decl. ¶ 5.

11.    When Mr. Wright inked the "Child Portrait Tattoo Artwork" on Mr. James, he "knew and intended that when [Mr. James] appeared in public, on television, in commercials, or in other forms of media, he would display the Child Portrait Tattoo."  Wright Decl. ¶ 10.

12.    Mr. Wright "intended that [Child Portrait Tattoo Artwork] become a part of Mr. James's likeness and part of his image."  Wright Decl. ¶ 10.

13.    Mr. Wright intended that "Mr. James was and is free to use his likeness as he desires, including allowing others to depict it, such as in advertisements and video games."  Wright Decl. ¶ 11.

**B.     330 and Flames Tattoo Artwork**

14.    Deshawn Morris also refers to himself as Shawn Rome.  Declaration of Deshawn Morris ("Rome Decl.") ¶ 4.

15.    The Tattoo titled "330 and Flames Tattoo Artwork" was inked on LeBron James by Mr. Rome.  Rome Decl. ¶ 4; Cendali Decl. Ex. A (Siegler Dep.) at 51:22–52:4.

16.    "The digits '330' were selected because it is the area code of Akron, Ohio,

Mr. James's hometown."  Rome Decl. ¶ 4; James Decl. ¶ 8; Cendali Decl. Exs. A (Siegler Dep.)

at 53:18–23 (330 is the telephone area code for Akron, Ohio and Akron, Ohio is LeBron James'

hometown), D (1st RFA Resp.) at No. 96 (admitting that "330 is the area code of Akron, Ohio").

17.    "Mr. James already had the outline of [330] inked on his arm."  Rome Decl. ¶ 4.

18.    In inking "330 and Flames Tattoo Artwork," Mr. Rome "inked over the existing

tattoo, and added flames and shading in the digits."  Rome Decl. ¶ 4.

19.    Mr. Rome added flames and shading to "330 and Flames Tattoo Artwork" at

Mr. James's request.  Rome Decl. ¶ 4.

20.    Flames are a "common" motif for tattoos.  Jablonski Decl. ¶ 24.

**C.    Script with a Scroll, Clouds and Doves Tattoo Artwork**

21.    The Tattoo titled "Script with a Scroll, Clouds and Doves" was inked on LeBron

James by Shawn Rome.  Rome Decl. ¶ 6; Cendali Decl. Ex. A (Siegler Dep.) at 68:5–11.

22.    To create "Script with a Scroll, Clouds, and Doves," Mr. Rome copied a design in

his sketchbook.  Rome Decl. ¶ 6.

23.    Solid Oak did not license the drawing used to create "Script with a Scroll, Clouds,

and Doves" from Mr. Rome.  Compl. Ex. C (only licensing rights to tattoo).

24.    Birds have been a "popular subject of tattoos since ancient times."  Jablonski

Decl. ¶ 24.

**D.    Wizard**

25.    The Tattoo titled "Wizard" was inked on Kenyon Martin by Thomas Ray Cornett.

Declaration of Thomas Ray Cornett ("Cornett Decl.") ¶ 12.

26.    "Wizard" is "a grim reaper holding a basketball."  Cornett Decl. ¶ 12.

4

27.    Mr. Martin "chose the design while in the tattoo shop from a selection of pre-designed tattoos on the walls and in books."  Declaration of Kenyon Martin ("Martin Decl.") ¶ 7.

28.    Mr. Cornett "did not design the tattoo," Cornett Decl. ¶ 13, instead he "primarily copied [Wizard] directly from the pre-existing design."  Martin Decl. ¶ 7.

29.    To create the "Wizard" Tattoo, Mr. Martin told Mr. Cornett "to replace what the grim reaper was originally holding, which [Mr. Martin] believe[s] was a sun or a moon, with a basketball."  Martin Decl. ¶ 7.

