UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SOLID OAK SKETCHES, LLC<br><br>    Plaintiff-Counterdefendant,<br><br>    v.<br><br>2K GAMES, INC. and TAKE-TWO INTERACTIVE SOFTWARE, INC.,<br><br>    Defendants-Counterclaimants. | CASE NO. 1:15-cv-724-LTS-SDA<br><br>ECF Case |

**DECLARATION OF THOMAS RAY CORNETT**

I, Thomas Ray Cornett, declare as follows:

**I.     Introduction**

1.     I submit this declaration in support of Take-Two Interactive Software, Inc. and 2K Games, Inc. (collectively, "Take-Two"), and to clarify the facts for the court and all parties involved. I learned of this lawsuit through my own investigation and from parties unrelated to the litigation. I am adamantly against Solid Oak Sketches, LLC ("Solid Oak") using my name in connection with its claims in this lawsuit. The position Solid Oak has taken is completely inconsistent with how I feel my work should be used, and quite candidly, I feel that Solid Oak's claims are ridiculous.

**II.    My Background**

2.     I am a tattooist currently living in Louisville, Kentucky, though I began my tattooing career in Cincinnati, Ohio. I currently own and am employed at a tattoo parlor named Bleed Blue Tattoo located at 527 South Upper Street in Lexington, Kentucky. Before working at Bleed Blue Tattoo, I was employed at a tattoo parlor named Big Tom's Uptown Tattoo ("Uptown Tattoo"), which to the best of my recollection was located at 2629 Vine Street in Cincinnati, Ohio.

3.     While employed at Uptown Tattoo, I was paid a regular salary and taxes were withheld from that salary. Clients paid Uptown Tattoo for my services, rather than paying me directly. I used Uptown Tattoo's equipment to ink my tattoos.

**III.   The Tattoo Industry**

4.     From my experience as a tattooist for over twenty years, most tattoo parlors conduct their business in the same manner as Uptown Tattoo, and have the same employment relationship with their tattooists.

5. Moreover, there are certain practices in inking tattoos on clients that have become "standard" in the tattoo industry. For example, the tattooist's role is to ink a tattoo that is faithful to the client's design for the tattoo, especially if the tattoo was a custom design for that client and was created at the client's request.

6. More importantly, the tattooist and client both understand that upon inking, the tattoo becomes a part of the client's body and likeness. The client does not need permission from the tattooist to display the tattoo, to have the tattoo photographed, or include the tattoo in any depiction of the client's likeness. Essentially, the client is free after the inking session to go about his or her business with the tattoo as just another part of his or her body. In addition, and as happens fairly frequently, clients can have tattoos changed or removed at any point if they want. These points are so commonly understood in the industry that it would not be standard to make a client sign any sort of agreement to this effect.

7. As discussed below, I tattooed Kenyon Martin and Eric Bledsoe before they were professional basketball players in the NBA. I have tattooed numerous other athletes, in part because my business is located near the University of Kentucky, where many professional athletes attend and have attended college.

8. I would never tell an athlete that he or she needs my permission to display their tattoos when they appear in any media. That is just not in my moral code as a tattooist. In my opinion, the athletes and any other clients pay for that right fair and square when they pay for their tattoo.

9. Because I have tattooed several basketball players, I have learned that some designs are commonly requested from basketball players—praying hands, basketballs, stars, and crowns are examples of those common elements.

## IV. Kenyon Martin's Tattoo

10. In the mid- to late-1990s, while employed at Uptown Tattoo, I inked a tattoo on Kenyon Martin. At that time, Mr. Martin was a freshman at the University of Cincinnati, and he had other tattoos when he came to Uptown Tattoo. It is my understanding that Mr. Martin has since obtained additional tattoos from other tattooists.

11. At the time that I inked the tattoo, I knew that Mr. Martin played basketball for the University of Cincinnati. I also knew that it was likely that Mr. Martin was going to appear in public, on television, in commercials, or in other forms of media, like video games, at some point in the future, especially if he was successful in his basketball career.

12. One of the tattoos that I inked on Mr. Martin, specifically on his shoulder, was a grim reaper holding a basketball. I understand that Solid Oak named the tattoo "Wizard" in the copyright registrations it filed with the Copyright Office and in this lawsuit, but I do not know why and that is not the name that I have used for the tattoo. Mr. Martin requested this tattoo to cover up a tattoo that previously had been inked on his shoulder while he was in high school. This tattoo was one of the very first tattoos that I inked in my career.

13. While I was the individual who inked the tattoo onto Mr. Martin, I did not design the tattoo. It was copied from what we refer to in the tattoo industry as a "flash" (*i.e.*, pre-existing) design. Clients can browse the tattoo parlor's selection of flash, often located in a binder or on the walls, and select a design. A tattooist then inks the flash onto the client.

14. In Mr. Martin's case, he selected the grim reaper design from flash. To the best of my recollection, the grim reaper in the flash design was originally holding a moon, sun, star, or something similar. Mr. Martin asked me to change it to a basketball.

15. When I inked the tattoo on Mr. Martin's shoulder according to Mr. Martin's request, I knew and intended that he would display the tattoo whenever he appeared in public. I

also knew and intended that this tattoo would be displayed if Mr. Martin appeared in media, such as on television or in commercials. This was obvious to me as it was tattooed on his shoulder and I knew that basketball jerseys do not have sleeves. As discussed above, I also intended that the tattoo become a part of Mr. Martin's likeness and part of his image. I knew and intended that the tattoo would need to be included if anyone were to create a rendition of Mr. Martin's likeness, such as in art or video games. I think that a depiction of Mr. Martin's likeness would not be considered accurate if it did not include his tattoos.

