Darren A. Heitner
HEITNER LEGAL, P.L.L.C.
215 Hendricks Isle
Fort Lauderdale, FL 33304
Telephone: (954) 558-6999
Facsimile: (954) 927-3333
Darren@HeitnerLegal.com
Alan@HeitnerLegal.com

Paul S. Haberman
Law Offices of Paul S. Haberman LLC
PO Box 167
Norwood, NJ 07648
Telephone: (201) 564-0590
Facsimile: (201) 767-2087
psh@paulhabermanlaw.com

*Attorneys for Plaintiff/Counter-Defendant*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

SOLID OAK SKETCHES, LLC,
a Delaware limited liability company,

                      Plaintiff/Counter-Defendant,

|  |  |
|---|---|
|  | **RESPONSE TO DEFENDANTS' RULE 56.1 STATEMENT OF PURPORTEDLY UNDISPUTED MATERIAL FACTS** |
| v. | 16-CV-00724 (LTS) (RLE) |

2K GAMES, INC., a Delaware corporation, and
TAKE-TWO INTERACTIVE SOFTWARE, INC.,
a Delaware corporation,

                      Defendants/Counterclaimants
-------------------------------------------------------------x

       Plaintiff/Counter-Defendant SOLID OAK SKETCHES, LLC, by and through its

attorneys, Heitner Legal, P.L.L.C. and Law Offices of Paul S. Haberman LL, submits the

following response to defendants/counterclaimants 2K GAMES, INC. and TAKE-TWO

INTERACTIVE SOFTWARE, INC.'s (the "Defendants") "Defendants-Counterclaimants 2K Games, Inc. and Take-Two Interactive Software, Inc.'s Rule 56.1 Statement of Undisputed Facts in Support of Their Motion for Summary Judgment," dated August 24, 2018.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Plaintiff submits the following statement of material facts, which reveal the existence of disputed material facts in opposition to Defendants' motion for summary judgment against Plaintiff.

As an initial matter, Plaintiff notes that this matter is exclusively about a legal question, i.e., whether Defendants infringed on the various copyrights that Plaintiff indisputably had the right to license pursuant to licensing agreements with three different tattooists. And that legal question is discussed at length in Plaintiff's Memorandum of Law. Defendants, however, have opted to endeavor to turn this case into a smorgasbord of sideshow issues that are no more than a distraction from that legal question and mar the proceedings with purportedly undisputed material facts which, even if accepted as true, do virtually nothing after the 118th undisputed material fact to even address the issue of copyright infringement at all. Accordingly, the reason that Plaintiff responds with such a narrow set of its own material facts woven in its responses is because the issue truly is a lot narrower than Defendants would like to bamboozle the Court into believing with their parade of overreaching, questionably qualified experts and splashy, but wholly irrelevant, declarations of NBA stars and their tattooists. This matter is about one small business and its right to license the copyrighted artwork of various tattooists whose work appear on NBA stars. Nothing more, nothing less. The Court is accordingly respectfully cautioned not to view with skepticism how large Plaintiff's record is not, but rather how large Defendants' record is and to contemplate why Defendants are attempting to turn something so narrow and

straightforward, even if it is a matter of first impression, into something so unnecessarily expansive and, at times, self-contradictory as to its purported facts.

I.    **THE TATTOOS**

1. Admit, except deny that the facts that "[t]attoos have been a party of human expression for thousands of years" and that "mummies were recently found, they're thousands of years old, with tattoos on them" are relevant, or otherwise have any bearing, on the material copyright issues to be determined in this lawsuit.

2. Deny, as the notion that "[m]odern tattoos reflect the personal expression of the person bearing the tattoo and are created for that purpose" is more of an opinion or personal conclusion of Dr. Jablonski and is otherwise unsupported by the record, not relevant to this case, and has no bearing on the material copyright issues to be determined in this lawsuit.

3. Admit.

4. Admit.

A.  **Child Portrait Tattoo Artwork**

5. Admit.

6. Admit.

7. Admit.

8. Admit.

9. Admit.

10. Admit.

11. Admit, except deny that Mr. Wright's knowledge and intentions as to LeBron James' display of the tattoo has any bearing on the material copyright issues to be determined in this lawsuit.

