Darren A. Heitner
HEITNER LEGAL, P.L.L.C.
215 Hendricks Isle
Fort Lauderdale, FL 33304
Telephone: (954) 558-6999
Facsimile: (954) 927-3333
Darren@HeitnerLegal.com
Alan@HeitnerLegal.com

Paul S. Haberman
Law Offices of Paul S. Haberman LLC
PO Box 167
Norwood, NJ 07648
Telephone: (201) 564-0590
Facsimile: (201) 767-2087
psh@paulhabermanlaw.com

*Attorneys for Plaintiff/Counter-Defendant*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SOLID OAK SKETCHES, LLC, | CASE NO. 1:16-cv-724(LTS)(RLE) |
| Plaintiff/Counter-Defendant, | ECF Case |
| v. | |
| VISUAL CONCEPTS, INC.; 2K GAMES, INC.; TAKE-TWO INTERACTIVE SOFTWARE, INC., | |
| Defendants/Counter-Plaintiffs. | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES………………………………………………………………..iv

PRELIMINARY

STATEMENT……………………………………………….....................................1

FACTUAL BACKGROUND………………………………………………….……..2

ARGUMENT……………………………………………………………………...2

I.       DEFENDANTS HAVE FAILED TO PROVE THAT NO DISPUTED
         MATERIAL FACTS EXIST AND THAT THEIR USE OF THE
         SUBJECT COPYRIGHTED MATERIAL WAS *DE MINIMUS* AS A MATTER OF
         LAW……………......………………………………………………………....3

II.      DEFENDANTS HAVE FAILED TO PROVE FAIR USE AS
         A MATTER OF LAW………………………………………………….......7

         i.   Purpose and Character of Use………………………………………..8

         ii.  Nature of the Work………………………………………………11

         iii. Amount and Substantiality……………………………………….13

         iv.  Effect on Potential Market…………………………………………13

III.     DEFENDANTS HAVE FAILED TO PROVE THAT THEY WERE
         AUTHORIZED TO USE THE COPYRIGHTS AS A MATTER
         OF LAW…………………………………………………………………...15

IV.      DEFENDANTS HAVE FAILED TO PROVE THAT THE TATTOO
         ARTWORK LACKS ORIGINALITY AND THUS NO COPYRIGHT
         ATTACHES AS A MATTER OF LAW……………………………………17

V.       DEFENDANTS' EXPERTS' OPINIONS AND TESTIMONY SHOULD
         BE SUMMARILY PRECLUDED BY THE COURT AS THEY DO NOT
         REST ON RELIABLE FOUNDATIONS, ARE IRRELEVANT TO THE
         CASE, AND ARE NOTHING MORE THAN A DISTRACTION FROM
         THE MATERIAL ISSUES…………………………………………………..19

         i.       The Survey Report of Defendants' Expert E.

Deborah Jay, Ph.D………………………………………………21

ii.     The Declaration and Expert Report of Defendants'
        Expert, Nina Jablonski, Ph.D……………………………………22

iii.    The Expert Report of Defendants' Expert,
        Ian Bogost, Ph.D……………………………………………………24

iv.     Expert Report of Defendants' Expert,
        James E. Malackowski………………………………………...26

CONCLUSION………………………………………………………………………..28

**TABLE OF AUTHORITIES**

<u>**Cases**</u>

Amorgianos v. Nat'l Railroad Passenger Corp., 303 F.3d 256 (2d Cir. 2002)......................19

Arista Inst., Inc. v. Palmer, 970 F.2d 1067 (2d Cir. 1992)..........................................7

Bausch & Lomb, Inc. v. Alcon Laboratories, Inc., 79 F. Supp.2d 252 (W.D.N.Y. 2000).....26, 27

Bill Graham Archives v. Dorling Kindersley, Ltd., 448 F.3d 605 (2d Cir. 2006)..............10, 13

Blanch v. Koons, 467 F.3d 244 (2d Cir. 2006)..............................................8, 11-12

Borawick v. Shay, 68 F.3d 597 (2d Cir. 1995)..................................................19

Bourjaily v. United States, 483 U.S. 171 (1987)...............................................19

Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569 (1994)........................8, 11, 13, 14

Cariou v. Prince, 714 F.3d 694 (2d Cir. 2013).............................................8, 9, 12

Castle Rock Entm't Inc. v. Carol Pub. Grp., Inc., 150 F.3d 132 (2d Cir. 1998).....................9

Crane v. Poetic Prods., 549 F. Supp.2d 566 (S.D.N.Y. 2008)...................................5

Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)..............................19

Davis v. Electronic Arts, No. 10-CV-03328-RS (N. D. Cal. August 17, 2018)...................5, 6

Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.,
307 F.3d 197 (3d Cir. 2002)...................................................................5

eScholar, LLC v. Otis Educational Systems, Inc., 2005 WL 2977569
(S.D.N.Y. Nov. 3, 2005)....................................................................6-7

Folsom v. March, 9 F. Cas. 342 (D. Mass. 1841)............................................13

Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539 (1985).......................14

Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999)....................................19, 20

Lappe v. American Honda Motor Corp., 857 F. Supp. 222 (N.D.N.Y. 1994)......................20

Lara v. Delta International Machinery Corp., 174 F. Supp.3d 719 (E.D.N.Y. 2016)...........24-25

Lennon v. Premise Media Corp., 556 F. Supp.2d 310 (S.D.N.Y. 2008)…………………………...12

Marketing Technology Solutions, Inc. v. Medizine LLC,
2010 WL 2034404 (S.D.N.Y. May 18, 2010)…………………………………………………………….6

Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc., 166 F.3d 65 (2d Cir. 1999)…………..13

North Jersey Media Group, Inc. v. Pirro, 74 F. Supp.3d 605 (S.D.N.Y. 2015)……………...13, 14

NXIVM Corp. v. Ross Inst., 364 F.3d 471 (2d Cir. 2004)……………………………………………14

On Davis v. The Gap, Inc., 246 F.3d 152 (2d Cir. 2001)……………………………………………12

R.F.M.A.S., Inc. v. So, 748 F. Supp.2d 244 (S.D.N.Y. 2010)………………………………………...19

Ringgold v. BET, Inc., 126 F.3d 70 (2d Cir. 1997)……………………………………………………5

Sandoval v. New Line Cinema Corp., 973 F. Supp. 401 (S.D.N.Y. 1997)……………………...13

Scott v. Harris, 550 U.S. 372 (2007)…………………………………………………………………3

Smith v. Smith, 2003 WL 22290984 (S.D.N.Y. Sept. 29, 2003)…………………………………28

Sparta Commercial Servs., Inc. v. DZ Bank, 680 Fed. Appx. 17 (2d Cir. 2017)…………..26, 27

Stewart v. Abend, 495 U.S. 207 (1990)………………………………………………………...7

Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P., 756 F.3d 73 (2d Cir. 2014)………………11

