UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

SOLID OAK SKETCHES, LLC,

       Plaintiff-
       Counterdefendant,

    -v-                                No.  16-CV-724-LTS-SDA

2K GAMES, INC. and TAKE-TWO
INTERACTIVE SOFTWARE, INC.,

       Defendants-
       Counterclaimants.

--------------------------------------------------------x

<u>MEMORANDUM OPINION AND ORDER</u>

       Solid Oak Sketches, LLC ("Solid Oak" or "Plaintiff"), brings this action against

Defendants 2K Games, Inc., and Take-Two Interactive Software, Inc. (collectively, "Take Two"

or "Defendants"), asserting a claim of copyright infringement pursuant to the Copyright Act of

1976, 17 U.S.C. § 101 <u>et seq.</u> (the "Copyright Act").  Following this Court's granting of

Defendants' motion to dismiss Plaintiff's claims for statutory damages and attorneys' fees on

August 2, 2016, Plaintiff filed a Second Amended Complaint ("SAC") on October 24, 2016.

(Docket Entry No. 55.)  On August 16, 2016, Defendants filed counterclaims for declaratory

judgment pursuant to the Copyright Act and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-

2202 ("Def. Countercl.").  (Docket Entry No. 47.)  The Court denied Plaintiff's motion to

dismiss the counterclaims on May 16, 2017 (docket entry no. 64) and, on March 30, 2018,

denied Defendants' motion for judgment on the pleadings ("March Op.," docket entry no. 117).

       The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1338.

Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56, requesting (i) an order dismissing Plaintiff's copyright infringement claim and (ii) entry of declaratory judgment in Defendants' favor on their de minimis use and fair use counterclaims.[1]  (Docket Entry No. 127.)  Plaintiff has cross moved to exclude the four expert declarations filed in support of Defendants' summary judgment motion.  (Docket Entry No. 147.)  The Court has considered carefully the parties' submissions in connection with the motions.  For the following reasons, Defendants' motion for summary judgment is granted and Plaintiff's cross motion to exclude is denied.

<u>BACKGROUND</u>

Familiarity with the facts underlying this case, which have been detailed in prior decisions of the Court, including the August 2, 2016, Memorandum Opinion and Order, the May 16, 2017, Memorandum Order, and the March 30, 2018, Memorandum Opinion and Order, is presumed.  (See Docket Entry Nos. 44, 64, and 117.)  The following summary focuses on facts that are pertinent to the question of whether Defendants are entitled to summary judgment. Except as otherwise noted, the following material facts are undisputed.[2]

---

[1]     Defendants have moved for summary judgment as to their first and second counterclaims only.  Defendants' third counterclaim for "declaratory judgment of fraud on the Copyright Office" remains pending.  (Def. Countercl. ¶¶ 228-35.)

[2]     The facts presented or recited as undisputed are drawn from the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1, or from evidence as to which there is no non-conclusory factual proffer.  Citations to Defendants' Local Civil Rule 56.1 Statement (Defendants-Counterclaimants 2K Games, Inc. and Take-Two Interactive Software, Inc.'s Rule 56.1 Statement of Undisputed Facts in Support of Their Motion for Summary Judgment ("Def. 56.1"), Docket Entry No. 129) and Plaintiff's Counterstatement (Response to Defendants' Rule 56.1 Statement of Purportedly Undisputed Facts ("Pl. 56.1"), Docket Entry No. 146) incorporate by reference citations to the underlying evidentiary submissions.  Plaintiff proffered no citations to record evidence to the extent it purported to dispute Defendants' documented proffers of undisputed facts in Defendants' 56.1 statement.  Where Plaintiff purported to deny or dispute particular

Take-Two is a major developer, publisher, and marketer of interactive entertainment and video games that develops and publishes products through its wholly-owned subsidiaries, 2K and Rockstar Games.  (SAC ¶¶ 17-18.)  Defendants annually release an updated basketball simulation video game that depicts basketball with realistic renderings of different National Basketball Association ("NBA") teams, including lifelike depictions of NBA players and their tattoos.  (Def. Countercl. ¶¶ 8, 141.)  Plaintiff alleges that Defendants have infringed its copyrights by publicly displaying works for which Plaintiff owns copyrights—five tattoos (the "Tattoos") that are depicted on NBA players Eric Bledsoe, LeBron James, and Kenyon Martin (the "Players")—in versions 2K14, 2K15, and 2K16 (released in 2013, 2014, and 2015, respectively) of Defendants' basketball simulation video game.  (SAC ¶¶ 9-11.)

Tattoos

According to Defendants' expert, Nina Jablonski, "[t]attoos have been a part of human expression for thousands of years."  (Def. 56.1 ¶ 1.)  In modern day, tattoos like the Tattoos at issue in this litigation "reflect the personal expression of the person bearing the tattoo and are created for that purpose."  (Def. 56.1 ¶¶ 2-3.)  The Tattoos reflect the Players' personal expression.  (Def. 56.1 ¶ 3.)

Solid Oak holds an exclusive license to each of the Tattoos.  (See Declaration in Opposition to Defendants' Motion and in Support of Cross-Motion ("Haberman Decl."), Docket Entry No. 149.)  However, Solid Oak is not licensed to apply the tattoos to a person's skin, and Solid Oak does not hold any publicity or trademark rights to the Players' likenesses.  (Def. 56.1 ¶¶ 101-02.)  The Players "have given the NBA the right to license [their] likeness to third-parties," and the NBA has granted such a license to Take-Two.  (Def. 56.1 ¶¶ 103-04.)  The

statements, Plaintiff made arguments regarding relevance or other legal issues or, as addressed infra, challenged the relevance or basis of proffered expert testimony.

Players also granted Take-Two permission to use their likenesses.  (Declaration of LeBron James ("James Decl."), Docket Entry No. 134, ¶ 13; Declaration of Kenyon Martin ("Martin Decl."), Docket Entry No. 135, ¶ 15.)