30.    It is "common for basketball players to have tattoos that incorporate basketballs." Jablonski Decl. ¶ 44.

31.    "[D]epictions of death or the grim reaper" are common tattoo motifs.  Jablonski Decl. ¶ 44.

32.    Mr. Cornett believes "any individuals who are tattooed. . . can authorize the display of their tattoos as part of their likenesses."  Cornett Decl. 16.

**E.      Basketball with Stars and Script**

33.    The Tattoo titled "Basketball with Stars and Script" was inked on Eric Bledsoe by Thomas Ray Cornett.  Cornett Decl. ¶ 20; Cendali Decl. Ex. A (Siegler Dep.) at 105:22–23.

34.    "Mr. Bledsoe specifically requested the design of a basketball with stars and script." Cornett Decl. ¶ 20.

**F.      Solid Oak's Lack of Knowledge of Tattoos' Creation**

35.    Solid Oak does not know how "330 and Flames Tattoo Artwork" was designed. Cendali Decl. Ex. A (Siegler Dep.) at 53:15–17.

36.    Solid Oak does not know if "330 and Flames Tattoo Artwork" was based on a pre-existing work.  Cendali Decl. Ex. A (Siegler Dep.) at 54:9–12.

37.   Solid Oak does not know who designed "Script with a Scroll, Clouds and Doves." Cendali Decl. Ex. A (Siegler Dep.) at 69:4–70:17.

38.   Solid Oak does not know whether "Script with a Scroll, Clouds and Doves" was based on a pre-existing work.  Cendali Decl. Ex. A (Siegler Dep.) at 69:4–70:17.

39.   Solid Oak has no information about how the design of "Child Portrait Tattoo Artwork" was created.  Cendali Decl. Ex. A (Siegler Dep.) at 94:21–95:1.

40.   Solid Oak does not know if Mr. James provided Mr. Wright with any pre-existing material for the design of "Child Portrait Tattoo Artwork."  Cendali Decl. Ex. A (Siegler Dep.) at 95:10–14.

41.   Solid Oak has no knowledge about who designed "Basketball with Stars and Script."  Cendali Decl. Ex. A (Siegler Dep.) at 105:17–106:11.

42.   Solid Oak does not know whether "Basketball with Stars and Script" was based on a pre-existing design.  Cendali Decl. Ex. A (Siegler Dep.) at 105:17–106:11.

43.   Solid Oak does not know who designed "Wizard."  Cendali Decl. Ex. A (Siegler Dep.) at 115:9–116:20.

44.   Solid Oak does not know whether "Wizard" was based on a pre-existing work. Cendali Decl. Ex. A (Siegler Dep.) at 115:9–116:23.

## II.   <u>TATTOO INDUSTRY</u>

### A.   **Tattoo Industry Norms**

45.    A client's tattoo is "an inextricable and inseparable part of [the client's] likeness." Jablonski Decl. ¶ 28.

46.   "Once a tattoo has been inked on to the client's skin, the tattooist exercises no control over it because the tattoo itself is part of the client's body.  In other words, clients and tattooists expect that a client's tattoo will be part of that person's body, image, likeness, and

6

identity."  Jablonski Decl. ¶ 30; Cendali Decl. Ex. A (Siegler Dep.) at 66:17–67:2 (tattooed

individuals have the right to remove, touch up, ink over, or change their tattoos).

47.   "[T]he norm of the tattoo industry is that tattooists do not seek to control their

tattoos as they appear on their clients."  Jablonski Decl. ¶ 46.

48.   In the tattoo industry, "the client is free to authorize the use or dissemination of his

or her likeness in whatever way he or she sees fit without the necessity of seeking permission

from the tattooist."  Jablonski Decl. ¶ 32.

49.   To require the tattooed person to return to obtain the tattooist's further permission

to use or display his or her tattoo "would encumber the client" and "hamper the client's abilities

to freely express himself or herself."  Jablonski Decl. ¶ 33.