16. In my opinion, any athlete I tattoo, including Mr. Martin, was and is free to use his likeness as he desires. This includes the ability to let third parties depict him in various media, like video games. In my experience, any individuals who are tattooed hold these rights and can authorize the display of their tattoos as part of their likenesses.

17. To the best of my knowledge, I have not inked the tattoo on any other individuals, though it is possible that other tattooists inked the underlying flash design of the grim reaper on other clients. I also have not sold any merchandise bearing the Wizard.

**V.     Eric Bledsoe's Tattoo**

18. In approximately 2009 or 2010, while I was employed by Bleed Blue Tattoo, I inked a tattoo on Eric Bledsoe. At that time, Mr. Bledsoe was a freshman at the University of Kentucky. It is my understanding that Mr. Bledsoe has since obtained additional tattoos from other tattooists.

19. At the time that I inked the tattoo, I knew that Mr. Bledsoe played basketball for the University of Kentucky. I also knew that it was likely that Mr. Bledsoe was going to appear in public, on television, in commercials, or in other forms of media, like video games, at some point in the future, especially if he was successful in his basketball career.

20. One of the tattoos that I inked on Mr. Bledsoe, specifically on his shoulder, was a basketball with a scroll with writing on it, which I understand Solid Oak to have named "Basketball with Stars and Script." Mr. Bledsoe specifically requested the design of a basketball with stars and script, and I inked the custom design with his direction and input.

21. When I inked Basketball with Stars and Script on Mr. Bledsoe's shoulder according to Mr. Bledsoe's request, I knew and intended that he would display the tattoo whenever he appeared in public. I also knew and intended that this tattoo would be displayed if Mr. Bledsoe appeared in media, such as on television or in commercials. This was obvious to me as it was tattooed on his shoulder and I knew that basketball jerseys do not have sleeves. As discussed above, I also intended that the tattoo become a part of Mr. Bledsoe's likeness and part of his image. I knew and intended that the tattoo would need to be included if anyone were to create a rendition of Mr. Bledsoe's likeness, such as in art or video games. I think that a depiction of Mr. Bledsoe's likeness would not be considered accurate if it did not include his tattoos.

22. In my opinion, any athlete I tattoo, including Mr. Bledsoe, was and is free to use his likeness as he desires. This includes the ability to let third parties depict him in various media, like video games. In my experience, any individuals who are tattooed hold these rights and can authorize the display of their tattoos as part of their likenesses.

23. I have not inked Basketball with Stars and Script on any other individuals because it was a custom tattoo designed for Mr. Bledsoe. I also have not sold any merchandise bearing Basketball with Stars and Script.

VI. **Solid Oak**

24. I initially was approached by Solid Oak in 2012. Matthew Siegler ("Siegler") represented to me that Solid Oak was interested in licensing my tattoo designs for use on

clothing. We entered into an agreement, and tt was my understanding that the agreement we entered into was for the purpose of providing me with approximately an eight percent royalty for any clothing that was sold displaying my particular tattoo designs.

25. In 2013, Mr. Siegler contacted me saying that he had specific interest in Kenyon Martin's tattoos, because Mr. Martin's agent reached out with interest in purchasing the rights to the tattoos. I was confused because I thought that Mr. Siegler's plans were to make clothing with the tattoo designs, and our agreement had related to clothing. We did not discuss the use of my tattoo designs outside of that context. I responded to Mr. Siegler that I didn't understand why I would sell Mr. Martin any rights to the tattoos, because he already had paid to use the tattoos in any way he wanted fair and square when I tattooed him. Mr. Siegler didn't respond to me except to thank me for the information I provided about tattooing Mr. Martin.

26. I have not received any royalties or other payments from Solid Oak. In fact, Solid Oak has not contacted me since this litigation commenced.

27. Solid Oak did not inform me that it would be pursuing any legal claims involving my tattoos. When I first heard about this litigation, I was surprised and frustrated because, as stated above, I do not believe that Solid Oak has the right to prevent Take-Two from including the tattoos I inked in their games as part of Mr. Martin's and Mr. Bledsoe's likenesses. I feel misled by Mr. Siegler as he told me he was going to use my tattoos to make clothing, and instead he is using my name in connection with a lawsuit I am completely against.

28. I believe it would hurt the tattoo industry and deter people from using tattoos as a way of expressing themselves if anyone thought that if he or she ever became successful or wanted to be displayed in any sort of media or advertising, they would be prevented from doing so without the tattooist's permission.

29.     I am concerned that Solid Oak's actions in pursuing this lawsuit and using my name this way has the potential to damage my reputation and harm my business. I regularly tattoo athletes who attend the University of Kentucky, and I do not want them to associate my name with being prevented at some point in the future from using their likeness as they are entitled to. If I was able to, I would tell Mr. Martin, Mr. Bledsoe, and the other athletes I have inked that I had nothing to do with this litigation, and they should be free to use their tattoos however they want, including permitting their tattoos to be depicted in a video game.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23 day of February, 2018.

_____
Thomas Ray Cornett