12. Admit, except deny that Mr. Wright's intentions that the tattoo would become part of LeBron James' likeness and part of his image has any bearing on the material copyright issues to be determined in this lawsuit.

13. Admit, except deny that Mr. Wright's intention for LeBron James to be free to use his likeness as he desired, including allowing others to depict it, such as in advertisements and video games has any bearing on the material copyright issues to be determined in this lawsuit.

**B. 330 and Flames Tattoo Artwork**

14. Admit.

15. Admit.

16. Admit.

17. Admit.

18. Admit, but deny that the fact that Mr. Rome "inked over the existing tattoo, and added flames and shading in the digits" has any hearing on the material copyright issues to be determined in this lawsuit.

19. Admit.

20. Admit Dr. Jablonski stated as much in her expert submission, but deny that it is anything more than generalization and *ipse dixit* and, in any event, has any bearing on the material copyright issues to be determined in this lawsuit.

**C. Script with a Scroll, Clouds and Doves Tattoo Artwork**

21. Admit.

22. Admit.

23. Admit, but deny it to the extent that the inference therein is that the fact that Plaintiff did not license the drawing used to create "Script with a Scroll, Clouds, and Doves" from Mr. Rome somehow takes away from the existence of a valid Tattoo Licensing Agreement between them. <u>Exh</u>. 1.

24. Admit Dr. Jablonski stated as much in her expert submission, but deny that it has any bearing on the material copyright issues to be determined in this lawsuit.

**D. Wizard**

25. Admit.

26. Admit.

27. Admit.

28. Admit, but deny that it has any bearing on the material copyright issues to be determined in this lawsuit.

29. Admit.

30. Admit Dr. Jablonski stated as much in her expert submission, but deny that such lay observations have any bearing on the material copyright issues to be determined in this lawsuit.

31. Admit Dr. Jablonski stated as much in her expert submission, but deny that such lay observations have any bearing on the material copyright issues to be determined in this lawsuit.

32. Admit that Mr. Cornett stated that in his declaration, but deny that Mr. Cornett has any legal background from which to make such a conclusion or is otherwise qualified to

speak on the topic of who can authorize what, and further deny any suggestion that this statement somehow takes away from the existence of a valid Tattoo Licensing Agreement between Plaintiff and Mr. Cornett.  Exh. 3.

**E.  Basketball with Stars and Script**

33. Admit.

34. Admit.

**F.  Solid Oak's Lack of Knowledge of Tattoo's Creation**

35. Admit, but deny that Solid Oak's lack of knowledge on how it was designed diminishes, in any way whatsoever, the existence of valid Tattoo Licensing Agreements with Mr. Rome, Mr. Cornett, and Mr. Wright, or otherwise negates the undisputed fact that each of the tattoos that is subject to said agreements is validly registered with United States Copyright Office.  Exhs. 1, 2, 3; Second Amended Complaint at Exhibits D, F, H, J, and K.

36. Admit, but deny that Solid Oak not knowing if "330 and Flames Tattoo Artwork" was based on a pre-existing work diminishes, in any way whatsoever, the existence of a valid Tattoo Licensing Agreement with Mr. Rome, or otherwise negates the undisputed fact that "330 and Flames Tattoo Artwork" is subject to said agreement and is validly registered with United States Copyright Office.  Exh. 1; Second Amended Complaint at Exhibit D.

37. Admit, but deny that Solid Oak not knowing who designed "Script with a Scroll, Cloud and Doves" diminishes, in any way whatsoever, the existence of a valid Tattoo Licensing Agreement with Mr. Rome, or otherwise negates the undisputed fact that "Script with a

Scroll, Clouds and Doves" is subject to said agreement and is validly registered with the United States Copyright Office. Exh. 1; Second Amended Complaint at Exhibit F.

38. Admit, but deny that Solid Oak not knowing whether "Script with a Scroll, Clouds and Doves" was based on a pre-existing work diminishes, in any way whatsoever, the existence of a valid Tattoo Licensing Agreement with Mr. Rome, or otherwise negates the undisputed fact that "Script with a Scroll, Clouds and Doves" is subject to said agreement and is validly registered with the United States Copyright Office. Exh. 1; Second Amended Complaint at Exhibit F.