TCA Television Corp. v. McCollum, 839 F.3d 168 (2d Cir. 2016)………………………….9, 10

United States v. Diaz, 878 F.2d 608 (2d Cir. 1989)……………………………………………...20

United States v. Figueroa, 618 F.2d 934 (2d Cir. 1980)……………………………………………21

United States v. Gelzer, 50 F.3d 1133 (2d Cir. 1995)……………………………………………...21

United States v. Kaplan, 490 F.3d 110 (2d Cir. 2007)………………………………………20, 21

USA v. Walker, 910 F. Supp. 861 (S.D.N.Y. 1995)……………………………………………28

Washington v. Wash. Hosp. Ctr., 579 A.2d 177 (D.C. 1990)…………………………………...25

**<u>Statutes and Other Authorities</u>**

17 U.S.C.S. § 107(1)……………………………………………………………………….8

17 U.S.C.S. § 107(2)……………………………………………………………………...11

17 U.S.C.S. § 107(3)……………………………………………………………………...13

17 U.S.C.S. § 107(4)……………………………………………………………………...13

Advisory Committee's Notes on Fed. Rule Evid. 401, 28 U.S.C. App., p. 688…………………20

Federal Rule of Evidence 401…………………………………………………………………20

Federal Rule of Evidence 402…………………………………………………………………20

Federal Rule of Evidence 403………………………………………………20, 21, 23, 24, 25, 27, 28

Federal Rule of Evidence 702………………………………………………………………...19

Plaintiff/Counter-Defendant, Solid Oak Sketches, LLC ("Solid Oak" or "Plaintiff"), submits this Memorandum of Law in support of its response in opposition to the motion for summary judgment filed by Defendants/Counter-Claimants 2K Games, Inc. and Take-Two Interactive Software, Inc. (collectively "Defendants") and in support of its cross-motion.

## PRELIMINARY STATEMENT

When LeBron James has his photograph taken, the content immediately has two streams of rights that will govern how it may be used commercially. The rights of publicity that Mr. James may enjoy, which include his name, image and likeness, could provide Mr. James with the ability to receive relief when such rights are used, commercially, clearly identifying him and doing so without his consent. That is separate and apart from the copyright ownership that is possessed by the individual who creates the content – the photographer.

Defendants, in their motion for summary judgment, have improperly attempted to combine and conflate what may be an individual's right of publicity with copyright ownership. While Mr. James may have granted his rights of publicity to the Defendants, through the National Basketball Association ("NBA") and/or the National Basketball Players Association ("NBPA"), that is a consideration completely separate and apart from whether the Defendants ever received a license to use the copyrights to the tattoo artwork that was fixed on Mr. James' body by tattoo artists. Importantly, neither Mr. James nor any of the other relevant professional basketball players whose tattoos are at issue in the instant lawsuit, did or could have licensed the underlying copyrights to Defendants.  Plaintiff has never attempted to argue that rights of publicity were not granted by Mr. James to Defendants through a third-party conduit (i.e. the NBA and/or NBPA), and Plaintiff has no interest in disputing same. However, Plaintiff disputes that any granting of consent to use Mr. James' likeness is at issue in this dispute or that the issue

1

of consent is even relevant to the copyright infringement claims made herein.

Outside of Defendants' new arguments concerning right of publicity, their motion for summary judgment is simply a restatement of what Defendants proffered to the Court in their motion for judgment on the pleadings [ECF No. 76], which was denied [ECF No. 117]. None of the testimony or data prepared and delivered by Defendants' expert witnesses bears any probative value at this stage of the lawsuit, because what they have proffered does not give the Court any more substance to declare a victory for Defendants as a matter of law. There remains very important issues of fact that are contested by the Parties and which Plaintiff maintains cannot be concretely established through expert witness testimony, which Plaintiff also seeks to exclude from the Court's analysis of the issues. Importantly, Defendants provided no additional, material evidence or support to prove that they should prevail based on claims of *de minimis* use or fair use that should change the Court's previous position when it denied Defendants motion for judgment on the pleadings. The only additional claim made by Defendants relevant to their summary judgment argument is that the tattoo artwork did not constitute the required amount of originality to attach copyright protection to the fixed content. However, Defendants have failed in meeting the strict burden of proof to ensure that there is no dispute of material fact on that issue and altogether fail to prove that the tattoo artists completely copied existing artwork without infusing any creativity of their own with regard to the designs. Further, the fact that the tattoo artists entered into licensing agreements with Plaintiff is dispositive of the fact that, at a minimum, the tattoo artists believed that they provided the minimum requirements to establish originality and thereby had copyright ownership of their creations. Even if that is in dispute, the opinions of tattoo artists are irrelevant in determining whether copyrights passed as a matter of

law.[1]

At a minimum, there remain material facts in dispute. For the reasons set forth below, Plaintiff respectfully requests that this Court deny Defendants' motion for summary judgment in whole.

## FACTUAL BACKGROUND

For the purpose of brevity, Plaintiff respectfully incorporates by reference the factual allegations and exhibits included within hereto its Rule 56.1 Statement and Declaration.

## ARGUMENT

I.      **DEFENDANTS HAVE FAILED TO PROVE THAT NO DISPUTED MATERIAL FACTS EXIST AND THAT THEIR USE OF THE SUBJECT COPYRIGHTED MATERIAL IS *DE MINIMUS* AS A MATTER OF LAW**

Defendants failed to establish that their use is *de minimis* as a matter of law when they filed their motion for judgment on the pleadings. They have failed to add any relevant, material evidence since that filing to otherwise prove *de minimis* use.

This Court previously established that there is no dispute as to whether Defendants have copied the tattooist artwork at issue and that Defendants have acknowledged they have realistically depicted the tattoos in their video games. [ECF No. 117 at 6]. As the Court noted, "[t]he stopwatch-in-hand observations made in Ringgold, Gottlieb, and Sandoval are impossible to make in a video game, where what is observable on screen depends on the choices of each individual user and is highly variable." [ECF No. 117 at 8]. No expert opinion can change the very fact that the amount of time and the level at which the tattoo artwork at issue is depicted is largely controlled by the user. Further, the fact that the tattoo artwork is fixed to notable

---

[1] Moreover, it is recognized that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).  Here, the record, and notably the licensing agreements that were entered into well before this litigation, reflect the artists' belief in the viability of their intellectual property rights in the subject tattoos at that time, notwithstanding what Defendants' tailor-made declarations for them now purport. Exhs. 1, 2, and 3.

professional basketball players only enhances the likelihood that the tattoo artwork will be substantially featured during game play.

The bottom-line is that, at the motion for judgment on the pleadings stage of the proceedings and now at the motion for summary judgment stage of the proceedings, there remains no objective tool for the Court to use to determine that the use of the tattoo artwork by the Defendants is *de minimis*. This Court held that it was unable to conclude "without the aid of extrinsic evidence" that "no reasonable jury, properly instructed, could find that the two works are substantially similar." [ECF No. 117 at 8]. The same conclusion should be reached now, as Defendants have provided no material extrinsic evidence that answers the material questions surrounding *de minimis* use, which remains at issue.

Defendants' retained expert, Ian Bogost, Ph. D., took the position that the tattoo artwork is a fractional, fleeting part of the game play, citing to the game's data. See ECF No. 136 (the "Bogost Report"). However, citation to the percentage of game data associated with the tattoo artwork at issue is not only confusing, but not compelling. Defendants fail to explain how percentage of game data plays a role in determining whether the use is *de minimis* and they fail to explain away the fact that one user may have greater exposure to the tattoo artwork at issue than another. Dr. Bogost also focuses on "ordinary play mode." Id. at ¶ 89. However, one of the central selling points of the video game is that users are able to largely customize their experience in game play and even create their own rosters made up of prominent basketball players such as LeBron James, whose tattoos are at issue in this case. While there may be more than 400 real-world players -- duplicated down to their tattoo artwork -- in the game, the reality is that most users are going to either choose to play with the NBA team that employs the real-life LeBron James or create a team that contains LeBron James as a player in the roster. Defendants'

4

expert fails to account for anything outside of "ordinary play mode" or respond to any of the customization options referenced above.