*Child Portrait Tattoo*

LeBron James's "Child Portrait" tattoo was inked by tattooist Justin Wright, and was copied from a baby picture provided by Mr. James.  (Def. 56.1 ¶¶ 5-10.)  Mr. Wright "knew and intended that when [Mr. James] appeared in public, on television, in commercials, or in other forms of media, he would display the Child Portrait Tattoo."  (Def. 56.1 ¶ 11.)  It was Mr. Wright's intention that the "Child Portrait" Tattoo "become a part of Mr. James's likeness," which, according to Mr. Wright, "Mr. James was and is free to use . . . as he desire[d], including allowing others to depict it, such as in advertisements and video games."  (Def. 56.1 ¶¶ 11-13.)

*330 and Flames Tattoo*

LeBron James's "330 and Flames" tattoo was inked by tattooist Deshawn Morris, also known as Shawn Rome ("Mr. Rome").  (Def. 56.1 ¶¶ 14-15.)  At Mr. James's request, Mr. Rome created the tattoo by shading in the outline of, and adding flames to, the number "330," which had already been inked on Mr. James's arm.  (Def. 56.1 ¶¶ 16-19.)  The number "330" represents the area code of Akron, Ohio.  (Def. 56.1 ¶ 16.)  According to Defendants' expert, Dr. Nina Jablonski, flames are a common motif used for tattoos.  (Def. 56.1 ¶ 20.)

Mr. Rome stated that, "[a]t the time that [he] inked [the '330 and Flames' tattoo] on Mr. James, [he] knew that Mr. James was a professional basketball player with the [NBA]," and that "it was likely that Mr. James was going to appear in public, on television, in commercials, or in other forms of media, like video games."  (Declaration of Deshawn Morris ("Morris Decl."), Docket Entry No. 132, ¶ 9.)  Mr. Rome also stated that, "[w]hen [he] inked [the

'330 and Flames' tattoo] on Mr. James according to his requests, [he] knew and intended that [Mr. James] would display [the '330 and Flames' tattoo] whenever he appeared in public," and that he "intended that [the '330 and Flames' tattoo] become a part of Mr. James's likeness and part of his image." (Morris Decl. ¶ 10.)

### Script with a Scroll, Clouds and Doves Tattoo

Shawn Rome also inked LeBron James's "Script with a Scroll, Clouds and Doves" tattoo. (Def. 56.1 ¶ 21.) The "Script" tattoo was copied from a design in Mr. Rome's sketchbook. (Def. 56.1 ¶ 22.) Solid Oak did not license the drawing used to create the "Script" tattoo. (Def. 56.1 ¶ 23.) According to Dr. Jablonski, birds, such as doves, "have been a popular subject of tattoos since ancient times." (Def. 56.1 ¶ 24.)

As with the "330 and Flames" tattoo, Mr. Rome "intended that [the 'Script' tattoo] become a part of Mr. James's likeness and part of his image," knowing that (i) Mr. James was a professional basketball player with the NBA and that (ii) it was "likely that Mr. James was going to appear in public, on television, in commercials, or in other forms of media, like video games." (Morris Decl. ¶¶ 9-10.)

### Wizard Tattoo

Kenyon Martin's "Wizard" tattoo was inked by Thomas Ray Cornett, and was "copied . . . directly from the pre-existing design" that Mr. Martin chose from designs featured on the walls and in books at Mr. Cornett's parlor. (Def. 56.1 ¶¶ 25, 27-28.) Mr. Cornett did not design the tattoo. (Declaration of Thomas Ray Cornett ("Cornett Decl."), Docket Entry No. 131, ¶ 13.) The "Wizard" tattoo appears as a grim reaper holding a basketball. (Def. 56.1 ¶ 26.) Both basketballs and "depictions of death or the grim reaper" are common tattoo motifs. (Def. 56.1 ¶¶ 30-31.)

When he inked the "Wizard" tattoo, Mr. Cornett "knew and intended" that the tattoo "would be displayed if Mr. Martin appeared in media, such as on television or in commercials." (Cornett Decl. ¶ 15.) Mr. Cornett "also intended that the tattoo become a part of Mr. Martin's likeness and part of his image." (<u>Id.</u>) Further, Mr. Cornett "knew and intended that the tattoo would need to be included if anyone were to create a rendition of Mr. Martin's likeness, such as in art or video games." (<u>Id.</u>)

*Basketball with Stars and Script*

Mr. Cornett also inked Eric Bledsoe's "Basketball with Stars and Script" tattoo. (Cornett Decl. ¶ 20.) This tattoo was designed by Mr. Cornett with Mr. Bledsoe's direction and input. (<u>Id.</u>) When Mr. Cornett inked the "Basketball with Stars and Script" tattoo on Mr. Bledsoe, he "knew and intended that [Mr. Bledsoe] would display the tattoo whenever he appeared in public," such as "on television or in commercials." (<u>Id.</u> ¶ 21.) As with Mr. Kenyon's "Wizard" tattoo, Mr. Cornett "intended that the ['Basketball with Stars and Script'] tattoo [would] become a part of Mr. Bledsoe's likeness and part of his image," and he "knew and intended that the tattoo would need to be included if anyone were to create a rendition of Mr. Bledsoe's likeness, such as in art or video games." (<u>Id.</u>)

<u>NBA 2K Video Game</u>

The NBA 2K game, which is much shorter in duration than an actual NBA game, has "many components, including graphics, characters, a fictitious plot, gameplay, [and] music." (Def. 56.1 ¶¶ 70, 72.) These components, which include auditory elements such as "the sound of shoes against the court's surface; the noise of the crowd, the horns and other audible warnings signaling elapsing shot clocks, ending timeouts, . . . television announcers performing play-by-play," and visual elements such as "the basketball; the hoop, . . . the court, . . . the players,

including multiple individuals on the court and on the sidelines, each of whom wears jerseys with different accessories and other features (such as tattoos); coaches; referees; cheerleaders; spectators; the stadium; and the game clock and scoring system," are designed to most accurately simulate the look and feel of an actual NBA game.  (Def. 56.1 ¶¶ 74, 93; see also Declaration of Jeffrey Thomas in Support of Defendants-Counterclaimants' Motion for Summary Judgment ("Thomas Decl."), Docket Entry No. 130, ¶ 2.)