50.   A "tattooist would not want to encumber his or her clients by exerting continuing

rights over the client's tattoo as it appears on the client's body" because "most success in [the

tattoo] industry is based on referrals and word-of-mouth."  Jablonski Decl. ¶ 47.

51.   "[I]t would hurt the tattoo industry and deter people from using tattoos as a way of

expressing themselves if anyone thought that if he or she ever became successful or wanted to be

displayed in any sort of media or advertising, they would be prevented from doing so without the

tattooist's permission."  Cornett Decl. ¶ 28; Jablonski Decl. ¶ 37 ("The impingement on personal

freedom that such a requirement would entail is untenable, and would lead to the decline of the

tattoo industry.").

**B.    Tattooists' Intent**

52.   Shawn Rome, Justin Wright, and Thomas Ray Cornett believe that the players on

whom the Tattoos were inked were and are free to use their likenesses as they desire, including

allowing others to depict them, such as in advertisements and video games, and have the right to

display and recreate the tattoos as part of the players' likenesses. Wright Decl. ¶ 11; Cornett Decl. ¶ 16; Rome Decl. ¶¶ 9–11.

53.    Mr. Rome "intended that [the tattoos he inked on Mr. James] become a part of Mr. James's likeness and part of his image."  Rome Decl. ¶ 10.

54.    Mr. Cornett intended that "any individuals who are tattooed . . .can authorize the display of their tattoos as part of their likenesses."  Cornett Decl. ¶ 16.

55.    Mr. Cornett "knew and intended" that his tattoos would be displayed when Eric Bledsoe and Kenyon Martin "appeared in public," "in media," or in renderings "such as in art or video games."  Cornett Decl. ¶¶ 15, 16, 21–22.

56.    Mr. Cornett intended that "any athlete [he] tattoo[ed] . . . was and is free to use his likeness as he desires," including "the ability to let third parties depict him in various media, like video games."  Cornett Decl. ¶¶ 16, 29.

57.    Mr. Cornett explained to Mr. Siegler in an e-mail that he "didn't understand why [he] would sell Mr. Martin any rights to the tattoos, because [Mr. Martin] had already paid to use the tattoos in any way he wanted fair and square when [Mr. Cornett] tattooed him."  Cornett Decl. ¶ 25; Cendali Decl. Ex. G (e-mail from T. Cornett to M. Siegler, dated October 7, 2013, Subject: "Re: Athlete Tattoos").

58.    Mr. Wright intended that "if anyone were to create a rendition of Mr. James's likeness, such as in art or video games, [Child Portrait Tattoo Artwork] should be depicted as part of his likeness."  Wright Decl. ¶ 10.

C.    **Athletes' Expectations**

59.    Mr. James understands that he "ha[s] the right to have [his] tattoos visible when people or companies depict what [he] look[s] like."  James Decl. ¶ 10.

60.    "No tattooist has ever told [Mr. James he] needed their permission to be shown with [his] tattoos, even when it was clear [he] was a public basketball player."  James Decl. ¶ 11; Cendali Decl. Ex. A (Siegler Dep.) at 63:4–24 (Solid Oak is not aware of any instance where any of the players bearing tattoos needed the permission of the tattooist before someone could create images of their likenesses).

61.    Mr. James understands that "the tattoos are a part of [his] body and [his] likeness." James Decl. ¶ 10.

62.    Mr. James "always thought that [he] had the right to license what [he] look[s] like to other people for various merchandise, television appearances, and other types of creative works, like video games."  James Decl. ¶ 10.

63.    Mr. James "granted Take-Two permission to use [his] likeness in its video game series *NBA 2K*."  James Decl. ¶ 13; Cendali Decl. Ex. F (Pl's Resp. to Take-Two's 3d Requests for Admission ("3d RFA Resp.")) at Nos. 396–397.