39. Admit, but deny that the fact that Solid Oak has no information about how the design of "Child Portrait Tattoo Artwork" was created diminishes, in any way whatsoever, the existence of a valid Tattoo Licensing Agreement with Mr. Wright, or otherwise negates the undisputed fact that "Child Portrait Tattoo Artwork" is subject to said agreement and is validly registered with the United States Copyright Office. Exh. 2; Second Amended Complaint at Exhibit H.

40. Admit, but deny that the fact that Solid Oak does not know if LeBron James provided Mr. Wright with any pre-existing material for the design of "Child Portrait Tattoo Artwork" diminishes, in any way whatsoever, the existence of a valid Tattoo Licensing Agreement with Mr. Wright, or otherwise negates the undisputed fact that "Child Portrait Tattoo Artwork" is subject to said agreement and is validly registered with the United States Copyright Office. Exh.2; Second Amended Complaint at Exhibit H.

41. Admit, but deny that the fact that Solid Oak has no knowledge about who designed "Basketball with Stars and Script" diminishes, in any way whatsoever, the existence of a valid Tattoo Licensing Agreement with Mr. Cornett, or otherwise negates the undisputed

fact that "Basketball with Stars and Script" is subject to said agreement and is validly registered with the United States Copyright Office. <u>Exh</u>. 3; <u>Second Amended Complaint</u> at Exhibit J.

42. Admit, but deny that the fact that Solid Oak does not know whether "Basketball with Stars and Script" was based on a pre-existing design diminishes, in any way whatsoever, the existence of a valid Tattoo Licensing Agreement with Mr. Cornett, or otherwise negates the undisputed fact that "Basketball with Stars and Script" is subject to said agreement and is validly registered with the United States Copyright Office. <u>Exh</u>. 3; <u>Second Amended Complaint</u> at Exhibit J.

43. Admit, but deny that the fact that Solid Oak does not know who designed "Wizard" diminishes, in any way whatsoever, the existence of a valid Tattoo Licensing Agreement with Mr. Cornett, or otherwise negates the undisputed fact that "Wizard" is subject to said agreement and is validly registered with the United States Copyright Office. <u>Exh</u>. 3; <u>Second Amended Complaint</u> at Exhibit J.

44. Admit, but deny that the fact that Solid Oak does not know whether "Wizard" was based on a pre-existing work diminishes, in any way whatsoever, the existence of a valid Tattoo Licensing Agreement with Mr. Cornett, or otherwise negates the undisputed fact that "Wizard" is subject to said agreement and is validly registered with the United States Copyright Office. <u>Exh</u>. 3; <u>Second Amended Complaint</u> at Exhibit J.

## II. TATTOO INDUSTRY

### A. Tattoo Industry Norms

45. Admit Dr. Jablonski stated as much in her expert submission, but deny that it has any bearing on the material copyright issues to be determined in this lawsuit.

46. Admit Dr. Jablonski stated as much in her expert submission, but deny that it has any bearing on the material copyright issues to be determined in this lawsuit.

47. Admit Dr. Jablonski stated as much in her expert submission, but deny that it has any bearing on the material copyright issues to be determined in this lawsuit.

48. Admit Dr. Jablonski stated as much in her expert submission, but deny that it has any bearing on the material copyright issues to be determined in this lawsuit.

49. Admit Dr. Jablonski stated as much in her expert submission, but deny that it has any bearing on the material copyright issues to be determined in this lawsuit or is any more than *ipse dixit* and broad over-generalization.

50. Admit Dr. Jablonski stated as much in her expert submission, but deny that it has any bearing on the material copyright issues to be determined in this lawsuit or is any more than *ipse dixit* and broad over-generalization.

51. Admit that Dr. Jablonski stated as much in her expert submission and that Mr. Cornett stated as much in his Declaration, but deny that the assertions have any bearing on the material copyright issues to be determined in this lawsuit or are any more than one tattooists' opinion in the case of Mr. Cornett or *ipse dixit* and rank speculation on the part of Dr. Jablonski.