A *de minimis* defense is not available "where the qualitative value of the copying is material." Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc., 307 F.3d 197, 208 (3d. Cir. 2002). To determine substantial similarity for the purposes of ruling on a *de minimis* defense, a court must decide "whether the average lay observer would recognize the challenged material as having been copied from the copyright work." Crane v. Poetic Prods., 549 F. Supp. 2d 566, 569 (S.D.N.Y. 2008). Moreover, in order to make a determination as to whether the quantitative threshold of substantial similarity is met in cases, such as the instant matter that involves the copying of visual works, courts consider the extent to which a protected work is copied within an allegedly infringing work. Ringgold v. BET, Inc., 126 F.3d 70, 75 (2d Cir. 1997). Defendants have invested significant resources to create exact digital replicas of NBA players within their video game franchise. Purchasers and users of the video games are able to utilize the same player (i.e. LeBron James) for the entirety of the playing time, therefore increasing the qualitative value of the copying material.

Defendants' retained expert Ian Bogost, Ph. D.'s statement that the tattoos "are hard to observe due to their obstruction by other game elements, because they often appear out-of-focus, and because players on whom the Tattoos appear move quickly in the game," Bogost Report at ¶ 66, affords little weight to their argument that the Defendants' use is merely *de minimis*. An August 2018 order from the United States District of the Northern District of California shut down a defendant's argument where the defendant relied on a survey conducted by its expert arguing "the vast majority of consumers did not associate the avatars at issue with any real person." Order Denying Motion for Summary Judgment at 4, in Davis v. Electronic Arts Inc.,

No. 10-cv-03328-RS (N.D. Cal. Aug. 17, 2018). In the survey, participants "were shown screenshots from Madden NFL 09 that featured pictures of the avatars[2] (including those avatars that Plaintiffs claim depict them) alongside the information that Plaintiffs allege constitutes their identity." Id. The defendant in Davis contended that the results overwhelmingly supported its position, as only one or two percent of respondents identified the avatars as the allegedly corresponding plaintiffs, and similar or larger percentages identified the avatars as other players. Id. In its opinion, the court noted that although a fact-finder may very well conclude that avatars are not sufficiently identifiable to support plaintiff's claims, the present record does not allow for such a finding to be made as a matter of law. Id. at 5.

The facts in Davis are analogous to the present case in that Defendants rely on their expert's testimony in a failing effort to prove the "fractional" impact the tattoos play in the NBA 2K game. A fact-finder may very well conclude that the use of the tattoo artwork by Defendants is *de minimis*, but the present record, with the expert's report, does not allow such a finding to be made as a matter of law. Given the similarities in the facts between the instant case and those in Davis, and Defendants' lack of any potentially substantial evidence (i.e. a survey of consumers discussing whether or not they can identify the tattoos on the respective athletes), this Court should not give any weight to Defendants' expert testimony and therefore should not rule in favor of Defendants on summary judgment, leaving the question to be determined by the trier of fact.

Furthermore, the issue of a *de minimis* defense is widely regarded as not being ripe even at the summary judgment stage. See, e.g., Marketing Technology Solutions, Inc. v. Medizine LLC, 2010 WL 2034404, *3 (S.D.N.Y. May 18, 2010) (holding that "[t]he qualitative value in the equation, on the present record . . . remains an issue of fact"); eScholar, LLC v. Otis

---

[2] Similar to the tattoos featured on the athletes in the instant case.

Educational Systems, Inc., 2005 WL 2977569, *28 (S.D.N.Y. Nov. 3, 2005) (holding that "[w]e do not find that it is undisputed any copying was *de minimis*. Nor do we find that the similarity concerns only non-copyrightable elements of eScholar's work, or that no reasonable trier of fact could determine that the works are substantially similar. These are the only circumstances where courts have required summary judgment at the substantial similarity stage").  The instant motion should accordingly be denied in its entirety.

## II.    DEFENDANTS HAVE FAILED TO PROVE FAIR USE AS A MATTER OF LAW

Defendants also failed to establish that their use is fair use a matter of law when they filed their motion for judgment on the pleadings. They now newly argue that each of the four factors of fair use weigh in their favor. However, Defendants have failed to add any relevant, material evidence since that filing to otherwise prove fair use. The fair use doctrine is an "equitable rule of reason which permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity that law is designed to foster."  Stewart v. Abend, 495 U.S. 207, 236 (1990) (internal citations omitted). The doctrine of "comprehensive non-literal similarity" allows copyright protection where there is no word-for-word or literal similarity, but where a defendant has nonetheless appropriated the fundamental essence or structure of a plaintiff's work. Arica Inst., Inc. v. Palmer, 970 F.2d 1067, 1073 (2d. Cir. 1992). A plaintiff succeeds under this doctrine when it shows that the pattern or sequence of the two works is similar. Id. Defendants acknowledged that, "Take-Two included the Tattoos in its video game . . . to accurately depict the physical likeness of the real-world basketball players as realistically as possible." [ECF No. 128 at 1-2]. Based on Defendants' admission, it is clear that Defendants' appropriated the fundamental essence of the tattoo artists' works, the copyright attached to same being owned by Plaintiff.

The Court previously found that there are "difficulties inherent in conducting a side-by-side comparison of the video game and the Tattoos." [ECF No. 117 at 10]. Those difficulties have not been alleviated through any discovery taken by Defendants nor testimony provided by Defendants' expert witnesses.

### i.      **Purpose and Character of the Use**.

Defendants' argument that their work is neither transformative nor commercial fails to satisfy the first factor of their fair use argument. The heart of the fair use inquiry is into the first specified statutory factor identified as the purpose and character of the use. 17 U.S.C.S. § 107(1). The central purpose of such an investigation is to see whether the new work merely supersedes the objects of the original creation, or where it instead adds something new, with a further purpose or different character, altering the first work with new expression, meaning, or message -- in other words, whether and to what extent the new work is "transformative." Blanch v. Koons, 467 F.3d 244, 251 (2d. Cir. 2006). Although such transformative use is not absolutely necessary for a finding of fair use, the goal of copyright -- to promote science and the arts -- is generally furthered by the creation of transformative works. Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 579 (1994). Such works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, and the more transformative the new work, the less will be the significance of other factors, like commercialism, that weigh against a finding of fair use. Id.