To further the goal of simulating an actual NBA game, Take-Two included the Tattoos in NBA 2K "to accurately depict the physical likenesses of the real-world basketball players as realistically as possible."  (Def. 56.1 ¶ 79.)  However, for a number of reasons, NBA 2K users do not see the Tattoos clearly, if at all, during gameplay.  (Def. 56.1 ¶¶ 91-99.)  NBA 2K does not depict the Tattoos separately from the Players.  (Def. 56.1 ¶ 85.)  Therefore, the Tattoos only appear when a user selects Mr. James, Mr. Martin, or Mr. Bledsoe from over 400 available players.  (Def. 56.1 ¶¶ 85-86.)  The Tattoos comprise only a miniscule proportion of the video game data: only 0.000286% to 0.000431% of the NBA 2K game data is devoted to the Tattoos.  (Def. 56.1 ¶¶ 75-78.)

When a Tattooed player is selected, the Tattoos are depicted on a computer or television screen at about 4.4% to 10.96% of the size that they appear in real life "due to the great distance from the camera that the players usually are depicted" and the resulting relatively small size of the player figures.  (Def. 56.1 ¶¶ 91-92; Expert Report and Declaration of Ian Bogost, Ph.D. ("Bogost Decl."), Docket Entry No. 136, ¶¶ 71-77.)  The Tattoos appear merely as "visual noise," "no more noticeable than a simulated player's nose shape or hairstyle."  (Def. 56.1 ¶¶ 94-95 (internal quotation marks omitted).)  The Tattoos "are subordinated to the display of the court and the players in competition."  (Def. 56.1 ¶ 96 (internal quotation marks omitted).)

The Tattoos also cannot be observed clearly because they are often "blocked from view by other players," are "obstruct[ed] by other game elements," "often appear out-of-focus," and "players on whom the Tattoos appear move quickly in the game."  (Def. 56.1 ¶ 97 (internal quotation marks omitted).)

Defendants provided video clips showing how each of the Players appears during NBA 2K gameplay.  (Thomas Decl., Exs. B, C, and D.)  At no point during the video clips are the Tattoos discernible to the viewer.  These videos demonstrate that the Players' tattoos, including the Tattoos at issue, appear entirely out-of-focus.  The Tattoos are further obscured by the Players' quick and erratic movements up and down the basketball court.  (Thomas Decl., Exs. B, C, and D.)

The Tattoos did not play a significant role in marketing NBA 2K.  The NBA 2K game covers do not depict the Players or their tattoos, and the advertising materials neither depicted nor discussed the Tattoos.  (See Def. Countercl. ¶¶ 161-67; Plaintiff's Answer to Defendants' Counterclaims ("Pl. Ans."), Docket Entry No. 65, ¶¶ 161-67.)  According to Defendants' expert, Dr. Jay, while "consumers buy NBA 2K video games for numerous reasons . . . consumers do not buy NBA 2K video games for the tattoos on LeBron James, Eric Bledsoe or Kenyon Martin."  (Def. 56.1 ¶ 90.)

Market for Licensing Tattoos

Solid Oak has not profited from licensing the Tattoos.  (Declaration of Dale M. Cendali, Esq. in Support of Defendants-Counterclaimants' Motion for Summary Judgment ("Cendali Decl."), Docket Entry No. 140, Ex. E at 370.)  Solid Oak has never created a video game that depicts the Tattoos, nor has Solid Oak licensed the Tattoos for use in a video game. (Def. 56.1 ¶¶ 105-06, 110.)  Defendants' expert, Dr. Bogost, stated that he is "not familiar with

any video game developer licensing the rights to tattoos for inclusion in a video game."  (Def. 56.1 ¶ 111.)  Solid Oak has not identified an instance in which a tattoo image has been licensed for use in a video game.  (Def. 56.1 ¶ 112.)  Defendants' expert, James Malackowski, opined that a market for licensing basketball players' tattoos for use in video games is "unlikely to develop." (Def. 56.1 ¶ 115.)  As noted above, Defendants' expert, Dr. Jay, relied on consumer survey data to conclude that "consumers do not buy NBA 2K video games for the tattoos on LeBron James, Eric Bledsoe or Kenyon Martin."  (Def 56.1 ¶ 90.)  Thus, there is no demand for licensing the Tattoos for use in a video game.

Solid Oak has neither licensed the Tattoo designs nor sold merchandise depicting the Tattoos.  (Def. 56.1 ¶¶ 107-08.)  Solid Oak's owner, Matthew Siegler, testified that he would "need permission from the players . . . to not infringe on their right of publicity," in order to move forward with a business selling "dry wick apparel" bearing the Players' tattoos.  (Cendali Decl., Ex. A at 389.)  Solid Oak does not have a license to use the Players' publicity or trademark rights.  (Def 56.1 ¶ 102.)  Solid Oak has not proffered any evidence indicating that it has a prospect of obtaining such rights.

DISCUSSION

Rule 56 Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is to be granted in favor of a moving party where that party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). For the purposes of summary judgment motion practice, a fact is considered material "if it might affect the outcome of the suit under the governing law," and an issue of fact is "genuine" where

"the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (internal quotation marks and

citations omitted).  The moving party bears the burden of demonstrating the absence of a

material fact, and the court must be able to find that, "'after drawing all reasonable inferences in

favor of a non-movant, no reasonable trier of fact could find in favor of that party.'"  Marvel

Entertainment, Inc. v. Kellytoy (USA), Inc., 769 F. Supp. 2d 520, 523 (S.D.N.Y. 2011) (quoting

Heublein v. U.S., 996 F.2d 1455, 1461 (2d Cir. 1993)).

A party that is unable to "make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden of proof at

trial," will not survive a Rule 56 motion.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Specifically, the party who bears the burden of proof at trial "must do more than simply show

that there is some metaphysical doubt as to the material facts and they may not rely on

conclusory allegations or unsubstantiated speculation."  Jeffreys v. N.Y.C., 426 F.3d 549, 554

(2d Cir. 2005) (citations omitted).  "[M]ere conclusory allegations or denials . . . cannot by

themselves create a genuine issue of material fact where none would otherwise exist."  Hicks v.

Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).