64.    Mr. Martin understood that "once inked, the tattoo became a part of [his] body, and [he] could use [his] body in any way without having to return to the tattooist for any kind of permission,. . . and [he] would be able to allow third parties to display or recreate [his] likeness with that tattoo."  Martin Decl. ¶ 10.

65.    Mr. Martin and the tattooist "understood that [Mr. Martin] would be able to allow third parties to display or recreate [his] likeness with that tattoo."  Martin Decl. ¶ 10.

66.    Mr. Bledsoe's tattooist understood that Mr. Bledsoe "was and is free to use his likeness as he desires," which "includes the ability to let third parties depict him in various media, like video games."  Cornett Decl. ¶ 22.

### III.   TAKE-TWO'S *NBA 2K* VIDEO GAME SERIES

67.   "NBA 2K is not a substitute for the TATTOOS."  Cendali Decl. Ex. C (Pl.'s 1st Am. Resps. to Take-Two's 1st Requests for Admission ("1st Am. RFA Resp.")) at No. 290.

68.   NBA players appear in NBA telecasts, photographs, advertisements, and news programs.  Answ. ¶¶ 102, 104, 106, 108, 110, 112, 113, 114, 116, 118.

69.   The "*NBA 2K16* disc contains 55 GB of data."  Bogost Decl. ¶ 105.

### A.   *NBA 2K* Gameplay

70.   Each game of basketball in *NBA 2K* is shorter than a professional NBA game. Declaration of Jeff Thomas ("Thomas Decl.") ¶ 6.

71.   Each quarter in a game in *NBA 2K* can be only a few minutes in length.  Thomas Decl. ¶ 6.

### B.   Features of *NBA 2K*

72.   *NBA 2K* "has many components, including graphics, characters, a fictitious plot, gameplay, [and] music."  Mem. Op., dated March 30, 2018, (Dkt. No. 117) ("Mar. 2018 Op."), at 2; Answ. ¶ 198; Thomas Decl. ¶ 7.

73.   The various visual and auditory components of *NBA 2K* create "an entire virtual world."  Answ. ¶ 201.

74.   *NBA 2K* contains auditory elements that include the sound of "shoes against the court's surface; the noise of the crowd, the horns and other audible warnings signaling elapsing shot clocks, ending timeouts, and so forth; television announcers performing play-by-play; and musical soundtrack."  Bogost Decl. ¶ 83; Cendali Decl. Ex. C (1st Am. RFA Resp.) at Nos. 22–24.

## IV.   TAKE-TWO'S USE OF THE TATTOOS IN *NBA 2K*

### A.   Tattoos' Data in *NBA 2K*

75.   In terms of data, each Tattoo represents "0.000286–0.000431% of NBA 2K." Bogost Decl. ¶¶ 105–06.

76.   "[T]he Tattoos are a fractional, fleeting, part of *NBA 2K*." Bogost Decl. ¶ 6; Thomas Decl. ¶¶ 15–18.

77.   The Tattoos "are minimal by comparison to the total size of the game." Bogost Decl. ¶ 99; Thomas Decl. ¶¶ 15–18.

78.   The texture files that are used to depict the NBA players are a small part of *NBA 2K's* 55 GB data package. Bogost Decl. ¶¶ 105–06.

### B.   Purpose of the Tattoos' Inclusion in *NBA 2K*

79.   "Take-Two included the Tattoos in its video game . . . to accurately depict the physical likenesses of the real-world basketball players as realistically as possible." Jablonski Decl. ¶ 43; Answ. ¶¶ 141 (Take-Two "depict[s] NBA players realistically in *NBA 2K*, including Messrs. Bledsoe, James, and Martin."), 142 (Take-Two "also ha[s] realistically depicted the Tattoos."); Thomas Decl. ¶ 16; Mem. Order, dated May 16, 2017, (Dkt. No. 64) ("May 2017 Order"), at 2 ("The games depict individual NBA players realistically, including the players' tattoos.").