**B.  Tattooists' Intent**

52. Admit that Mr. Rome, Mr. Wright, and Mr. Cornett appear to take that position/ have that opinion according to their carefully orchestrated Declarations, but deny that the assertions of three tattooists have any bearing on the material copyright issues to be determined in this lawsuit or in any way diminish the fact that they entered into Tattoo Licensing Agreements with Plaintiff notwithstanding this position/ opinion. Exhs. 1, 2, 3.

53. Admit that Mr. Rome stated as much in his Declaration, but deny that the fact that he intended that the tattoos he inked on LeBron James become a party of his likeness and part of his image has any bearing on the material copyright issues to be determined in this lawsuit or in any way diminishes that fact that Mr. Rome entered into a Tattoo Licensing Agreement with Plaintiff notwithstanding this position. Exh. 1.

54. Admit that Mr. Cornett stated as much in his Declaration, but deny the fact that his opinion that any individuals who are tattooed can authorize the display of said tattoos on their likenesses, has any bearing on the material copyright issues to be determined in this lawsuit or in any way diminishes the fact that Mr. Cornett entered into a Tattoo Licensing Agreement with Plaintiff notwithstanding this position. Exh. 3.

55. Admit that Mr. Cornett stated as much in his Declaration, but deny the fact that his knowledge and intention that his tattoos would be displayed when Eric Bledsoe and Kenyon Martin appeared in public, in the media, or in renderings, such as in art or videogames, has any bearing on the material copyright issues to be determined in this lawsuit, or in any way diminishes the fact that Mr. Cornett entered into a Tattoo Licensing Agreement with Plaintiff notwithstanding his knowledge and intention as stated in the Declaration. Exh. 3.

56. Admit that Mr. Cornett stated as much in his Declaration, but deny the fact that his intention is that any athlete that he tattoos is (or was) fee to use his likeness as he desires has any bearing on the material copyright issues to be determined in this lawsuit, or in any way diminishes the fact that Mr. Cornett entered into a Tattoo Licensing Agreement with Plaintiff notwithstanding his intention when tattoos athletes. <u>Exh</u>. 3.

57. Admit that Mr. Cornett stated as much to Matt Siegler in an email, but deny that his belief that Mr. Martin had already paid to use the tattoos in any way he wanted fair and square when Mr. Cornett tattooed him has any bearing on the material copyright issues to be determined in this lawsuit, or in any way diminishes the fact that Mr. Cornett entered into a Tattoo Licensing Agreement with Plaintiff notwithstanding the aforementioned belief. <u>Exh</u>. 3.

58. Admit that Mr. Wright stated as much in his Declaration, but deny that his intention as to the depiction of LeBron James' tattoo inked by him has any bearing on the material copyright issues to be determined in this lawsuit, or in any way diminishes the fact that Mr. Wright entered into a Tattoo Licensing Agreement with Plaintiff notwithstanding the intention recapped in his Declaration. <u>Exh</u>. 2.

**C. <u>Athletes' Expectations</u>**

59. Admit that Mr. James stated as much in his Declaration, but deny that what he understands as to his right to have his tattoos visible when people or companies depict what he looks like has any bearing on the material copyright issues to be determined in this lawsuit rather than on right of publicity issues that are not at issue in this lawsuit.

60. Admit that Mr. James stated as much in his Declaration, but deny that what any tattooist ever told him or did not tell him about needing their permission to be shown with his

tattoos as a public figure/basketball player has any bearing on the material copyright issues to be determined in this lawsuit rather than on right of publicity issues that are not at issue in this lawsuit.

61. Admit that Mr. James stated as much in his Declaration, but deny that what Mr. James understands about tattoos as part of his body and likeness has any bearing on the material copyright issues to be determined in this lawsuit rather than on right of publicity issues that are not at issue in this lawsuit.

62. Admit that Mr. James stated as much in his Declaration, but deny that what Mr. James always though as to whether he had the right to license what he looks like to other people for various merchandise, television appearances, and other types of creative works like video games has any bearing on the material copyright issues to be determined in this lawsuit rather than on right of publicity issues that are not at issue in this lawsuit.