Similar to the facts of the current case, in Cariou v. Prince, the defendant, an "appropriation artist," used the plaintiff's copyrighted photographs and altered them to create "crude and jarring collages." 714 F.3d 694, 706 (2d. Cir. 2013). The Second Circuit held that the work was transformative because the defendant's use was so "heavily obscured and altered" that

the original photographs were "barely recognizable" with the new work, a clear distinction from the unique facts of this case.  Id. at 710. Where lesser changes retained certain of the original work's aesthetics, the court should not say "for sure" that their incorporation into defendant's works had "transformed [the original] work enough to render it transformative." TCA Television Corp. v. McCollum, 839 F.3d 168, 181 (2d. Cir. 2016). Defendants argue that their use of Plaintiff's copyrights is for a different purpose than that to which Plaintiff intends to use same, and thus should qualify as transformative. However, Defendants not only incorrectly assume that the Plaintiff has no desire or claim to use the copyrights in a fixed form such as a video game, but also incorrectly reason that using another's copyright in a manner not yet used by the owner is somehow transformative when copied with the intention of strict duplication. Copying is transformative only if it "uses the copyrighted material itself for a purpose, or imbues it with a character, different from that for which it was created."  Id. at 180; see also Castle Rock Entm't Inc. v. Carol Pub. Grp., Inc., 150 F.3d 132, 143 (2d. Cir. 1998) (holding that a work that merely transforms an original work, yielding a modified or derivative work, is not transformative for the purposes of analyzing fair use). The copyrighted material was created for the purpose of displaying on the body of the athletes on which it is fixed; this is the same exact use made by Defendants.

Defendants' use was not "heavily obscured and altered" so that the original works are "barely recognizable."  Cariou, 714 F.3d at 710. In fact, the exact opposite is true, as Defendants have done their best to ensure that the tattoo artwork is highly recognizable by the consumer, copying every element of the artwork in an effort to expressly not transform it from its original form. The tattoo artwork, as displayed on the athletes within Defendants' video game, clearly portrays the tattoos as they would be displayed in real-life. **Defendants have sought to create as**

9

**close of a replication to the tattoo artworks within their highly successful video games for the sole purpose of promoting the games' "real-life" experience to the consuming public.** [ECF No. 88 at 7]. Defendants, in a further attempt to justify their use, argue that there is an "anchor," but it does not transform the original works so that it conveys such message. The video games contain the tattoo artwork, without alteration, for the sole purpose of causing consumers to readily recognize them in their entirety. It would have been quite simple for Defendants to make even the slightest alterations to the tattoo artwork in order to possibly cause some transformative effect, but that was never the Defendants' intention.

Despite possessing no supporting evidence, Defendants posit that using the tattoo artwork is analogous to use as a "biographical anchor." [ECF No. 77 at 22]. However, their argument fails, because the use of the tattoos does not reference an event or provide commentary on images. Bill Graham Archives v. Dorling Kindersley, Ltd., 448 F.3d 605, 608 (2d. Cir. 2006). To the contrary, the video games are released at or near the time of the upcoming NBA season. [ECF No.55 at 3]. LeBron James, being the highest rated player in video game,[3] is clearly displayed in the same way he appears at, or around the same time the video games are released. There is nothing transformative about using an original work in the manner it was made to be used. TCA Television Corp., 839 F.3d at 182-183.

Defendants continue to attempt to compare and align themselves with the facts of the aforementioned Bill Graham Archives case. As stated in Plaintiff's response to Defendants' motion for judgment on the pleadings [ECF No. 88], the facts of the Bill Graham case cannot be used to support the facts in the present case because the Defendants' use did not commemorate certain events or individuals; they used the tattoos to entertain and further promote to consumers

---

[3] See Nick Schwartz, *The 26 highest-rated players in NBA 2K17*, FOX Sports, Oct. 20, 2016, at https://www.foxsports.com/nba/gallery/nba-2k17-player-ratings-highest-lebron-james-stephen-curry-kevin-durant-091816

within the professional basketball market. [ECF No. 88 at 9-10]. Despite arguments made by the Defendants, the size of the tattoos has not been "significantly reduced" to render them unrecognizable. Consumers can view the tattoos, as displayed on the athletes, on big screen televisions, projectors, and computer screens which would undoubtedly enhance and emphasize the tattoo in its original form. Size of the hardware matters when it comes to judging how large the tattoo artwork appears on screen. Accordingly, the tattoos cannot be argued as significantly reduced and should be given the appropriate level of protection as warranted by the copyright laws.

Finally, Defendants argue that "consumers do not buy NBA 2K video games for the tattoos on LeBron James, Eric Bledsoe or Kenyon Martin." Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Defendants' Memorandum of Law") at 16. As stated herein, LeBron James was the highest rated player in NBA 2K17 and Defendants did not provide any substantial evidence to rebut the fact that consumers were purchasing the game due to its real-life replication of Mr. James or any of the other athletes subject to this case. There is no correlation that would support the argument that "the link between the defendant's commercial gain and its copying is attenuated." Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P., 756 F.3d 73, 83 (2d. Cir. 2014). There is no evidence to support any claim that Defendants' commercial use of the tattoo artwork was transformative. As such, Defendants have failed to satisfy this factor.

### ii.    Nature of the Work.

The second fair use statutory factor is "the nature of the copyrighted work." 17 U.S.C. § 107(2). It "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the

former works are copied." <u>Campbell</u>, 510 U.S. at 586. Two types of distinctions as to the nature of the copyrighted work have emerged that have figured in the decisions evaluating the second factor: (1) whether the work is expressive or creative, such as a work of fiction, or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower. <u>Blanch</u>, 476 F.3d at 256. Thus, works that are "expressive or creative" are entitled to a greater protection than works that are "factual or informational." <u>Cariou</u>, 714 F.3d at 709-710. This factor, though, is "rarely found to be determinative." <u>On Davis v. The Gap, Inc.</u>, 246 F.3d 152, 175 (2d. Cir. 2001). Even where a creative work is published, publication status is afforded only "a bit" of weight.  <u>Lennon v. Premise Media Corp.</u>, 556 F. Supp.2d 310, 325 (S.D.N.Y. 2008). Where the original work is creative and published, the nature-of-the work factor weighs *against* a fair use determination. <u>Cariou</u>, 714 F.3d at 710.

The copyrighted tattoo artwork was inked on the relevant professional athletes by highly skilled tattooists, who portrayed an expressive and creative piece of work on LeBron James, Eric Bledsoe and Kenyon Martin. The tattoo artworks are all subject to valid copyright protection as shown in Exhibit D, Exhibit F, Exhibit H, Exhibit J and Exhibit K of Plaintiff's Second Amended Complaint.  <u>See</u> ECF No. 55 at 28-29, 34-39, 45-46, 56-57, 59-60.   Despite the fact that the tattoo artworks were previously published, the original works maintain a high level of protection.  <u>Lennon</u>, 556 F. Supp.2d at 325. The tattoo artworks as displayed on the athletes, clearly reflect the creative and expressive efforts of the tattooists. The individual tattoo artists clearly created each tattoo based on their unique and subjective approach to the work. Defendants argue that some of the tattoos were based on "pre-existing designs," but nothing in

their arguments present any material evidence to support that works influenced by "pre-existing designs" cannot be offered copyright protection after the "pre-existing design" has been used as a reference point in an attempt to create a completely different piece of work in a completely different medium. As such, Defendants have failed to satisfy this factor.