Plaintiff's Copyright Infringement Claim

Defendants move to dismiss Plaintiff's complaint for copyright infringement,

arguing that Plaintiff cannot prove its claim because Defendants' use of the Tattoos is de

minimis and Plaintiff is thus unable to prove the key substantial similarity element of its cause of

action.  Defendants further argue that the copyright claim must fail because their use of the

images was pursuant to implied authorization granted prior to Plaintiff's acquisition of any rights

in the Tattoos.

*De Minimis Use*

"In order to establish a claim of copyright infringement, a plaintiff with a valid copyright must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 63 (2d Cir. 2010) (internal quotation marks omitted).  To be substantially similar, the amount copied must be more than de minimis. Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc., 150 F.3d 132, 138 (2d Cir. 1998) (citing Ringgold v. Black Entertainment Television, Inc., 126 F.3d 70, 75 (2d Cir. 1997)).  "To establish that the infringement of a copyright is de minimis, and therefore not actionable, the alleged infringer must demonstrate that the copying of the protected material is so trivial 'as to fall below the quantitative threshold of substantial similarity, which is always a required element of actionable copying.'" Sandoval v. New Line Cinema Corp., 147 F.3d 215, 217 (2d Cir. 1998) (quoting Ringgold, 126 F.3d at 74).

The quantitative component of a de minimis analysis concerns (i) "the amount of the copyrighted work that is copied," (ii) "the observability of the copied work – the length of time the copied work is observable in the allegedly infringing work," and (iii) factors such as "focus, lighting, camera angles, and prominence." Ringgold, 126 F.3d at 75 (citing 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright §§ 13.03[A][2] (1997)).  "[O]bservability of the copyrighted work in the allegedly infringing work" is fundamental to a determination of whether the "quantitative threshold" of substantial similarity has been crossed. Sandoval, 147 F.3d at 217.

Substantial similarity must be determined through application of the "ordinary observer test," which considers "whether an average lay observer would recognize the alleged

copy as having been appropriated from the copyrighted work." Rogers v. Koons, 960 F.2d 301, 307 (2d Cir. 1992) (internal quotation marks omitted).  In other words, the Court considers "whether the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." Id. at 307-08 (internal quotation marks omitted).  Summary judgment may be granted on a de minimis use claim when "no reasonable trier of fact could find the works substantially similar." Estate of Smith v. Cash Money Records, Inc., 253 F. Supp. 3d 737, 746 (S.D.N.Y. 2017) (internal quotation marks omitted).

As noted above, Defendants assert that Plaintiff cannot establish substantial similarity because their use of the Tattoos is de minimis.  (See Memorandum of Law in Support of Defendants-Counterclaimants 2K Games, Inc. and Take-Two Interactive Software, Inc.'s Motion for Summary Judgment ("Def. Opening Br."), Docket Entry No. 128, at 9-11.)  Plaintiff protests that "Defendants have provided no material extrinsic evidence that answers the material questions surrounding de minimis use."  (Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion ("Pl. Opp. Br."), Docket Entry No. 148, at 3-7.)

In resisting Defendants' earlier motion for judgment on the pleadings, Plaintiff had argued that, "if an NBA2K player selects Messrs. James, Martin and Bledsoe in a given game or series of games, or 'employs the broad range of the video game's features to focus, angle the camera on, or make the subject tattoos more prominent,' 'the overall observability of the subject tattoos can be fairly significant.'"  (March Op. at 7-8.)  The Court denied the motion, holding, inter alia, that, at the pleading stage,

> there [was] no objective perspective as to how the Defendants'
> video game is generally played, or to what extent certain game

> features can be or are actually utilized, that would allow this Court to make determinations about the choices and subsequent observations of the 'average lay observer,' or about the observability and prominence of the Tattoos.  The Court [was] thus unable to conclude without the aid of extrinsic evidence that 'no reasonable jury, properly instructed, could find that the two works are substantially similar.'

(March Op. at 8.)

Here, Defendants are entitled as a matter of law to summary judgment dismissing Plaintiff's copyright infringement claim because no reasonable trier of fact could find the Tattoos as they appear in NBA 2K to be substantially similar to the Tattoo designs licensed to Solid Oak.[3]  The Tattoos only appear on the players upon whom they are inked, which is just three out of over 400 available players.  The undisputed factual record shows that average game play is unlikely to include the players with the Tattoos and that, even when such players are included, the display of the Tattoos is small and indistinct, appearing as rapidly moving visual features of rapidly moving figures in groups of player figures.  Furthermore, the Tattoos are not featured on any of the game's marketing materials.

When the Tattoos do appear during gameplay (because one of the Players has been selected), the Tattoos cannot be identified or observed.  (Thomas Decl., Exs. B, C, and D.) The Tattoos are significantly reduced in size: they are a mere 4.4% to 10.96% of the size that they appear in real life.  The video clips proffered by Defendants show that the Tattoos "are not displayed [in NBA 2K] with sufficient detail for the average lay observer to identify even the subject matter of the [Tattoos], much less the style used in creating them."  Sandoval, 147 F.3d at 218.  The videos demonstrate that the Tattoos appear out of focus and are observable only as

---

[3]    The Court notes that Solid Oak has not proffered images of the Tattoo designs.  For purposes of its substantial similarity analysis, the Court has used the Tattoo images included in James Malackowski's Declaration.  (Declaration of James Malackowski in Support of Defendants-Counterclaimants' Motion for Summary Judgment, Docket Entry No. 139, Ex. A at 7-9.)

undefined dark shading on the Players' arms.  Further, the Players' quick and erratic movements

up and down the basketball court make it difficult to discern even the undefined dark shading.

The uncontroverted evidence proffered by Defendants demonstrates that the Tattoos often do not

appear during the NBA 2K video game and, when they do, they are so small and distorted by the

camera angles and other game elements that they are indiscernible to the average game users.

While Plaintiff previously asserted that NBA 2K "employs the broad range of the video game's

features to focus, angle the camera on, or make the subject tattoos more prominent" (March Ord.

at 7-8), Plaintiff has not proffered any evidence to support that proposition.  The undisputed

evidence of record shows that Defendants' use of the Tattoos in NBA 2K falls below the

quantitative threshold of substantial similarity.  No reasonable fact finder could conclude that

Plaintiff has carried its burden of proving that Defendants' use of the copyrighted material was

substantially similar to Plaintiff's copyrighted work.  Thus, Defendants are entitled as a matter of

law to judgment dismissing Plaintiff's SAC, which asserts only a copyright infringement claim,

and a declaration that Defendants' use of the Tattoos is <u>de</u> <u>minimis</u>.