80.   Take-Two includes the Tattoos in *NBA 2K* by "scanning the athlete's entire body with a series of cameras." Thomas Decl. ¶ 3.

81.   *NBA 2K* "would look more realistic" if the players bearing the Tattoos "included the tattoos [they] actually wear[]." Cendali Decl. Ex. A (Siegler Dep.) at 461:17–462:1.

82.    The Tattoos "creat[e] realism" in *NBA 2K*.  Bogost Decl. ¶ 89 (the Tattoos are "visual noise creating realism"); Thomas Decl. ¶ 16; Cendali Decl. Ex. B (Zivin Dep.) at 106:14–19 (admitting that the tattoos "contribute to the game's realism").

83.    In *NBA 2K*, "the Tattoos are depicted only as an incidental part of Take-Two's focus on creating realistic video games."  Thomas Decl. ¶ 16.

84.    In *NBA 2K*, the Tattoos "only appear on the players on which they are inked in real life."  Cendali Decl. Exs. B (Zivin Dep.) at 97:25–98:4, A (Siegler Dep.) at 258:21–259:3, 259:12–23, D (1st RFA Resp.) No. 265 ("[I]n NBA 2K, the TATTOOS are depicted in the same manner as they appear in real life."); Answ. ¶ 153; Bogost Decl. ¶ 68 ("The Tattoos only appear when [LeBron James, Eric Bledsoe, and Kenyon Martin] appear in a given game."); Thomas Decl. ¶ 14.

85.    *NBA 2K* does not present the Tattoos in any way separate from Mr. Bledsoe, Mr. James and Mr. Martin.  Thomas Decl. ¶ 14; Cendali Decl. Ex. A (Siegler Dep.) at 261:22–262:2 (admitting that you cannot add the Tattoos to a custom character).

86.    Over 400 NBA players are depicted each year in *NBA 2K*.  Thomas Decl. ¶ 15.

87.    During the average basketball game in *NBA 2K*, only "two teams of 5 on-court players each" appear on the court.  Thomas Decl. ¶ 15.

88.    "[I]n the average game of *NBA 2K*, the players on which the Tattoos are inked (and by extension the Tattoos) will not appear."  Bogost Decl. ¶ 66; Thomas Decl. ¶ 15.

89.    "[T]he Tattoos play no role in the plot of *NBA 2K*'s MyCareer mode."  Bogost Decl. ¶ 66.

90.    While "consumers buy NBA 2K video games for numerous reasons. . . consumers do not buy NBA 2K video games for the tattoos on LeBron James, Eric Bledsoe or Kenyon Martin."  Declaration of E. Deborah Jay, Ph.D. ("Jay Decl.") Ex. A, at 21.

## C.    Visibility of the Tattoos

91.    On an average screen, during a basketball game, the players, and by extension the Tattoos, "would be much smaller than they appear in regular life."  Cendali Decl. Ex. A (Siegler Dep.) at 270:1–4; Thomas Decl. ¶¶ 16, 18.

92.    In *NBA 2K*, "when the players appear, the Tattoos generally are depicted about 4.4– 10.96% of the size that they appear in real life due to the great distance from the camera that the players usually are depicted."  Bogost Decl. ¶ 66.

93.    "[W]hen the Tattoos are depicted [in *NBA 2K*], they appear among a plethora of other visual and auditory elements, including other tattoos."  Bogost Decl. ¶¶ 66, 81 ("Visually, the Tattoos will appear on screen with the basketball; the hoop, including its rim, net, and backboard; the court, including various insignia of the home team, markings for the sidelines, baselines, mid-court lines, three-point lines, free-throw lines, the free-throw circle, lane-lines, and center-circle; the players, including multiple individuals on the court and on the sidelines, each of whom wears jerseys with different accessories and other features (such as tattoos); coaches; referees; cheerleaders; spectators; the stadium; and the game clock and scoring system."); Thomas Decl. ¶ 15 ("There are over 400 NBA players in *NBA 2K*, and many of them bear multiple tattoos."); Answ. ¶¶ 146–48 (admitting that Mr. James, Mr. Martin, and Mr. Bledsoe have multiple tattoos); Cendali Decl. Exs. A (Siegler Dep.) at 108:5–8 (admitting that many basketball players have visible tattoos when they play basketball games), 272:14-16 (admitting that "it's common for NBA players to have tattoos"), 273:10–13 (admitting that Mr.