63. Admit that Mr. James granted defendant TAKE-TWO permission to use his likeness in its video game series NBA 2K but deny that this fact has any bearing on the material copyright issues to be determined in this lawsuit rather than on right of publicity issues that are not at issue in this lawsuit.

64. Admit that Mr. Martin stated as much in his Declaration but deny that his understanding that once inked, the tattoo became a part of his body and that he could use his body in any way without having to return to the tattooist for any kind of permission and that he would be able to allow third parties to display or re-create his likeness with that tattoo has any bearing on the material copyright issues to be determined in this lawsuit rather than on right of publicity issues that are not at issue in this lawsuit.

65. Admit that Mr. Martin stated as much in his Declaration but deny that he and his tattooist's understanding that he would be able to allow third parties to display or recreate his likeness with that tattoo has any bearing on the material copyright issues to be determined in this lawsuit rather than on right of publicity issues that are not at issue in this lawsuit.

66. Admit that Mr. Bledsoe stated as much in his Declaration but deny that what his tattooist understood about Mr. Bledsoe being free to use his likeness as he desires, including the ability to let third parties depict him in various media, such as video games, has any bearing on the material copyright issues to be determined in this lawsuit rather than on right of publicity issues that are not at issue in this lawsuit.

III.   **TAKE-TWO'S NBA 2K VIDEO GAME SERIES**

67. Admit, but deny that such a self-evident admission has any bearing on the material copyright issues to be determined in this lawsuit.

68. Admit, but note that NBA players' right of publicity is not at issue in this lawsuit.

69. Admit that Dr. Bogost stated as much in his expert submission, but deny that it has any bearing on the material copyright issues to be determined in this lawsuit.

A.  **NBA 2K Gameplay**

70. Admit that Mr. Thomas stated as much in his Declaration but deny that the fact that each game of basketball in NBA 2K is shorter than a professional NBA game has any bearing on the material copyright issues to be determined in this lawsuit.

71. Admit that Mr. Thomas stated as much in his Declaration but deny that the fact that each quarter in a game in NBA 2K can be only a few minutes in length has any bearing on the material copyright issues to be determined in this lawsuit.

**B. Features of NBA 2K**

72. Admit.

73. Admit.

74. Admit.

IV. **TAKE-TWO'S USE OF THE TATTOOS IN NBA 2K**

**A. Tattoos' Data in NBA 2K**

75. Admit that Dr. Bogost stated as much in his expert submission, but deny that the amount of data that each tattoo represents in NBA 2K has any bearing on the material copyright issues to be determined in this lawsuit.

76. Deny, the cited evidence does not support this proposition, which is more appropriately termed the subjective conclusion of a single so-called expert.

77. Admit that Dr. Bogost and Mr. Thomas stated as much in their submissions, but deny that the idea that the tattoos "are minimal by comparison to the total size of the game" has any bearing on the material copyright issues to be determined in this lawsuit.

78. Admit that Dr. Bogost stated as much in his expert submission, but deny that whether or not the texture file that are used to depict NBA players are a small part of NBA 2K's 55 GB data package has any bearing on the material copyright issues to be determined in this lawsuit.

**B. Purpose of the Tattoos' Inclusion in NBA 2K**

79. Admit and note that this material fact actually cuts against the idea of fair use or *de minimus* use, and not in favor of such a proposition, for reasons discussed in Plaintiff's Memorandum of Law.

80. Admit, but deny that the fact that the tattoos in NBA 2K are depicted as a result of scanning the athlete's entire body with a series of cameras has any bearing on the material copyright issues to be determined in this lawsuit rather than on right to publicity issues that are not at issue in this lawsuit.

81. Admit, but deny that the fact that NBA 2K would look more realistic if the players bearing the tattoos included those that they actually wore has any bearing on the material copyright issues to be determined in this lawsuit rather than on right to publicity issues that are not at issue in this lawsuit.

82. Admit.

83. Deny, the cited evidence either does not support this proposition or is inadmissible. Rather, Mr. Thomas' Declaration is little more than the type of subjective *ipse dixit* the Court should expect from someone in Defendants' employ as to why the tattoos are depicted.