### iii.   **Amount and Substantiality**.

The third factor bearing on fair use is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). The relevant question is whether "'the quantity and value of the materials used,' are reasonable in relation to the purpose of the copying." Campbell, 510 U.S. at 586 (quoting Folsom v. Marsh, 9 F. Cas. 342 (D. Mass. 1841))*; see also* Id. at 587 (noting that the analysis "calls for thought not only about the quantity of the materials used, but about their quality and importance, too."); Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc., 166 F.3d 65, 73 (2d Cir. 1999). Courts routinely conclude that copying in the entirety weighs against fair use. See, e.g., North Jersey Media Group Inc. v. Pirro, 74 F. Supp. 3d 605, 621 (S.D.N.Y. 2015); Sandoval v. New Line Cinema Corp., 973 F. Supp. 401, 414 (S.D.N.Y 1997).

Defendants do not offer any evidence to prove that their use was "reasonable in relation to the purpose of copying."  Campbell, 510 U.S. at 586.   Their use, as previously established, remains commercial. Defendants specifically copied the copyrightable works in their entirety, solely for commercial use and to take advantage of Plaintiff's good faith effort in acquiring an exclusive licensing agreement. Furthermore, Defendants' use of the works is not and should not be considered "historical artifact," thereby weighing against fair use. Contrast, e.g., Bill Graham Archives, 448 F.3d at 613.  As such, Defendants have failed to satisfy this factor.

### iv.   Effect on the Potential Market

The final fair use statutory factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). "In considering the fourth factor, our concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work." NXIVM Corp. v. Ross Inst., 364 F.3d 471, 481-842 (2d. Cir. 2004). "The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop." Campbell, 510 U.S. at 592.

The Supreme Court has stated that, in general, when a use is commercial, market harm to the copyright owner is presumed. Id. at 591. That is, the defendant has the burden of rebutting the presumption by demonstrating that its use will not cause harm to an existing or potential market for the original work. Id. "To negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work." Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 568 (1985). Impact on the market can be proven even without exploiting the market for derivative works or showing that the alleged use diminished the work's profitability. See Castle Rock Entm't Inc., 150 F.3d at 145-156 (noting that although the plaintiff had little interest in exploiting the market for derivative works based on the copyrighted material, "the copyright law must respect that creative and economic choice"). When conducting the analysis on this factor, courts are "mindful that the more transformative the secondary use, the less likelihood that the secondary use substitutes for the original, even though fair use, being transformative, might well harm, even destroy, the market for the original." North Jersey Media Group Inc., 74 F. Supp. 3d at 622.

Defendants are using the tattoos, in their entirety, without consent or compensation as a

14

key element of a notably successful video game.[4]  Defendants diminished the commercial value

of the tattoo artwork in the marketplace for licensing its use in other works including, but not

limited to, video games, apparel, and memorabilia. If Defendants are left unchecked, the

marketplace will believe that it can use the copyrights as they choose, commercially or not,

without any consequence, since Defendants' use is admittedly intended to duplicate the at issue

copyrights as directly as possible. Defendants argue that a market is unlikely to be developed for

the tattoo artwork, because Plaintiff has admitted that it has not obtained the players' publicity or

trademark rights, which Defendants believe Plaintiff needs to commercialize the tattoos. [ECF

No. 128 at 21]. That argument does not impact the danger that Defendants' unchecked,

continued use poses. Defendants' use will create a common trend whereby other such video

game manufacturers, and other similarly situated companies, take advantage of and fail to pay

licensing fees for the tattoo artwork and instead opt to use the tattoos without either consent or

credit to the rights holder. Defendants fail to take into consideration the upward moving trend in

technology when they argue that "Solid Oak is trying to create a market in this case that has

never existed before."  The fourth factor only demands harm in potential markets.  As such,

Defendants have failed to satisfy this factor.

### III.    DEFENDANTS HAVE FAILED TO PROVE THAT THEY WERE AUTHORIZED TO USE THE COPYRIGHTS AS A MATTER OF LAW

In the preamble to their motion for summary judgment, Defendants state that "[t]his is a

case about protecting personal liberty and freedom of expression." Defendants' Memorandum of

Law at 6. That statement is very far from a truthful description of the instant dispute.

Professional basketball players such as LeBron James are uninhibited from freely expressing

---

[4] See Brian Mazique, *'NBA 2K18' Was The Highest-Selling Sports Game Of 2017 In The United States*, Forbes (Feb 12, 2018, 3:11pm), https://www.forbes.com/sites/brianmazique/2018/02/12/nba-2k18-was-the-highest-selling-sports-game-of-2017-in-the-united-states/#3eb3ce7d6565.

themselves. Nor are they restricted from licensing their rights of publicity for large sums of money. Neither this case nor the result therefrom will have any effect on a professional athlete's ability to market himself or herself or receive royalties for use of names, images or likenesses in commerce. Instead, this case merely focuses on whether artwork, fixed on an individual, can be merely copied by a third party for commercial gain, at the expense of a copyright owner.

Defendants would like the Court to believe that any result in favor of Plaintiff's claims will lead to a slippery slope that ends with the suppression of all content featuring professional basketball players unless the content providers first obtain licenses from copyright holders. It is a false statement that should bear no weight in the Court's decision concerning the pending motion. Plaintiff is not concerned with, nor is this case concerning, the way in which broadcasters air professional basketball games and make no claim to royalties from broadcasters for these types of live transmissions. Instead, Plaintiff is merely alarmed by Defendants' acknowledged and intended use of the tattoo artwork at issue in a graphical representation that gets as close to copying the artwork as possible, for pure commercial gain. Further, television broadcasters have made no overt effort to exploit the copyrights at issue to sell their product, while Defendants have purposefully leaned on the realism of their graphical replications of living beings, specifically pointing out the tattoo artwork fixed on these graphical representations, to earn significant profits. The distinction is important in order to appreciate that Plaintiff's claim will not create the "unprecedented obligation" that Defendants reference in their motion.

Defendants' retained expert, Nina Jablonski Ph. D., is quoted in Defendants' motion as stating that, "clients and tattooists expect that a client's tattoo will be part of that person's body, image, likeness and identity." Defendant's Memorandum of Law at 8. An individual's expectation plays no role in copyright law. Instead, there is an actual analysis that must be

followed to determine whether a copyright exists and to establish rightful ownership. Dr. Jablonski instead conflates a copyright issue with what would otherwise be a right of publicity concern, despite Plaintiff having no right of publicity case pending before the Court.  Further, Dr. Jablonski's claim, unsupported by probative evidence, that a tattooist truly believes that the tattoo artwork (which is what is at issue as opposed to any likeness claim) is owned by the person on whom it is fixed is contrary to the clear fact that multiple tattoo artists voluntarily signed exclusive licensing agreements with Plaintiff in order to effectively transfer all rights to the underlying artwork for Plaintiff's commercial benefit. The tattooists' declarations that may support Dr. Jablonski's position are immaterial and irrelevant, since any restriction on Plaintiff's ability to commercially exploit the underlying artwork should have been included in the actual exclusive licensing agreements, which speak for themselves. Exhs. 1, 2, and 3.

It is of ultimate importance to note that Defendants have mistakenly tried to tie a right of publicity issue to a copyright concern.  Plaintiff recognizes that the relevant professional basketball players may have given the NBA the right to license their likenesses to third parties. However, they did not also give the NBA the right to license the copyrights to the tattoo artwork to third parties, which is why it would be improper to rule in favor of Defendants on their motion. Defendants' motion should accordingly be denied in its entirety.