   *Implied License*

Defendants also argue persuasively that Plaintiff's copyright infringement claim

must fail because they were authorized to use the Tattoos in NBA 2K; Defendants assert that

they had an implied license to feature the Tattoos as part of the Players' likenesses.  (Def.

Opening Br. at 23-25.)  Plaintiff disputes this proposition, arguing that the tattooist's

expectations about whether a tattoo would become a part of his or her client's likeness "play[] no

role in copyright law."  (Pl. Opp. Br. at 16.)  Plaintiff also asserts that "any restriction on

Plaintiff's ability to commercially exploit the underlying artwork should have been included in

the [Tattoo] licensing agreements."  (Pl. Opp. Br. at 17.)

"A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement."  Graham v. James, 144 F.3d 229, 236 (2d Cir. 1998).  "Although the Second Circuit has not yet ruled on the precise circumstances under which an implied non-exclusive license will be found," courts in this Circuit have found an implied non-exclusive license "where one party created a work at the other's request and handed it over, intending that the other copy and distribute it."  Weinstein Co. v. Smokewood Entm't Grp., LLC, 664 F. Supp. 2d 332, 344 (S.D.N.Y. 2009) (internal quotation marks omitted).

Here, the undisputed factual record clearly supports the reasonable inference that the tattooists necessarily granted the Players nonexclusive licenses to use the Tattoos as part of their likenesses, and did so prior to any grant of rights in the Tattoos to Plaintiff.  According to the declarations of Messrs. Thomas, Cornett, and Morris, (i) the Players each requested the creation of the Tattoos, (ii) the tattooists created the Tattoos and delivered them to the Players by inking the designs onto their skin, and (iii) the tattooists intended the Players to copy and distribute the Tattoos as elements of their likenesses, each knowing that the Players were likely to appear "in public, on television, in commercials, or in other forms of media."  (Declaration of Justin Wright ("Wright Decl."), Docket Entry No. 133, ¶ 10.)  Thus, the Players, who were neither requested nor agreed to limit the display or depiction of the images tattooed onto their bodies, had implied licenses to use the Tattoos as elements of their likenesses.  Defendants' right to use the Tattoos in depicting the Players derives from these implied licenses, which predate the licenses that Plaintiff obtained from the tattooists.

The Players "have given the NBA the right to license their likeness to third-parties," and the NBA has granted such license to Take-Two.  (Def. 56.1 ¶¶ 103-04 (internal

quotation marks omitted).)  The Players also granted Take-Two permission to use their likeness.

(James Decl. ¶ 13; Martin Decl. ¶ 15.)  Therefore, Defendants had permission to include the

Tattoos on the Players' bodies in NBA 2K because the Players had an implied license to use the

Tattoos as part of their likeness, and the Players either directly or indirectly granted Defendants a

license to use their likenesses.  Defendants are therefore entitled as a matter of law to summary

judgment dismissing Plaintiff's copyright infringement claim for this reason as well.

Fair Use Counterclaim

Defendants also seek a declaration that their use of the Tattoos in NBA 2K is fair

use.  (Def. Opening Br. at 11-22.)  Plaintiff argues that Defendants have failed to proffer any

relevant, material evidence to "prove fair use."  (Pl. Opp. Br. at 7.)  Plaintiff's assertion is belied

by the undisputed evidence of record.

The Copyright Act provides that

the fair use of a copyrighted work . . . for purposes such as criticism, comment,
news reporting, teaching . . ., scholarship, or research, is not an infringement of
copyright.  In determining whether the use made of a work in any particular case
is a fair use the factors to be considered shall include –
> (1) the purpose and character of the use, including whether such use is of a
> commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the
> copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the
> copyrighted work.

17 U.S.C. §107.

"The determination of fair use is a mixed question of fact and law," Swatch Grp.

Mgmt. Serv. Ltd. v. Bloomberg L.P., 756 F.3d 73, 81 (2d Cir. 2014), and is an "open-ended and

context-sensitive inquiry."  Blanch v. Koons, 467 F.3d 244, 251 (2d Cir. 2006).  "Although the

issue of fair use is a mixed question of law and fact, the court may resolve issues of fair use at

the summary judgment stage where there are no genuine issues of material fact as to such issues." Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 608 (2d Cir. 2006).

   *Purpose and Character of the Use*

    In evaluating the purpose and character of an allegedly infringing use, courts consider "whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." Bill Graham Archives, 448 F.3d at 608 (internal quotation marks omitted). To that end, courts consider whether the allegedly infringing use is "transformative," that is, (i) whether the two works have different purposes, (ii) the size of the reproductions, (iii) whether the expressive value of the reproduced material is minimized, and (iv) the proportion of copied material. Id. at 609-11. Courts also consider whether the allegedly infringing use is commercial in nature. Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 578 (1994).

    Here, the undisputed evidence demonstrates that Defendants' use of the Tattoos is transformative. First, while NBA 2K features exact copies of the Tattoo designs, its purpose in displaying the Tattoos is entirely different from the purpose for which the Tattoos were originally created. The Tattoos were originally created as a means for the Players to express themselves through body art. Defendants reproduced the Tattoos in the video game in order to most accurately depict the Players, and the particulars of the Tattoos are not observable. The uncontroverted evidence thus shows that the Tattoos were included in NBA 2K for a purpose—general recognizability of game figures as depictions of the Players—different than that for which they were originally created.

Second, Defendants "significantly reduced the size of the [Tattoos]" in the video game.  Bill Graham Archives, 448 F.3d at 611.  It is undisputed that, when comparing the size of the Tattoos as they appear in NBA 2K to the size they appear on the Players' skin in real life, the Tattoos appear at 4.4% to 10.96% of their actual size because the player figures are themselves proportionately smaller than in real life.  This reduction in size, along with the other game elements discussed above, makes the Tattoos more difficult to observe.  Thus, NBA 2K does not "offer more than a glimpse of [the Tattoos'] expressive value[,]" as the Tattoos are too small and distorted for game users to even recognize them in NBA 2K.  See id. (finding second transformative use factor satisfied when thumbnail-sized images were "sufficient to permit readers to recognize the historical significance of the [works]," but were too small to see more than "a glimpse of [the works'] expressive value").