James, Mr. Martin, and Mr. Bledsoe have multiple tattoos); *id.* Ex. C (1st Am. RFA Resp.) at No. 275.

94.    "[I]n ordinary play mode . . . the ordinary player will perceive the Tattoos as a kind of visual noise."  Bogost Decl. ¶¶ 89, 99 (the Tattoos "are used in a fleeting way, in small size, out-of-focus, with a relative visual indistinctiveness"); Thomas Decl. ¶ 16.

95.    The Tattoos are no more noticeable than a "simulated player's nose shape or hairstyle."  Bogost Decl. ¶ 89; Thomas Decl. ¶ 16 ("In the same way that we try to recreate an athlete's hair, nose shape, and other physical features of his body, an athlete's tattoos are included in *NBA 2K* to make the depiction of his physical body look as realistic as possible.").

96.    In *NBA 2K*, the Tattoos "are subordinated to the display of the court and the players in competition."  Bogost Decl. ¶ 85; Thomas Decl. ¶¶ 15–18.

97.    When "a user plays NBA 2K, some players on the court may be blocked from view by other players," resulting in the Tattoos potentially being "blocked from view by other players."  Cendali Decl. Ex. C (1st Am. RFA Resp.) at Nos. 37–38; Bogost Decl. ¶¶ 6 (the Tattoos "are hard to observe due to their obstruction by other game elements, because they often appear out-of-focus, and because players on whom the Tattoos appear move quickly in the game"), 66 (In *NBA 2K*, the Tattoos are obstructed "by other game elements, such as the players' own bodies, the bodies of other players, and other in-game avatars."); Thomas Decl. ¶¶ 16–18.

98.    "[T]he [Tattoos] sometimes appear out of focus during NBA 2K gameplay." Cendali Decl. Ex. C (1st Am. RFA Resp.) at No. 42; Bogost Decl. ¶ 66 (The tattoos often appear "out-of-focus."); Thomas Decl. ¶¶ 16–18.

99.    In *NBA 2K*, the Tattoos are "difficult to observe due to. . . the quick movements of the players on which the Tattoos are inked."  Bogost Decl. ¶ 66; Cendali Decl. Ex. C (1st Am.

RFA Resp.) at No. 278 ("[I]n NBA 2K, the NBA PLAYERS are often moving,"); Thomas
Decl. ¶ 17.

## V.    SOLID OAK

### A.    Solid Oak's Lack of Rights

100.  Solid Oak does not hold "the right to tattoo a permanent tattoo rendering onto a
person's skin."  Compl. Exs. C, G, I.

101.  Solid Oak has never licensed to any party "the ability to ink the Tattoos on other
people."  Answ. ¶ 183; Cendali Decl. Ex. A (Siegler Dep.) at 194:10–13.

102.  Solid Oak did not obtain the publicity rights or trademark rights for Eric Bledsoe,
Kenyon Martin, or LeBron James.  Answ. ¶¶ 187–90; Cendali Decl. Ex. A (Siegler Dep.) at
389:7–18 ( "I not only need the permission from the artists for the copyrights, but I need
permission from the players as well to not infringe on their right of publicity."), 393:14–394:5
("I will need all athlete approval to move forward."), 407:20–408:1 (admitting that Solid Oak
tried "to avoid mentioning the players' full name and face, for fear that would trigger the
player['s] right of publicity"), 420:10–20 ("We need to steer away from using LeBron James'
likeness in general."); *id.* Exs. B (Zivin Dep.) at 74:14–24, G–J (e-mails from M. Siegler stating
he did not have publicity rights and could not use players' likenesses), Jablonski Decl. ¶ 51,
Malackowski Decl. Ex. A, at 18–20.