84. Admit.

85. Admit, but deny that the fact that the tattoos only appear on the players on which they are inked in real life has any bearing on the material copyright issues to be determined in this lawsuit.

86. Admit.

87. Deny, the cited evidence either does not support this proposition or is inadmissible. The term "average" as used is rather ambiguous, especially given the multitude of modes that Defendants themselves have indicated elsewhere are available.

88. Deny, the cited evidence either does not support this proposition or is inadmissible. Dr. Bogost's assertion as to what appears on an "average" game of NBA 2K is surmise, to say the least, and does not appear to take into account any number of variables, including the personal player preferences of particular gamers.

89. Admit, but deny that the fact that the tattoos play no role in the plot of NBA 2K's MyCareer mode has any bearing on the material copyright issues to be determined in this lawsuit.

90. Admit, but deny that the fact that while consumers why buy NBA 2K video games may not buy them because of the tattoos on Mr. James, Mr. Bledsoe, or Mr. Marin has any bearing on the material copyright issues to be determined in this lawsuit. Moreover, Defendants themselves acknowledge that they were driven to include tattoos in the video games to "accurately depict the physical likenesses of the real-world basketball players as realistically as possible." See ECF No. 129 at 79.

**C. Visibility of the Tattoos**

91. Admit, but deny that the fact that the on the average screen, during a basketball game, the players, and by extension the tattoos would be much smaller than they might appear in real life has any bearing on the material copyright issues to be determined in this lawsuit.

92. Deny, the cited evidence does not support this proposition or is inadmissible. Dr. Bogost's assertion, using such open-ended terms as "generally" and "usually" do not provide anything of probative value to this lawsuit.

93. Admit, but deny that the fact that the subject tattoos appear among other visual and auditory elements, including other tattoos has any bearing on the material copyright issues to be determined in this lawsuit.

94. Deny, the cited evidence does not support this proposition or is inadmissible. Dr. Bogost could not say with any degree of expert certainty whether any tattoos within the NBA 2K's games would be deemed "visual noise" by anyone with any degree of regularity.

95. Admit, but note that one's nose and hairstyle could actually be quite noticeable, so this is a curious concession from Defendants, and deny that the fact that tattoos may be no more noticeable than a simulated player's nose shape or hairstyle has any bearing on the material copyright issues to be determined in this lawsuit.

96. Admit, but deny that the fact that the tattoos "are subordinated to the display of the court and the players in competition" has any bearing on the material copyright issues to be determined in this lawsuit.

97. Admit, but deny that the fact that when a user plays NBA 2K, some players on the court may be blocked from view by other players resulting in the tattoos potentially being blocked as a result of same has any bearing on the material copyright issues to be determined in this lawsuit.

98. Admit, but deny that the fact that the tattoos sometimes appear out of focus during game play has any bearing on the material copyright issues to be determined in this lawsuit.

99. Deny, the cited evidence does not support this proposition or is inadmissible. Dr. Bogost simply cannot summarily make such statement, nor can anyone, with the metaphysical certainty for the purpose of its being an undisputed fact and also deny that, even if indisputable truth, the fact that the tattoos are difficult to observe as a result of the quick

movement of the players on which the tattoos are inked has any bearing on the material copyright issues to be determined in this lawsuit.

## V.   **SOLID OAK**

### A.  **Solid Oak's Purported Lack of Rights**

100.     Admit, but deny that the fact that Plaintiff does not hold the right to tattoo a permanent tattoo rendering onto a person's skin has any bearing on the material copyright issues to be determined in this lawsuit.  Plaintiff never held itself out as a tattooist, but rather has Tattoo Licensing Agreements with several tattooists, including Mr. Rome, Mr. Wright, and Mr. Cornett. <u>Exhs</u>. 1, 2, 3.

101.     Admit, but deny that the fact that Plaintiff has never licensed to any party the ability to ink tattoos on other people has any bearing on the material copyright issues to be determined in this lawsuit.