### IV.     DEFENDANTS HAVE FAILED TO PROVE THAT THE TATTOO ARTWORK LACKS ORIGINALITY AND THUS NO COPYRIGHT ATTACHES AS A MATTER OF LAW

While a ruling in favor of Plaintiff should be of no concern with regard to the possible suppression of professional basketball players' expression, a ruling for Defendants would set a terrible precedent for tattoo artists and potential licensees. The tattooist has the discretion to offer suggestions and ideas to the intended recipient and ultimately fixes the tattoo artwork on the

individual in the manner in which the tattooist chooses. While the recipient of the tattoo artwork undoubtedly is involved in the decision making process prior to the fixing of the tattoo, the tattoo artist retains ultimate control of the finished product. This is no different than an individual commissioning an artist to create artwork on a canvas. Despite the commissioning individual providing input and guidance as to what is requested, the copyright itself is owned by the artist. The caveat to that is that when there is a written agreement shifting copyright ownership to the commissioning individual, then the copyright may be properly assigned. No such agreement was made and entered into between any of the relevant professional basketball players or tattoo artists in the instant matter.

That one of the tattooists, specifically Thomas Ray Cornett, may have disagreed with Plaintiff's position in this case is completely irrelevant and also suspect. Why would Mr. Cornett have entered into an exclusive licensing agreement with Plaintiff if he did not believe that the Plaintiff would enforce the rights granted to it? Why would the Plaintiff provide consideration if not to receive some valuable intellectual property rights in exchange? While he may not agree with Plaintiff's claims, he is not an expert in copyright law nor has he been listed by Defendants to provide any expert opinion on the matter. His commentary should be summarily disregarded by the Court in its consideration of Defendants' motion.

Plaintiff has met its burden to establish that the tattoo artwork is original by way of its exclusive licensing agreements with the tattoo artists and the fact that it is undisputed that the tattoo artists fixed the tattoos on the relevant basketball players. Further, Defendants have not met their burden to demonstrate that the professional basketball players created the tattoo artwork from scratch and that the tattooists merely manufactured exact copies of same on the bodies of said athletes.  Defendants' motion should accordingly be denied in its entirety.

**V.    DEFENDANTS' EXPERTS' OPINIONS AND TESTIMONY SHOULD BE
SUMMARILY PRECLUDED BY THE COURT AS THEY DO NOT REST ON
RELIABLE FOUNDATIONS, ARE IRRELEVANT TO THE CASE, AND ARE
NOTHING MORE THAN A DISTRACTION FROM THE MATERIAL**

**ISSUES**

A district court assessing the admissibility of expert testimony under Federal Rule of

Evidence 702 serves a "gatekeeping" function in that "it is charged with 'the task of ensuring

that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"

Amorgianos v. Nat'l Railroad Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (quoting

Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993)). This duty extends to

all expert opinions, and not exclusively those concerning scientific matters. R.F.M.A.S., Inc. v.

So, 748 F. Supp.2d 244, 252 (S.D.N.Y. 2010) (citing Kumho Tire Co., Ltd. v. Carmichael, 526

U.S. 137 (1999)).

Federal Rule of Evidence 702, which governs the admissibility of expert witness

testimony provides that:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case."

Pursuant to Rule 702 and Daubert, the district courts are assigned a critical gatekeeping role to

determine whether an expert is qualified by requisite knowledge, skill, experience, training, or

education to testify.  The proponent has the burden of establishing that the pertinent admissibility

requirements are met by a preponderance of the evidence.  Bourjaily v. United States, 483 U.S.

171, 175 (1987).  Although the Second Circuit applies a "presumption of admissibility of

evidence," Borawick v. Shay, 68 F.3d 597, 610 (2d Cir. 1995), Rule 702 mandates that experts

19

"stay within the reasonable confines of [their] subject area, and cannot render expert opinion[s] on an entirely different field or discipline."  Lappe v. American Honda Motor Corp., 857 F. Supp. 222, 227 (N.D.N.Y. 1994).  Furthermore, the gatekeeping function of a district court requires that it ensure that potential expert testimony is both reliable and relevant.  Accordingly, before allowing expert testimony, a district court must make a preliminary assessment of "whether the [proposed] expert testimony is both reliable and relevant."  Kumho Tire Co., Ltd., 526 U.S. at 147.

Under Federal Rule of Evidence 401, evidence is relevant only if it tends to make the existence of any fact that is of consequence to the determination of the dispute more or less probable than it would be without the evidence. Thus, "to be relevant, (i) evidence must be probative of the proposition it is offered to prove and (ii) that proposition must be one that is of consequence to the determination of the action." United States v. Kaplan, 490 F.3d 110, 121 (2d Cir.2007) (citing United States v. Diaz, 878 F.2d 608, 614 (2d Cir.1989)); see also Fed. R. Evid. 401. Evidence that is not relevant is not admissible. See Fed. R. Evid. 402. "Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case." Advisory Committee's Notes on Fed. Rule Evid. 401, 28 U.S.C. App., p. 688.

Even if evidence is relevant and admissible; however, it does not automatically mean that a court should admit it if the probative value of the evidence is substantially outweighed by other concerns, such as unfair prejudice, undue delay, or waste of time. Fed. R. Evid. 403. Furthermore, "even as to evidence that is plainly relevant, the trial judge retains discretion to exclude the evidence if its probative value is substantially outweighed by the danger of unfair prejudice." Kaplan, 490 F.3d at 121 (internal citations and quotations omitted). Mere prejudice, of course, is not sufficient to exclude relevant evidence, since all inculpatory evidence is, by definition, prejudicial. To be excludable under Rule 403, the prejudice must be "unfair," in the sense that the evidence has some "adverse effect beyond tending to prove the fact or issue that

justified its admission into evidence." United States v. Gelzer, 50 F.3d 1133, 1139 (2d Cir.1995) (internal quotation marks and alteration omitted); see also United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980).

i. __The Survey Report of Defendants' Expert, E. Deborah Jay, Ph. D.__

Defendants rely on E. Deborah Jay, Ph.D. as an "expert" on their motion. The substance of Dr. Jay's proffered opinions is set forth in Defendants' "NBA 2K Video Game Survey Report" (the "Survey") conducted by Dr. Jay. See ECF No. 138-1. For reasons that are more fully hereinafter set forth, Dr. Jay should be precluded from testifying as to any matters contained in the Survey and the Survey should be precluded from being entered into evidence because the Survey postulates only as to the reasons consumers buy the NBA 2K line of video games, which is an irrelevant distraction from the actual material issues in this lawsuit.[5] The Survey presents a proposition that is not one of consequence to the determination of this action, as required of expert evidence. Kaplan, 490 F.3d at 121. It should thus be precluded from use in this trial and summarily disregarded by the Court in its consideration of Defendants' summary judgment motion.

Even if Defendants could establish the relevance of the Survey, the document should still be excluded under Rule 403, because it is unfairly prejudicial and will confuse and mislead the jury. Defendants' reckless employment of the Survey to support their inaccurate and unfounded theory that the reasons consumers buy the NBA 2K video game has bearing on the present copyright infringement claim should not be rewarded by the Court. Rather, Defendants should be barred from using the Survey to imply consumers do not buy NBA 2K video games for the duplicated tattoos on LeBron James, Eric Bledsoe or Kenyon Martin. Such an inflammatory suggestion is unfairly prejudicial and wholly impertinent to the questions concerning copyrights.