Third, the Tattoos' expressive value is minimized in NBA 2K.  The Tattoo images are infrequently and only imprecisely observable and are combined with myriad other auditory and visual elements, like the other players, referees, the sound of shoes against the court's surface, the noise of the crowd, the horns and other audible warnings signaling elapsing shot clocks, ending timeouts, television announcers performing play-by-play—elements all included to simulate an actual NBA game.  As discussed above, the uncontroverted factual record shows that the Tattoos were not included for their expressive value, but rather to most accurately recreate certain NBA players' likenesses.

Fourth, the Tattoos constitute an inconsequential portion of NBA 2K.  As noted above, it is undisputed that they only appear on three out of 400 available players, they comprise only 0.000286% to 0.000431% of the total game data, and they cannot be seen clearly during

gameplay.  Game users can see that the Players have tattoos, but cannot identify the specific Tattoos at issue.

Lastly, NBA 2K's purpose is commercial and, as a result, the Tattoos' inclusion in the game is also commercial.  However, as discussed above, the Tattoos are indistinguishable during gameplay and they do not feature in any of the game's marketing materials.  Further, the Tattoo images are merely "incidental to the commercial . . . value of the [game]," because "consumers do not buy NBA 2K video games for the tattoos on LeBron James, Eric Bledsoe or Kenyon Martin."  (Def 56.1 ¶ 90.)

*Nature of the Copyrighted Work*

The Court must next consider the nature of the copyrighted work.  This factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied."  Blanch, 467 F.3d at 256 (internal quotation marks omitted).  Courts consider two factors in evaluating whether the copyrighted work is of the nature that is conducive to fair use: "(1) whether the work is expressive or creative . . . or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower."  Id.

The nature of the copyrighted works at issue here weighs in favor of finding fair use.  First, Plaintiff concedes that the Tattoos were previously published.  (Pl. Opp. Br. at 12.)  Second, the Tattoo designs are more factual than expressive because they are each based on another factual work or comprise representational renderings of common objects and motifs that are frequently found in tattoos.  The "Child Portrait" tattoo is factual—it is a reproduction of a

photograph of Mr. James's son, which was copied "as closely as possible" from the picture Mr. James provided.  (Wright Decl. ¶ 9.)  The "330 and Flames" tattoo was created by adding flames—a common tattoo motif—to a number tattoo that Mr. James already had on his skin. The "Script with a Scroll" tattoo was based on a design Mr. James selected from one of Mr. Rome's sketchbooks.  The "Wizard" tattoo was "copied . . . directly from the pre-existing design" that Mr. Martin chose from a selection of tattoo designs featured on the walls and in books in Mr. Cornett's parlor.  (Def. 56.1 ¶¶ 25, 27-28.)  Similarly, the "Basketball with Stars and Script" tattoo is based on common tattoo motifs such as basketballs and stars.

None of the tattooists stated in his declaration that the Tattoos were based on unique or expressive features.  To the contrary, the tattooists each stated that the Tattoos copied common tattoo motifs or were copied from designs and pictures they themselves did not create. The one artist who referred to his sketchbook as a source of one design does not claim that the scroll-words-doves image had particular creative or expressive features.  Therefore, there is no evidence from which a reasonable fact finder could conclude that the Tattoos were sufficiently "expressive" or "creative" to make this factor weigh against a finding of fair use.

*Amount and Substantiality of the Use*

Next, the Court considers "whether the secondary use employs more of the copyrighted work than is necessary, and whether the copying was excessive in relation to any valid purposes asserted under the first factor."  Authors Guild, Inc. v. HathiTrust, 755 F.3d 87, 96 (2d Cir. 2014).  Copying the entire work does not necessarily weigh against fair use "because copying the entirety of a work is sometimes necessary to make a fair use of the image."  Bill Graham Archives, 448 F.3d at 613 (finding fair use despite entire copying where (i) whole

images were necessary to portray historical artifacts and (ii) copied images were reduced in size, such that "the visual impact of their artistic expression [was] significantly limited").

Here, the undisputed evidence shows that, while the Tattoos were copied in their entirety, Defendants did so in order to effectuate the transformative purpose of creating a realistic game experience.  Considering this purpose, it would have made little sense for Defendants to copy just half or some smaller portion of the Tattoos, as it would not have served to depict realistically the Players' likenesses.  Furthermore, much like the copied images at issue in Bill Graham, the Tattoos were reduced in size, such that "the visual impact of their artistic expression [was] significantly limited."  Id.  Unlike the images at issue in Bill Graham, the Tattoos depicted in Defendants' game are not recognizable, reducing further the impact of their artistic expression.  Accordingly, the third factor does not weigh against fair use.

*Effect on the Market*

The fourth fair use factor considers the effect of the allegedly infringing work on any existing or potential market for, or value of, the copyrighted work.  This inquiry focuses on "whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original."  Authors Guild v. Google, Inc., 804 F.3d 202, 223 (2d Cir. 2015).  "[T]he Factor Four analysis is concerned with only one type of economic injury to a copyright holder: the harm that results because the secondary use serves as a substitute for the original work."  Authors Guild, Inc. v. HathiTrust, 755 F.3d at 99.  Transformative uses do not cause actionable economic harm because "by definition, [such uses] do not serve as substitutes for the original work."  Id.; see also Authors Guild v. Google, Inc., 804 F.3d at 223 ("the more the copying is done to achieve a purpose that

differs from the purpose of the original, the less likely it is that the copy will serve as a satisfactory substitute for the original").