103.  Kenyon Martin, Eric Bledsoe and LeBron James "have given the NBA the right to
license [their] likeness to third-parties."  Cendali Decl. Ex. F (3d RFA Resp.) at No. 396; James
Decl. ¶ 13; Martin Decl. ¶ 17.

104.  "TAKE-TWO is licensed by the NBA to use [Kenyon Martin's, Eric Bledsoe's, and
LeBron James'] likeness[es]."  Cendali Decl. Ex. F (3d RFA Resp.) at No. 397; James Decl. ¶
13; Martin Decl. ¶ 15.

**B.**    **Solid Oak's Lack of Market**

105.  Solid Oak "has never created, or contributed to the creation of, a video game depicting the Tattoos."  Answ. ¶ 192; Cendali Decl. Ex. A (Siegler Dep.) at 194:17–19, 460:4–6.

106.  Solid Oak "has never licensed a video game depicting the Tattoos."  Answ. ¶ 193; Cendali Decl. Ex. A (Siegler Dep.) at 460:4–9.

107.  Solid Oak "has never licensed to any other party the ability to ink the Tattoos on other people."  Answ. ¶ 183.

108.  Solid Oak "has never sold merchandise depicting the Tattoos."  Answ. ¶¶ 186, 192–93; Cendali Decl. Ex. E (Pl.'s 1st Am. Resp. to Take-Two's 2d Requests for Admission ("2d RFA Resp.") at No. 371; Cendali Decl. Ex. A (Siegler Dep.) at 458:23–460:3.

109.  Dr. Jablonski's unrebutted testimony is that "Solid Oak is trying to create a market in this case that has never existed before and would not be reasonable or likely to be developed based on the customs and practices of the tattoo industry."  Jablonski Decl. ¶ 45.

110.  Dr. Jablonski is "not aware of any instance in which a license for a tattoo has been sought or issued for use in a video game."  Jablonski Decl. ¶ 46.

111.  Dr. Bogost is "not familiar with any video game developer licensing the rights to tattoos for inclusion in a video game."  Bogost Decl. ¶ 108.

112.  Solid Oak could not identify an instance in which a license for a tattoo has been issued for use in a video game.  Cendali Decl. Ex. A (Siegler Dep.) at 159:10–19.

113.  Solid Oak has no evidence showing a "customary practice" of paying for the use of the Tattoos that Take-Two has made.  Cendali Decl. Ex. A (Siegler Dep.) at 295:9–17.

114.  Mr. Malackowski's opinion is that "there is no market for tattoo licensing to video games for tattoo artwork of tattoos that are inked on basketball players in real life."  Declaration of James Malackowski ("Malackowski Decl.") ¶ 5.

115.  Mr. Malackowski's opinion is that a market "is unlikely to develop" for licensing tattoos for use in video games on the basketball players on whom the tattoos are inked in real life.  Malackowski Decl. ¶ 5.

116.  "The video game industry would not reasonably anticipate licensing the Tattoos" for depicting players on whom the Tattoos were inked.  Bogost Decl. ¶ 110.

117.  If Solid Oak prevails, video game developers are unlikely to undertake the "herculean task of identifying and negotiating with the tattooist for each tattoo."  Thomas Decl. ¶ 19.

118.  Video game developers may not even be able to find and identify the hundreds of tattooists who may be responsible for inking NBA players.  Thomas Decl. ¶ 19.

Dated: New York, New York
       August 24, 2018

/s/ Dale M. Cendali
Dale M. Cendali
Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
dale.cendali@kirkland.com
joshua.simmons@kirkland.com

*Attorneys for Defendants-Counterclaimants*