102.     Admit, but deny that publicity or trademark rights for Mr. Bledsoe, Mr. Martin, or Mr. James are at issue in this lawsuit. They are not. Only copyright infringement is at issue in this lawsuit, and there is no allegation that any of those aforementioned players has a copyright interest in their tattoos.

103.     Admit, but deny that the right to license Mr. Martin's, Mr. Bledsoe's, and Mr. James' likeness to third-parties is at issue in this lawsuit. It is not.  Only copyright infringement is at issue in this lawsuit, and there is no allegation that any of those aforementioned players has a copyright interest in their tattoos.

104.     Admit, but deny that Defendants' license by the NBA to use Mr. Martin's, Mr. Bledsoe's, and Mr. James' also gave Defendants any copyright interest in their tattoos, and Defendants never state that it did.

18

## B. **Solid Oak's Purported Lack of Market**

105.    Admit, but deny the fact that Plaintiff has never created or contributed to the creation of a video game depicting tattoos has any bearing on the material copyright issues to be determined in this lawsuit. Plaintiff has Tattoo Licensing Agreements with Mr. Rome, Mr. Wright, and Mr. Cornett as to their copyrighted works that appear on Mr. Martin, Mr. Bledsoe, and Mr. James and thus is entitled to any monetary gain that may come from having such a right regardless of creation or contribution to a video game under law. Exhs. 1, 2, 3.

106.    Admit, but deny that the fact that Plaintiff never licensed a video game depicting the tattoos has any bearing on the material copyright issues to be determined in this lawsuit. One video game necessarily has to be first, and that could have been the subject NBA 2K games.

107.    Deny, the cited evidence either does not support this proposition or is inadmissible. Defendants cite only their Answer for this proposition without any other supporting foundation. Notwithstanding, even if Plaintiff has never licensed to any other party the ability to ink the tattoos on other people, Plaintiff has Tattoo Licensing Agreements with Mr. Rome, Mr. Wright, and Mr. Cornett as to their copyrighted works that appear on Mr. Martin, Mr. Bledsoe, and Mr. James and thus is entitled to any monetary gain that may come from having such a right regardless of whether licensure for any one particular purpose has ever happened yet under law. Exhs. 1, 2, 3.

108.    Admit, but deny that the fact that Plaintiff has never sold merchandise depicting the tattoos has any bearing on the material copyright issues to be determined in this lawsuit. Defendants' "undisputed fact" is essentially akin to saying an author of an

unpublished copyrighted story does not have a copyright since he or she has not sold any book containing the story. Plaintiff has Tattoo Licensing Agreements with Mr. Rome, Mr. Wright, and Mr. Cornett as to their copyrighted works that appear on Mr. Martin, Mr. Bledsoe, and Mr. James and thus is entitled to any monetary gain that may come from having such a right regardless of whether any merchandise has been sold bearing the copyrighted material under law. Exhs. 1, 2, 3.

109.    Admit that Dr. Jablonski states as much in her expert submission but deny that Dr. Jablonski is competent to make that assertion for reasons discussed at length in the Memorandum of Law or otherwise that her assertion that Plaintiff is trying to create a market in this case that has never existed before and would not be reasonable or likely to be developed based on the customs and practices of the tattoo industry has any bearing on the material copyright issues to be determined in this lawsuit.    Furthermore, Dr. Jablonski's bold assertion materially conflicts with Mr. Cornett's assertion that "it would hurt the tattoo industry and deter people from using tattoos as a way of expressing themselves if anyone thought that if he or she ever became successful or wanted to be displayed in any sort of media or advertising, they would be prevented from doing so without the tattooist's permission.    ECF No. 129 at 51.    Plaintiffs, in sum, have endeavored to sell to the Court both that it is undisputed that there is no industry for this type of licensure according to Dr. Jablonski, yet that allowing others to do what Plaintiff does would be ruinous to the tattoo industry if one were to take Mr. Cornett's position as undisputed truth.

110.    Admit that Dr. Jablonski states as much in her expert submission, but deny that the fact that she is personally not aware of any instance in which a license for a tattoo has

been sought or issued in a video game means that it has not happened or otherwise has any bearing on the material copyright issues to be determined in this lawsuit.