Further, Defendants should be prohibited from using the Survey, in the event that Defendants no not prevail on their summary judgment motion, because the presence of a

---

[5] Indeed, the Survey is but one of a multitude of facially attractive, but ultimately immaterial distractions that Defendants employ in this would-be show of force to make their claim for summary judgment on a matter that is a matter of first impression that's very subjectivity should render it difficult for the Court to make any conclusions at this stage.

purportedly "official report" is likely to cause the jury to afford it undue significance. The prejudice that will result from disclosing the Survey to a jury or referring to it in any way would greatly outweigh any probative value that could be attributed to the document as, once again, it is wholly impertinent to the question of intellectual property rights.

Based on the foregoing, Plaintiff respectfully requests that the Court preclude the Survey and, if this matter ultimately proceeds to trial, the testimony of Dr. Jay in its entirety and summarily disregards the Survey in its consideration of Defendants' summary judgment motion.

## ii. __The Declaration and Expert Report of Defendants' Expert, Nina Jablonski, Ph.D.__

Defendants' have also employed Nina Jablonski. Ph. D. as an "expert" in this case. Dr. Jablonski's qualifications and the substance of her anticipated testimony are set forth in ECF No. 137. For reasons that are more fully hereinafter set forth, Dr. Jablonski's opinions, conclusions, and testimony should be precluded since she is wholly unqualified to competently comment as an expert as to the matters addressed in her report.

As an initial matter, a review of Dr. Jablonski's report, and especially Section VII entitled "There Is No Market for Licensing Tattoos in Video Games," reveals that Dr. Jablonski is not qualified to give an opinion on the whether there is a market for licensing tattoos or if such a market is reasonable or likely to be established. This is because Dr. Jablonski is inarguably neither an economist nor a market researcher according to her CV. Accordingly, Dr. Jablonski's opinions speak to matters beyond her expertise. In fact, Defendants do not even present Dr. Jablonski as a market expert, and indeed they cannot. She is simply an anthropologist.

Additionally, the evidence elicited by Defendants and encapsulated in Sections III, IV, and V of Dr. Jablonski's report appear to be exclusively intended to prejudice a trier of fact, and are wholly irrelevant to Plaintiff's claims. Specifically, Section III entitled "Tattoos Are a Part of An Individual Likeness and Are Used for Self-Expression," Section IV entitled "Those on Whom Tattoos are Inked Expect to Have the Right to Authorize the Display and Depiction of Their Tattoos on Their Bodies," and Section V entitled "If These Norms Are Disrupted, It Would

22

Compromise Tattoo Culture and the Industry," should be excluded because their probative value, if any, is substantially outweighed by their unfairly prejudicial effect given their inflammatory titles yet terrific irrelevance to issues material to this matter.  Fed. R. Evid. 403.

Finally, Dr. Jablonski's "expert" opinions should be stricken because they address topics easily evaluated by the common sense of laymen and are unhelpful to the fact-finder.  Her "expert" qualification to talk about tattoos provide nothing more than a restatement of common-sense topics and cannot possibly be helpful to a fact-finder in this case that is charged with identifying exclusively whether or not an intellectual property right has been misappropriated under the fact set of this litigation, and not the impact that an adverse finding would theoretically have on Defendants and others.

Based on the foregoing, Plaintiff respectfully requests the Court grant Plaintiff's cross-motion to preclude the use of Dr. Jablonski as Defendants' expert as to issues relating to the market for tattoos, which is an area for which she is not a qualified expert and which, when this case is stripped to its basics, should have absolutely zero bearing on its outcome.   Relatedly, Dr. Jablonski's opinions should be precluded as they relate to irrelevant areas where the probative value of the evidence, if any, is substantially outweighed by its unfairly prejudicial effect.  Defendants should not be rewarded for their myriad distractions to the Court on their motion for summary judgment by having such an unqualified, meaningless, yet highly prejudicial, expert and her overreaching opinions be contemplated by a finder of facts.

###   iii.   **The Expert Report of Defendants' Expert, Ian Bogost, Ph.D.**

Defendants have also proffered the expert opinions of Ian Bogost, Ph. D. in support of their motion for summary judgment. See Bogost Report.   Dr. Bogost's qualifications and the substance of his anticipated testimony are set forth within same.  Id.  For reasons that are more fully hereinafter set forth, Dr. Bogost should be precluded, as he is wholly unqualified to competently offer opinions as an expert on the matter he addresses in the instant litigation.

As an initial matter, the evidence elicited by Defendants via Section III (A) through (D) of Dr. Bogost's report are wholly irrelevant to Plaintiff's claim against Defendants. Specifically,

the speculation in Section III (A) entitled "Video Games Are a More Expressive Version of Films and Television," Section III (B) entitled "NBA 2K Is a Highly Expressive Video Game," Section III (C) entitled "The Tattoos Are a Tiny Part of NBA 2K That Would Rarely Be Noticed During Ordinary Game Play," and Section III (D) entitled "The Tattoos Are a Small Part of the NBA 2K Computer Program," should be excluded because their probative value, if any, is substantially outweighed by their unfairly prejudicial effect.  Bogost Report; Fed. R. Evid. 403. These "expert" opinions are mere speculations by Dr. Bogost that should be excluded because they are irrelevant to, or otherwise have no bearing as to, Defendants' acts of infringement and to the issues in this lawsuit. See, e.g., Lara v. Delta International Machinery Corp., 174 F. Supp.3d 719, 729 (E.D.N.Y. 2016) (noting that expert's testimony may be precluded where "'testimony is bottomed upon nothing more than mere speculation and guesswork'") (internal citation and quotation omitted); Washington v. Wash. Hosp. Ctr., 579 A.2d 177, 181 (D.C. 1990) (holding that "[t]he purpose of expert testimony is to avoid jury findings based on mere speculation or conjecture").

Furthermore, Dr. Bogost is not an "economist" and is not qualified to give an opinion on the whether there is a market for licensing tattoos. Dr. Bogost's opinions contained in the portion of Section III (E) of his report, entitled "There is No Market for the Tattoos in Video Games," speak to matters beyond his expertise.   Specifically, his statement in paragraph 113 regarding the license is beyond his purview.  Id. at ¶ 113.  By Dr. Bogost's own account, his expertise is in Media Studies and Business, and not in licensing or market research.

Even if Defendants could establish that Dr. Bogost is qualified to give an opinion on the whether there is a market for licensing tattoos, the aforementioned section of Dr. Bogost's report and testimony concerning same still should be excluded under Rule 403.  This is due to the fact that it is unfairly prejudicial, and would confuse and mislead the jury. His report is about characteristics of the NBA 2K video game pertaining to data and elements of the game, not about the market for tattoos.  Dr. Bogost's "expert" opinion regarding the market is tacked on to the end of his report and does not relate to the balance of his opinions within same.  Id. at ¶¶ 111-

114.  This "expert" testimony concerning the market should be stricken because it is unfairly prejudicial, and will confuse and mislead the jury due to the fact it is not a logical conclusion or even remotely related to a report about the characteristics of the game, never mind the material issues of this case.