Plaintiff asserts that "Defendants diminished the commercial value of the tattoo artwork in the marketplace for licensing its use in other works including, but not limited to, video games, apparel, and memorabilia." (Pl. Opp. Br. at 15.) However, Defendants' use of the Tattoos in NBA 2K is transformative: the Tattoos as featured in the video game cannot serve as substitutes for use of the Tattoo designs in any other medium. Indeed, Plaintiff has conceded that "NBA 2K is not a substitute for the TATTOOS." (Def. 56.1 ¶ 67.) Therefore, use of the Tattoos in NBA 2K could not "deprive the rights holder of significant revenues" because potential purchasers of the Tattoo designs are unlikely to "opt to acquire the copy in preference to the original." Authors Guild v. Google, Inc., 804 F.3d at 223. For this reason alone, the fourth factor does not weigh against fair use.

Further, there is no evidence from which a reasonable fact finder could conclude that a market for licensing tattoos for use in video games or other media is likely to develop. The Court may consider only the "impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets." Swatch Grp. Mgmt. Servs. Ltd., 756 F.3d at 91 (internal quotation marks omitted). Plaintiff's hypothetical market for licensing tattoos in video games or other, unspecified media does not satisfy this standard. Defendants have proffered uncontroverted evidence that such a market is unlikely to develop and that, if it did, Plaintiff could not capitalize on such a market because the Tattoos are imprinted on the bodies of the Players and Plaintiff is not licensed to use the Players' publicity rights. Plaintiff has failed to proffer any evidence from which a reasonable fact finder could conclude that a market for

licensing tattoos for use in video games or other media is a "traditional, reasonable or likely to be developed market[]." Id. Thus, the fourth fair use factor weighs in Defendants' favor.

Because the uncontroverted evidence demonstrates that all four factors weigh in Defendants' favor, the Court concludes that no reasonable fact finder could determine that Defendants' use of the Tattoos in NBA 2K was not fair use. Therefore, Defendants are entitled to judgment as a matter of law on their second counterclaim and to a declaration that their use of the Tattoos in the challenged video game versions constitutes fair use.

Plaintiff's Motion to Exclude Expert Declarations and Opinions

Plaintiff moves to exclude the opinions of Defendants' four experts—Dr. E. Deborah Jay, Dr. Nina Jablonski, Dr. Ian Bogost, and Mr. James E. Malackowski—offered in connection with Defendants' motion for summary judgment. Plaintiff asserts broadly that the opinions "do not rest on reliable foundations, are irrelevant to the case, and are nothing more than a distraction from the material." (Pl. Opp. Br. at 19-27.)

"It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions." Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005). Pursuant to Federal Rule of Evidence 702, expert testimony should be admitted if the expert is "qualified as an expert by knowledge, skill, experience, training, or education" and "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. In assessing the expert's qualifications, "the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp., No. 04 Civ.

7369 (LTS), 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006) (internal quotation marks omitted).

   If the requirements of Rule 702 are met, "the district court must also analyze the testimony under Rule 403 and may exclude the testimony 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" Tiffany (NJ) Inc. v. eBay, Inc., 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007) (quoting Fed. R. Evid. 403). Under these principles, "expert evidence must be both relevant and reliable." Id. (internal quotation marks omitted). "In assessing the relevance of proffered expert testimony, the Court looks to whether the testimony has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Id. at 459.

   Plaintiff's motion to exclude raises general, conclusory challenges to the qualifications of Defendants' experts as well as challenges to their opinions under Federal Rules of Evidence 401 (relevance) and 403 (prejudice). As explained below, Plaintiff's objections are unavailing. Defendants' expert reports are sufficient to satisfy Defendants' burden of demonstrating that the experts' testimony is the product of reliable principles and methods, that their opinions and data are relevant to the issues raised in Defendants' motion for summary judgment, and their probative value is not substantially outweighed by any danger of unfair prejudice. The Court will address each expert report in turn.

   *Report of Dr. E. Deborah Jay*

   Dr. Jay's report analyzes survey data to examine why consumers purchased NBA 2K, and considers whether, and to what extent, the Tattoos drove consumer demand for the game. Dr. Jay has more than 40 years of experience conducting large-scale surveys and has been

qualified as an expert in "survey methodology" by at least a dozen courts.  Plaintiff asserts that

Dr. Jay's report is "an irrelevant distraction from the actual material issues in this lawsuit" and

that Dr. Jay's reference to the survey as an "official report," is likely to cause the jury to afford it

undue significance.  (Pl. Opp. Br. at 21-22.)  Plaintiff does not challenge Dr. Jay's qualifications

or her survey methodology.

By examining whether Defendants profited (and, consequently, Plaintiff lost

potential revenue) from the Tattoos' inclusion in NBA 2K, Dr. Jay's report addresses questions

relevant both to the "commercial use" factor of Defendants' fair use claim and to Plaintiff's

potential damages.  Indeed, the Court's reliance on Dr. Jay's findings in deciding Defendants'

motion for summary judgment demonstrates that her report is material to the issues involved in

this case.  Further, Plaintiff has failed to demonstrate how Dr. Jay's report would be unfairly

prejudicial.  Plaintiff's disagreement with Defendants' legal positions does not render competent

expert testimony consistent with those positions unfairly prejudicial.  Accordingly, Plaintiff's

motion to exclude Dr. Jay's report and testimony pursuant to Federal Rules of Evidence 403 and

702 is denied.

*Report of Dr. Nina Jablonski*

In her declaration and report, Dr. Jablonski, a professor of anthropology who has

been researching the evolution and cultural meaning of human skin for 30 years and is the author

of Skin: A Natural History, a book addressing the history and meaning of tattooing in humans, as

well as numerous other works relating to skin and human interactions, offered her opinion on the

use of tattoos as a means of personal expression, about customs and norms within the tattoo

industry (including between tattooist and client), and the unlikelihood that a market for licensing

tattoos will develop.  Plaintiff challenges Dr. Jablonski's report on three principal grounds,

arguing that: (i) Dr. Jablonski is not qualified to give an opinion on the market for licensing tattoos because she is "simply an anthropologist;" (ii) her report is more prejudicial than probative; and (iii) her "expert" opinions should be stricken because they address topics easily evaluated by the common sense of laymen.  (Pl. Opp. Br. at 22-23.)