111. Admit that Dr. Bogost states as much in his expert submission, but deny that the fact that he is personally unfamiliar with any videogame developer licensing the rights to tattoos for inclusion in a video game either means that it has not happened or otherwise has any bearing on the material copyright issues to be determined in this lawsuit.

112. Admit, but deny that the fact that Plaintiff could not identify an instance in which a license for a tattoo has been issued for use in a video game has any bearing on the material copyright issues to be determined in this lawsuit. Plaintiff has Tattoo Licensing Agreements with Mr. Rome, Mr. Wright, and Mr. Cornett as to their copyrighted works that appear on Mr. Martin, Mr. Bledsoe, and Mr. James and thus is entitled to any monetary gain that may come from having such a right regardless of whether it has been done before, or not, under law. Exhs. 1, 2, 3.

113. Admit, but deny that the fact Plaintiff has no evidence showing a "customary practice" of paying for the use of the tattoos that Defendants have made has any bearing on the material copyright issues to be determined in this lawsuit. This appears to be a matter of first impression for the courts according to available case law.

114. Admit that Mr. Malackowski states as much in his expert submission, but deny that he is either qualified to speak on the topic of such a market for reasons stated within the Memorandum of Law or that his opinion that there is no market for tattoo licensing to video games for the tattoo artwork of tattoos that are inked on basketball players in real life, despite Mr. Cornett's contrary concern, has any bearing on the material copyright issues to be determined in this lawsuit. ECF No. 129 at 51.

115.     Admit that Mr. Malackowski states as much in his expert submission, but deny that he is either qualified to speak on the topic of such a market for reasons stated within the Memorandum of Law or that his opinion that a market is unlikely to develop for licensing tattoos for use in video games on the basketball players on whom the tattoos are inked in real life, despite Mr. Cornett's contrary concern, has any bearing on the material copyright issues to be determined in this lawsuit. ECF No. 129 at 51.

116.     Admit that Dr. Bogost states as much in his expert submission, but deny that his surmise that the video game industry would not reasonably anticipate licensing the tattoos for depicting players on whom the tattoos are inked has no bearing on the material copyright issues to be determined in this lawsuit.  Anticipation of a use of a copyrighted work is indisputably not part of the calculus as to whether there has been an infringement.

117.     Deny, the cited evidence either does not support this proposition or is inadmissible. Mr. Thomas' proclamations about what happens if Plaintiff prevails are nothing more than pure surmise and fear mongering.  Moreover, his statement on the "herculean task of identifying and negotiating with the tattooist for each tattoo" tacitly acknowledges that there is, or can be, an industry for this type of licensure for video game manufacturers to prepare for, despite the proclamations of both Dr. Jablonski and Mr. Malackowski of the lack of any such market potential.  ECF No. 129 at 109, 114.

118.     Deny, the cited evidence either does not support this proposition or is inadmissible.  Mr. Thomas' statement that video game developers may not even be able to find and identify the hundreds of tattooists who may be responsible for inking NBA players is the product of baseless speculation.

Dated: Norwood, New Jersey
       September 22, 2018

**HEITNER LEGAL, P.L.L.C**
*Attorney for Plaintiff*
215 Hendricks Isle
Fort Lauderdale, FL 33301
Phone: 954-558-6999
Fax: 954-927-3333

By: _____
DARREN A. HEITNER
Florida Bar No.: 85956
Darren@heitnerlegal.com

LAW OFFICES OF PAUL S. HABERMAN, LLC

/s/ *Paul S. Haberman*

By: _____
PAUL STUART HABERMAN (PH 2771)
P.O. Box 167
Norwood, New Jersey 07648
(201) 564-0590: Phone
(201) 767-2087: Facsimile
psh@paulhabermanlaw.com: E-Mail

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd day of September, 2018, I electronically filed the foregoing document using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

By: _____
DARREN A. HEITNER
Florida Bar No.: 85956
Darren@heitnerlegal.com

**SERVICE LIST**

Dale M. Cendali
Joshua L. Simmons
Emma Raviv

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

dale.cendali@kirkland.com
joshua.simmons@kirkland.com
emma.raviv@kirkland.com