Based on the foregoing, Plaintiff respectfully requests the Court grant Plaintiff's cross-motion to preclude the use of Dr. Bogost as a market expert, as when this case is stripped to its basics, his purported insights have absolutely zero bearing on subject issues.   Relatedly, Dr. Bogost's opinions should be precluded as they relate to irrelevant areas where the probative value of the evidence, if any, is substantially outweighed by its unfairly prejudicial effect.

iv.    **The Expert Report of Defendants' Expert, James E. Malackowski.**

Defendants proffered an expert report of James E. Malackowski in their motion for summary judgment. Mr. Malackowski's qualifications and the substance of his opinions are set forth in the "Expert Report of James E. Malackowski" (the "Malackowski Report").  See ECF No. 139[1].    This "expert" report should be excluded due to the fact it merely states a legal conclusion. In Section 10.2, entitled "Infringer's Profits Attributable to Alleged Infringement," Mr. Malackowski states: "none of the profits of Take-Two or 2K are attributable to the depiction of the Tattoos in the NBA 2K video game, resulting in no calculable damages to award to Solid Oak under this measure of copyright infringement damage."  Id. at 26.   In Bausch & Lomb, Inc. v. Alcon Laboratories, Inc., the Western District of New York held that portions of an expert's testimony were inadmissible as "testimony that is designed to instruct the jury on the applicable law."  79 F. Supp.2d 252, 254 (W.D.N.Y. 2000).   "Simply put, testimony that is designed to instruct the jury on the applicable law is not admissible because, by purporting to do what lies with the exclusive province of the court, it cannot be helpful to the jury."  Id. at 255.   Mr. Malackowski's report is precisely the kind of testimony stricken in Bausch & Lomb, Inc. as being an inadmissible legal conclusion. See also Sparta Commercial Servs., Inc. v. DZ Bank, 680 Fed. Appx. 17, 19-20 (2d Cir. 2017) (holding that "[a] district court properly rejects an expert's testimony when the testimony involves qualitative opinions about an area outside the expert's

25

field of expertise, or when the expert opines on witnesses' credibility or inappropriately draws legal conclusions").

Furthermore, in Section 8 of Mr. Malckowski's report, entitled "Copyright Infringement Remedies," Mr. Malackowski just articulates the law, and states that "[f]or my analysis, I have considered the available remedies for copyright infringement as provided by the U.S. statute on copyright and as allowed by rulings of the Court in this matter."  Malackowski Report at 15. Again, Mr. Malackowski is not a legal expert and thus not qualified to give a legal opinion on anything, in this matter or others.  Bausch & Lomb, Inc., 79 F. Supp.2d at 254; Sparta Commercial Servs., Inc., 680 Fed. Appx. at 19-20.

Moreover, Mr. Malackowski is not qualified to provide an opinion on the whether there is a market for licensing tattoos. Mr. Malackowski's opinions contained in the portion of his report at Section 9.2, entitled "Assessment of a Market for Licensing Tattoos for Video Games," speak to matters beyond his expertise. Malackowski Report at 16-24.  Defendants present Mr. Malackowski as an expert of "financial services related to intellectual property."  However, this alleged "expert" bases his opinions of the market on the opinions of Dr. Jablonski and Dr. Bogost whom, as shown above, are not themselves experts in the field.  Thus, Mr. Malackowski should be precluded from testifying as to any matters contained in the report because he is not qualified to competently testify as an expert as to the matters he intends to address in this case. This supposed "assessment of a market" is then used in the report to help support his ultimate conclusion, thus renders the entirety of the report irrelevant.

Additionally, the evidence elicited by Defendants regarding the allegations set forth in Section 9.1 of Mr. Malackowski's report, entitled "Revenue Generation Efforts by Solid Oak," appears to be designed for no particular purpose other than to prejudice a finder of fact, and is not relevant to Plaintiff's claim against Defendants. Specifically, the evidence in Section 9.1.1, entitled "Solid Oak Monetization Efforts Unrelated to Video Games," and Section 9.1.2, entitled "Solid Oak's Monetization Efforts Related to Video Games," should be excluded because their probative value, if any, is substantially outweighed by their unfairly prejudicial effect. Fed. R.

Evid. 403. The monetization effort is wholly irrelevant to Defendants' acts of infringement and to the material issues in this lawsuit.

Additionally, the statements contained in Section 10 of Mr. Malackowski's report, entitled "Infringer's Profits Attributable to Alleged Infringement," amount to nothing more than a cumulative recitation of information contained in the Survey of Dr. Jablonski, which should be precluded and otherwise deemed inadmissible for the reasons stated above.  Specifically, the portion of Mr. Malackowski's report Section 10.2, entitled "NBA 2K Video Game Survey," consists of snippets of information cherry-picked from the Survey, which is then infused with Mr. Malackowski's conclusions in Section 10.2 entitled "Infringer's Profits Attributable to Alleged Infringement." Malackowski Report at 25-26.   As indicated, his conclusions are drawn, for the most part, from hearsay or other inadmissible evidence.   The proffer of such testimony would be cumulative and a waste of time, and should be excluded under Rule 403 of the Federal Rules of Evidence. See, e.g., Smith v. Smith, 2003 WL 22290984 (S.D.N.Y.  Sept. 29, 2003) (holding that "[i]f the trial court found that an expert's testimony would confuse the jury or would be cumulative of other evidence in the case, it would be within its discretion to refuse to admit the testimony"); USA v. Walker, 910 F. Supp. 861, 863 (S.D.N.Y. 1995) (holding that evidence that will only duplicate the testimony of another expert witness is "simply cumulative" and thus inadmissible under Fed. R. Evid. 403);

Therefore, for the reasons set forth above, Plaintiff respectfully requests that the Court grant Plaintiff's cross-motion in its entirety as to James E. Malackowski and otherwise disregard his expert report in its consideration of Defendants' motion for summary judgment.

## CONCLUSION

Based on the foregoing reasons, Plaintiff respectfully requests that this Court deny the Defendants' motion for summary judgment in its entirety and grant Plaintiff's cross-motion in its entirety together with such other and further relief as this Court deems just and proper.

Respectfully submitted,

**HEITNER LEGAL, P.L.L.C**
*Attorney for Plaintiff*
215 Hendricks Isle
Fort Lauderdale, FL 33301
Phone: 954-558-6999
Fax: 954-927-3333

By:

DARREN A. HEITNER
Florida Bar No.: 85956
Darren@heitnerlegal.com

**LAW OFFICES OF PAUL S. HABERMAN LLC**

/s/ *Paul S. Haberman*

By: _____

PAUL S. HABERMAN (PH 2771)
Attorney for Plaintiff
P.O. Box 167
Norwood, NJ 07648
Phone: 201-564-0590
Fax:    201-767-2087
Email: psh@paulhabermanlaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd day of September 2018, I electronically filed the foregoing document using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

By:

    DARREN A. HEITNER
    Florida Bar No.: 85956
    Darren@heitnerlegal.com

**LAW OFFICES OF PAUL S. HABERMAN LLC**

/s/ *Paul S. Haberman*

By: _____
    PAUL S. HABERMAN (PH 2771)
    Attorney for Plaintiff
    P.O. Box 167
    Norwood, NJ 07648
    Phone: 201-564-0590
    Fax:     201-767-2087
    Email: psh@paulhabermanlaw.com

## SERVICE LIST

Dale M. Cendali
Joshua L. Simmons

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

dale.cendali@kirkland.com
joshua.simmons@kirkland.com