Plaintiff has proffered nothing more than ipse dixit to support its claim that Dr. Jablonski is unqualified to offer her opinions concerning the tattoo industry.  The record, by contrast, amply demonstrates Dr. Jablonski's relevant body of knowledge.  Dr. Jablonski has spent years studying skin and tattoos, she has published over 100 peer-reviewed "scholarly contributions" on skin, and she currently works as an anthropology professor.  Dr. Jablonski's knowledge of the tattoo industry is sufficiently specialized to permit the Court to conclude that her opinions will likely assist the trier of fact in arriving at the truth.  Thus, her qualifications are sufficient to meet the threshold requirements of Rule 702 of the Federal Rules of Evidence.

Nor can Dr. Jablonski's opinion be excluded on relevance grounds.   Dr. Jablonski's report is relevant to questions of fair use (namely, the Tattoo's expressive value) and whether norms in the tattoo industry support Defendants' claim that they had an implied license to use the Tattoos in NBA 2K.  Further, Dr. Jablonski's opinions are not merely based on "common sense," but rather are based on her years of study of the tattoo industry.  Expert testimony is admissible where it is grounded in the expert's "academic and practical experience." McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1043 (2d Cir. 1995).  Finally, Plaintiff's protest of "prejudice" appears to be grounded solely in Plaintiff's recognition that Dr. Jablonski's testimony supports Defendant's case and undermines Plaintiff's conclusory and speculative arguments.  Plaintiff has identified no unfair prejudice that could outweigh the substantial probative value of Dr. Jablonski's testimony.

Therefore, Plaintiff's motion pursuant to Federal Rules of Evidence 403 and 702 to exclude Dr. Jablonski's expert report is denied.

*Report of Dr. Ian Bogost*

Dr. Ian Bogost, professor of interactive computing and business, has proffered a declaration and report detailing information and opinions concerning video game features generally and certain aspects of NBA 2K, including Defendants' use of the Tattoos. Dr. Bogost concluded that, by any measure, the Tattoos are an insignificant part of the video game and, thus, it would not be reasonable to license such a fleeting use of a copyrighted image. Plaintiff challenges Dr. Bogost's report as more prejudicial than probative. Plaintiff also asserts that Dr. Bogost is not qualified to give an opinion on the market for licensing tattoos because he is not an economist.

Dr. Bogost's qualifications are well demonstrated. He has been recognized as a key figure in the field of video game studies and he has authored over 200 journal publications, articles, book chapters, and conference papers on video games and digital culture. His studies have also been included in course books. Dr. Bogost's field of study qualifies him to opine on matters concerning video games and the market for video games. Dr. Bogost need not be a trained economist to offer his opinions on factors affecting the market for video games; "[t]he law does not require such a narrow specialty as [Plaintiff] suggest[s]." Tiffany (NJ) Inc., 576 F. Supp. 2d at 459. Studies concerning the market for licensing certain copyrights for use in video games are well within Dr. Bogost's expertise. His report and conclusions are probative of material elements of Plaintiff's claims and, as with its objection to Dr. Jablonski's report, Plaintiff has identified no unfair prejudice.

Therefore, Plaintiff's motion pursuant to Federal Rules of Evidence 403 and 702 to exclude Dr. Bogost's expert report is denied.

*Report of Mr. James E. Malackowski*

Mr. Malackowski is chairman and chief executive officer of a company that provides financial services related to intellectual property, including valuations and strategy consulting. His declaration and report explain that he reviewed Dr. Jay's survey data and concluded that (i) none of the profits associated with NBA 2K are attributable to the Tattoos and, as a result, Plaintiff has not been damaged by Defendants' alleged infringement, (ii) there is currently no market for licensing tattoo artwork, and (iii) such market is unlikely to develop. Plaintiff challenges Mr. Malackowski's report as (i) providing a legal conclusion, (ii) "wholly irrelevant to Defendants' acts of infringement and to the material issues in this lawsuit," and (iii) based on hearsay. Plaintiff also asserts that Mr. Malackowski is not qualified to give an opinion on the market for licensing tattoos.

Plaintiff alleges that "Defendants caused direct and proximate harm to the Plaintiff," and, as a result, "Plaintiff is entitled to damages in an amount to be determined at trial." (SAC ¶ 42.) Therefore, the issue of damages is squarely raised in this litigation and Defendants are entitled to offer opinions from experts, like Mr. Malackowski, on the issue of damages. See Semerdijian v. McDougal Littell, 641 F. Supp. 2d 233, 242-43 (S.D.N.Y. 2009) (permitting expert to testify regarding damages calculation in copyright infringement suit). Plaintiff does not challenge Mr. Malackowski's methodology or his qualifications as a damages expert. Furthermore, Mr. Malackowski's reliance in part on Dr. Jay's survey results, which, as discussed above, have not been excluded, is not improper. U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co., 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015) (holding that an expert "is

permitted to rely on facts, opinions, and data not of the expert's own making—including analyses performed or findings made by another expert in the case—even if those facts, opinions, and data are otherwise inadmissible").  Mr. Malackowski's opinions concerning the market for licensing tattoos are directly relevant to the fourth fair use factor, which concerns the effect upon the potential market for or value of the copyrighted work.  Plaintiff's motion to exclude Mr. Malackowski's declaration and testimony is denied.

CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment is granted in its entirety and Plaintiff's cross motion to exclude Defendants' expert testimony is denied.

Plaintiff's Second Amended Complaint is dismissed in its entirety.  Defendants are granted summary judgment on their First and Second Counterclaims, and the Court hereby declares that Defendants' use of the Tattoos in the challenged versions of their video game is de minimis and fair use and therefore does not infringe Plaintiff's copyrights.

This Memorandum Opinion and Order resolves Docket Entry Nos. 127 and 147.

Defendants' Third Counterclaim remains unresolved.  The parties are directed to meet and confer and file a joint report as to what, if any, steps remain to be taken to settle or

otherwise resolve the Third Counterclaim.  The joint report must be filed by **May 15, 2020**, and

shall be directed to Magistrate Judge Aaron, to whom this case remains referred for general

pretrial management.

                SO ORDERED.


Dated: New York, New York
       March 26, 2020


                                    /s/ Laura Taylor Swain
                                LAURA TAYLOR SWAIN
                                United States District Judge